AMY K. VAN ZANT (STATE BAR NO. 197426)
avanzant@orrick.com
JASON K. YU (STATE BAR NO. 274215)
jasonyu@orrick.com
TAMMY SU (STATE BAR NO. 329652)
tsu@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:   +1 650 614 7400
Facsimile:   +1 650 614 7401

Attorneys for Plaintiff
TRADESHIFT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRADESHIFT, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BUYERQUEST, INC., an Ohio corporation,<br><br>Defendant. | Case No. 3:20-cv-1294<br><br>**COMPLAINT FOR**<br><br>**1. BREACH OF CONTRACT;**<br>**2. TORTIOUS INTERFERENCE WITH CONTRACT;**<br>**3. BREACH OF THE IMPLIED COVENENT OF GOOD FAITH AND FAIR DEALING.**<br><br><br>**DEMAND FOR JURY TRIAL** |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

COMPLAINT
CASE NO. 3:20-cv-1294

Plaintiff Tradeshift, Inc. ("Tradeshift") hereby complains and alleges against Defendant BuyerQuest, Inc. ("BuyerQuest") as follows:

**THE PARTIES**

1. At all relevant times, Tradeshift was, and is, a Delaware corporation and is authorized to conduct business in California. Tradeshift is headquartered in San Francisco, California.

2. Defendant BuyerQuest is an Ohio domestic corporation and on information and belief is headquartered in Berea, Ohio.

**JURISDICTION AND VENUE**

3. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

4. The Court has personal jurisdiction over Tradeshift and BuyerQuest because Tradeshift is headquartered in San Francisco, California and also through BuyerQuest's consent. As further alleged below, Tradeshift and BuyerQuest entered into a contract (the "Master Agreement for the Tradeshift Partner Program"), in which they agreed that "[a]ny legal action or proceeding relating to this Agreement shall be instituted in a state or federal court in San Francisco, California" and "consent[ed] to personal jurisdiction in such counties." In that same contract, BuyerQuest and Tradeshift agreed that each of them would "unconditionally undertake[] to take any and all steps which may be necessary in order to: (i) confer jurisdiction on the Selected Venue . . .," wherein the Selected Venue is defined as state or federal court in San Francisco, California.

5. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c). Tradeshift is headquartered and maintains its principal place of business in San Francisco, California and BuyerQuest, having consented to personal jurisdiction in San Francisco, California, is likewise considered a resident of this District under 28 U.S.C. 1391(c)(2).

**GENERAL ALLEGATIONS**

6. Founded in 2010, Tradeshift is a software company comprised of some 900

employees that provides a cloud-based business-to-business network and platform that transforms the way companies buy, pay, and work with suppliers. Tradeshift Software as a Service ("SaaS") products help business customers connect with all their suppliers digitally; remove paper and manual processes across procure-to-pay; seize early payment discounts to save money; buy what they need faster; and manage supplier risk.

7. On information and belief, founded in 2012, BuyerQuest is a privately-held company with approximately 55 employees offering cloud-based enterprise procurement software solutions.

### The J.M. Smucker Project

8. In early 2019, J.M. Smucker, Inc. ("Smucker") was looking for a new provider to replace its existing spend management and e-procurement software provider, whose contract term was coming to an end. Smucker solicited information from various potential SaaS spend management and e-procurement software providers, including from Tradeshift, to determine which company could best meet its requirements. Tradeshift coordinated with another software company, BuyerQuest, in jointly responding to the Smucker vendor search. Ultimately, Smucker selected the Tradeshift/BuyerQuest solution with Tradeshift serving as its new vendor and BuyerQuest acting as a subcontractor to Tradeshift.

9. On June 28, 2019, Tradeshift entered into an agreement (the "Smucker Services Agreement") with Smucker pursuant to which Tradeshift and would provide Smucker with certain software on an annual subscription basis and certain services related to implementing and managing that software. As part of the Smucker Services Agreement, Tradeshift agreed to, among other things, implement a procurement solution for Smucker using the Tradeshift Platform Business Edition solution and the Tradeshift Pay Business Edition solution. BuyerQuest was identified as a "key subcontractor" to Tradeshift in the Smucker Services Agreement and its BuyerQuest Procurement Application was also part of the SaaS subscription services that Smucker contracted for with Tradeshift.

10. Under the Smucker Services Agreement, Smucker was responsible for paying Tradeshift and had no direct payment obligations to BuyerQuest. Instead, Tradeshift and

BuyerQuest entered into separate agreements pursuant to which Tradeshift agreed to pay BuyerQuest a portion of the fees that Tradeshift received from Smucker.

