

**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

January 15, 2021

The Honorable Richard Seeborg
U.S. District Court for the Northern District of California
Courtroom 3, 17th Floor
450 Golden Gate Avenue
San Francisco, California 94102

Re:   *Tradeshift, Inc. v. BuyerQuest, Inc.*, Case No. 20-cv-1294-RS

Dear Judge Seeborg:

Pursuant to Paragraph 4 of the Initial Case Management Scheduling Order (D.E. 36), Plaintiff Tradeshift, Inc. ("Tradeshift") and Defendant BuyerQuest, Inc. ("BuyerQuest") submit this joint letter regarding Tradeshift's request that BuyerQuest be compelled to supplement its responses to Tradeshift's Requests for Production Nos. 22, 23, and 26.  In compliance with L.R. 37-1(a), the parties have conferred by telephone but were unable to resolve this dispute.[1]

## Tradeshift's Statement

**Factual Background:** In 2019, Tradeshift and BuyerQuest agreed to license their software and jointly integrate and implement that software for Smucker Services Company ("Smucker").  *See* D.E. 1 ("Complaint") at ¶¶ 8-11.  The relationships among the three parties were governed by two sets of contracts.  *Id.*  Smucker and Tradeshift entered into an agreement for the entire project ("the Smucker Project") as Client/Contractor (the "Smucker/Tradeshift Agreement").  *Id.*  Tradeshift and BuyerQuest entered into a separate set of agreements for a portion of the project as Contractor/Subcontractor (the "Tradeshift/BuyerQuest Agreement").  *Id.*

From almost the moment the project began, BuyerQuest campaigned secretly for Smucker to terminate Tradeshift and enter into a direct agreement with BuyerQuest for the entire project (thus cutting Tradeshift out of the deal entirely).  *Id.*, ¶¶ 12–15 and 26-15.  BuyerQuest's officers contacted Smucker management, disparaged Tradeshift for minor project delays and hiccups, and claimed that Tradeshift would not be able to complete the project.  *Id.*  Indeed, discovery shows that BuyerQuest officers contacted Smucker privately as early as October 2019, and  met privately with Smucker by January 2020 to propose specific options for replacing Tradeshift.  BuyerQuest gave Smucker a deadline of January 17, 2020, and indicated that failing to make a decision by that date could adversely affect the project's completion date.

BuyerQuest's scheme succeeded.  On January 16, 2020, Smucker wrote Tradeshift and repudiated the Smucker/Tradeshift Agreement by claiming it was "voidable" for fraud, citing

---

[1] The parties have been conferring on numerous discovery issues.  While they have resolved many, others are becoming ripe for adjudication.  The parties submit this brief on the first limited issue so that the Court may refer the matter to a Magistrate as described in the Scheduling Order.  The parties intend to submit additional issues in separate letters or in a manner consistent with the Scheduling Order and the Magistrate's forthcoming instructions.

The Honorable Richard Seeborg
January 15, 2020
Page No. 2

project delays and problems. *See id.* ¶¶ 17, 26-27. Smucker's purported termination did not comply with the termination provision in the agreement. While the agreement permitted Smucker to terminate for material breaches, it required that Smucker first give Tradeshift written notice and 30 days to cure those alleged breaches. Smucker, however, could not comply with this provision because (1) Smucker did not have that much time (given BuyerQuest's January 17 deadline) and (2) there were no material breaches to speak of. Accordingly, Smucker concocted an argument that Tradeshift had fraudulently induced Smucker to enter into the contract. *Id.*, ¶ 17. Specifically, Smucker accused Tradeshift of falsely stating (during the pre-contracting period) that it could provide certain "must have" requirements that it was not providing and that it was not capable of providing. Smucker thus immediately terminated the project without identifying any material breaches or providing the required period to cure. After dispatching Tradeshift, Smucker promptly handed the project to BuyerQuest, and the two parties signed a new agreement for BuyerQuest to take over.