11. Under the Smucker Services Agreement, Smucker contracted to pay certain SaaS software subscription fees to Tradeshift for a period of five years. Smucker also agreed to pay Tradeshift certain service fees for implementing the SaaS software and for managing the software thereafter.

### The Tradeshift/BuyerQuest Agreements

12. Tradeshift and BuyerQuest entered into several agreements in connection with the Smucker project. This included a written contract entitled "Master Agreement for the Tradeshift Partner Program" (the "Tradeshift Partner Program Agreement"), which was executed on June 7, 2019, several weeks before Smucker and Tradeshift signed the Smucker Services Agreement. The Tradeshift Partner Program Agreement sets forth terms and conditions under which BuyerQuest can participate in Tradeshift's Partner Program. The Tradeshift Partner Program Agreement "envisions the creation of one or more Attachments by which the Parties may mutually agree to engage in other alliance business practices, such as reselling, joint marketing, integration development, sub-contracting, the participation of Partner in Tradeshift's Global Partner Program and other potential arrangements."

13. In connection with the Tradeshift Partner Program Agreement, Tradeshift and BuyerQuest entered into the "Cross Selling Attachment," which was also executed on June 7, 2019. The Cross Selling Attachment incorporates the terms and conditions of the Tradeshift Partner Program Agreement and sets forth the terms and conditions under which Tradeshift may, acting as an authorized distributor for BuyerQuest, resell certain BuyerQuest products and offer those products to third party clients. The Cross Selling Attachment states that the terms of any particular third party client engagement will be set forth in a separate "Reseller Order Form." Neither the Tradeshift Partner Program nor the Cross Selling Attachment reference the Smucker Agreement or the Smucker project.

14. Tradeshift and BuyerQuest executed a document entitled "Reseller Order Form" on June 28, 2019. Unlike the Tradeshift Partner Program and Cross Selling Attachment, the

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 4 -

COMPLAINT
CASE NO. 3:20-cv-1294

Reseller Order Form specifically identifies Smucker as the "Client," Tradeshift as the "Reseller," and BuyerQuest as the "Provider." The Reseller Order Form specifies that BuyerQuest, as the Provider, agrees to provide certain BuyerQuest SaaS subscriptions and consulting services to Tradeshift, as Reseller, for use in the Smucker project, while Tradeshift, in turn, agrees to pay BuyerQuest a portion of the service and subscription fees it collected from Smucker, the Client.

15. BuyerQuest, was contractually obligated under the Reseller Order Form and related attachments to include Tradeshift in communications with Smucker on the implementation of the Smucker software project. For example, BuyerQuest agreed to support Tradeshift with "planning, configuration, deliverables, integrations, change requests, and product updates" as necessary to complete the Smucker project. BuyerQuest also agreed in the Reseller Order Form to "support any change request through the Change Control Process" and that it would jointly "review and agree on all scope changes prior to adding new requirements to the project." Per the Reseller Order Form and in BuyerQuest's role as a subcontractor, Tradeshift, not BuyerQuest, was responsible for handling all program management duties except for those that exclusively impacted BuyerQuest resources. These contract terms were material and helped ensure that implementing the Smucker project would be managed smoothly through Tradeshift and that BuyerQuest would not unilaterally agree to changes that would negatively affect Tradeshift, the implementation timeline, or the overall Smucker project.

<u>The Smucker Project & Notice of Termination</u>

16. The parties began work on the Smucker project in July 2019. The parties made substantial implementation progress and quickly completed several milestones. Project progress continued apace into January 2020, when the parties were engaged in system and user acceptance testing in preparation for "going live" with the solution for Smucker later that spring.

17. In the midst of the parties' work to complete the next milestone(s), Smucker sent a letter dated January 16, 2020 ("the Smucker Notice"), purporting to terminate the Smucker Services Agreement effective January 17, 2020. The purported basis for Smucker's termination was that Tradeshift had allegedly made certain intentional and material misrepresentations about its product capabilities that rendered the agreement voidable. Without identifying any specific

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 5 -

COMPLAINT
CASE NO. 3:20-cv-1294

alleged misrepresentations, Smucker claimed that Tradeshift "knew that these representations were false when made to Smucker" and that "Smucker would never have entered into the [Smucker Services] Agreement" had Tradeshift been accurate.