Tradeshift filed its complaint in this case on February 20, 2020. Tradeshift asserts, among other things, that BuyerQuest's tortiously interfered with the Smucker/Tradeshift Agreement. *Id.* ¶¶ 26-27, 34-39.

**Discovery Dispute:** In the requests at issue here, Tradeshift seeks project documents for the Smucker Project after Smucker terminated Tradeshift (i.e., after BuyerQuest took over). Ex. A (Excerpt of Tradeshift Document Requests Set 2) at Request Nos. 22-23 and 26. BuyerQuest has refused to produce *any* responsive documents, arguing that documents related to the project *after* Smucker removed Tradeshift are irrelevant to any of the claims or defenses in this case.

Contrary to BuyerQuest's arguments, however, responsive documents are directly relevant to Tradeshift's interference claim and BuyerQuest's defense. A key element of that claim—and a large factual dispute here—is whether BuyerQuest's interfering conduct was a "substantial factor" in Smucker's decision to terminate, i.e., whether BuyerQuest's conduct contributed to Smucker's decision in a way that was not "negligible." *See* CACI 2200 (for interference, an element of the claim is that defendant's conduct was a "substantial factor" in causing the breach); *Rutherford v. Owens–Illinois, Inc.*, 16 Cal.4th 953, 978 (1997) ("The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical."). At trial, Tradeshift intends to show that BuyerQuest's campaign to take over the project contributed to Smucker's January 16, 2020 termination.

BuyerQuest completely ignores this element in its arguments below, but it has made clear that it intends to dispute it vigorously. BuyerQuest has itself asked for "all documents" reflecting "defects," "delays," "scheduling," and "complaints" on the Smucker Project, and does not dispute that it intends to argue that such documents—which are routine for any software implementation—prove that Tradeshift's performance was inadequate. Ex. B (Excerpt of BuyerQuest Document Requests Set 1) at Request Nos. 10 & 13. BuyerQuest has also asked for all documents related to Tradeshift ability (or inability) to perform certain "must have" requirements. *Id.* at Request Nos. 11-12. In other words, BuyerQuest will argue at trial that Tradeshift's poor performance and inability to meet certain "must have" project requirements were the sole reasons for Smucker's decision to terminate Tradeshift.

Tradeshift is entitled to seek out evidence that may rebut BuyerQuest's arguments. Tradeshift should be allowed to show, for example, that: (1) the "must have" requirements BuyerQuest cites

were not really "must haves" as evidenced by the fact that they were never implemented after Tradeshift left, (2) Tradeshift's performance was not inadequate or unusual as evidenced by the fact that BuyerQuest performed similarly after Tradeshift left, and (3) the events on the project (including defects lists, scheduling adjustments, and changes in scope) were typical for this type of project as evidenced by the fact that such events continued after Tradeshift left.  Documents discussing the scope of work after BuyerQuest took over, for example, will likely show that the "must have" requirements were not a part of the project at all, and that BuyerQuest never implemented them and was never asked to implement them (i.e., they were nothing more than pretext for Smucker's termination).[2]  Scheduling documents after BuyerQuest took over will likely show that scheduling adjustments persisted even after Tradeshift left.  And defect lists after BuyerQuest took over will demonstrate that identifying and resolving defects was not unusual and certainly not a reason to terminate a contract.  Documents related to the ongoing project will also show that the objective of BuyerQuest's interference—to obtain a direct contract with Smucker—came to fruition through BuyerQuest's efforts.

BuyerQuest argues that the documents are confidential and that producing the documents would be unduly burdensome.  But the parties have agreed to a protective order to protect sensitive discovery, and BuyerQuest has not articulated any burden.  Moreover, BuyerQuest overstates Tradeshift's requests, which do not seek every document related to the project and, instead, seek project documents (e.g., schedules, defect lists, change orders, statements of work) (No. 22), communications discussing "complaints, defects, schedule changes, or feedback" (No. 23), and presentations (No. 26).