18. The Smucker Notice advised that Tradeshift should "immediately cease access to and use of Smucker's systems, or to any Smucker Confidential Information provided in connection with the project." In addition, Smucker said that it would "advise any Tradeshift personnel planning to travel to a Smucker facility [in the] next week that their onsite presence is not required" and that access to Smucker systems and facilities has been suspended. Finally, Smucker noted that it had "advised [its] team not to have any further communication with Tradeshift personnel."

19. Although BuyerQuest is not a party to the Smucker Services Agreement, Smucker emphasized in the Notice that it "is also important to note that all the documented misrepresentations were in connection with the capabilities of the Tradeshift SaaS, not those represented as part of the BuyerQuest SaaS." Even though Smucker had no direct contractual relationship with BuyerQuest, the Smucker Notice also stated that Smucker would notify BuyerQuest of its termination decision.

20. The Smucker Notice took Tradeshift's Smucker team by total surprise. Tradeshift promptly attempted to contact senior project executives from both the Smucker and the BuyerQuest teams. Having had no response, Tradeshift wrote to BuyerQuest on January 23, 2020 to notify it of Smucker's January 16 notice. In that January 23 letter, Tradeshift expressed its "complete surprise" at Smucker's notice and emphasized that Tradeshift had "not yet established the basis for the claims [Smucker had] made." Consequently, Tradeshift cautioned that BuyerQuest should "[c]onsider this notice of termination of the SOW per our agreement" only "to the extent of an effective termination of the SOW by the client." Tradeshift went on to explain that it was investigating the effectiveness of the Smucker Notice and asked for BuyerQuest's cooperation, noting that BuyerQuest had been ignoring outreach from Tradeshift executives. Tradeshift specifically requested a time for discussions between executive representatives. Contrary to the accusations in the Smucker Notice, Tradeshift determined that there had been no

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 6 -

COMPLAINT
CASE NO. 3:20-cv-1294

1   such misrepresentations and Smucker's attempt to terminate the agreement was therefore
2   ineffective.

3       21.   Concerned that BuyerQuest might be working to interfere with the Smucker
4   Services Agreement, Tradeshift also reminded BuyerQuest of its obligation of good faith and fair
5   dealing and warned that certain previous and suspected BuyerQuest communications with
6   Smucker during the project could be viewed as breach of contract and tortious interference.  As
7   examples, Tradeshift noted concerns raised "about BuyerQuest failing to work with Tradeshift to
8   mutually agree on scope changes in the project" and "instances of BuyerQuest personnel
9   improperly directly addressing topics with BuyerQuest that should have gone through Tradeshift
10  or should have been a joint message to the customer."  Tradeshift said that such instances were
11  not only a breach of the Reseller Order Form, but "may have contributed to dissatisfaction by the
12  customer."

13      22.   BuyerQuest responded to Tradeshift's January 23, 2020 letter *that same day with a*
14  *letter from an outside law firm*.  The January 23 letter confirmed that BuyerQuest had, in fact,
15  directly communicated with Smucker about both the termination dispute *and* the Smucker project
16  without involving Tradeshift. Citing Smucker's supposed termination of the Smucker Services
17  Agreement, BuyerQuest argued, however, "there is no bar on direct communications or dealings
18  between BuyerQuest and Smucker."

19      23.   Under the terms of the Reseller Order Form, which had not been terminated,
20  BuyerQuest was contractually obligated to communicate with Tradeshift, including in resolving
21  Smucker project change requests and disputes. The Statement of Work ("SOW") attached at
22  Exhibit F to the Reseller Order Form is replete with provisions that obligate BuyerQuest to
23  communicate with and through Tradeshift in connection with integration and implementation
24  issues on the Smucker project.

25      24.   Tradeshift exchanged a series of further letters with Smucker and BuyerQuest
26  between January 27 and February 13, 2020.  Smucker maintained in these communications that
27  the Smucker Services Agreement was terminated.  BuyerQuest likewise maintained that Smucker
28  terminated its agreement with Tradeshift and noted that both Smucker and Tradeshift had

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 7 -

COMPLAINT
CASE NO. 3:20-cv-1294

instructed BuyerQuest to do no further work on the Smucker project. BuyerQuest told Tradeshift it had no ongoing obligation to communicate with it about the Smucker project because the project had been "terminated by both Smucker and Tradeshift."