This is not a close call.  The documents at issue bear on perhaps the biggest factual dispute in the case; the true reasons for Smucker's decision to terminate.  BuyerQuest asserts that it was Tradeshift's failure to meet certain requirements and its performance, but documents after Tradeshift left will show that those requirements were not requirements at all and Tradeshift's performance was not unusual or inadequate.

## BuyerQuest's Statement

**Factual Background.**  Onetime collaborators; sometime-competitors; now, litigation adversaries, BuyerQuest and Tradeshift are both providers of procurement software. In early 2019, Smucker approached BuyerQuest about a new software implementation project. BuyerQuest, in-turn, approached Tradeshift and the two agreed to collaborate on the project under the terms of the Tradeshift/BuyerQuest Agreement, executed on June 7, 2019.  On June 28, 2019, the Smucker/Tradeshift Agreement was executed, naming BuyerQuest as a key subcontractor.

The software implementation project began in July 2019.  By August, it became apparent that Tradeshift could not perform its portion of the project.  Smucker began to document the defects and delays encountered from Tradeshift and to rely increasingly on BuyerQuest to pick up the slack from Tradeshift's performance failures.

---

[2] Indeed, although these requirements were discussed during the pre-contracting phase, Smucker did not incorporate many of them into the scope of work for the Smucker Project and that is why they were not implemented.

The Honorable Richard Seeborg
January 15, 2020
Page No. 4

On January 17, 2020, Smucker terminated the Smucker/Tradeshift Agreement. Smucker cited a series of pre-contracting misrepresentations made by Tradeshift about its products and capabilities which, in Smucker's view, rendered the Smucker/Tradeshift Agreement void. Smucker noted that none of the misrepresentations pertained to BuyerQuest's products.

On February 20, 2020, Tradeshift filed this lawsuit against BuyerQuest asserting claims for breach of contract and implied covenant (as to the Tradeshift/BuyerQuest Agreement) and for intentional interference with contract (as to the Smucker/Tradeshift Agreement). Tradeshift and Smucker would later sue one another for breach of contract and fraud, respectively, in federal court in New York.

On March 6, 2020, BuyerQuest and Smucker executed a separate new contract under which BuyerQuest successfully completed the software implementation without Tradeshift.

**Tradeshift's Requests For Production.** Tradeshift's Request for Production No. 22 seeks, verbatim: "All project DOCUMENTS for the project described in BuyerQuest's March 6, 2020 contract with SMUCKER." [3]

BuyerQuest timely objected on grounds of relevance, proportionality; over-breadth; and, because the Requests seek trade secrets, confidential, proprietary, and/or sensitive business information. BuyerQuest declined to produce documents responsive to RFP Nos. 22, 23, or 26.

**The Court Should Deny Tradeshift's Request to Compel Irrelevant and Confidential Documents about the March 6, 2020 Project.** The documents Tradeshift seeks were all necessarily created after March 6, 2020 - *after* every event relevant to this lawsuit, i.e., the January 17, 2020 termination of the Smucker-Tradeshift Agreement. And, indeed, after the date Tradeshift filed this lawsuit (February 20, 2020). Tradeshift's performance failures and the alleged disparagement of Tradeshift by BuyerQuest and Smucker's decision to terminate the Smucker/Tradeshift Agreement all necessarily took place before January 17, 2020.

*The Documents Are Irrelevant*. Tradeshift argues that post-termination documents are relevant to its claim for tortious intentional interference with contract. The elements of that claim are (1) existence of a valid contract; (2) defendant's knowledge of the contract; (3) defendant's intentional acts intended to induce a breach of contract; (4) actual breach; and, (5) damages. *Reeves v. Hanlon* (2004) 33 Cal. 4th 1140, 1148; *see also*, *Jenni Rivera Enters., LLC v. Latin World Enters. Holdings, Inc.*, 36 Cal. App. 5th 766, 768 (Cal. Ct. App. 2019)("the actor must have knowledge of the contract with which he is interfering and of the fact he is interfering with the performance of the contract.").