25. In its communications, Tradeshift continued to argue that Smucker has not effectively terminated the Smucker Services Agreement and that instead BuyerQuest had breached its agreements in refusing to engage with Tradeshift to communicate with Smucker, both during the project and following Smucker's unfounded misrepresentation claims. Tradeshift warned Smucker and BuyerQuest of its suspicion that the two were working together to falsely disparage Tradeshift in an effort to justify cancelling the Smucker Services Agreement in favor of a direct Smucker-BuyerQuest deal. Neither Smucker nor BuyerQuest has denied that they intend to work directly together following Smucker's attempt to terminate its contract with Tradeshift.

26. On information and belief, BuyerQuest's misconduct has directly contributed to Tradeshift's loss of benefits under the Smucker Services Agreement. On information and belief, BuyerQuest had multiple communications with Smucker about the Smucker project in breach of its obligations under the Reseller Order Form and related agreements. On information and belief, BuyerQuest disparaged Tradeshift to Smucker in such communications, including claiming that Tradeshift could not provide functionality that Tradeshift could, in fact, provide and, on information and belief, claiming that Tradeshift was solely at fault for all problems on the Smucker project. On information and belief, BuyerQuest agreed with Smucker to make changes to the scope and requirements for the Smucker project without involving Tradeshift in the communications, following the "Change Control Process" requirement by the SOW, and without obtaining Tradeshift's agreement.

27. Additionally, on information and belief, BuyerQuest has taken affirmative steps to derail and interfere with Tradeshift's contract with Smucker in order to secure a direct contract with Smucker for itself. BuyerQuest was aware of the Smucker Services Agreement but, on information and belief, BuyerQuest falsely and unfairly disparaged Tradeshift's products and services to Smucker in order to encourage and cause Smucker to improperly terminate the Smucker Services Agreement. On information and belief, BuyerQuest did so in order to secure

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 8 -

COMPLAINT
CASE NO. 3:20-cv-1294

its own direct contract with Smucker for the entire scope of the Smucker project. Smucker has maintained that the Smucker Services Agreement is terminated and has continued to refuse to allow Tradeshift to perform its obligations; as a result, Tradeshift is being damaged.

### FIRST CAUSE OF ACTION
### Breach of Contract

28. Tradeshift hereby alleges and incorporates by reference paragraphs 1 through 27, inclusive, of this complaint, as though fully set forth herein.

29. In June 2019, Tradeshift and BuyerQuest entered into the Tradeshift Partner Program Agreement, Cross Selling Attachment, and Reseller Order Form (collectively, "the BuyerQuest Agreements"). Among other things, the BuyerQuest Agreements require BuyerQuest to provide the services outlined in the Statement of Work attached to the Reseller Order Form. As part of the services, the BuyerQuest Agreements require BuyerQuest to support Tradeshift with planning, configurations, deliverables, integrations, change requests, and product updates as necessary for Smucker's implementation. The BuyerQuest Agreements also require BuyerQuest to cooperate with Tradeshift to review and agree on all scope changes prior to changing scope or adding new requirements to the project. BuyerQuest was also contractually required under the BuyerQuest Agreements to include Tradeshift in communications with Smucker unless the communications related solely to BuyerQuest product functionality.

30. Tradeshift has substantially complied with all conditions, covenants and promises required on its part to be performed under each of the BuyerQuest Agreements except to the extent they have been excused by BuyerQuest's refusal to perform. Moreover, all conditions required for BuyerQuest's performance under the Agreement have occurred.

31. BuyerQuest has materially breached the BuyerQuest Agreements on multiple occasions, including, on information and belief, by, for example, failing to obtain Tradeshift's review and consent to scope changes to the Smucker project; interfering with Tradeshift's program management duties; failing to support Tradeshift with planning, configurations, deliverables, integrations, change requests, and product updates necessary for the Smucker project implementation; failing to follow Tradeshift's lead with respect to supplier onboarding

strategy and planning; failing to follow the Change Control Process; and failing to include Tradeshift in communications with Smucker related to the Smucker project.

32. BuyerQuest has further materially breached the Agreements by refusing to perform any of its work or obligations following Smucker's purported termination of the Smucker Services Agreement.

33. As a direct and proximate result of BuyerQuest's breach of the BuyerQuest Agreements, Tradeshift has been damaged in an amount to be determined at trial but no less than the amount it had paid BuyerQuest under the BuyerQuest Agreements plus other consequential and expectation damages in amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Intentional Interference with Contractual Relations

34. Tradeshift hereby alleges and incorporates by reference paragraphs 1 through 33, inclusive, of this complaint, as though fully set forth herein.

35. Tradeshift and Smucker entered into the Smucker Services Agreement effective June 30, 2019.

36. BuyerQuest was aware of the Smucker Services Agreement and its terms, including because it is expressly referenced in the Reseller Order Form.