The tort Tradeshift alleges was complete on January 17, 2020 and the subject of this lawsuit by February 20. Tradeshift does not explain how conduct after March 6, 2020 can establish the elements of interference or have been a "substantial factor" in bringing about termination of the Tradeshift-Smucker contract two months before. Axiomatically, only intentional acts before January 17 could have induced a breach on that date. Execution and performance of a different contract months later is irrelevant to the claim. *Vera v. O'Keefe*, 2012

---

[3] The other two Requests seek subsets of the documents sought by No. 22. *See*, RFP No. 23 and 26.

WL 896175, at *4 (S.D. Cal. Mar. 15, 2015)(denying motion to compel documents that pertain to "neither an element of the…claim brought in the Complaint, nor a basis for defenses.").[4]

Tradeshift's performance and the events surrounding Smucker's termination must be measured against the Smucker/Tradeshift Agreement alone. Whether the Smucker- BuyerQuest contract had different terms or requirements than the Smucker/Tradeshift Agreement cannot diminish the material terms or performance of the Smucker/Tradeshift Agreement. Tradeshift either agreed to deliver Smucker's "must have" items or did not. Tradeshift either performed as agreed or did not. It either represented its capabilities honestly or did not. A different contract with a different party at a different time does not retroactively expunge Tradeshift's failures and misrepresentations. Tradeshift's supposition that the 2020 contract and project performed by BuyerQuest were not identical to the 2019 Agreement Tradeshift failed to perform establishes nothing with respect to the 2019 Agreement or Smucker's decision to terminate.

Tradeshift also does not explain how "BuyerQuest's defenses put these documents squarely at issue." Tradeshift bears the burden of proof and the record will reflect that Tradeshift failed to perform the 2019 Smucker/Tradeshift Agreement, leading to termination of that contract by Smucker in January 2020. Smucker made a rational business decision free from interference. No more is required to defeat Tradeshift's claims. The fact that BuyerQuest went on to execute and successfully perform a different contract in 2020 has no more bearing on BuyerQuest's defenses than on Tradeshift's claim .

***Any Probative Value of the Documents Is Outweighed by the Undue Burden of Production.*** The documents sought are not relevant. Even if Tradeshift could tie its Requests to an element of a claim or defense, the breadth of the Requests outweighs their probative value, as does the commercial sensitivity of the information they contain.

Tradeshift tried and failed to deliver the same outcome that its competitor BuyerQuest successfully delivered under its March 2020 contract with Smucker. It now seeks every single document generated over the course of that complex and months-long software implementation. Tradeshift offers only speculation about what problems might have occurred on the 2020 project and whether the documents might reveal a "pretext" for Smucker's termination of the Smucker/Tradeshift Agreement. There is no reason to believe such documents exist nor to indulge Tradeshift in the archetypal "fishing expedition" into its rival's confidential business documents. Nor is the Stipulated Protective Order a license to conduct one. *See*, *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1532 (9th Cir. 1992)(A protective order's "purpose…is to prevent harm by limiting disclosure of relevant and necessary information.")(citation omitted).

The Requests go beyond allowing Tradeshift to compare the requirements of the two contracts and the standards to which Smucker held its competing vendors. Rather, they seek a "soup-to-nuts" account of BuyerQuest's performance of its 2020 contract with Smucker. Such competitive insight is unavailable to Tradeshift by means outside this litigation.

---

[4] *Id*. ("Certainly information that addresses the claim and potential defenses at issue in the action, even tangentially, would be relevant but without a reasonable expectation for much more expansive discovery into what appears to be extraneous facts, the materials plaintiff seeks are overbroad and beyond the scope of relevancy as that term is understood.").