37. With knowledge of the Smucker Services Agreement, on information and belief, BuyerQuest engaged in conduct that was designed to interfere with the Smucker Services Agreement and that did, in fact, interfere with the Smucker Services Agreement. For example, on information and belief, BuyerQuest disparaged Tradeshift and its products to Smucker and misrepresented the capabilities of Tradeshift and its products. On information and belief, BuyerQuest also engaged in communications with Smucker about the Smucker project to the exclusion of Tradeshift which subsequently caused program delays and disruptions that reflected poorly (and unfairly) on Tradeshift and its products. On information and belief, BuyerQuest discussed, proposed, and/or agreed to certain project modifications without including Tradeshift and which caused Smucker to lose confidence in Tradeshift. This conduct, taken altogether, on information and belief was intended to interfere with the Smucker Services Agreement and cause

Smucker to terminate the Smucker Services Agreement.

38. BuyerQuest's tortious interference with the Smucker Services Agreement caused harm to Tradeshift because Smucker has purported to terminate the Smucker Services Agreement. Consequently, Tradeshift has lost fees to which it was entitled under the terms of the Smucker Services Agreement.

39. BuyerQuest's tortious conduct was a substantial factor in causing Smucker to purport to terminate the Smucker Services Agreement and the subsequent harm to Tradeshift. As a direct and proximate result of BuyerQuest's tortious interference, Tradeshift has been damaged in an amount to be determined at trial but no less than the amount it had yet to collect under the Smucker Services Agreement.

## THIRD CAUSE OF ACTION
**Breach of Implied Covenant of Good Faith and Fair Dealing**

40. Tradeshift hereby alleges and incorporates by reference paragraphs 1 through 39, inclusive, of this complaint, as though fully set forth herein.

41. Tradeshift and BuyerQuest entered into the BuyerQuest Agreements in June 2019. BuyerQuest had an implied obligation to deal with Tradeshift honestly, fairly, and in good faith in connection with each such agreement.

42. Tradeshift has substantially complied with all conditions, covenants and promises required on its part to be performed under the BuyerQuest Agreements except to the extent they have been excused by BuyerQuest's refusal to perform. Moreover, all conditions required for BuyerQuest's performance under the BuyerQuest Agreements had occurred.

43. BuyerQuest has taken actions that unfairly interfered with Tradeshift's right to receive the benefits of the BuyerQuest Agreements. On information and belief, BuyerQuest took steps to encourage Smucker to wrongfully terminate the Smucker Services Agreement so that BuyerQuest could do a direct deal with Smucker without Tradeshift for the Smucker project. In turn, BuyerQuest has cited Smucker's ineffective termination of the Smucker Services Agreement for BuyerQuest's own refusal to continue to perform under and comply with the terms of the BuyerQuest Agreements. BuyerQuest also refused to communicate with, cooperate with, or

support Tradeshift in seeking to finish implementation of the Smucker Project. Accordingly, on information and belief, BuyerQuest manufactured an excuse not to perform its obligations under the BuyerQuest Agreements and thus deprived Tradeshift of its benefit under those agreements.

44. As a direct and proximate result of Tradeshift's breach of the implied covenant of good faith and fair dealing, Tradeshift has been damaged in an amount to be determined at trial but no less than the amount it had paid BuyerQuest under the BuyerQuest Agreements plus other consequential and expectation damages in amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Tradeshift prays for judgment as follows:

1. For actual damages in an amount to be proven at trial, but not less than $4,323,070;
2. Punitive and/or statutory damages;
3. Pre-judgment and post-judgment interest at the maximum rate allowed by law;
4. Reasonable attorneys' fees, court costs, and expert witness fees incurred by virtue of this action; and
5. Such other and further relief as the Court may deem proper.

Dated: February 20, 2020

AMY K. VAN ZANT
JASON K. YU
TAMMY SU
Orrick, Herrington & Sutcliffe LLP

By: __/s/ Amy K. Van Zant__
AMY K. VAN ZANT
Attorneys for Plaintiff
TRADESHIFT, INC.

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated:  February 20, 2020

AMY K. VAN ZANT
JASON K. YU
TAMMY SU
Orrick, Herrington & Sutcliffe LLP


By: _/s/ Amy K. Van Zant_
　　　AMY K. VAN ZANT
　　　Attorneys for Plaintiff
　　　TRADESHIFT, INC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 13 -

COMPLAINT
CASE NO. 3:20-cv-1294