Tradeshift's request should therefore be denied on these grounds, also. *See*, *U.S. ex rel. Carter*, 305 F.R.D. 225, 237 (S.D. Cal. 2015)("When discovery by a competitor could penetrate areas of business or scientific sensitivity, and when responding to that discovery imposes burdens, it should not be sufficient simply to state that the material sought might lead to the discovery of admissible evidence."); *Advanced Semiconductor Prod., Inc. v. Tau Labs, Inc.*, 1986 WL 215149, at *2 (N.D. Cal. Jan. 23, 1986)("a party should be required to justify this kind of discovery with a more substantial showing.").

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Amy K. Van Zant*
AMY K. VAN ZANT
Attorneys for Plaintiff
TRADESHIFT, INC.


GORDON REES SCULLY MANSUKHANI LLP

*/s/ Anthony D. Phillips*
ANTHONY D. PHILLIPS
Attorneys for Defendant
BUYERQUEST, INC.


## ATTESTATION REGARDING SIGNATURES

In compliance with Local Rule 5-1(i)(3), the undersigned ECF user whose identification and password are being used to file this document, hereby attests that all signatories have concurred in the filing of this document and all supporting declarations and exhibits.

*/s/ Amy K. Van Zant*
AMY K. VAN ZANT

# EXHIBIT A

Craig J. Mariam (SBN: 225280)
cmariam@grsm.com
Anthony D. Phillips (SBN: 259688)
aphillips@grsm.com
Eunice J. Liao (SBN: 330655)
eliao@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 986-5900
Facsimile: (877) 306-0043

Attorneys for Defendant
BUYERQUEST, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRADESHIFT, INC., a Delaware corporation, | CASE NO. 3:20-cv-01294-RS |
| Plaintiff, | Judge: Hon. Richard Seeborg |
| vs. | **DEFENDANT BUYERQUEST, INC.'S RESPONSES TO PLAINTIFF TRADESHIFT, INC.'S REQUESTS FOR PRODUCTION OF DOCUMENTS, SET TWO** |
| BUYERQUEST, INC., an Ohio corporation, | |
| Defendant. | |

PROPOUNDING PARTY:   Plaintiff, TRADESHIFT, INC.

RESPONDING PARTY:   Defendant, BUYERQUEST, INC.

SET NO.:   TWO

Defendant BUYERQUEST, INC. ("Responding Party") responds to the Requests for Production of Documents, Set Two of Plaintiff TRADESHIFT, INC. ("Propounding Party") as follows:

///

///

-1-
DEFENDANT BUYERQUEST'S RESPONSES TO PLAINTIFF'S
REQUESTS FOR PRODUCTION OF DOCUMENTS, SET TWO

1 bearing on the claims or defenses in this litigation. Responding Party objects to this Request to
2 the extent it seeks documents protected by the attorney-client privilege, attorney work-product
3 doctrine, the joint defense doctrine and other applicable laws, rules, privileges, or immunities.
4 Responding Party further objects to this Request on the grounds that it is overbroad and unduly
5 burdensome to the extent it seeks "All DOCUMENTS" relating to the subject matter of this
6 Request.

7 Subject to and without waiving the foregoing Preliminary Statement, General and
8 Specific Objections, Responding Party responds as follows: Responding Party is willing to meet
9 and confer with Propounding Party on a reasonable and specific scope of this Request.

**REQUEST FOR PRODUCTION NO. 22:**

All project DOCUMENTS for the project described in BuyerQuest's March 6, 2020 contract with SMUCKER.

**RESPONSE TO REQUEST NO. 22:**

Responding Party objects to this Request as vague and ambiguous as to the terms "project DOCUMENTS," and "the project described in BuyerQuest's March 6, 2020 contract," and not reasonably limited in scope or in time. Responding Party further objects that this Request seeks trade secrets, confidential, proprietary, and/or sensitive business information, the disclosure of which would be prejudicial to Responding Party or to a party to whom Responding Party owes a duty of confidentiality. Responding Party also objects to this Request to the extent that it is not proportional to the needs of the case and seeks irrelevant information that has no bearing on the claims or defenses in this litigation. Responding Party objects to this Request to the extent it seeks documents protected by the attorney-client privilege, attorney work-product doctrine, the joint defense doctrine and other applicable laws, rules, privileges, or immunities. Responding Party further objects to this Request on the grounds that it is overbroad and unduly burdensome to the extent it seeks "All project DOCUMENTS" relating to the subject matter of this Request.

**REQUEST FOR PRODUCTION NO. 23:**

ALL DOCUMENTS comprising or DISCUSSING any complaints, defects, schedule

-11-

1 changes, or feedback REGARDING the project described in BuyerQuest's March 6, 2020

2 contract with SMUCKER.

3 **RESPONSE TO REQUEST NO. 23:**

4 Responding Party objects to this Request as vague and ambiguous as to the terms

5 "complaints," "defects," "schedule changes," "feedback," and "the project described in

6 BuyerQuest's March 6, 2020 contract," and not reasonably limited in scope or in time.

7 Responding Party further objects that this Request seeks trade secrets, confidential, proprietary,

8 and/or sensitive business information, the disclosure of which would be prejudicial to

9 Responding Party or to a party to whom Responding Party owes a duty of confidentiality.

10 Responding Party also objects to this Request to the extent that it is not proportional to the needs

11 of the case and seeks irrelevant information that has no bearing on the claims or defenses in this

12 litigation. Responding Party objects to this Request to the extent it seeks documents protected by

13 the attorney-client privilege, attorney work-product doctrine, the joint defense doctrine and other

14 applicable laws, rules, privileges, or immunities. Responding Party further objects to this

15 Request on the grounds that it is overbroad and unduly burdensome to the extent it seeks "ALL

16 DOCUMENTS" relating to the subject matter of this Request.

17 **REQUEST FOR PRODUCTION NO. 24:**

18 DOCUMENTS sufficient to show BUYERQUEST's cash on hand on a weekly basis for

19 the period June 1, 2019 to present.

20 **RESPONSE TO REQUEST NO. 24:**

21 Responding Party objects to this Request as vague and ambiguous as to the term "cash on

22 hand," and not reasonably limited in scope or in time. Responding Party further objects that this

23 Request seeks trade secrets, confidential, proprietary, and/or sensitive business information, the

24 disclosure of which would be prejudicial to Responding Party or to a party to whom Responding

25 Party owes a duty of confidentiality. Responding Party also objects to this Request to the extent

26 that it is not proportional to the needs of the case and seeks irrelevant information that has no

27 bearing on the claims or defenses in this litigation. Responding Party objects to this Request to

28

*Gordon Rees Scully Mansukhani, LLP*
*275 Battery Street, Suite 2000*

-12-
DEFENDANT BUYERQUEST'S RESPONSES TO PLAINTIFF'S
REQUESTS FOR PRODUCTION OF DOCUMENTS, SET TWO

**RESPONSE TO REQUEST NO. 26:**

Responding Party objects to this Request as vague and ambiguous as to the term "presentations," and not reasonably limited in scope or in time. Responding Party objects to this Request as unduly burdensome to the extent it seeks documents already in Propounding Party's possession, custody, or control. Responding Party further objects that this Request seeks trade secrets, confidential, proprietary, and/or sensitive business information, the disclosure of which would be prejudicial to Responding Party or to a party to whom Responding Party owes a duty of confidentiality. Responding Party also objects to this Request to the extent that it is not proportional to the needs of the case and seeks irrelevant information that has no bearing on the claims or defenses in this litigation. Responding Party objects to this Request to the extent it seeks documents protected by the attorney-client privilege, attorney work-product doctrine, the joint defense doctrine and other applicable laws, rules, privileges, or immunities.

**REQUEST FOR PRODUCTION NO. 27:**

All COMMUNICATIONS and agreements between SMUCKER and BUYERQUEST regarding the LITIGATION.

**RESPONSE TO REQUEST NO. 27:**

Responding Party objects to this Request as vague and ambiguous, and not reasonably limited in scope or in time. Responding Party further objects that this Request seeks trade secrets, confidential, proprietary, and/or sensitive business information, the disclosure of which would be prejudicial to Responding Party or to a party to whom Responding Party owes a duty of confidentiality. Responding Party also objects to this Request to the extent that it is not proportional to the needs of the case and seeks irrelevant information that has no bearing on the claims or defenses in this litigation. Responding Party objects to this Request to the extent it seeks documents protected by the attorney-client privilege, attorney work-product doctrine, the joint defense doctrine and other applicable laws, rules, privileges, or immunities.

# EXHIBIT B

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (CA Bar No. 226112)
Jeffrey M. Rosenfeld (CA Bar No. 222187)
Liana W. Chen (CA Bar No. 296965)
Ruben Peña (CA Bar No. 328106)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@KRInternetLaw.com
jeff@KRInternetLaw.com
liana@KRInternetLaw.com
ruben@KRInternetLaw.com

Attorneys for Defendant BuyerQuest, Inc.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **TRADESHIFT, INC.**, a Delaware corporation,<br><br>   Plaintiff,<br><br>   v.<br><br>**BUYERQUEST, INC.**, an Ohio corporation,<br><br>   Defendant. | Case No. 3:20-cv-01294-RS<br><br>**DISCOVERY**<br><br>**DEFENDANT BUYERQUEST, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF TRADESHIFT, INC.** |

but is no longer, in YOUR possession or subject to YOUR control, or in existence, state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. In addition, where appropriate, set forth: (i) the content of said DOCUMENT; (ii) the location of ANY copies of said DOCUMENT; (iii) the date of such destruction; and (iv) the name of the PERSON who ordered or authorized such destruction.

5. These Requests shall be deemed continuing in nature so as to require supplementary answers between the time answers are served and the time of trial, in accordance with Rule 26(e) of the Federal Rules of Civil Procedure. Therefore, if and when YOU obtain ANY information which materially affects a response to a Request for production of DOCUMENTS, INCLUDING information as to the creation or receipt of records or DOCUMENTS, the affected response or answer shall be deemed no longer true, and YOUR failure to promptly supplement or amend such response or answer shall be deemed, in substance, a knowing concealment.

6. Unless otherwise noted, the relevant time period for ALL requests include documents created, sent, or received since January 1, 2019 to March 6, 2020.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**

ALL DOCUMENTS submitted by TRADESHIFT to SMUCKER in response to SMUCKER's vendor search described in Paragraph 8 of YOUR Complaint.

**REQUEST NO. 2:**

ALL DOCUMENTS provided by SMUCKER to YOU in connection with SMUCKER's vendor search described in Paragraph 8 of YOUR Complaint.

**REQUEST NO. 3:**

ALL DOCUMENTS regarding TRADESHIFT'S response to SMUCKER's vendor

search referenced in Paragraph 8 of YOUR Complaint.

**REQUEST NO. 4:**

ALL DOCUMENTS REGARDING the negotiation and formation of the BUYERQUEST AGREEMENTS.

**REQUEST NO. 5:**

ALL DOCUMENTS REGARDING the negotiation and formation of the SMUCKER SERVICES AGREEMENT.

**REQUEST NO. 6:**

ALL DOCUMENTS REGARDING YOUR performance or non-performance under the BUYERQUEST AGREEMENTS.

**REQUEST NO. 7:**

ALL DOCUMENTS REGARDING BUYERQUEST's performance or non-performance under the BUYERQUEST AGREEMENTS.

**REQUEST NO. 8:**

ALL DOCUMENTS REGARDING YOUR performance or non-performance under the SMUCKER SERVICES AGREEMENT.

**REQUEST NO. 9:**

ALL DOCUMENTS REGARDING SMUCKER's performance or non-performance under the SMUCKER SERVICES AGREEMENT.

**REQUEST NO. 10:**

ALL DOCUMENTS REGARDING the SMUCKER PROJECT, INCLUDING

DOCUMENTS reflecting the request for proposal, planning, progress, milestones, implementations, defects, product capabilities, delays, scheduling, project management, supplier onboarding strategy, change requests, changes in scope, and the change control process.

**REQUEST NO. 11:**

DOCUMENTS sufficient to evidence YOUR ability to complete the business criteria and capabilities that YOU represented to SMUCKER that YOU could complete, INCLUDING the following:

(a) the ability to have one to many supplier site relationships;

(b) the ability for a user to "hide" the overall purchase order value on a purchase order communication to the supplier;

(c) the ability to integrate supplier master data from Oracle in an automated manner;

(d) the ability to setup various approval routing rules (at entry of invoice);

(e) the ability to setup reconciliation routing rules;

(f) the ability to customize the entry form;

(g) the ability for all master data to be real-time;

(h) the ability to enter a credit memo for returns; and

(i) the ability to perform invoice handling for combination purchase orders (*i.e.*, a purchase involving services and products).

**REQUEST NO. 12:**

ALL DOCUMENTS REGARDING YOUR inability to complete the business criteria and capabilities that YOU represented to SMUCKER that YOU could complete, INCLUDING the following:

(a) the ability to have one to many supplier site relationships;

(b) the ability for a user to "hide" the overall purchase order value on a purchase order communication to the supplier;

(c) the ability to integrate supplier master data from Oracle in an automated manner;

(d) the ability to setup various approval routing rules (at entry of invoice);

(e) the ability to setup reconciliation routing rules;

(f) the ability to customize the entry form;

(g) the ability for all master data to be real-time;

(h) the ability to enter a credit memo for returns; and

(i) the ability to perform invoice handling for combination purchase orders (*i.e.*, a purchase involving services and products).

**REQUEST NO. 13:**

ALL COMPLAINTS that YOU have received REGARDING the Tradeshift Platform Business Edition and the Tradeshift Pay Business Edition.

**REQUEST NO. 14:**

ALL DOCUMENTS supporting the allegation in Paragraph 31 of YOUR Complaint that BUYERQUEST "fail[ed] to obtain Tradeshift's review and consent to scope changes to the Smucker project."

**REQUEST NO. 15:**

ALL DOCUMENTS supporting the allegation in Paragraph 31 of YOUR Complaint that BUYERQUEST "interfer[ed] with Tradeshift's program management duties."

**REQUEST NO. 16:**

ALL DOCUMENTS supporting the allegation in Paragraph 31 of YOUR Complaint that BUYERQUEST "fail[ed] to support Tradeshift with planning, configurations, deliverables, integrations, change requests, and product updates necessary for the Smucker project implementation."

**REQUEST NO. 17:**

ALL DOCUMENTS supporting the allegation in Paragraph 31 of YOUR Complaint that BUYERQUEST "fail[ed] to follow Tradeshift's lead with respect to supplier onboarding strategy and planning."

**REQUEST NO. 18:**

ALL DOCUMENTS supporting the allegation in Paragraph 31 of YOUR Complaint that BUYERQUEST "fail[ed] to follow the Change Control Process."

**REQUEST NO. 19:**

ALL DOCUMENTS supporting the allegation in Paragraph 31 of YOUR Complaint that BUYERQUEST "fail[ed] to include Tradeshift in communications with Smucker related to the Smucker project."

**REQUEST NO. 20:**

ALL DOCUMENTS supporting the allegation in Paragraph 37 of YOUR Complaint that "BuyerQuest disparaged Tradeshift and its products to Smucker."

**REQUEST NO. 21:**

ALL DOCUMENTS supporting the allegation in Paragraph 37 of YOUR Complaint that BUYERQUEST "misrepresented the capabilities of Tradeshift and its products."

**REQUEST NO. 22:**

ALL DOCUMENTS REGARDING ANY effort by BUYERQUEST to interfere with the SMUCKER SERVICES AGREEMENT (other than by misrepresentation or disparagement).

//