ANTHONY D. PHILLIPS
APHILLIPS@GRSM.COM



GORDON&REES
SCULLY MANSUKHANI
YOUR 50 STATE PARTNER®
ATTORNEYS AT LAW
275 BATTERY STREET, SUITE 2000
SAN FRANCISCO, CA 94111
WWW.GRSM.COM

April 8, 2021

<u>ELECTRONIC MAIL AND ECF</u>

The Honorable Thomas Hixson
United States District Court
Northern District of California
450 Golden Gate Avenue
Courtroom A - 15th Floor
San Francisco, CA 94102

    Re:    *Tradeshift, Inc. v. BuyerQuest, Inc.*, No. 3:20-cv-01294-RS

## JOINT STATEMENT ON DISCOVERY DISPUTE

Dear Judge Hixson:

Pursuant to Your Honor's Discovery Standing Order (ECF 48-1), Defendant-BuyerQuest, Inc. and Plaintiff-Tradeshift, Inc. respectfully submit this Joint Statement respecting a discovery dispute on which they have reached an impasse. Namely, whether Tradeshift must produce its CEO, Christian Lanng, for deposition pursuant to BuyerQuest's Notice of Deposition Pursuant to FRCP 30.

### ATTESTATION

In compliance with Local Rule 37-1(a) and the Standing Order of the Honorable Thomas Hixson, the parties have conferred in good faith by telephone but could not resolve this dispute.

DATED: April 8, 2021           GORDON REES SCULLY MANSUKHANI LLP

                                      */s/ Anthony D. Phillips*
                                      Anthony D. Phillips
                                      Attorneys for Defendant
                                      BUYERQUEST, INC.

DATED: April 8, 2021           ORRICK, HERRINGTON & SUTCLIFFE LLP

                                        */s/ Amy K. Van Zant*
                                      Amy K. Van Zant
                                      Attorneys for Plaintiff
                                      TRADESHIFT, INC.

April 8, 2021
Page 2

**BUYERQUEST'S POSITION**

**Requested Relief:**    An order compelling Tradeshift to produce its CEO, Christian Lanng, for deposition.

**Factual Background**: This case is about a software implementation project jointly undertaken by Tradeshift and BuyerQuest pursuant to their June 2019 "Tradeshift/BuyerQuest Agreement". The project itself was undertaken for non-party J.M. Smucker, pursuant to the June 2019 "Tradeshift/Smucker Agreement". In January 2020, Smucker concluded that Tradeshift could not perform, terminated the Tradeshift/Smucker Agreement and replaced Tradeshift with BuyerQuest - who successfully completed the project alone.

Tradeshift sued BuyerQuest for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing arising out of the Tradeshift/BuyerQuest Agreement and for Tortious Interference with the Tradeshift/Smucker Agreement. Tradeshift alleges that BuyerQuest disparaged it to Smucker, in part by making false statements about Tradeshift's financial situation. Mr. Lanng was, and is, the CEO of Tradeshift and participated directly in a number of the critical events at issue in this lawsuit, for example:

- He attended and presented at pre-contracting sales pitches made to Smucker. Smucker has since sued Tradeshift for fraudulent inducement related to the Tradeshift/Smucker Agreement and based, in part, on those presentations.[1]
- Tradeshift failed to timely pay BuyerQuest as required by the Tradeshift/BuyerQuest Agreement. Mr. Lanng participated in decisions about whether and when to pay BuyerQuest and BuyerQuest's complaints about nonpayment were escalated to him.
- In November 2019, Mr. Lanng and Smucker's CFO spoke directly via phone and Mr. Lanng reassured Smucker about Tradeshift's financial stability in an attempt to convince Smucker to continue with the Tradeshift/Smucker Agreement. No one else participated in that call.[2] Mr. Lanng attended at least one other in-person meeting with Smucker and BuyerQuest in October 2019 to discuss problems with the project.

Tradeshift does not dispute Mr. Lanng's involvement in the foregoing. Mr. Lanng therefore has unique first-hand knowledge of events central to the substantive issues of the litigation.

**The Discovery Dispute:** On March 16, 2021, BuyerQuest noticed the deposition of Mr. Lanng, pursuant to Rule 30. *See*, Exhibit A. The deposition was set to go forward on March 31, 2021 and to be conducted via Zoom, in accordance with the parties' agreement in the case.

On March 26, 2021, Tradeshift objected on grounds of relevance and by citing the "apex witness doctrine", based upon Mr. Lanng's position as Tradeshift's CEO. *See*, Exhibit B.

---

[1] *Tradeshift, Inc. v. Smucker Services Company*, No. 1:20-cv-03661 (S.D.N.Y.)
[2] Documents supporting each of these facts are available for *in camera* review. Ongoing discovery is strengthening, not diminishing, the case for Mr. Lanng's direct involvement and the need for his deposition.

April 8, 2021
Page 3

Standing on its objections, Tradeshift has refused to produce Mr. Lanng for deposition.[3]  The apex witness doctrine does not preclude Mr. Lanng's deposition.  He has unique, first-hand knowledge central to the events at issue in this litigation.  Nor can Tradeshift or Mr. Lanng establish any undue harm posed by proceeding with the remote deposition.

**BuyerQuest Is entitled to Mr. Lanng's Deposition Testimony.[4]**  "A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied."[5][6] The judge-made apex witness doctrine is at odds with the "broad allowance for discovery of party witnesses and the federal rules." *Apple,* at 263. While it may shield from the "potential for the discovery rules to serve as a tool for harassment" it is not a sword to "itself become a tool for evading otherwise relevant and permissible discovery." *Id.*

Thus, it is Tradeshift's "heavy burden" to demonstrate that 1) Mr. Lanng is an "apex" witness; 2) who lacks personal knowledge; and, 3) specific harm would result from his deposition. *Kennedy v. Jackson Nat. Life Ins. Co.*, 2010 WL 164944, at 1 (N.D. Cal. Apr. 22, 2010)(the Court held a one-day deposition was not burdensome and denied CEO's motion for protective order based only on broad unsubstantiated assertions of harassment and disruption to his schedule).

The parties do not dispute a party's CEO is an apex witness.[7]  They do not dispute Mr. Lanng has personal knowledge of relevant facts in this case.  During the meet and confer process, however, Tradeshift insisted Mr. Lanng's knowledge is "repetitive" of other witnesses who participated in the same meetings.  Tradeshift went so far as to argue that Mr. Lanng's interlocutor at Smucker - the CFO of a non-party - is the proper source of information about their one-on-one conversation.  Exhibit C [March 12, 2021 Meet and Confer].

This is not the law but an archetypical misuse of the apex witness doctrine as a "sword" to frustrate legitimate party discovery.  "The mere fact … other witnesses may be able to testify as to what occurred at a particular time or place does not mean that a high-level corporate officer's testimony would be 'repetitive.'" *First Nat. Mortg. Co. v. Fed. Realty Inv. Tr.*, 2007 WL 4170548, at *2 (N.D. Cal. Nov. 19, 2007)(Judge Seeborg compelled CEO deposition and noted "[i]ndeed, it is not uncommon for different witnesses to an event to have differing recollection of what occurred."); *see also, Google, Inc. v. American Blind & Wallpaper Factory, Inc*, 2006 WL 2578277 at *3-4 (Judge Seeborg compelled deposition of ***Google's founder*** over apex witness objection where the record suggested his "possible personal involvement" in relevant matters)(emphasis added).   The record is replete with evidence of Mr. Lanng's direct personal involvement in the dispositive events of this litigation – including the formation, validity, and real reasons for the termination of the Tradeshift/Smucker Agreement and Tradeshift's performance or breach of the Tradeshift/BuyerQuest Agreement.

---

[3] During the meet and confer process, Tradeshift offered to produce Mr. Lanng for a one-hour deposition on only topics it had preapproved and only after all other depositions had been completed.

[4] FRCP 30(a). "A party may… depose any… party, without leave[.]"

[5] *Apple, Inc. v. Samsung Elecs. Co. Ltd.*, 282 F.R.D. 259, 263.

[6] FRCP 26(c) "A party or any person from whom discovery is sought may move for a protective order …. The court may, ***for good cause***, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense …" (emphasis added).

[7] Tradeshift has noticed the deposition of BuyerQuest's CEO and other "C-Suite" executives.  Whatever the Court's decision on this Motion, the same ruling should apply to BuyerQuest's apex witnesses.

April 8, 2021
Page 4

Tradeshift has made no showing of any harm either it or Mr. Lanng would suffer by his deposition.  Nor can it.  The deposition would take place remotely and Mr. Lanng would face no greater burden than any other witness called to testify about their personal knowledge.  And Tradeshift is the **_plaintiff_** in this lawsuit – the possibility that its senior managers would be deposed about their knowledge of its claims surely factored in its pre-litigation calculations.  The type of harassment the apex witness doctrine is intended to shield against is simply not present here.

**Final Proposed Compromise:** BuyerQuest will take a single, seven-hour deposition of Mr. Lanng by remote means and after the depositions of other Tradeshift witnesses.

## TRADESHIFT'S POSITION

The Court should deny BuyerQuest's motion to compel the deposition of Tradeshift's CEO and co-founder, Christian Lanng, under the apex doctrine because (1) Mr. Lanng was not a decision-maker on issues relevant to this case and does not have unique, first-hand non-repetitive knowledge regarding relevant material facts, (2) BuyerQuest's motion is premature because it has not yet deposed the lower-level employees who were more directly involved in the relevant issues, and (3) at a minimum, the court should limit any deposition in scope and in time to safeguard against harassment and abuse.

The parties negotiated over deposition dates for three months.  During that time, BuyerQuest never once identified Mr. Lanng on its witness list even though Tradeshift had identified BuyerQuest's CEO, Jack Mulloy, on its witness list from the start. This made perfect sense since Mr. Mulloy conceived of, architected, directed, and personally executed BuyerQuest's "Operation Fyrefest" scheme to cause Smucker to terminate its agreement with Tradeshift so BuyerQuest could get the contract. Ex. I at 17-25. The parties have produced more than 500 communications sent to or from Mr. Mulloy about the Smucker project and BuyerQuest designated Mr. Mulloy as its 30(b)(6) designee for seven of the ten topics noticed to BuyerQuest.[8]  In contrast, the most BuyerQuest can show for Mr. Lanng is that he attended one meeting (along with a number of other people) and took one phone call, neither of which are central to any of the claims or defenses in the case or about which others are not already set to testify. There is simply no comparison and, most importantly, no need for Mr. Lanng's testimony. Instead, it seems Mr. Lanng's deposition was noticed solely in retribution for Mr. Mulloy's deposition.

**Procedural Background:** Tradeshift identified the BuyerQuest witnesses it wanted to depose (including Mr. Mulloy) on December 18, 2020. Ex.  B  at 1-3. BuyerQuest identified the witnesses it wanted to depose on December 29.  _Id._ at 1. Mr. Lanng was not on BuyerQuest's list.  _Id._ The parties discussing scheduling the depositions over the next three months, ultimately setting the schedule on March 3, 2021, with Tradeshift was set to depose five BuyerQuest

---

[8] Despite already agreeing in March to produce Mulloy for deposition on April 20 and designating him on April 1 as BuyerQuest's 30(b)(6) corporate designee for over half of the 30(b)(6) topics that have been noticed, BuyerQuest turned around and served objections to Mulloy's deposition on April 6, citing the apex doctrine and stating that it will not be producing Mr. Mulloy unless some horse trade is agreed upon for Mr. Lanng's deposition.

April 8, 2021
Page 5

witnesses and BuyerQuest was set to depose eight Tradeshift witnesses. Mr. Mulloy was scheduled for deposition on April 20, 2021; Mr. Langg was not one of the scheduled witnesses.

In March 2021, BuyerQuest suddenly said that it also wanted to take the deposition of Mr. Langg (Ex. C) and, after Tradeshift indicated it would object under the apex doctrine, unilaterally served a March 16 notice of deposition setting the deposition for March 31.[9] Ex. A. Tradeshift responded with formal objections. Ex. D. The parties continued to confer throughout March, with Tradeshift painstakingly explaining why the deposition was improper.[10] *See* Exs. E, F, G. On April 7, 2021, BuyerQuest reneged on its agreement to produce Mr. Mulloy, explaining in an April 8 email that it did so in order to force a horse trade for the Langg deposition.

**Legal Standard:** "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Affinity Labs of Texas v. Apple, Inc.*, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011). Accordingly, courts regularly exercise their discretion to preclude or limit such depositions after considering "(1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Anderson v. Cty. of Contra Costa*, No. 15-CV-01673-RS (MEJ), 2017 WL 930315, at *3 (N.D. Cal. Mar. 9, 2017). Courts will generally preclude or limit the depositions "where the information sought can be obtained through less intrusive discovery methods, such as by interrogatory or depositions of lower-level employees with more direct knowledge of the facts at issue." *Id.*

**Argument:** BuyerQuest does not dispute that Mr. Langg is an apex witness. As Chairman, CEO, and Co-Founder of Tradeshift, Mr. Langg is the highest-ranking officer at Tradeshift, a global company of hundreds of employees worldwide. Accordingly, he is entitled to the highest protections under the apex doctrine. *See Apple Inc. v. Samsung Elecs. Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("On the proverbial sliding scale, the closer that a proposed witness is to the apex of some particular peak in the corporate mountain range, and the less directly relevant that person is to the evidence proffered in support of his deposition, the more appropriate the protections of the apex doctrine become.")

Mr. Langg does not have unique or particularly relevant information to the case.[11] In assessing what unique knowledge an apex witness possesses, courts generally look for non-repetitive "firsthand-knowledge of important, relevant, and material facts." *In re Transpacific Passenger Air Transportation Antitrust Litig.*, 2014 WL 939287, at *2 (N.D. Cal. Mar. 6, 2014). Here, there is no such knowledge because Mr. Langg is <u>not</u> responsible for responding to RFPs, closing sales deals, managing day-to-day execution of contracts, or responding to customer inquiries; lower-level managers are responsible for such tasks. He was not a relevant decision-

---

[9] Notably, and in violation of the Guidelines for Professional Conduct, BuyerQuest set Mr. Langg's deposition for just two weeks out from the notice date and set to take place *before* the other party depositions that the parties had negotiated to schedule for three months.

[10] BuyerQuest misstates that Tradeshift "offered to produce Mr. Langg for a one-hour deposition." *Supra* at fn.3. This is untrue. Tradeshift hypothetically discussed a number of possibilities for resolving the dispute but ultimately never offered any deposition, whether for an hour or anything else.

[11] BuyerQuest misrepresents that "Tradeshift does not dispute Mr. Langg's involvement" in the three topics it broadly identifies in its argument section. *Supra* at 2. But, as discussed herein, Tradeshift very much disputes his involvement in the broad topics identified by BuyerQuest.

April 8, 2021
Page 6

maker in bidding for the Smucker Project, contracting with Smucker or BuyerQuest, or implementing the Smucker Project.

BuyerQuest does not cite any evidence to support its claim that Mr. Lanng has the requisite knowledge. Instead, it resorts to overstating Mr. Lanng's involvement in vague and inaccurate terms. Ultimately, BuyerQuest has only cited to two specific events about which it claims Mr. Lanng has unique knowledge: (1) a meeting that Mr. Lanng attended with Smucker in May 2019 and (2) a phone call Mr. Lanng had with Smucker in November 2019. These two events, however, are not sufficient to warrant Mr. Lanng's deposition, both because he does not have unique knowledge of them and also because BuyerQuest has not yet sought to obtain information about those two events through other means.

BuyerQuest claims that Mr. Lanng "attended and presented at pre-contracting sales pitches" that are supposedly relevant because Smucker (not BuyerQuest) "has since sued Tradeshift for fraudulent inducement . . . based, in part, on those presentations." *Supra* at 2. But BuyerQuest has only ever identified one such meeting that Mr. Lanng attended, in May 2019.[12] *See* Ex. E at 3; Ex. F at 2. And, contrary to BuyerQuest's representations, Smucker's fraud-based claims are premised on statements Tradeshift made in written RFP and BRD responses; Smucker does not allege that Mr. Lanng made any misrepresentations at the May 2019 meeting.[13] Ex. G (Smucker Complaint). Accordingly, Mr. Lanng's knowledge of this meeting is not important, relevant, or material. Moreover, any knowledge Mr. Lanng has is not unique or non-repetitive because Tradeshift's VP of sales (Jim Rahill) (who is being deposed on April 23) also attended the May 2019 meeting and was more directly involved in sales meetings and pitches. At a minimum, BuyerQuest's request is premature because BuyerQuest has not yet deposed Mr. Rahill or Tradeshift's Vice President of Global Professional Services, Sean Norton (scheduled April 29), who was directly involved in the sales process and is testifying as a corporate designee under Rule 30(b)(6) about Tradeshift's communications with Smucker during that process.

BuyerQuest also argues that "Mr. Lanng participated in decisions about whether and when to pay BuyerQuest and BuyerQuest's complaints about nonpayment were escalated to him." *Supra* at 2. They also say that Mr. Lanng reassured Smucker (not BuyerQuest) about Tradeshift's financial stability in a November 2019 call "in an attempt to convince Smucker to continue with the Tradeshift/Smucker Agreement." *Id.* But, again, Smucker does not allege that any relevant misrepresentations took place on the November 2019 call and, in fact, while Mr. Lanng took the initial call he subsequently passed Smucker's inquiry about financial stability on to Tradeshift Chief Financial Officer, Peter van Pruissen, who managed the discussion with Smucker. Moreover, BuyerQuest has not provided any evidence that Mr. Lanng was the decision-maker

---

[12] BuyerQuest has suddenly expanded his involvement to multiple "sales pitches" (*supra* at 2), but has only ever disclosed the May 2019 meeting. BuyerQuest did not identify any other "sales pitches" during conferral and it doesn't identify any specific ones here. BuyerQuest claims it can provide "[d]ocuments supporting each of these facts" "for *in camera* review" though fails to explain why the documents must be reviewed *in camera* at all. *Supra* at fn. 2. This highly unusual proposal is unfair to Tradeshift and completely unjustified on the present facts. Further, if BuyerQuest has additional support for its deposition demand, it should have provided it during the conferral process.

[13] And, in any event, BuyerQuest does not explain why any alleged misrepresentations made at the May 2019 presentation would be relevant to *this* lawsuit, which does not include a claim of fraudulent inducement. Indeed, BuyerQuest has no counterclaims in this case at all. Dkt. No. 37 (BuyerQuest Answer).

April 8, 2021
Page 7

regarding payments when those decisions would have, again, naturally fallen to the CFO, Mr. van Pruissen. Again, Mr. Lanng's knowledge of this call is not important, relevant, or material and, at best, BuyerQuest's request is premature because it has not yet deposed Mr. van Pruissen (scheduled for April 30). BuyerQuest also fails to explain why it cannot acquire information about this call from an interrogatory, written deposition questions, or a 30(b)(6) deposition.[14]

If, in the unlikely event, after completing other relevant depositions, BuyerQuest can demonstrate Mr. Lanng actually has some unique and personal knowledge of relevant and material facts, the Court should at most order a limited, two-hour deposition on the topics of the May 2019 meeting and the November 2019 phone call. Courts regularly limit apex depositions in scope and time. *See e.g.*, *In re Transpacific*, 2014 WL 939287, at *6 (limiting deposition to "no longer than two hours on the subjects discussed at the hearing."); *Google*, 2006 WL 2578277 at *3 ("The deposition, however, shall be limited in scope to Page's knowledge of and involvement in the policy change and shall be limited to three hours").[15]

BuyerQuest's belated demand to depose Mr. Lanng appears to be part of some larger ruse to try to put the parties on "equal footing" where none is warranted. In agreeing to his April 20 deposition, BuyerQuest conceded that the testimony of its own CEO was not only warranted, but it designated him to speak on behalf of the whole company as its 30(b)(6) designee. BuyerQuest never explains why it only suddenly realized Mr. Lanng's deposition was totally necessary some three months after the parties had first identified witnesses, including Mr. Mulloy, but the fact that it took so long suggests that Mr. Lanng is more of a pawn than a witness here. The Court should deny BuyerQuest's motion as unsupported by the record and premature or, at a most, limit the deposition to 2 hours of testimony on the topics of the May 2019 meeting and November 2019 call.

Respectfully submitted,

Anthony D. Phillips for BuyerQuest, Inc.
Jason Yu for Tradeshift, Inc.

---

[14] The cases BuyerQuest relies on actually indicate that BuyerQuest's motion is, at best, premature. In *First National Mortgage,* Judge Seeborg recognized that "[c]ourts generally do refuse to allow the immediate deposition of high-level 'apex deponent' executives, before the testimony of lower level employees with more intimate knowledge of the case has been secured." 2007 WL 4170548 at *2. He then granted the deposition, but only because the moving party had already taken the relevant lower-level employee depositions and the record supported that the apex witnesses had additional relevant testimony. *Id.* at *3. He did the same in *Google*. 2006 WL 2578277 at *3 fn 3. Moreover, in both cases, Judge Seeborg limited the depositions in scope and/or time to prevent abuse. *First Nat'l Mortg.,* 2007 WL 4170548 at *3; *Google,* 2006 WL 2578277 at *3 ("The deposition, however, shall be limited in scope to Page's knowledge of and involvement in the policy change and shall be limited to three hours").

[15] The protections are particularly appropriate here given the likelihood for abuse and harassment during Mr. Lanng's deposition. Counsel for BuyerQuest has—both during conferral and this motion—continued to hide-the-ball regarding its true intentions for Mr. Lanng's deposition. *See e.g.,* Ex. E at 1-2 (refusing to "preview" the topics that would warrant Mr. Lanng's deposition); *supra* at 2 (relying on *in camera* review to support arguments). Moreover, BuyerQuest never served any specific discovery on the issues it now contends warrant Mr. Lanng's deposition. *See In re Transpacific,* 2014 WL 939287, at *5 (lack of effort to obtain the information through other discovery "can shed considerable light on whether the party is seeking the apex deposition for appropriate purposes" and may require "safeguards against abuse, harassment, and undue burden."). And, BuyerQuest did not identify Mr. Lanng as a witness until late in the case. BuyerQuest should not be able to use two specific meetings to justify a broad and harassing deposition of an apex corporate executive on other topics.

April 8, 2021
Page 8

Enclosures

## <u>ATTESTATION REGARDING SIGNATURES</u>

In compliance with Local Rule 5-1(i)(3), the undersigned ECF user whose identification and password are being used to file this document, hereby attests that all signatories have concurred in the filing of this document and all supporting declarations and exhibits.

GORDON REES SCULLY MANSUKHANI LLP

*/s/ Anthony D. Phillips*
ANTHONY D. PHILLIPS
Attorneys for Defendant
BUYERQUEST, INC.

# BUYERQUEST EXHIBIT A

1  Craig J. Mariam (SBN: 225280)
   cmariam@grsm.com
2  Anthony D. Phillips (SBN: 259688)
   aphillips@grsm.com
3  Eunice J. Liao (SBN: 330655)
   eliao@grsm.com
4  GORDON REES SCULLY MANSUKHANI, LLP
   275 Battery Street, Suite 2000
5  San Francisco, CA 94111
   Telephone:  (415) 986-5900
6  Facsimile:  (877) 306-0043
   Attorneys for Defendant
7  BuyerQuest, Inc.

8

9                 UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11

12  TRADESHIFT, INC., a Delaware      )   CASE NO.  3:20-cv-01294-RS
    corporation,                      )
13                                    )   **DEFENDANT BUYERQUEST, INC.'S**
                          Plaintiff,  )   **NOTICE OF DEPOSITION OF**
14                                    )   **CHRISTIAN LANNG PURSUANT TO**
          vs.                         )   **FEDERAL RULE OF CIVIL PROCEDURE**
15                                    )   **30**
    BUYERQUEST, INC., an Ohio         )
16  corporation,                      )   Hon. Richard Seeborg
                                      )   Hon. Thomas Hixson
17                        Defendant.  )

18       TO PLAINTIFF AND ITS COUNSEL OF RECORD:

19       PLEASE TAKE NOTICE THAT, on March 31, 2021 at 9:00 a.m., pursuant to Federal

20  Rule of Civil Procedure ("Rule") 30, defendant-BuyerQuest, Inc. ("BuyerQuest") will take the

21  deposition of Christian Lanng ("Lanng" or "Deponent") at the offices of Gordon Rees Scully

22  Mansukhani LLP, located at 275 Battery Street, Suite 2000, San Francisco, California. The

23  deposition will continue from day to day, weekends and holidays excepted, until complete.

24       The above deposition will be taken upon oral examination before a notary public, or other

25  person lawfully authorized to administer oaths and take deposition testimony.

26       The deposition will be recorded stenographically and may also be videotaped and

27  audiotaped for use as evidence in this action, at trial, or for such other purposes as are permitted,

28  as authorized by Rule 30(b)(2).  The deposition testimony may also be recorded through

-1-
DEFENDANT BUYERQUEST'S NTC. OF DEPOSITION OF CHRISTIAN LANNG

LiveNote, an instant visual display of the testimony, of which a rough draft of the testimony may be requested, as authorized by Rule 30(b)(3).

Due to the ongoing COVID-19 pandemic, the deposition will be taken by audio-video conference and in accordance with the parties' Stipulation on Protocol for Remote Depositions. Deponent need not be physically present with the deposition officer at the time of deposition. Counsel for all parties and their clients may participate from various separate locations.

Dated: March 16, 2021          GORDON REES SCULLY MANSUKHANI, LLP

By: _____
          Craig J. Mariam
          Anthony D. Phillips
          Eunice J. Liao
          Attorneys for Defendant BuyerQuest, Inc.

**Gordon Rees Scully Mansukhani, LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA 94111**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Rees Scully Mansukhani, LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA 94111**

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  One of my business addresses is: Gordon & Rees LLP, 633 W. 5th Street, 52nd Floor, Los Angeles, California 90071. On March 16, 2021, I served the within document(s):

**DEFENDANT BUYERQUEST, INC.'S NOTICE OF DEPOSITION OF CHRISTIAN LANNG PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30**

☐ **BY OVERNIGHT MAIL:**  by placing a true copy thereof enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for overnight delivery as part of the ordinary business practices of Gordon Rees, LLP.

☒ **BY ELECTRONIC TRANSMISSION** by causing such document(s) to be electronically mailed in .pdf format as an email attachment to each addressee for the above-entitled case as listed below.  The transmission was complete and confirmed. A copy of the transmittal e-mail will be maintained with the original document(s) in our office.

☐ **BY U.S. MAIL** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in United States mail in the State of California addressed as set forth below.

☐ **BY ELECTRONIC FILING.**  I hereby certify that on March 16, 2021, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

| Amy Kathleen VanZant, Esq.<br>Jason Yu, Esq.<br>Tammy Su, Esq.<br>Orrick, Herrington & Sutcliffe LLP<br>1000 Marsh Road<br>Menlo Park, CA 94025<br>Tel: 650-614-7400<br>Fax: 650-614-7401<br>Email: avanzant@orrick.com<br>       jasonyu@orrick.com<br>       tsu@orrick.com | Attorneys for Plaintiff |
|---|---|

1       I am readily familiar with the firm's practice of collection and processing

2   correspondence for mailing.  Under that practice it would be deposited with the

3   U.S. Postal Service on that same day with postage thereon fully prepaid in the

4   ordinary course of business.  I am aware that on motion of the party served, service

5   is presumed invalid if postal cancellation date or postage meter date is more than

6   one day after the date of deposit for mailing in affidavit.

7       I declare under penalty of perjury under the laws of the United States of

8   America that I am employed in the office of a member of the Bar of this Court at

9   whose direction the service was made.

10       Executed on March 16, 2021.

11

12   _____

                Julie Vernon

# BUYERQUEST
# EXHIBIT B

AMY K. VAN ZANT (STATE BAR NO. 197426)
avanzant@orrick.com
JASON K. YU (STATE BAR NO. 274215)
jasonyu@orrick.com
TAMMY SU (STATE BAR NO. 329652)
tsu@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

Attorneys for Plaintiff
TRADESHIFT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRADESHIFT, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BUYERQUEST, INC., an Ohio corporation,<br><br>Defendant. | Case No. 3:20-cv-1294-RS<br><br>**PLAINTIFF TRADESHIFT, INC.'S OBJECTIONS TO DEFENDANT BUYERQUEST, INC.'S NOTICE OF DEPOSITION OF CHRISTIAN LANNG**<br><br>Judge:  Hon. Richard Seeborg |

Plaintiff Tradeshift, Inc. ("Tradeshift") hereby provides the following objections and responses to Defendant BuyerQuest, Inc.'s ("BuyerQuest") Notice of Deposition of Christian Lanng Pursuant to Federal Rule of Civil Procedure 30, dated March 16, 2021 (the "Notice").

### OBJECTIONS TO NOTICE OF DEPOSITION

1.      Tradeshift to the date and time of the deposition which BuyerQuest set without conferring with Tradeshift.  Tradeshift does not intend to provide Mr. Lanng for deposition at the stated date or time.

2.      Tradeshift objects to the Notice as seeking information that is not relevant to the claims and defenses at issue in this case and that is not proportional to the needs of the case.

3.      Tradeshift objects to the Notice as overbroad, unduly burdensome, not proportional to the needs of the case, harassing, and as seeking duplicative information because it seeks information from an apex witness.  "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Groupion, LLC v. Groupon, Inc.*, No. 11-0870 MEJ, 2012 WL 359699, at *2 (N.D. Cal. Feb. 2, 2012). Courts will therefore protect high-level corporate officers from depositions when the officer has no first-hand knowledge of the facts of the case or where the officer's testimony would be repetitive.  *In re Transpacific Passenger Air Transportation Antitrust Litig.*, No. C-07-05634 CRB (DMR), 2014 WL 939287, at *2 (N.D. Cal. Mar. 6, 2014).  Courts should also limit these depositions when the party seeking the deposition has not exhausted other less intrusive discovery methods.  *Apple Inc. v. Samsung Elecs. Co.*, Ltd, 282 F.R.D. 259, 263 (N.D. Cal. 2012); *Groupion*, 2012 WL 359699, at *2.  Because Mr. Lanng is a high-level executive and does not possess unique, first-hand knowledge of relevant facts, as discussed above, he should not be compelled to testify.

Dated:  March 23, 2021                                   ORRICK, HERRINGTON & SUTCLIFFE LLP


By:     */s/ Jason K. Yu*
        JASON K. YU

        Attorneys for Plaintiff
        TRADESHIFT, INC.

TRADESHIFT'S OBJECTIONS TO NOTICE
OF DEPOSITION OF CHRISTIAN LANNG
CASE NO. 3:20-cv-1294-RS

4152-6949-2524

1

## PROOF OF SERVICE

2          I am a resident of the State of California and over the age of eighteen years, and not a

3   party to the within action.  My place of business is Orrick, Herrington & Sutcliffe, LLP, 1000

4   Marsh Road, Menlo Park, CA 94025.  On March 23, 2021, I served the within document(s):

5

6   **PLAINTIFF TRADESHIFT, INC.'S OBJECTIONS TO DEFENDANT
BUYERQUEST, INC.'S NOTICE OF DEPOSITION OF CHRISTIAN LANNG**

7

| **X** | By transmitting a courtesy copy **via electronic mail** the document(s) listed above to the email addresses set forth below on March 23, 2021. |
|---|---|

8

9   Anthony Phillips
    Craig Mariam
10  Eunice Liao
    Gordon Rees Scully Mansukhani, LLP
11  275 Battery Street, Ste. 2000
    San Francisco, CA 94111
12  aphillips@grsm.com
    cmariam@grsm.com
13  eliao@grsm.com
14  **ATTORNEYS FOR DEFENDANT BUYERQUEST, INC.**

15         Executed on March 23, 2021 at Fremont, California.  I declare under penalty of perjury

16  under the laws of the State of California that the foregoing is true and correct.

17                                                  */s/ Sema Virrueta*
                                                    Sema Virrueta
18

19

20

21

22

23

24

25

26

27

28

- 1 -

4152-6949-2524

# BUYERQUEST
# EXHIBIT C

**Joshua Bradus**

| | |
|---|---|
| **From:** | Yu, Jason K. <jasonyu@orrick.com> |
| **Sent:** | Friday, March 12, 2021 8:57 AM |
| **To:** | Anthony Phillips |
| **Cc:** | Craig Mariam; Eunice Liao; Van Zant, Amy K.; Su, Tammy; Joshua Bradus |
| **Subject:** | RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS |

Hello Tony,

Thanks for the response. I'm still working on dates for Mr. Rahill.

With respect to Mr. Lanng, we disagree this is a sufficient basis for Mr. Lanng's deposition. Any information Mr. Lanng has about the "joint" presentation is, by definition, duplicative information that can be obtained from other witnesses (including BuyerQuest's own employees) and does not justify an apex deposition. The conversations you mention in Q4 2019 also seem to constitute duplicative information that can be obtained elsewhere (e.g., from Smucker), but we'll need more information. Please let us know who why you believe these conversations would be relevant and non-duplicative.

Thanks,
Jason

---

**From:** Anthony Phillips <aphillips@grsm.com>
**Sent:** Thursday, March 11, 2021 10:56 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Joshua Bradus <jbradus@grsm.com>
**Subject:** RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Dear Jason,

Thank you for confirming those dates, we will issue Notices shortly. Let us know about Mr. Rahill.

As for Mr. Lanng, we are confident he possesses firsthand discoverable information to which BuyerQuest is entitled and entitled to explore by deposition. For example, Mr. Lanng made a joint presentation with BuyerQuest to Smucker in May 2019 that was critical to securing the contract with Smucker. He also spoke directly with Smucker's senior management in Q4 2019 at which time Smucker raised concerns about Tradeshift's performance and stability.

Please consider your position and advise whether or not Tradeshift will produce Mr. Lanng for his deposition.

Thanks again,
Tony

---

> **From:** Yu, Jason K. <jasonyu@orrick.com>
> **Sent:** Wednesday, March 10, 2021 3:43 PM
> **To:** Anthony Phillips <aphillips@grsm.com>
> **Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
> **Subject:** RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS
>
> Thanks, Tony. We will reserve these dates for those witnesses. I'm looking into dates for Mr. Rahill.

# TRADESHIFT
# EXHIBIT A

1  Craig J. Mariam (SBN: 225280)
   cmariam@grsm.com
2  Anthony D. Phillips (SBN: 259688)
   aphillips@grsm.com
3  Eunice J. Liao (SBN: 330655)
   eliao@grsm.com
4  GORDON REES SCULLY MANSUKHANI, LLP
   275 Battery Street, Suite 2000
5  San Francisco, CA 94111
   Telephone:  (415) 986-5900
6  Facsimile:  (877) 306-0043
   Attorneys for Defendant
7  BuyerQuest, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12 TRADESHIFT, INC., a Delaware        )   CASE NO.  3:20-cv-01294-RS
   corporation,                        )
13                                     )   **DEFENDANT BUYERQUEST, INC.'S**
                        Plaintiff,     )   **NOTICE OF DEPOSITION OF**
14                                     )   **CHRISTIAN LANNG PURSUANT TO**
       vs.                             )   **FEDERAL RULE OF CIVIL PROCEDURE**
15                                     )   **30**
   BUYERQUEST, INC., an Ohio           )
16 corporation,                        )   Hon. Richard Seeborg
                                       )   Hon. Thomas Hixson
17                        Defendant.   )

18        TO PLAINTIFF AND ITS COUNSEL OF RECORD:

19        PLEASE TAKE NOTICE THAT, on March 31, 2021 at 9:00 a.m., pursuant to Federal

20 Rule of Civil Procedure ("Rule") 30, defendant-BuyerQuest, Inc. ("BuyerQuest") will take the

21 deposition of Christian Lanng ("Lanng" or "Deponent") at the offices of Gordon Rees Scully

22 Mansukhani LLP, located at 275 Battery Street, Suite 2000, San Francisco, California. The

23 deposition will continue from day to day, weekends and holidays excepted, until complete.

24        The above deposition will be taken upon oral examination before a notary public, or other

25 person lawfully authorized to administer oaths and take deposition testimony.

26        The deposition will be recorded stenographically and may also be videotaped and

27 audiotaped for use as evidence in this action, at trial, or for such other purposes as are permitted,

28 as authorized by Rule 30(b)(2).  The deposition testimony may also be recorded through

-1-
DEFENDANT BUYERQUEST'S NTC. OF DEPOSITION OF CHRISTIAN LANNG

1    LiveNote, an instant visual display of the testimony, of which a rough draft of the testimony may

2    be requested, as authorized by Rule 30(b)(3).

3            Due to the ongoing COVID-19 pandemic, the deposition will be taken by audio-video

4    conference and in accordance with the parties' Stipulation on Protocol for Remote Depositions.

5    Deponent need not be physically present with the deposition officer at the time of deposition.

6    Counsel for all parties and their clients may participate from various separate locations.

7

8    Dated: March 16, 2021                GORDON REES SCULLY MANSUKHANI, LLP

9

10                                        By: _____

11                                            Craig J. Mariam
                                              Anthony D. Phillips
12                                            Eunice J. Liao
                                              Attorneys for Defendant BuyerQuest, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT BUYERQUEST'S NTC. OF DEPOSITION OF CHRISTIAN LANNG

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Rees Scully Mansukhani, LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA 94111**

# PROOF OF SERVICE

    I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  One of my business addresses is: Gordon & Rees LLP, 633 W. 5th Street, 52nd Floor, Los Angeles, California 90071. On March 16, 2021, I served the within document(s):

**DEFENDANT BUYERQUEST, INC.'S NOTICE OF DEPOSITION OF CHRISTIAN LANNG PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30**

☐   **BY OVERNIGHT MAIL:**  by placing a true copy thereof enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for overnight delivery as part of the ordinary business practices of Gordon Rees, LLP.

☒   **BY ELECTRONIC TRANSMISSION** by causing such document(s) to be electronically mailed in .pdf format as an email attachment to each addressee for the above-entitled case as listed below.  The transmission was complete and confirmed. A copy of the transmittal e-mail will be maintained with the original document(s) in our office.

☐   **BY U.S. MAIL** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in United States mail in the State of California addressed as set forth below.

☐   **BY ELECTRONIC FILING.**  I hereby certify that on March 16, 2021, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

| Amy Kathleen VanZant, Esq.<br>Jason Yu, Esq.<br>Tammy Su, Esq.<br>Orrick, Herrington & Sutcliffe LLP<br>1000 Marsh Road<br>Menlo Park, CA 94025<br>Tel: 650-614-7400<br>Fax: 650-614-7401<br>Email: avanzant@orrick.com<br>      jasonyu@orrick.com<br>      tsu@orrick.com | Attorneys for Plaintiff |
| --- | --- |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on March 16, 2021.

_____
Julie Vernon

DEFENDANT BUYERQUEST'S NTC. OF DEPOSITION OF CHRISTIAN LANNG

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

# TRADESHIFT
# EXHIBIT B

**Yu, Jason K.**

| | |
|---|---|
| **From:** | Anthony Phillips <aphillips@grsm.com> |
| **Sent:** | Tuesday, December 29, 2020 2:08 PM |
| **To:** | Yu, Jason K. |
| **Cc:** | Eunice Liao; Craig Mariam; Van Zant, Amy K.; Su, Tammy |
| **Subject:** | RE: Tradeshift, Inc. v. BuyerQuest, Inc., No. 20-cv-1294 |

Dear Jason,

We are available next week to confer respecting a protocol and the schedule for both sides' depositions in the case. Schedule-wise, early February will work best. We also anticipate deposing the following Tradeshift witnesses to begin with:

1. Jeffrey Larsen;
2. Sean Norton;
3. Himanshu Shah;
4. Chris Todd;
5. Peter Van Pruissen;
6. Tradeshift, Inc. under Rule 30(b)(6).

We also ask that we meet and confer respecting Tradeshift's recent responses to our Requests For Production (Set Two) and Requests For Admission. Correspondence identifying specific issues will follow under separate cover.

In the interim, please advise on the status of Tradeshift's document production and when we can expect it.

Many thanks,
Tony

---

**From:** Yu, Jason K.
**Sent:** Tuesday, December 29, 2020 11:09 AM
**To:** Anthony Phillips
**Cc:** Eunice Liao ; Craig Mariam ; Van Zant, Amy K. ; Su, Tammy
**Subject:** RE: Tradeshift, Inc. v. BuyerQuest, Inc., No. 20-cv-1294

Hello Tony,

We would appreciate a response on the deposition issues I mentioned in my email below. Let us know if there is a time that works to discuss.

Thanks,
Jason

---

**From:** Yu, Jason K.
**Sent:** Friday, December 18, 2020 1:28 PM
**To:** 'Anthony Phillips' <aphillips@grsm.com>
**Cc:** Eunice Liao <eliao@grsm.com>; Craig Mariam <cmariam@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** RE: Tradeshift, Inc. v. BuyerQuest, Inc., No. 20-cv-1294

Hi Tony,

Thanks for your letter and your time on the call this week.

With respect to Tradeshift's supplemental production, I believe we are in agreement on most of the issues.  We are aiming to provide an additional production by the end of the year and, if necessary, a follow up production two weeks after.  Here are some of the specifics we discussed:

- The collection will include responsive documents from Himanshu Shah and Sara Brategren (in addition to the others we have already discussed).

- Tradeshift will not be producing Jira tickets in addition to responsive email communications as we understand these documents would be duplicative.  We are open to discussing this issue once BuyerQuest has reviewed the documents we are producing.

We do not appear to be in agreement regarding documents related to Smucker's RFP/BRD and, in particular, internal documents about that process.  You explained that, for reasons summarized in your email of November 19, 2020, you contend these documents are relevant to Tradeshift's claims, including, e.g., the formation of the Tradeshift/BuyerQuest contract.  We disagreed those arguments justify production of the documents you are seeking.  I again asked that you confirm whether BuyerQuest is asserting a defense/allegation that Tradeshift fraudulently induced Smucker into entering into the Smucker Services Agreement rendering that contract void (or otherwise unable to be interfered with).  You said you don't know if BuyerQuest has such a defense because you haven't seen the documents, but that BuyerQuest contends that it is entitled to discovery on that defense to explore it.  We do not agree, and we don't believe it's appropriate for BuyerQuest to demand documents related to this potential theory while refusing to produce its own documents that may go towards disproving that theory.  Accordingly, we believe we are at an impasse on this issue.

We also discussed the issues outlined in Tradeshift's meet and confer letter regarding its second set of RFPs and BuyerQuest's response.  Below are some of the specifics:

- <u>Nos. 14, 15, 21, and 25</u>: You indicated that you would confirm the Scope of BuyerQuest's earlier production to see if it already included the documents we are seeking here.  We look forward to your response on these issues.

    - For No. 14, you agreed to confirm that the search terms used addressed the full request (i.e., were not limited to the keywords "Operation Fyrefest" or "FyreFest") and would encompass any documents discussing plans to replace Tradeshift or take over Tradeshift's portion of the Smucker Project.

    - For No. 15, you agreed that documents discussing Tradeshift were likely responsive.

    - For No. 21, you agreed to confirm the extent of the production of the smucker_p2p Slack channel.  We understand that you do not plan to produce communications in the smucker_p2p Slack channel should they post-date March 6, 2020, and that we are at an impasse on that issue.  We would appreciate you would confirm (1) that BQ has produced all documents from the Channel prior to March 6, 2020 and (2) whether there are any documents in the channel after March 6, 2020 (or whether this issue is moot).

- For No. 25, Your letter of December 15, 2020 confirmed comprehensive production in response to this request.

- <u>Nos. 22, 23, and 26</u>:  We appear to be at an impasse here.  As noted in our letters, we contend that documents related to the March 6, 2020 project and ongoing work are relevant to proving whether Smucker's purported reasons for terminating the Smucker Services agreement were material or merely pretextual.  BuyerQuest disagrees the documents are relevant.

- <u>Nos. 17 and 27</u>:  We appear to be at an impasse here.  In order to tee up the issues, we asked that you produce any joint defense agreement between Smucker and BuyerQuest.  You indicated that you would not produce the document but that you would log the document and we could move to compel.  Please let us know when we can expect that supplemental log.

- <u>No. 16</u>:  You agreed to discuss producing responsive documents with your client.

- <u>Nos. 18, 19, 20, 24</u>:  These requests seek documents related to BuyerQuest's financial condition.  We noted that BuyerQuest was seeking similar documents from Tradeshift and asked if we could reach a compromise whereby the parties would exchange similar categories of documents.  You indicated that you would follow up with your client.  You asked us to consider whether Tradeshift could obtain its desired information with alternative discovery mechanisms, such as an interrogatory, or to provide authority supporting this discovery to support a damages theory.  We will get back to you on that issue.

- <u>Subpoena in Smucker matter</u>: You confirmed that the scope of BuyerQuest's production in response to the subpoena in the Smucker action would not exceed the scope of its production in this case.  Accordingly, to the extent we are at an impasse as to the issues in this case, we understand we are at an impasse with respect to the New York matter as well.

Looking forward in the case, we'd like to discuss a few depositions.  Tradeshift plans to notice the following depositions for mid to late January and early February.  We propose the following dates:

- Luke Batman (1/20)
- Jack Mulloy (1/22)
- Kyle Muskoff (1/25)
- Salman Siddiqui (1/27)
- Dan Utyuzh (1/29)
- Tradeshift, Inc., under Rule 30(b)(6) (2/2)

Can you let us know if these dates work for you.  Additionally, please let us know if you will stipulate to the taking of remote depositions in this case as permitted under FRCP 30(b)(4), and if you would be interested in discussing a protocol to guide the conduct of remote depositions in this case.  We would be happy to discuss specific details further.

Thanks,
Jason

# TRADESHIFT
# EXHIBIT C

## Yu, Jason K.

| | |
|---|---|
| **From:** | Anthony Phillips <aphillips@grsm.com> |
| **Sent:** | Thursday, March 4, 2021 2:36 PM |
| **To:** | Yu, Jason K. |
| **Cc:** | Craig Mariam; Eunice Liao; Van Zant, Amy K.; Su, Tammy |
| **Subject:** | RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS |

Jason,

Please add one more deponent to our list and provide available dates:  Christian Laange.

March 9 at 3:00 is confirmed.

Thanks,
Tony

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Wednesday, March 3, 2021 4:37 PM
**To:** Anthony Phillips <aphillips@grsm.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K.
<Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** FW: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Hello Tony,

Thanks for circulating these dates.  Tradeshift accepts the proposed dates below for the BuyerQuest witnesses.

- Luke Batman:     April 16
- Jack Mulloy:      April 20
- Kyle Muskoff:     April 12
- Salman Siddiqui: April 8
- Dan Utyuzh:       April 22

Below are potential deposition dates for the Tradeshift witnesses you've identified:

- Debbie Gillman:        March 30-April 2
- Jeff Larsen:            March 25-26
- Sean Norton:           April 27-30
- Peter van Pruissen:     April 20-23
- Dan Roehrs:            April 13-16
- Himanshu Shah:         April 6-7, 9
- Wendy Sciara:          April 13, 20, 27
- Chris Todd:            March 30-31, April 8-9

Unfortunately, I'm no longer available on March 8 to discuss.  I can be available March 9 after 2pm if that works for you.

Separately, please find attached Tradeshift's third set of document request and interrogatories.

Thanks,
Jason

---

**From:** Anthony Phillips <aphillips@grsm.com>
**Sent:** Tuesday, March 2, 2021 5:29 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Su, Tammy <tsu@orrick.com>; Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>
**Subject:** Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Dear Jason,

As you requested, the BuyerQuest witnesses whose depositions Tradeshift has asked for are available as follows:

- Luke Batman:     March 22-30; April 12-30;
- Jack Mulloy:     April 20; 26; or, 30;
- Kyle Muskoff:    *Unavailable* March 31-April 11.  Otherwise, generally available until April 30;
- Salman Siddiqui: April 5-9;
- Dan Utyuzh:      April 20-30.

As also requested, we can confer further on deposition scheduling on March 8.  Please suggest convenient times.  In the interim, please also provide deposition availability for the following Tradeshift witnesses, which we can discuss at the same time:

- Debbie Gillman;
- Jeff Larsen;
- Sean Norton;
- Peter van Pruissen;
- Dan Roehrs;
- Himanshu Shah;
- Wendy Sciara;
- Chris Todd.

Many thanks,
Tony

**ANTHONY D. PHILLIPS**  |  Partner

**GORDON REES SCULLY MANSUKHANI**
**YOUR 50 STATE PARTNER™**

275 Battery Street, Suite 2000
San Francisco, CA 94111
D: 415-875-3137  |  P: 415-986-5900  |  aphillips@grsm.com

www.grsm.com

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE PARTNER®**
[http://www.grsm.com](http://www.grsm.com)

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at [https://www.orrick.com/Privacy-Policy](https://www.orrick.com/Privacy-Policy) to learn about how we use this information.

# TRADESHIFT
# EXHIBIT D

1  AMY K. VAN ZANT (STATE BAR NO. 197426)
   avanzant@orrick.com
2  JASON K. YU (STATE BAR NO. 274215)
   jasonyu@orrick.com
3  TAMMY SU (STATE BAR NO. 329652)
   tsu@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
5  Menlo Park, CA  94025-1015
   Telephone:    +1 650 614 7400
6  Facsimile:    +1 650 614 7401

7  Attorneys for Plaintiff
   TRADESHIFT, INC.

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12  TRADESHIFT, INC., a Delaware corporation,      Case No. 3:20-cv-1294-RS

13                 Plaintiff,                      **PLAINTIFF TRADESHIFT, INC.'S
                                                   OBJECTIONS TO DEFENDANT
14         v.                                      BUYERQUEST, INC.'S NOTICE OF
                                                   DEPOSITION OF CHRISTIAN LANNG**
15  BUYERQUEST, INC., an Ohio corporation,

16                 Defendant.                      Judge:  Hon. Richard Seeborg

17

18

19

20

21

22

23

24

25

26

27

28

4152-6949-2524

Plaintiff Tradeshift, Inc. ("Tradeshift") hereby provides the following objections and responses to Defendant BuyerQuest, Inc.'s ("BuyerQuest") Notice of Deposition of Christian Lanng Pursuant to Federal Rule of Civil Procedure 30, dated March 16, 2021 (the "Notice").

## OBJECTIONS TO NOTICE OF DEPOSITION

1.      Tradeshift to the date and time of the deposition which BuyerQuest set without conferring with Tradeshift.  Tradeshift does not intend to provide Mr. Lanng for deposition at the stated date or time.

2.      Tradeshift objects to the Notice as seeking information that is not relevant to the claims and defenses at issue in this case and that is not proportional to the needs of the case.

3.       Tradeshift objects to the Notice as overbroad, unduly burdensome, not proportional to the needs of the case, harassing, and as seeking duplicative information because it seeks information from an apex witness.  "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Groupion, LLC v. Groupon, Inc.*, No. 11-0870 MEJ, 2012 WL 359699, at *2 (N.D. Cal. Feb. 2, 2012). Courts will therefore protect high-level corporate officers from depositions when the officer has no first-hand knowledge of the facts of the case or where the officer's testimony would be repetitive.  *In re Transpacific Passenger Air Transportation Antitrust Litig.*, No. C-07-05634 CRB (DMR), 2014 WL 939287, at *2 (N.D. Cal. Mar. 6, 2014).  Courts should also limit these depositions when the party seeking the deposition has not exhausted other less intrusive discovery methods.  *Apple Inc. v. Samsung Elecs. Co.*, Ltd, 282 F.R.D. 259, 263 (N.D. Cal. 2012); *Groupion*, 2012 WL 359699, at *2.  Because Mr. Lanng is a high-level executive and does not possess unique, first-hand knowledge of relevant facts, as discussed above, he should not be compelled to testify.

Dated:  March 23, 2021                    ORRICK, HERRINGTON & SUTCLIFFE LLP


By:     */s/ Jason K. Yu*
        JASON K. YU

        Attorneys for Plaintiff
        TRADESHIFT, INC.

TRADESHIFT'S OBJECTIONS TO NOTICE
OF DEPOSITION OF CHRISTIAN LANNG
CASE NO. 3:20-cv-1294-RS

4152-6949-2524

## PROOF OF SERVICE

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action.  My place of business is Orrick, Herrington & Sutcliffe, LLP, 1000 Marsh Road, Menlo Park, CA 94025.  On March 23, 2021, I served the within document(s):

**PLAINTIFF TRADESHIFT, INC.'S OBJECTIONS TO DEFENDANT BUYERQUEST, INC.'S NOTICE OF DEPOSITION OF CHRISTIAN LANNG**

| X | By transmitting a courtesy copy **via electronic mail** the document(s) listed above to the email addresses set forth below on March 23, 2021. |
|---|---|

Anthony Phillips
Craig Mariam
Eunice Liao
Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Ste. 2000
San Francisco, CA 94111
aphillips@grsm.com
cmariam@grsm.com
eliao@grsm.com
**ATTORNEYS FOR DEFENDANT BUYERQUEST, INC.**

Executed on March 23, 2021 at Fremont, California.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*/s/ Sema Virrueta*
Sema Virrueta

# TRADESHIFT
# EXHIBIT E

**Yu, Jason K.**

| | |
|---|---|
| **From:** | Yu, Jason K. |
| **Sent:** | Tuesday, March 16, 2021 7:06 AM |
| **To:** | 'Anthony Phillips' |
| **Cc:** | Craig Mariam; Eunice Liao; Van Zant, Amy K.; Su, Tammy; Joshua Bradus |
| **Subject:** | RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS |

Hello Tony,

I have a couple of updates regarding depositions.

Unfortunately, Mr. Van Pruissen's availability has changed and he is no longer available on April 23. Mr. Rahill, however, can be available that day and can take his place. Mr. Van Pruissen can be available on April 30 if that works for you.

With respect to Mr. Lanng, we disagree with BuyerQuest's position. Mr. Lanng is clearly differently situated from BuyerQuest's CEO and CFO, Mr. Mulloy and Mr. Batman. Mr. Mulloy had dozens of one-on-one conversations, meetings, texts, and phone calls with Smucker that Tradeshift contends directly interfered with the Smucker Services Agreements. Those communications are documented in detail in Tradeshift's interrogatory responses, and are at the heart of this case. Mr. Batman (CFO) was also heavily involved in the contracting and management of the project and regularly appears on communication and meetings. Indeed, on our recent call regarding depositions, you indicated that Mr. Mulloy and Mr. Batman between themselves would likely cover most of the topics that Tradeshift has propounded for BuyerQuest's corporate depositions. Mr. Lanng, in contrast, was not involved in the project except for, perhaps, a single phone call that you still have not explained.

We are also open to continued conferral on this issue, but would again ask that you explain what non-duplicative relevant information that Mr. Lanng possesses. We disagree that BuyerQuest need not "preview" at least this information so that we can have a meaningful discussion.

Thanks,
Jason

---

**From:** Anthony Phillips <aphillips@grsm.com>
**Sent:** Monday, March 15, 2021 4:41 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Joshua Bradus <jbradus@grsm.com>
**Subject:** RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Dear Jason,

Tradeshift's position respecting Mr. Lanng's deposition is an unfortunate departure from the parties' recent cooperation in discovery. Mr. Lanng has personal knowledge of significant events relevant to this litigation and Tradeshift has cited no harm that the deposition poses – a deposition in a lawsuit Tradeshift itself filed. BuyerQuest is under no obligation to preview deposition topics for approval nor to seek the information Mr. Lanng indisputably has from non-parties. The "apex witness" doctrine does not preclude Mr. Lanng's deposition.

Notably, Tradeshift set the deposition of BuyerQuest's CEO and CFO and has sought discovery of its CEO's personal email records via three different discovery devices. We expect the Court will agree that all apex witnesses with personal knowledge in the case should be treated alike.

As we appear headed for a dispute, we will notice Mr. Lanng's deposition and Tradeshift can formalize its objections accordingly. In the meantime, we remain open to conferral about timing should Tradeshift reconsider its position and remain hopeful that it will.

Many thanks,
Tony

**ANTHONY D. PHILLIPS** | Partner

**GORDON REES SCULLY MANSUKHANI**
**YOUR 50 STATE PARTNER™**

275 Battery Street, Suite 2000
San Francisco, CA 94111
D: 415-875-3137 | P: 415-986-5900 | aphillips@grsm.com

www.grsm.com

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Friday, March 12, 2021 8:57 AM
**To:** Anthony Phillips <aphillips@grsm.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Joshua Bradus <jbradus@grsm.com>
**Subject:** RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Hello Tony,

Thanks for the response. I'm still working on dates for Mr. Rahill.

With respect to Mr. Lanng, we disagree this is a sufficient basis for Mr. Lanng's deposition. Any information Mr. Lanng has about the "joint" presentation is, by definition, duplicative information that can be obtained from other witnesses (including BuyerQuest's own employees) and does not justify an apex deposition. The conversations you mention in Q4 2019 also seem to constitute duplicative information that can be obtained elsewhere (e.g., from Smucker), but we'll need more information. Please let us know who why you believe these conversations would be relevant and non-duplicative.

Thanks,
Jason

---

**From:** Anthony Phillips <aphillips@grsm.com>
**Sent:** Thursday, March 11, 2021 10:56 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Joshua Bradus <jbradus@grsm.com>
**Subject:** RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Dear Jason,

Thank you for confirming those dates, we will issue Notices shortly.  Let us know about Mr. Rahill.

As for Mr. Lanng, we are confident he possesses firsthand discoverable information to which BuyerQuest is entitled and entitled to explore by deposition.  For example, Mr. Lanng made a joint presentation with BuyerQuest to Smucker in May 2019 that was critical to securing the contract with Smucker.  He also spoke directly with Smucker's senior management in Q4 2019 at which time Smucker raised concerns about Tradeshift's performance and stability.

Please consider your position and advise whether or not Tradeshift will produce Mr. Lanng for his deposition.

Thanks again,
Tony

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Wednesday, March 10, 2021 3:43 PM
**To:** Anthony Phillips <aphillips@grsm.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Thanks, Tony.  We will reserve these dates for those witnesses.  I'm looking into dates for Mr. Rahill.

Tradeshift objects to the deposition of Christian Lanng.  Mr. Lanng is the CEO of Tradeshift and was not personally involved in the contracting for or implementation of the Smucker project.  Requests for the deposition of such high-level executives "create[] tremendous potential for abuse or harassment," and courts limit discovery where the discovery sought "can be obtained from some other source that is more convenient, less burdensome, or less expensive."  *Apple Inc. v. Samsung Elecs. Co.*, Ltd, 282 F.R.D. 259, 262–63 (N.D. Cal. 2012).  To the extent BuyerQuest contends that Mr. Lanng has non-repetitive first-hand knowledge that cannot be obtained by other, less intrusive discovery means (e.g., by written deposition questions or interrogatories), please let us know what information that knowledge pertains to and Tradeshift will consider.

Thanks,
Jason

---

**From:** Anthony Phillips <aphillips@grsm.com>
**Sent:** Tuesday, March 9, 2021 4:33 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** RE: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Dear Jason,

Thank you for your time on the phone this afternoon.  As discussed, we accept the following proposed dates for depositions of Tradeshift witnesses:

- Jeff Larsen.            March 26.
- Debbie Gillman.        March 30.

- Himanshu Shah.           April 6.
- Dan Roehrs.              April 14.
- Peter van Pruissen.      April 23.
- Wendy Sciara.            April 27.
- Sean Norton.             April 29.

Please also advise of Tradeshift's position on producing Christian Laange.  Also, please provide dates for Jim Rahill instead of Chris Todd.

Thanks again,
Tony

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Wednesday, March 3, 2021 4:37 PM
**To:** Anthony Phillips <aphillips@grsm.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Eunice Liao <eliao@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** FW: Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Hello Tony,

Thanks for circulating these dates.  Tradeshift accepts the proposed dates below for the BuyerQuest witnesses.

- Luke Batman:    April 16
- Jack Mulloy:     April 20
- Kyle Muskoff:    April 12
- Salman Siddiqui: April 8
- Dan Utyuzh:      April 22

Below are potential deposition dates for the Tradeshift witnesses you've identified:

- Debbie Gillman:       March 30-April 2
- Jeff Larsen:          March 25-26
- Sean Norton:          April 27-30
- Peter van Pruissen:   April 20-23
- Dan Roehrs:           April 13-16
- Himanshu Shah:        April 6-7, 9
- Wendy Sciara:         April 13, 20, 27
- Chris Todd:           March 30-31, April 8-9

Unfortunately, I'm no longer available on March 8 to discuss.  I can be available March 9 after 2pm if that works for you.

Separately, please find attached Tradeshift's third set of document request and interrogatories.

Thanks,
Jason

4

**From:** Anthony Phillips <aphillips@grsm.com>
**Sent:** Tuesday, March 2, 2021 5:29 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Su, Tammy <tsu@orrick.com>; Craig Mariam <cmariam@grsm.com>; Eunice Liao
<eliao@grsm.com>
**Subject:** Tradeshift v. BuyerQuest, No. 20-cv-01294-RS

Dear Jason,

As you requested, the BuyerQuest witnesses whose depositions Tradeshift has asked for are
available as follows:

- Luke Batman:    March 22-30; April 12-30;
- Jack Mulloy:    April 20; 26; or, 30;
- Kyle Muskoff:   *Unavailable* March 31-April 11.  Otherwise, generally available until April
  30;
- Salman Siddiqui: April 5-9;
- Dan Utyuzh:     April 20-30.

As also requested, we can confer further on deposition scheduling on March 8.  Please suggest
convenient times.  In the interim, please also provide deposition availability for the following
Tradeshift witnesses, which we can discuss at the same time:

- Debbie Gillman;
- Jeff Larsen;
- Sean Norton;
- Peter van Pruissen;
- Dan Roehrs;
- Himanshu Shah;
- Wendy Sciara;
- Chris Todd.

Many thanks,
Tony

**ANTHONY D. PHILLIPS**  |  Partner

**GORDON REES SCULLY MANSUKHANI**
**YOUR 50 STATE PARTNER™**

275 Battery Street, Suite 2000
San Francisco, CA 94111
D: 415-875-3137  |  P: 415-986-5900  |  aphillips@grsm.com

www.grsm.com

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE PARTNER®**
**http://www.grsm.com**

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit http://www.orrick.com.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by

return e-mail and please delete
this message from your
system. Thank you in advance
for your cooperation.

For more information about
Orrick, please visit
*http://www.orrick.com*.

In the course of our business
relationship, we may collect,
store and transfer information
about you. Please see our
privacy policy at
https://www.orrick.com/Privacy-
Policy to learn about how we
use this information.

**NOTICE TO RECIPIENT** | This
e-mail is meant for only the
intended recipient of the
transmission, and may be a
communication privileged by
law. If you received this e-mail
in error, any review, use,
dissemination, distribution, or
copying of this e-mail is strictly
prohibited. Please notify us
immediately of the error by
return e-mail and please delete
this message from your
system. Thank you in advance
for your cooperation.

For more information about
Orrick, please visit
*http://www.orrick.com*.

In the course of our business
relationship, we may collect,
store and transfer information
about you. Please see our
privacy policy at
https://www.orrick.com/Privacy-
Policy to learn about how we
use this information.

# TRADESHIFT
# EXHIBIT F



March 29, 2021

**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400
**orrick.com**

*Via E-Mail*

Anthony D. Phillips
GORDON REES SCULLY MANSUKHANI, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**Jason K. Yu**

E  jasonyu@orrick.com
D  +1 650 614 7363
F  +1 650 614 7401

Re:     *Tradeshift v. BuyerQuest*: Meet and Confer re Lanng Deposition

Dear Tony:

I am writing regarding BuyerQuest's March 16, 2021 Notice of Deposition of Tradeshift's CEO Christian Lanng and Tradeshift's March 23 objections thereto based on the Apex Doctrine.

Tradeshift objects to BuyerQuest's last-minute request to depose Mr. Lanng, which appears to be motivated purely by a desire to harass Tradeshift and a high-ranking officer.  As discussed below, to date, BuyerQuest has not identified any specific instances of non-duplicative personal knowledge that Mr. Lanng possesses and that would warrant his deposition in this case.

"Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Groupion, LLC v. Groupon, Inc.*, No. 11-0870 MEJ, 2012 WL 359699, at *2 (N.D. Cal. Feb. 2, 2012).  Courts will therefore protect high-level corporate officers from depositions when the officer has no first-hand knowledge of the facts of the case or where the officer's testimony would be repetitive.  *In re Transpacific Passenger Air Transportation Antitrust Litig.*, No. C-07-05634 CRB (DMR), 2014 WL 939287, at *2 (N.D. Cal. Mar. 6, 2014).  Courts should also limit these depositions when the party seeking the deposition has not exhausted other less intrusive discovery methods.  *Apple Inc. v. Samsung Elecs. Co.*, Ltd, 282 F.R.D. 259, 263 (N.D. Cal. 2012); *Groupion*, 2012 WL 359699, at *2.  In general, litigants should establish a special need before seeking the deposition of a high-level corporate employee.  *Rembrandt Diagnostics, LP v. Innovacon, Inc.*, No. 16-cv-0698 CAB, 2018 WL 692259, at *6–7 (S.D. Cal. Feb. 2, 2018).

Here, BuyerQuest has not established a special need or attempted to use other less-intrusive discovery, including by first taking the depositions of lower-level employees.  When considering the deposition of apex witnesses, courts limit depositions "where the information sought can be obtained through less intrusive discovery methods, such as by interrogatory or depositions of lower-level employees with more direct knowledge of the facts at issue." *Anderson v. Cty. of Contra Costa*, No. 15-CV-01673-RS (MEJ), 2017 WL 930315, at *3 (N.D. Cal. Mar. 9, 2017).  Courts regularly require the party seeking the deposition to prove that the deponent has unique personal knowledge and that it has exhausted all less intrusive discovery methods. *Id*.;  *See In re TFT-LCD (Flat Panel)*



Anthony D. Phillips
March 29, 2021
Page 2

*Antitrust Litig.*, 2011 WL 10967617, at *1 (N.D. Cal. Aug. 1, 2011) ("[C]ourts have required that the party seeking to depose an apex executive demonstrate that he possesses some 'unique personal knowledge' about the case."); *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *4 (N.D. Cal. Jan. 25, 2007) (declining to order depositions of apex employees where party seeking deposition failed to show deponents possessed unique personal knowledge).

Mr. Lanng is the CEO of Tradeshift. There is no dispute that the apex doctrine applies to him.

BuyerQuest cannot establish that Mr. Lanng has unique, non-duplicative relevant information that cannot be obtained from lower-level employee witnesses or other less intrusive sources. Mr. Lanng was not directly involved in the contracting with Smucker or the direct contracting with BuyerQuest. Mr. Lanng also was not directly involved in the implementation of the Smucker Project.

BuyerQuest has argued the deposition of Tradeshift's CEO is necessary because "Mr. Lanng made a joint presentation with BuyerQuest to Smucker in May 2019 that was critical to securing the contract with Smucker." 3/11/2021 A. Phillips email. Nothing in this argument suggests a unique need for Mr. Laang's testimony. First, BuyerQuest's own employees were at the May 2019 meeting *and jointly made the presentation with Tradeshift*. Thus, BuyerQuest already knows what happened at that meeting and does not require testimony from any Tradeshift employee, much less its CEO, to secure that information. Second, to the extent BuyerQuest wants to ask a Tradeshift witness about this meeting, it can ask Jim Rahill. He also attended the meeting and is scheduled to appear for deposition on April 23. Third, even if Mr. Rahill were not available, BuyerQuest could seek the information through less intrusive means, including through an interrogatory response, written deposition questions, or a corporate deposition topic under Rule 30(b)(6). Indeed, Tradeshift has already agreed to provide a corporate witness to testify regarding Tradeshift's pre-implementation communications with Smucker, which would include the meeting you mention.

BuyerQuest also contends that Mr. Lanng's deposition is relevant and necessary because he "spoke directly with Smucker's Senior management in Q4 2019 at which time Smucker raised concerns about Tradeshift's performance and stability." *Id.* The mere fact that Mr. Lanng spoke to Smucker one time, however, does not make his testimony relevant or necessary. By BuyerQuest's account, Mr. Lanng spoke with "Smucker," meaning that whoever he spoke to from Smucker is an alternative witness. And, because BuyerQuest and Smucker have a joint-defense agreement, BuyerQuest likely can obtain this information directly from Smucker without the need for a deposition at all. *See* 2/13/2021 BuyerQuest Privilege Log at Line 16 (citing joint defense agreement). And, again, BuyerQuest can also seek this information through an interrogatory response or testimony from a corporate witness under Rule 30(b)(6).



Anthony D. Phillips
March 29, 2021
Page 3

Most recently, you have also argued that Mr. Lanng has personal knowledge regarding "representations he personally made to induce Smucker to contract with Tradeshift and later representations he again personally made in an effort to reassure Smucker about continuing to do business with Tradeshift." 3/26/2021 A. Phillips email. It appears, however, that you are simply recharacterizing the same events that you described in our March 11 email exchange and that have already been addressed here (*i.e.,* the May 2019 meeting between Smucker, Tradeshift, and BuyerQuest, and the single phone call with Smucker in Q4 2019). To the extent you are referring to different facts or events, please specify, along with explaining why written or documentary discovery or the deposition of another witness would not suffice.

You have tried to sidestep the lack of Mr. Lanng's unique information by citing to *Kennedy v. Jackson Nat. Life Ins. Co.*, 2010 WL 1644944, at *2 (N.D. Cal. Apr. 22, 2010). But in *Kennedy*, the apex witness had more intimate and personal knowledge of the relevant facts than other witnesses who deferred to the apex witness for information. *Id.* The court in *Kennedy* still acknowledged the rule that an apex deposition is improper where lower-level employees with the same or similar facts have not been first deposed. *Id.* ("Courts will usually not permit an apex deposition to go forward where lower level employees with more intimate knowledge of the case have not yet been deposed."). Indeed, in *Kennedy*, the Court allowed the deposition only because a lower-level witness had already been deposed and deferred to the CEO as the "the main decision-maker" regarding the relevant issues. *Id.* Here, in contrast, Mr. Lanng was only (at best) tangentially involved in securing the Smucker Agreement and had almost no involvement in the Smucker Project whatsoever.

Finally, your attempt to draw comparisons between BuyerQuest's CEO (Mr. Mulloy) and Tradeshift's CEO (Mr. Lanng) are revealing yet unavailing. Unlike Mr. Lanng, who was not making decisions, directing conduct, or communicating regularly regarding the issues in this case, Mr. Mulloy was intimately involved with the communications and decisions at the heart of this case, *i.e.*, BuyerQuest's interference with Tradeshift's contract with Smucker. In fact, Mr. Mulloy conceived of and executed Project Fyrefest, his scheme to cajole Smucker into firing Tradeshift and securing the Smucker Project for BuyerQuest. That is likely why you have indicated that Mr. Mulloy will be the corporate designee for a number of the 30(b)(6) topics that Tradeshift has propounded. Because of his extensive involvement in the misconduct that led to Smucker claiming to "void" the Smucker Service Agreement, Mr. Mulloy is almost certainly the single most pertinent witness in this case. For example:

- Mr. Mulloy conceived of, directed, and implemented the Operation Fyrefest plan.

- On September 26, 2019, Mr. Mulloy emailed his BuyerQuest employees instructing that they "need to be ready to pivot away from [Tradeshift]" and "be prepared to execute 'Operation Fyrefest' . . . ." (BQ043884). He said BuyerQuest should "discuss and agree



Anthony D. Phillips
March 29, 2021
Page 4

to . . . [Tradeshift's] inability to execute, [Tradeshift's] unwillingness to enable suppliers, [Tradeshift's] unwillingness to pay their bills or communicate properly with BQ, etc." and "Potential communication plans between BQ/Smucker's."

- On October 21, 2019, Mr. Mulloy communicated with Jason Barr from Smucker regarding Tradeshift in an "off the record" conversation.  Mr. Mulloy reported to his team that he made Mr. Barr aware of his "skepticism" around Tradeshift and that Mr. Barr himself was "on board" with Mulloy's Operation Fyrefest scheme.  Tradeshift has propounded interrogatories specifically asking for the content of this discussion and, to date, BuyerQuest has refused to provide any *specific* information about what was discussed during that call.  *See* 3/26/2021 BuyerQuest Second Supp. Resp. to Tradeshift First Set of Interrogatories at No. 4.

- On November 20, 2019, Mr. Mulloy communicated directly and privately with Jason Barr from Smucker regarding Tradeshift and the Smucker Project.  Tradeshift has propounded interrogatories specifically asking for the content of this discussion and, to date, BuyerQuest has refused to provide any *specific* information about what was discussed during that call.  *See* 3/26/2021 BuyerQuest Second Supp. Resp. to Tradeshift First Set of Interrogatories at No. 4.

- On December 5, 2019, Mr. Mulloy and Salman Siddiqui met with Dan Nowicki and others at Smucker, and Mr. Siddiqui indicated that Mr. Mulloy ran the meeting and mostly "oversold and just bitched about Tradeshift."  (BQ109258).  Tradeshift has propounded interrogatories specifically asking for the content of this discussion and, to date, BuyerQuest refused to provide any information about what was discussed during that call.  *See* 3/26/2021 BuyerQuest Second Supp. Resp. to Tradeshift First Set of Interrogatories at No. 4.

- On December 13, 2019, Mr. Mulloy communicated directly and privately with one of BuyerQuest's board members, Clark Khayat (BQ091161).  He indicated that he had been personally communicating directly with Smucker and that, as a result, "Smucker's is very concerned about Tradeshift's ability to execute."  *Id.*

- On December 19, 2019, Mr. Mulloy communicated directly and privately with Jason Barr from Smucker.  Tradeshift has propounded interrogatories specifically asking for the content of this discussion and, to date, BuyerQuest has refused to provide any *specific* information about what was discussed during that call.  *See* 3/26/2021 BuyerQuest Second Supp. Resp. to Tradeshift First Set of Interrogatories at No. 4.



Anthony D. Phillips
March 29, 2021
Page 5

- On December 20, 2019, Mr. Mulloy communicated directly and privately with Jason Barr and Mike Sterle from Smucker regarding Tradeshift and the Smucker Project.  Tradeshift has propounded interrogatories specifically asking for the content of this discussion and, to date, BuyerQuest has refused to provide any ***specific*** information about what was discussed during that call.  *See* 3/26/2021 BuyerQuest Second Supp. Resp. to Tradeshift First Set of Interrogatories at No. 4.

- Mr. Mulloy regularly communicated directly with Jason Barr via text message and private email.  *See e.g.*, BQ103100, BQ103101, BQ103102, BQ103103, BQ103104, BQ103105.

There is no BuyerQuest employee who can substitute for Mr. Mulloy's testimony on the aforementioned topics.  Accordingly, BuyerQuest's contention that he is on equal footing with Mr. Lanng, who had almost no involvement in the relevant facts, is completely off base.

We are willing to meet and confer further this week should BuyerQuest wish to continue pursuing this harassing deposition.


Sincerely,

/s/ *Jason K. Yu*

Jason K. Yu


cc:    Craig J. Mariam
       Eunice Liao

# TRADESHIFT
# EXHIBIT G

## Yu, Jason K.

| | |
|---|---|
| **From:** | Anthony Phillips <aphillips@grsm.com> |
| **Sent:** | Wednesday, March 31, 2021 3:30 PM |
| **To:** | Yu, Jason K. |
| **Cc:** | Craig Mariam; Joshua Bradus; Van Zant, Amy K.; Su, Tammy |
| **Subject:** | RE: Tradeshift, Inc. v. BuyerQuest, Inc., March 30 Meet & Confer |

Dear Jason,

Please suggest days and time next week to confer about Topic No. 13 of Tradeshift's Rule 30(b)(6) notice.  I am not available the rest of this week.  As you know, BuyerQuest has objected to this topic and will not designate a witness to testify about it.  Nevertheless, when we confer, please be prepared to explain why this topic is not precluded by the Court's discovery order holding that "the CONTINUED SMUCKER PROJECT" is not relevant to this litigation and what cognizable damages theory would entitle Tradeshift to recover based on "profit projections".

Your recollection of our conversation yesterday is, to put it mildly, revisionist:

- The issue of Mr. Lanng's deposition is ripe for motion practice because we both expressly agreed that it is and went on to discuss how to proceed with motion practice.  Your attempt to now renege and stall is unavailing.  We offered to notice Mr. Lanng's deposition later in the calendar and cancel if it truly appeared redundant – not "to wait until…the scheduled depositions of lower level employees before determining whether Mr. Lanng's deposition was necessary."  We also noted that Mr. Lanng appears on over thirty documents produced in discovery and was directly involved in decisions about whether and when to pay BuyerQuest, in addition to the direct and unique conversations he had with decision-makers at Smucker.  The authority you cite supports our position – a party cannot resist producing witnesses with direct firsthand knowledge of relevant events, no matter how vaunted their position.  You will have our letter brief on this issue directly.

- You misunderstand our position on Topic 8 of BuyerQuest's Rule 30(b)(6) notice.  The Glassdoor website contains dozens of negative reviews of Tradeshift commenting on a wide variety of topics during the time period relevant to this case.  In some instances, it appears Tradeshift's management responded to them.  To the extent Tradeshift reviewed, investigated, or responded to any Glassdoor (or other social media) postings about it, we expect Tradeshift to designate and produce a witness about those endeavors.  The content of the postings pertain directly to the true state of affairs at Tradeshift, including the basis for statements made about Tradeshift that it now claims were false or disparaging, and the real reasons why Smucker ceased doing business with it.  Please advise whether Tradeshift will produce witnesses on this Topic and our Topic No. 7 as soon as possible.

- Noncompliance with your unilaterally-proclaimed deadlines is not "gamesmanship".  We agreed to confirm BuyerQuest's 30(b)(6) designees sufficiently in advance of their depositions and will do so.

- Tradeshift's refusal to take "yes" for an answer and its determination to have motion practice respecting Mr. Mulloy's gmail account is disappointing.  What you expect the Court to order that will go beyond what BuyerQuest has offered is baffling.  We are indeed at an impasse and await your letter brief.  For clarity in the meantime, I did not confirm "that the document does not exist in Mr. Mulloy's email account."  I confirmed that our search of Mr. Mulloy's gmail account produced a single responsive document, which we produced.  We can confirm nothing about a document Tradeshift has refused to share.

We remain open to informal good faith resolution of discovery disputes where possible and to prompt presentation of genuine disputes for resolution by the Court.  It is unfortunate that Tradeshift has made an apparent tactical decision to depart from this approach.

With best regards,
Tony

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Tuesday, March 30, 2021 7:21 PM
**To:** Anthony Phillips <aphillips@grsm.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Joshua Bradus <jbradus@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** FW: Tradeshift, Inc. v. BuyerQuest, Inc., March 30 Meet & Confer

Thanks, Tony.  I have provided some responses in-line below.

Please also confirm that BuyerQuest will produce the documents responsive to Request No. 15 by COB Friday.  Those documents are likely to bear on our deposition of Mr. Siddiqui, which is scheduled for next Thursday.  Tradeshift reserves its rights with respect to the delayed production of these documents.

Additionally, we would like to meet and confer regarding certain Topic No. 13 of Tradeshift's Notice of Deposition of BuyerQuest under Rule 30(b)(6).  That topics asks BuyerQuest to provide a witness to testify about BuyerQuest's profit projections for its work on the SMUCKER PROJECT and for its work on the CONTINUED SMUCKER PROJECT.  This topic pertains to information directly relevant to Tradeshift's damages claims, including for the profits that BuyerQuest improperly obtained by interfering with the Smucker-Tradeshift contract in order to obtain the Smucker-BuyerQuest contract.  Please confirm that you will provide a witness on this topic or provide a time you are available this week to discuss.

Thanks,

Jason

---

**From:** Anthony Phillips <aphillips@grsm.com>
**Sent:** Tuesday, March 30, 2021 3:15 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Joshua Bradus <jbradus@grsm.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** RE: Tradeshift, Inc. v. BuyerQuest, Inc., March 30 Meet & Confer

Dear Jason,

Thank you (and Tammy) for your time on the phone this afternoon.  To summarize the outcome of our discussion:

- The parties have reached an impasse as to the deposition of Tradeshift's Mr. Lanng.  We will prepare our portion of a Motion to Compel letter brief and circulate.

    o **[Tradeshift]**  We don't believe this issue is ripe for motion practice.  During the call, you indicated that BuyerQuest would be willing to wait until it took the scheduled depositions of lower-level employees before determining whether Mr. Lanng's deposition was necessary.  This would be the appropriate course of action the court will likely require BuyerQuest to exhaust other such depositions before seeking the deposition of an apex witness like Mr. Lanng.  *See e.g.*, *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, No. C 03-

5340 JF (RS), 2006 WL 2578277, at *3 (N.D. Cal. Sept. 6, 2006), objections overruled, No. C 03-5340-JF (RS), 2006 WL 3050866 (N.D. Cal. Oct. 23, 2006) ("Courts generally refuse to allow the immediate deposition of a high level executive . . . before the testimony of lower level employees with more intimate knowledge of the case has been secured."); *In re Glumetza Antitrust Litig.*, No. 19CV05822WHARMI, 2020 WL 3498067, at *9 (N.D. Cal. June 29, 2020), motion for relief from judgment denied, No. C 19-05822 WHA, 2020 WL 4362247 (N.D. Cal. July 22, 2020) ("Accordingly, courts will regularly require interrogatories, requests for admission, and depositions of lower level employees before allowing the deposition of an apex witness."). Accordingly, we propose that BuyerQuest complete the other depositions that have been scheduled in this case before moving to compel and, should BuyerQuest still believe it needs to file such a motion, Tradeshift will agree not to oppose that motion on grounds that Mr. Lanng's deposition would be untimely.

Separately, we appear to disagree as to the burden associated with seeking an apex deposition. We agree that the party seeking to preclude or limit the deposition has the burden to demonstrate that the witness is, in fact, an apex witness. *See Apple Inc. v. Samsung Elecs. Co.*, Ltd, 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("It is thus Samsung's burden to demonstrate that each "apex" witness is so entitled to that designation"). Here, however, Mr. Lanng is the CEO of Tradeshift and that issue is not in dispute. *See Id.* ("On the proverbial sliding scale, the closer that a proposed witness is to the apex of some particular peak in the corporate mountain range, and the less directly relevant that person is to the evidence proffered in support of his deposition, the more appropriate the protections of the apex doctrine become."). Accordingly, it becomes BuyerQuest's obligation to proffer evidence suggesting that the witness has unique or non-duplicative personal knowledge. *See e.g. id.* at 266 ("With respect to this lawsuit, Shin inhabits a key, high-level position for which [the party seeking the deposition]'s showing of unique knowledge and exhaustion of other means of obtaining discovery is insufficient . . . the evidence cited by [the moving party] does not demonstrate a personal role or strategic design decision that Shin orchestrated or even approved.") (emphasis added); *Affinity Labs of Texas v. Apple, Inc.*, No. C 09-4436 CW JL, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011) ("parties seeking to depose a high ranking corporate officer must first establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts at issue in the case . . . .").

With respect to the two meetings/interactions you've identified (the May 2019 meeting with BuyerQuest and Smucker and the Q4 2021 phone call with Smucker), I noted that we disagreed these warranted a full deposition of Mr. Lanng for the reasons stated in my March 29 Letter. I asked whether BuyerQuest would consider less-intrusive means of discovery into those issues including, for example, written deposition questions or a 30(b)(6) witness deposition. You disagreed. I asked whether BuyerQuest would consider a deposition of Mr. Lanng that was limited to the two specific topics you've identified and limited in time. You disagreed. We disagree the deposition is warranted at all but, at a minimum, the deposition should be limited in time and to the specific topics that would warrant the apex deposition. Indeed, even when courts do grant apex depositions, to prevent unnecessary harassment and abuse, they generally limit the depositions in time and/or scope to the proffered topics. *See e.g., Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, No. C 03-5340 JF (RS), 2006 WL 2578277, at *3 (N.D. Cal. Sept. 6, 2006) ("The deposition, however, shall be limited in scope to Page's knowledge of and involvement in the policy change and shall be limited to three hours"); *Finisar Corp. v. Nistica, Inc.*, No. 13-CV-03345-BLF(JSC), 2015 WL 3988132, at *4 (N.D. Cal. June 30, 2015) ("[T]he Court ORDERS that Mr. Gerter's deposition shall be limited to two hours, which is sufficient time for Nistica to cover the distinct issues identified in the joint letter brief."); *Hunt v. Cont'l Cas. Co.*, No. 13-CV-05966-HSG, 2015 WL 1518067, at *3 (N.D. Cal. Apr. 3, 2015) ("[T]he Court ORDERS that Mr.

Motamed's deposition shall be limited to three hours, which should be ample time for Plaintiff's counsel to cover the targeted issues identified in Plaintiff's filings.")

To the extent BuyerQuest is seeking to compel Mr. Lanng's deposition as to other issues, we disagree that BuyerQuest has adequately met and conferred about those reasons. I asked whether BuyerQuest was relying on any other specific instances of non-duplicative personal knowledge that Mr. Lanng possess, but you did not identify any specific instances. If there are any other such instances, we would be happy to discuss them.

- You confirmed that Tradeshift does not plan to assert "apex witness" objections to any of the other depositions we have noticed

  - **[Tradeshift]** As I noted on the call, we're not asserting any such objection to any witnesses that we've agreed to produce.

- You will confirm whether or not Tradeshift will designate a 30(b)(6) witness on our topics 7 (financial condition) and 8 (Glassdoor reviews).

  - **[Tradeshift]** I said I would get back to you on these. I believe I understand BuyerQuest's position on Topic 7. I would appreciate some additional clarification regarding Topic 8. I understand BuyerQuest's position on Topic No. 8 to be that certain Glassdoor reviews that Mr. Mulloy sent to Smucker contained responses from persons at Tradeshift regarding Tradeshift's financial condition, and BuyerQuest would like a witnesses to testify about those company responses to the Glassdoor comments. BuyerQuest contends that, because the responses bear on the financial condition of Tradeshift they are relevant to an allegation that Mr. Mulloy disparaged Tradeshift's finances. Is that correct? Can you identify the specific comments and responses that you are referring to?

- We will confirm BuyerQuest's 30(b)(6) designees as soon as we receive confirmation from the client. In the interim, we do not anticipate designating Mr. Siddiqui (whose deposition is scheduled for next week) on any of the topics.

  - **[Tradeshift]** We had an agreement to exchange this information last week. We provided our information and BuyerQuest did not. And, notwithstanding my email over the weekend and yesterday, we are still waiting on this information. We object to this type of gamesmanship and ask that you provide this information by COB tomorrow.

- With respect to Jack Mulloy's gmail account, we searched that account for correspondence with Mr. Barr in February and produced the single email returned by that search. No documents returned in that search were withheld. If you have reason to believe additional searches would return additional documents, we are willing to perform a follow-up search. We will also confirm whether Mr. Mulloy used his LinkedIn account to communicate with Mr. Barr. We will then amend and verify our responses to Tradeshift's RFPs to reflect the search undertaken, including a representation as to whether any responsive documents may have been deleted. We are willing to consider whether a Declaration from Mr. Mulloy on this topic would also be agreeable. In consideration for the foregoing, we expect Tradeshift to agree its demands for documents from Mr. Mulloy's gmail account have been satisfied and to the withdrawal of its subpoenas to Google and Mr. Mulloy in his personal capacity. Otherwise, we appear to be at an impasse on this issue.

  - **[Tradeshift]** We appreciate you investigating whether Mr. Mulloy has any responsive Linkedin messages. As I mentioned on our call, Mr. Barr's attorney indicated that Mr. Barr and Mr. Mulloy communicated this way.

We've already confirmed that your production is missing at least one communication between Mr. Mulloy and Mr. Barr because Smucker has produced evidence of that communication. Smucker still has not agreed to produce the document in this case yet, but the fact that it was sent from Mr. Mulloy to Mr. Barr should have been enough to locate it with any reasonable or diligent search. It sounds like you are confirming that the document does not exist in Mr. Mulloy's email account. Please let me know if that is not correct. If you locate any additional responsive documents, we ask that you notify us promptly.

During the call, I asked whether BuyerQuest's searches involved actually collecting and searching Mr. Mulloy's email account. You confirmed that BuyerQuest had not done that, and neither BuyerQuest nor Mr. Mulloy would agree to do so in response to Tradeshift's document requests or subpoena. I also asked whether you were simply relying on Mr. Mulloy to forward you emails that he deemed responsive. You refused to confirm one way or another. You also noted that, while you would agree to provide the discovery responses you describe above: (1) BuyerQuest/Mulloy would not agree that the follow-up search would involve electronically collecting and searching the emails and (2) Mr. Mulloy would not agree to drop his objections to the Google Subpoena.

I believe we are at an impasse on this issue. Based on our discussions, it's my understanding that BuyerQuest's proposed follow-up search and verified discovery responses would not involve collecting and reviewing Mr. Mulloy's emails and, instead, would only involve (again) asking Mr. Mulloy to forward along responsive documents. Because it appears that Mr. Mulloy has already withheld or deleted a responsive email, we don't think this is sufficient. Moreover, the Google subpoena—which does not ask for substantive documents—is important to show documents that Mr. Mulloy has recently deleted. Accordingly, we intend do move forward with a motion to compel. We will prepare our portion of the brief and circulate it shortly.

Thanks again,
Tony

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Monday, March 29, 2021 8:03 PM
**To:** Anthony Phillips <aphillips@grsm.com>
**Cc:** Craig Mariam <cmariam@grsm.com>; Joshua Bradus <jbradus@grsm.com>; Van Zant, Amy K. <AVanzant@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** FW: Tradeshift, Inc. v. BuyerQuest, Inc., March 30 Meet & Confer

Hello Tony,

Thanks for circulating this agenda. Here are some responses in anticipation of our call.

- With respect to Mr. Lanng's deposition, please find attached a conferral letter on the issue. I don't think the dispute is ripe yet, but we are happy to discuss any thoughts BuyerQuest has on the issues in this letter including (1) what additional events, if any, BuyerQuest believes Mr. Lanng was involved in other than the one group meeting in May and the one phone call in Q4 2019 and (2) whether BuyerQuest will wait until the parties have exhausted other less intrusive means of discovery before determining whether Mr. Lanng's deposition is necessary.

- With respect to "other noticed depositions," I believe we've already agreed to produce (and scheduled) all of the other witnesses BuyerQuest requested for deposition.  If there are any other outstanding notices for which we have not yet agreed to produce a witness, please let me know.

- We are happy to discuss deposition topic Nos. 7 & 8, but it would be helpful if you would explain what specific information you're looking for and why BuyerQuest contends it is relevant.

- We will be ready to discuss Mr. Mulloy's emails, and would also like to discuss Mr. Mulloy's objections to the Google Subpoena.

- We would also like to discuss BuyerQuest's refusal to disclose its 30(b)(6) designations.  The parties agreed to exchange these designations last week.  Tradeshift provided its designations on Friday, but we didn't receive anything from BuyerQuest.

Thanks,
Jason

---

**From:** Anthony Phillips <aphillips@grsm.com>
**Sent:** Monday, March 29, 2021 1:59 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Su, Tammy <tsu@orrick.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Joshua Bradus <jbradus@grsm.com>; Craig Mariam <cmariam@grsm.com>
**Subject:** Tradeshift, Inc. v. BuyerQuest, Inc., March 30 Meet & Confer

Dear Jason,

To set our agenda and expectations for tomorrow's meet and confer call, please be prepared to discuss the following:

1.  Whether we have a ripe dispute respecting a motion to compel the deposition of Christian Lanng and Tradeshift's "apex witness" objections.  Please also confirm whether Tradeshift intends to make the same apex witness objections to any of the other noticed depositions as it has to Mr. Lanng's.

2.  Whether Tradeshift will designate and produce a 30(b)(6) witness for the specific topics identified below and in our Deposition Notice.  If not, please be prepared to explain the basis for Tradeshift's refusal:

- Topic No. 7.  The financial condition of Tradeshift between January 1, 2019 and February 20, 2020.
- Topic No. 8.  Tradeshift's knowledge of and response to comments about its business posted on Glassdoor and other social media.

3.  The ongoing issues respecting Tradeshift's demands for searches of Jack Mulloy's personal email account.

We look forward to a productive discussion tomorrow.

Thanks,
Tony

**ANTHONY D. PHILLIPS** | Partner

6

**GORDON REES SCULLY MANSUKHANI**
**YOUR 50 STATE PARTNER™**

275 Battery Street, Suite 2000
San Francisco, CA 94111
D: 415-875-3137  |  P: 415-986-5900  |  aphillips@grsm.com

www.grsm.com

---

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE PARTNER®**
http://www.grsm.com

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit
*http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at
https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# TRADESHIFT EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TRADESHIFT, INC., | ) | CASE NO. 1:20-cv-03661-ER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SMUCKER SERVICES COMPANY, | ) | **DEFENDANT SMUCKER SERVICES** |
| | ) | **COMPANY'S ANSWER TO** |
| Defendant. | ) | **PLAINTIFF'S COMPLAINT AND** |
| | ) | **COUNTERCLAIM** |
| | ) | |

Defendant Smucker Services Company ("Smucker"), by and through counsel, and for its

Answer to Tradeshift, Inc.'s ("Tradeshift") Complaint, states as follows:

## PARTIES

1.      Upon information and belief, Smucker admits the allegations in Paragraph 1 of

the Complaint.

2.      Smucker admits the allegations in Paragraph 2 of the Complaint.

## JURISDICTION AND VENUE

3.      The allegations in Paragraph 3 are legal conclusions to which no response is

required. To the extent a response is required, Smucker admits the allegations in Paragraph 3.

4.      The allegations in Paragraph 4 are legal conclusions to which no response is

required. To the extent a response is required, Smucker admits the allegations in Paragraph 4.

## GENERAL ALLEGATIONS

5.      Smucker is without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 5 of the Complaint and, therefore, denies the same.

6.      In response to the allegations in Paragraph 6, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019 and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same.

7.      In response to the allegations in Paragraph 7, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019 and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same. Further responding to the allegations, Smucker is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 of the Complaint and, therefore, denies the same.

8.      In response to the allegations in Paragraph 8, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019 and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same.

9.      In response to the allegations in Paragraph 9, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019 and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same.

10.     In response to the allegations in Paragraph 10, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019 and that agreement is the best evidence of its terms and denies any inconsistent characterizations of same.

11.     In response to the allegations in Paragraph 11, Smucker admits that Tradeshift began performance under the Services Agreement but denies the remaining allegations as drafted.

12.     In response to the allegations in Paragraph 12, Smucker states that its January 16, 2020 correspondence is the best evidence of its terms and denies any inconsistent characterizations of same.

13.     In response to the allegations in Paragraph 13, Smucker states that its January 16, 2020 correspondence is the best evidence of its terms and denies any inconsistent characterizations of same.

14.     In response to the allegations in Paragraph 14 of the Complaint regarding Tradeshift's response, Smucker is without knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies the same. Smucker denies the remaining allegations in Paragraph 14 of the Complaint.

15.     In response to the allegations in Paragraph 15, Smucker states that to the extent it purports to summarize confidential settlement communications between the parties that is a breach of the confidential nature of those proceedings. As a result, Smucker denies the allegations in Paragraph 15 as alleged.

16.     In response to the allegations in Paragraph 16, Smucker states that to the extent it purports to summarize confidential settlement communications between the parties that is a breach of the confidential nature of those proceedings. As a result, Smucker denies the allegations in Paragraph 16 as alleged.

## COUNT I: BREACH OF CONTRACT

17.     Smucker incorporates its responses to each and every allegation in this Paragraph as if fully set forth herein.

18.     Paragraph 18 states a legal conclusion to which no response is required. To the extent a response is required, Smucker admits the allegations on Paragraph 18.

19.     Smucker denies the allegations in Paragraph 19 of the Complaint.

20.     In response to the allegations in Paragraph 20, Smucker admits that it entered into a "Services Agreement" with Tradeshift on June 28, 2019 as that agreement is the best evidence of its terms and it denies any inconsistent characterizations of same.

21.     Smucker denies the allegations in Paragraph 21 of the Complaint.

## GENERAL DENIAL

22.     Each and every allegation and request for relief not specifically admitted herein is denied.

## FIRST AFFIRMATIVE DEFENSE

23.     The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

24.     Plaintiff's alleged damages, if any, were caused in whole or in part by the acts or omissions of Plaintiff.

## THIRD AFFIRMATIVE DEFENSE

25.     The claims are barred in whole or in part, by Plaintiff's failure to mitigate its damages, if any.

## FOURTH AFFIRMATIVE DEFENSE

26.     Plaintiff's claims are barred, in whole or in part, by the applicable doctrines of waiver, laches, unclean hands, accord and satisfaction, and/or administrative or equitable estoppel.

## FIFTH AFFIRMATIVE DEFENSE

27.     Plaintiff's claims are barred because there is no causation or connection between the alleged breaches and any alleged economic losses or damages, as well as being barred because any alleged causation or connection between the alleged breaches and any alleged damages is not attributable to Smucker.

## SIXTH AFFIRMATIVE DEFENSE

28.     Plaintiff's claims for losses or damages (if there are any losses or damages, which there are not) would improperly constitute unjust enrichment, and/or must be reduced by any setoff, offset, recoupment, or other provisions applicable for the reduction of amounts owed.

## SEVENTH AFFIRMATIVE DEFENSE

29.     Plaintiff's claims are barred by Tradeshift's own breaches of contract and fraud, as set forth in Smucker's Counterclaims and incorporated by reference as if rewritten herein.

## EIGHTH AFFIRMATIVE DEFENSE

30.     Smucker hereby reserves the right to identify additional defenses or claims, including, but not limited to those which become apparent from further investigation and discovery.

## COUNTERCLAIM – JURY DEMAND REQUESTED

Defendant/Counterclaim Plaintiff Smucker Services Company ("Smucker") for its Counterclaim against Plaintiff/Counterclaim Defendant Tradeshift, Inc. ("Tradeshift"), states as follows:

## NATURE OF THE CASE

1.      Smucker brings this case to recover the significant damages it incurred as a result of the fraudulent inducement, fraudulent and/or negligent misrepresentations, and breaches of contract committed by Tradeshift concerning its capabilities to perform under a services agreement dated June 30, 2019 ("Services Agreement" or "Agreement")[1].

2.      Smucker is a household name synonymous with the consumer-packaged goods that it and a network of suppliers make available across the nation. Given the number of suppliers, brands, and volume of products it provides, Smucker requires a comprehensive and attuned software system to manage its supply chain.

3.      In 2019, Smucker began a rigorous search for a vendor that could provide operating systems and applications for its supply chain's procure-to-pay process. As part of the search, Smucker asked contending vendors to answer over 200 questions in response to a formal Request for Proposal ("RFP"), complete an extensive report addressing hundreds of unique business criteria and capabilities (the "Business Requirements Document" or "BRD"), and agree to an interview.

4.      In response to Smucker's requests, Tradeshift submitted information about its business, capabilities, financial health, and experience that was replete with material misrepresentations. Among other things, Tradeshift falsely represented that it was uniquely

---

[1] As the Agreement is marked "Confidential" it is not attached hereto but can be provided to the Court for an *in camera* review.

qualified and able to satisfy hundreds of unique criteria listed in the Business Requirements Document.

5.     Smucker, in reliance on Tradeshift's submissions and without knowledge of the material misrepresentations contained therein, selected Tradeshift over other companies to serve as its vendor, and, on June 30, 2019, the parties subsequently entered into the Services Agreement.  After the parties entered into the Services Agreement, Smucker discovered that Tradeshift could not provide the services it contractually agreed to perform. Had Tradeshift launched its program for Smucker as its enterprise procure-to-pay solution, it would have been riddled with critical and fatal defects, which would have undoubtedly caused significant delays and disrupted communications with and payments from Smucker's suppliers.

6.     If Smucker had known that Tradeshift materially misrepresented its ability to meet Smucker's stringent business requirements and its experience providing services to companies of similar size and scope, Smucker would not have selected Tradeshift as its vendor or entered into the Services Agreement.

7.     Tradeshift was and remains incapable of satisfying Smucker's exacting, much less than basic, requirements it knew or reasonably should have known, that it could not perform.

8.     As a direct result of Tradeshift's inability to perform its obligations under the Services Agreement, Smucker was forced to extend its contract with the existing software vendor to perform those services and hire a new vendor, both at additional cost and expense, all in addition to the hundreds of thousands of dollars it paid Tradeshift under the Services Agreement.

9.     As a direct result of Tradeshift's fraud, misrepresentations, and breach of contract, Smucker has been damaged, and through this action, seeks rescission of the Services Agreement, as well as compensatory damages and punitive damages, and the other relief requested herein.

## THE PARTIES

10.    Smucker is an Ohio corporation with its principal place of business at One Strawberry Lane, Orrville, Ohio 44667.

11.    Smucker is an iconic one hundred twenty-three year old American company that manufactures and sells scores of consumable products like jam, peanut butter, jelly, fruit syrups, beverages, shortening, ice cream toppings, cooking oils, coffee, pet food, and other products.

12.    Tradeshift is a Delaware corporation with its principal place of business at 612 Howard Street, Suite 100, San Francisco, California 94105.

13.    Tradeshift represents itself as a provider of a cloud-based network and platform to assist companies in digitizing the supply chain process

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

15.    Venue is proper in this Court pursuant to Section 14 of the Services Agreement in which the parties agreed to the Southern District of New York as the exclusive venue for purposes of disputes pursuant to the Agreement.

## FACTS COMMON TO ALL COUNTS

### SMUCKER CONDUCTED DUE DILIGENCE IN SEARCH OF VENDORS THAT COULD MEET ITS EXACTING AND ABSOLUTE BUSINESS REQUIREMENTS

16.    In 2019, Smucker began the process of selecting a vendor that could electronically manage its supply chain, including, but not limited to, supplier master data management, creating and revising purchase requisitions, creating and revising purchase orders ("PO"), entering goods receipts, invoice processing and reconciliation, and payments.

8

17.    Smucker was specifically looking for a vendor to provide an operating system and application that would allow Smucker to perform these functions electronically while also limiting the manual intervention and handling of electronic data sources throughout the procure-to-pay process.

18.    Smucker deals with hundreds of suppliers on a daily basis for the different facets of its business and requires a robust operating system and program tailored to meet its individual and unique business needs.

19.    Smucker engaged in a rigorous vendor selection process to find a company that could provide the services it sought. It interviewed several vendors and required each to complete a written RFP response and an extensive Business Requirements Document.

20.    The RFP alone requested answers to over 200 questions regarding the vendors' business and capabilities. The BRD sought detailed information about hundreds of requirements sought by Smucker, which were categorized as either "Want" or "Must Have." The BRD included over 180 "Must Have" requirements that vendors had to be able to perform in order to provide the services sought by Smucker.

21.    The BRD clearly explained that a vendor's failure to deliver a "Must Have" requirement would result in complete project failure.

### TRADESHIFT MATERIALLY MISREPRESENTED ITS CAPABILITIES

22.    Tradeshift is one of the vendors that participated in Smucker's selection process, which included an interview and completing the RFP and BRD.

23.    During its interactions with Smucker, Tradeshift made a number of material representations regarding its qualifications and capabilities.

24.     For example, in its March 2, 2019 submission in response to the RFP[2], Tradeshift responded to hundreds of questions regarding its business and program capability and functionality which addressed, among other topics, catalog management, configuration, user interface, guided buying, purchase orders (including purchase order setup and collaboration), budgeting, receiving, invoicing, supplier information, system security and technology, general architecture, integration, error handling, data security, support, and implementation.

25.     While every representation cannot be included in this Counterclaim, Smucker provides a sampling of some of the representations.

26.     For example, Tradeshift represented that it had done "over 20 implementations over the past 24 months" for companies similar in size and complexity to Smucker.

27.     Tradeshift also included many representations about how its product was superior to that of its competitors, stating "[o]ne of the key differentiators between Tradeshift and our competitors is our ability to onboard suppliers for electronic invoicing as well as take up a myriad of other opportunities on the Tradeshift network."

28.     Tradeshift represented that its revenue was $300-$500 million in the preceding year.

29.     Tradeshift represented and publicly disclosed that it received at least $250 million in Series E funding in May 2018. On May 15, 2019, Tradeshift emailed Smucker a presentation about its customers and funding that included this representation.

30.     In regards to the questions about whether its software had certain capabilities, with minimal exceptions, the answers were unequivocally "Yes."

---

[2] Given the voluminous nature of the RFP, as well as the confidentiality of the submission, it is not attached hereto but can be provided to the Court for an *in camera* review.

31.     Based on Tradeshift's response to all of the questions in the RFP, Smucker selected the company to participate as a final vendor in the selection process and asked it to complete the BRD. On June 14, 2019, Chris Todd of Tradeshift submitted a completed BRD that expressly represented that the company could fulfill most, if not all, of Smucker's "Want" and "Must Have" requirements.[3]

32.     The scope of the representations is voluminous, and, as a result, they are not repeated in this Complaint, but are contained in the BRD itself.

33.     There were roughly 250 requirements on the BRD, over 180 of which were listed by Smucker as "Must Have" requirements.

34.     In other words, without these features the system would not work for Smucker.

35.     Tradeshift not only represented that it could meet these requirements, but that the majority were available "out of the box." Thus, Tradeshift represented that its product was already designed to meet Smucker's "Want" and "Must Have" requirements.

36.     Based on these representations, Smucker selected Tradeshift as its vendor.

37.     A material consideration leading Smucker to select Tradeshift and enter into the Services Agreement was the numerous representations made by Tradeshift in its RFP and BRD submissions regarding the capability and functionality of its services platform.

38.     As a result of Tradeshift's representations, the parties entered into the Services Agreement on June 30, 2019.

**THE PROJECT FAILED AS A RESULT OF NUMEROUS FATAL FLAWS**

39.     Shortly after the parties entered into the Services Agreement, the project experienced significant delays.

---

[3] Again, given the voluminous nature of the BRD, as well as the confidentiality of the submission, it is not attached hereto but can be provided to the Court for an *in camera* review

40.     The issues were so numerous that Smucker was forced to review with and/or provide a defects list to Tradeshift on a weekly, if not daily, basis.

41.     In addition, it became necessary for the Smucker and Tradeshift project team to speak daily and project management weekly, in an attempt to address the myriad of problems and issues with the project.

42.     Among the list of defects identified by Smucker were those identified as either being "fatal" or "critical" in nature.

43.     "Critical defect" is defined on the Smucker defects list as "one that prevents the application from functioning and will delay go-live. This is a major flaw in the design that inhibits a 'Must Have' business requirement from being met and has no workaround."

44.     "Fatal defect" is defined by that same document as a defect that "causes system level errors that prevent the test execution from continuing.   For example, clicking on the 'Submit' button causes the application to crash.   Fatal defects must be fixed immediately, so testing can continue."

45.     Throughout this process, Smucker realized that Tradeshift misrepresented its software's capabilities in the RFP. For example, it represented that its system provided real-time integration with Oracle, which later proved to be false. It also represented its system could "hide" the overall value of a PO, which later proved to be false.

46.     In addition, Smucker documented several instances in the BRD where Tradeshift misrepresented the functionality of its software.

47.     Of those misrepresentations, several were included in the BRD as "Must Have" requirements that Tradeshift represented would be included in the program.

48.     The following are examples of the "Must Have" requirements that Tradeshift represented its program could meet:

(a)  the ability to have one to many supplier site relationships;

(b)  the ability for a user to 'hide' the overall PO value on a PO communication to the supplier;

(c)  the ability to integrate supplier master data from Oracle in an automated manner;

(d)  the ability to setup various approval routing rules (at entry of invoice);

(e)  the ability to setup reconciliation routing rules;

(f)  the ability to customize the entry form;

(g)  the ability for all master data to be real-time; and,

(h)  the ability to enter a credit memo for returns.

49.     Without these key "Must Have" requirements, Smucker's procure-to-pay process would not be able to handle a live production environment, as it would create stalled transactions, data inaccuracies, and a lack of proper audit controls.

50.     Several of these "Must Have" requirements, including the ability to enter a credit memo for returns, were among the "out of the box" capabilities Tradeshift represented its program could deliver.

51.      It eventually became apparent, and Tradeshift later admitted, that its program could not process credit memos or perform several of the other "Must Have" requirements identified by Smucker.

52.     When confronted with the critical and/or fatal defects in its program, and the discrepancies between its representations and actual capabilities, including those that were supposedly "out of the box," Tradeshift merely offered to consider, but not commit to, addressing the issues in a future release of the program software.

53.     In other words, when confronted with the fact of a critical and/or fatal defect, Tradeshift responded that it would consider an upgrade in the future.

54.     It soon became apparent to Smucker that Tradeshift's program did not have the basic functionality needed to meet critical requirements and/or cure critical and/or fatal defects.

55.     Tradeshift was aware of each of the defects and after weeks of attempts to cure, nothing had been fixed.

56.     As late as January 6, 2020, the program still had several defects, some of which were critical, and others which were fatal, to the program.

57.     Tradeshift's software did not meet Smucker's most basic functionality requirements, and Tradeshift was unable to perform its obligations under the Services Agreement.

58.     And it also became apparent to Smucker that Tradeshift had not worked with 20 similar companies on similar projects, its revenue in 2018 was not $300-$500 million, its financial position was brittle despite claims of ample funding in May 2018, and its product was not superior to that of competitors and was woefully inadequate for the needs of Smucker.

## TRADESHIFT'S FRAUD VOIDED THE AGREEMENT

59.     As it became apparent that Tradeshift could no longer perform under the Services Agreement, and that it had materially misrepresented the capabilities and functionality of its product, Smucker was forced to void the contract as of January 16, 2019. Had Tradeshift accurately represented its capabilities, Smucker would never have entered into the Services Agreement.

## SMUCKER INCURRED SIGNIFICANT DAMAGES

60.     As a result of Tradeshift's material misrepresentations and fraud, Smucker entered into the Services Agreement and, because Tradeshift proved incapable of performing its obligations, incurred and continues to incur significant damages.

61.     To date, Smucker has paid Tradeshift $850,217.52, and there is an additional $232,410.91 in outstanding invoices. Smucker was also forced to incur hundreds of thousands of dollars in selecting a vendor to replace Tradeshift and to integrate a new product into Smucker's system.

## COUNT I
## FRAUDULENT INDUCEMENT

62.     Counter Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

63.     As set forth above and reflected in correspondence between the parties, in responding to Smucker's RFP and BRD, Tradeshift misrepresented material facts about its capabilities and the functionality of the product it could deliver to Smucker.

64.     In the RFP that Tradeshift sent to Smucker on March 2, 2019, the misrepresentations are numerous, including, but not limited to, the financial stability of Tradeshift, its experience with similar companies and projects, its superiority to competitor products, and the functionality of its software including that its system provided real-time integration with Oracle and could "hide" the overall value of a PO.

65.     In the BRD that Tradeshift sent to Smucker on June 14, 2019, the misrepresentations were also numerous, including, but not limited to, (1) the ability to have one to many supplier site relationships; (2) the ability for a user to 'hide' the overall PO value on a PO communication to the supplier, (3) the ability to integrate supplier master data from Oracle in an automated manner; (4) the ability to setup various approval routing rules (at entry of invoice); (5) the ability to setup reconciliation routing rules; (6) the ability to customize the entry form; (7) the ability for all master data to be real-time; and (8) the ability to enter a credit memo for returns.

15

66.     If Tradeshift had responded truthfully and with full and complete disclosures, including the limitations of its product's capabilities, Tradeshift's submission to the BRD would have revealed that it was incapable of meeting many of Smucker's "Want" and "Must Have" requirements.

67.     Smucker did not know or have reason to know that Tradeshift's submissions contained material misrepresentations and instead relied on Tradeshift's responses in evaluating the RFP and BRD and selecting Tradeshift as its vendor.

68.     Tradeshift knew or should have known that many of its statements in the RFP and BRD were false, misleading, and/or incomplete, or it knew or should have known that it was misrepresenting information that was material to the RFP and BRD.

69.     Alternatively, Tradeshift acted with utter disregard for the truth of its statements.

70.     Tradeshift intended for Smucker to reply upon its responses to the RFP and BRD and Smucker reasonably relied on those responses.

71.     Smucker was injured because, but for Tradeshift's false and misleading representations, Smucker would not have selected Tradeshift as its vendor or entered into the Services Agreement.

72.     Smucker is entitled to rescission of the Services Agreement, compensatory damages, and punitive damages in an amount sufficient to punish and deter Tradeshift from engaging in similar fraudulent behavior in the future.

## COUNT II
## FRAUDULENT MISREPRESENTATION

73.     Counter Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

74.     Tradeshift made misrepresentations of material fact before the execution of the Services Agreement, as described above, as well as misrepresentations following the execution of the Services Agreement, including representations regarding its financial stability, that its product was superior to that of competitors, the capabilities of its product, and representations of active relationships with customers of a similar size and scope, as stated above and throughout this Complaint.

75.     Smucker entered into the Services Agreement relying on Tradeshift's responses to the RFP and BRD.

76.     After executing the Services Agreement, Tradeshift continued to misrepresent material facts respecting its ability to perform its obligations under the Agreement.

77.     Tradeshift's representations were false when made, and Tradeshift acted intentionally, recklessly, willfully, and/or maliciously in making them.

78.     Tradeshift knew, or should have known, that its representations were false, and it intended or knew that Smucker would rely on those representations to its detriment.

79.     Smucker justifiably relied on these misrepresentations in evaluating Tradeshift's responses to the RFP and BRD, and in entering the Services Agreement and continuing to do business with Tradeshift.

80.     Smucker suffered damage and injury as a direct and proximate result of its reliance on Tradeshift's material misrepresentations. As a result, Smucker is entitled to compensatory and punitive damages.

## COUNT III
## NEGLIGENT MISREPRESENTATION

81.     Counter Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

82.     As described in detail above, Tradeshift misrepresented the functionality and performance of its product and the suitability of its system and features for a complex operation like Smucker.

83.     The information communicated to Smucker was false and misleading.

84.     Tradeshift failed to exercise reasonable care in communicating the information.

85.     Smucker justifiably relied on the information provided by Tradeshift in deciding to select Tradeshift as its vendor for the project and enter into the Services Agreement.

86.     Smucker suffered damage and injury as a direct and proximate result of its reliance on the false information provided by Tradeshift.

## COUNT IV
## BREACH OF CONTRACT

87.     Counter Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

88.     For all the reasons stated above, Tradeshift committed a material breach of the Services Agreement that cannot be remedied.

89.     Thus, Smucker is entitled to receive all sums paid to Tradeshift under the Services Agreement.

## PRAYER FOR RELIEF

Counter Plaintiff Smucker Services Company prays for judgment in its favor and against Tradeshift, Inc. for damages for fraudulent inducement, fraudulent and/or negligent misrepresentation, and breach of contract, pre- and post-judgment interest, punitive damages, costs, and such further relief to which Counter Plaintiff may be entitled.

## JURY DEMAND

Counter Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ *Ronie M. Schmelz*

Ronie M. Schmelz (5026158)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113
Telephone:   216.592.5000
Facsimile:    216.592.5009
E-mail:        ronie.schmelz@tuckerellis.com

*Attorneys for Defendant and Counter Plaintiff*
*Smucker Services Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.


/s/ *Ronie M. Schmelz*
Ronie M. Schmelz

*One of the Attorneys for Defendant and*
*Counter Plaintiff Smucker Services Company*

# TRADESHIFT
# EXHIBIT I

AMY K. VAN ZANT (STATE BAR NO. 197426)
avanzant@orrick.com
JASON K. YU (STATE BAR NO. 274215)
jasonyu@orrick.com
TAMMY SU (STATE BAR NO. 329652)
tsu@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:     +1 650 614 7400
Facsimile:     +1 650 614 7401

Attorneys for Plaintiff
TRADESHIFT, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRADESHIFT, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BUYERQUEST, INC., an Ohio corporation,<br><br>Defendant. | Case No. 3:20-cv-1294-RS<br><br>**PLAINTIFF TRADESHIFT, INC.'S OBJECTIONS AND RESPONSES TO DEFENDANT BUYERQUEST, INC.'S FIRST SET OF INTERROGATORIES (NOS. 1-19)** |

**PROPOUNDING PARTY:**          **Defendant BuyerQuest, Inc.**

**RESPONDING PARTY:**          **Plaintiff Tradeshift, Inc.**

**SET NUMBER:**          **One**

**CONTAINS INFORMATION DESIGNATED "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY " UNDER THE PROTECTIVE ORDER**

Orrick, Herrington &
Sutcliffe LLP
Attorneys at Law
Silicon Valley

4153-0116-1765

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    In accordance with Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Tradeshift,

2    Inc. ("Tradeshift" or "Plaintiff") hereby provides the following objections and responses

3    ("Responses") to the First Set of Interrogatories propounded by BuyerQuest, Inc.

4    ("BuyerQuest" or "Defendant").

5                                         **GENERAL OBJECTIONS**

6           In addition to the specific objections noted below, Tradeshift asserts the following general

7    objections to each and every Interrogatory.

8           1.     By responding to any Interrogatory, Tradeshift does not waive any objection that

9    may be applicable to: (a) the use, for any purpose, by BuyerQuest of any information provided in

10   the response; or (b) the admissibility, relevance, or materiality of any of the information to any

11   issue in this case.

12          2.     Tradeshift objects to BuyerQuest's definitions and instructions to the extent they

13   require Tradeshift to provide information beyond that required by the Federal Rules of Civil

14   Procedure, the local rules of the Northern District of California, or any other applicable rules.

15          3.      Tradeshift objects to BuyerQuest's definitions and instructions to the extent they

16   add discrete subparts to individual interrogatories such that those interrogatories are compound

17   and should constitute multiple interrogatories that may exceed the maximum number of

18   interrogatories allowed in this case.  Tradeshift will respond to the prompts of the individual

19   interrogatories and is willing to confer regarding additional information that would be responsive

20   to additional interrogatories.

21          4.     Tradeshift objects to BuyerQuest's definition of "COMMUNICATION(S)" as

22   overly broad, seeking discovery of information where the burden of the proposed discovery

23   outweighs its likely benefit, seeking information not relevant to any claim or defense, and not

24   proportional to the needs of the case because the definition includes "any and all communications

25   of any kind" "whether written, oral, or by any other means."  Tradeshift further objects to this

26   definition as overly broad, unduly burdensome, and duplicative to the extent it is used to request

27   information contained in documents that Tradeshift will be producing in response to

28   BuyerQuest's requests for the production of documents.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                              - 1 -                    TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

5.      Tradeshift objects to BuyerQuest's definition of "IDENTIFY" as overly broad, unduly burdensome, seeking irrelevant information, and seeking information not proportional to the needs of the case.  Tradeshift also objects to this definition as seeking information subject to a right of privacy and information that is duplicative of information that will be provided through other means, for example, in response to BuyerQuest's requests for production of documents. When identifying persons, Tradeshift will identify them by name and provide additional information to the extent it is reasonably available, relevant, not subject to a right of privacy, and not duplicative.  When identifying documents, Tradeshift will identify documents by Bates number if available, or by a reasonable description of the document.

6.      Tradeshift objects to BuyerQuest's definition of "YOU," "YOUR," and "TRADESHIFT" as vague and ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense, and not proportional to the needs of the case because the definition purports to include persons or entities who are not parties to the lawsuit, have no involvement in the subject matter of the lawsuit, have no information that would be relevant to the claims or defenses in this lawsuit, and/or are not within Tradeshift's control.  Tradeshift will respond only on behalf of, and with respect to, Tradeshift, Inc.  Tradeshift construes "you," "your," and "Tradeshift" to mean Plaintiff Tradeshift, Inc.

7.      Tradeshift objects to BuyerQuest's definition of "BUYERQUEST" as vague and ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense, and not proportional to the needs of the case because the definition includes "ALL PERSONS acting on its behalf, including without limitation, ALL past or present officers, directors, employees, representatives, consultants, partners, independent contractors, agents, or attorneys." Tradeshift construes "BUYERQUEST" to mean Defendant BuyerQuest, Inc.

8.      Tradeshift objects to BuyerQuest's definition of "SMUCKER" as vague and ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                    - 2 -                    TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   and not proportional to the needs of the case because the definition includes "J.M. Smucker

2   Company, J.M. Smucker Inc., and ALL PERSONS acting on their behalf, including without

3   limitation, ALL past or present officers, directors, employees, representatives, consultants,

4   partners, independent contractors, agents, or attorneys."  Tradeshift construes "SMUCKER" to

5   mean Smucker Services Company, the J.M. Smucker Company, and J.M. Smucker, Inc.

6          9.      Tradeshift objects to Definition 16 as overly broad, seeking discovery of

7   information where the burden of the proposed discovery outweighs its likely benefit, seeking

8   discovery of information that is not relevant to any claim or defense, not proportional to the needs

9   of this case, and inconsistent with Rules 26 and 34 of the Federal Rules of Civil Procedure

10  because it purports to require Tradeshift to provide documents regarding hypothetical future

11  events that have not yet occurred.

12         10.     Tradeshift objects to each Interrogatory to the extent that it calls for Tradeshift to

13  reveal information that is the subject of the attorney-client privilege, the attorney work product

14  doctrine, or any other applicable privilege or doctrine.  Tradeshift will not provide privileged

15  information and, instead, to the extent it is consistent with the parties' agreements regarding

16  privileged communications, will withhold and log responsive privileged communications.

17         11.     To the extent that Tradeshift identifies and/or produces any information or

18  documents in response to the Interrogatories, it does so with the understanding that such

19  information or document shall not be deemed or construed to constitute a waiver of any privilege

20  or right of Tradeshift, including the right to designate materials as confidential.  Tradeshift

21  reserves all rights to recall from discovery any inadvertently produced document protected by the

22  attorney-client privilege, the work product doctrine, or any other applicable privilege, doctrine, or

23  immunity.  Tradeshift also reserves the right to designate (or redesignate) any confidential

24  documents that may be inadvertently produced without the appropriate confidentiality

25  designation.

26         12.     Tradeshift objects to these Interrogatories as premature to the extent they purport

27  to request "all" facts or information in support of Tradeshift's claims.  Much of the documents

28  and information supporting Tradeshift's claims is in the possession of BuyerQuest and/or

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                        - 3 -                    TRADESHIFT'S OBJECTIONS AND
                                                              RESPONSES TO BUYERQUEST'S FIRST
                                                              SET OF FIRST SET OF ROGS (NOS. 1-19)

Smucker.  Fact discovery remains open, and BuyerQuest and Smucker have yet to make complete productions of all such documents and information in response to Tradeshift's discovery requests. Accordingly, Tradeshift's responses are made without prejudice to its right to supplement or amend its responses and to present evidence discovered hereafter at trial.

13.      Tradeshift objects to these Interrogatories to the extent that they seek confidential, sensitive, or proprietary business or trade secret information of any third party.  Should any interrogatory call for such information, Tradeshift will make reasonable efforts to obtain the consent of any such third party and if it cannot obtain such third-party consent, Tradeshift will clearly state so in its response.

14.      Tradeshift objects to these Interrogatories to the extent that they seek information beyond what is available from: (a) a reasonable search of Tradeshift's files likely to contain relevant or responsive documents or information and (b) a reasonable inquiry of Tradeshift employees likely to have information relevant to a claim or defense of any party, or to the subject matter of the litigation.

**SPECIFIC OBJECTIONS AND RESPONSES**

Subject to and without waiving the above General Objections, Tradeshift objects and responds to BuyerQuest's First Set of Requests for Production to Tradeshift as follows:

**INTERROGATORY NO. 1:**

IDENTIFY EACH TRADESHIFT employee, agent, or contractor who worked on or was involved with the negotiation, drafting, or formation of the BUYERQUEST AGREEMENTS.

**RESPONSE TO INTERROGATORY NO. 1:**

Tradeshift specifically incorporates by reference each of its General Objections asserted above.

Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal information that is the subject of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine.  Tradeshift will log any such communications it excludes on this basis to the extent consistent with the parties' privilege log agreement.

Tradeshift objects to this interrogatory to the extent it seeks information that is equally or

Orrick, Herrington &
Sutcliffe LLP
Attorneys at Law
Silicon Valley

4153-0116-1765

- 4 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   more readily available to BuyerQuest.

2        Tradeshift objects to the phrase "worked on or was involved with the negotiation, drafting,

3   or formation" as vague and ambiguous, overbroad, duplicative, and not proportional to the needs

4   of this case to the extent it seeks information about every individual remotely involved in the

5   subject matter of the request (including, for example, administrative assistants who may have

6   typed the agreements); Tradeshift will identify the principal parties responsible for negotiating the

7   terms of the BuyerQuest Agreements for Tradeshift.

8        In light of the foregoing objections and limitations, Tradeshift responds as follows:

9        Dan Roehrs (Apps Partnerships & Alliances) with support internally from Tradeshift's in-

10   house legal department, the content of which is privileged.

11        Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

12   to supplement this response as additional information is identified.

13   **INTERROGATORY NO. 2:**

14        IDENTIFY EACH TRADESHIFT employee, agent, or contractor who worked on or was

15   involved with the negotiation, drafting, or formation of the SMUCKER SERVICES

16   AGREEMENT.

17   **RESPONSE TO INTERROGATORY NO. 2:**

18        Tradeshift specifically incorporates by reference each of its General Objections asserted

19   above.

20        Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

21   information that is the subject of the attorney-client privilege, the attorney work product doctrine,

22   or any other applicable privilege or doctrine.  Tradeshift will log any such communications it

23   excludes on this basis to the extent consistent with the parties' privilege log agreement.

24        Tradeshift objects to the phrase "worked on or was involved with the negotiation, drafting,

25   or formation" as vague and ambiguous, overbroad, duplicative, and not proportional to the needs

26   of this case to the extent it seeks information about every individual remotely involved in the

27   subject matter of the request.  Tradeshift will identify the principal parties responsible for

28   negotiating the terms of the Smucker Services Agreement for Tradeshift.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 5 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    In light of the foregoing objections and limitations, Tradeshift responds as follows:

2    Christopher Todd (Account Manager) and Jim Rahill (Regional VP of Sales) with support

3 internally from Tradeshift's in-house legal department, the content of which is privileged.

4    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

5 to supplement this response as additional information is identified.

6 **INTERROGATORY NO. 3:**

7    IDENTIFY EACH TRADESHIFT employee, agent, or contractor who worked on or was

8 involved with the SMUCKER PROJECT.

9 **RESPONSE TO INTERROGATORY NO. 3:**

10    Tradeshift specifically incorporates by reference each of its General Objections asserted

11 above.

12    Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

13 information that is the subject of the attorney-client privilege, the attorney work product doctrine,

14 or any other applicable privilege or doctrine.  Tradeshift will log any such communications it

15 excludes on this basis to the extent consistent with the parties' privilege log agreement.

16    Tradeshift objects to this interrogatory to the extent it seeks information that is equally or

17 more readily available to BuyerQuest.

18    Tradeshift objects to the phrase "worked on or was involved with the SMUCKER

19 PROJECT" as vague and ambiguous, overbroad, duplicative, and not proportional to the needs of

20 this case to the extent it seeks information about every individual remotely involved in the subject

21 matter of the request, including those with peripheral or non-substantive roles; Tradeshift will

22 identify the principal persons who performed work on and/or supervised implementation of the

23 SMUCKER PROJECT on behalf of Tradeshift.

24    In light of the foregoing objections and limitations, Tradeshift responds as follows:

25    Sean Norton (Global VP, Professional Services); Deborah Gillman (Engagement

26 Manager); Catherine Fahidin (Professional Services Architect); Gareth Bowen (Professional

27 Services Solutions Architect); Wendy Sciara (Senior Client Executive); Doug Cottington

28 (Engagement Manager);  Amy Dhanoa (Program Manager); Alexandra Balan (Professional

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY
4153-0116-1765                    - 6 -                    TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1  Services Architect); Simona Saulean, (Professional Services Architect);  Kavita Rajagopal

2  (Solutions Consultant); Jeff Larsen (Senior Program Manager – Bristlecone).

3       Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

4  to supplement this response as additional information is identified.

5  **INTERROGATORY NO. 4:**

6       IDENTIFY EACH SMUCKER employee, agent, or contractor with whom YOU worked

7  on SMUCKER PROJECT.

8  **RESPONSE TO INTERROGATORY NO. 4:**

9       Tradeshift specifically incorporates by reference each of its General Objections asserted

10  above.  Tradeshift further objects to this interrogatory to the extent it seeks information that is not

11  in Tradeshift's possession, custody, or control or that is equally or more readily available to

12  BuyerQuest.

13       Tradeshift objects to the phrase "worked on SMUCKER PROJECT" [sic] as vague and

14  ambiguous, overbroad, duplicative, seeking information equally available to BuyerQuest, and not

15  proportional to the needs of this case to the extent it seeks information about every individual

16  remotely involved in the subject matter of the request, including those with peripheral or non-

17  substantive roles and including contractors and subcontractors like Tradeshift and BuyerQuest;

18  Tradeshift will identify the SMUCKER employees it interacted with while working on the

19  SMUCKER PROJECT.

20       In light of the foregoing objections and limitations, Tradeshift responds as follows:

21       Clint Adams
22       Jason Barr
      Angela Burick,
23       Molly Davis
      Joanna Dobina
24       Jeff Eshelman
      Daniel Fill
25       Robert Ferguson
26       Danielle Frantz
      Kevin Hare
27       Bryan Hiles
      Kelly Hensch
28       Ryan Hoffman

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 7 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

Bryan Hutson
Debra Janda
Michelle Lawson
Steve Lutikoff
Pai Milind
Megan Morr
Dan Nowicki
Viraaj Patel
Jacqueline Perchinske
Susan Reed
Mike Resan
John Slowey
Jennifer Smith
Mike Sterle
Dustin Stout
Jay Watson
Rowdy White
Russ Wilson
Brandon Wilhelm
Sunil Yerramesetti

Discovery has just started.  Tradeshift is continuing its investigation and reserves its right to supplement this response as additional information is identified.

**INTERROGATORY NO. 5:**

IDENTIFY EACH incident in which BUYERQUEST failed "to obtain Tradeshift's review and consent to scope changes to the Smucker project," as alleged in Paragraph 31 of YOUR Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

Tradeshift specifically incorporates by reference each of its General Objections asserted above.

Tradeshift objects to this Interrogatory because it seeks information that is equally or more readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and communications between BuyerQuest and Smucker.  Accordingly some responsive information was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during discovery.  Tradeshift reserves the right to update its response to this Interrogatory after BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable opportunity to review that information and incorporate it into its response.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                    - 8 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

Tradeshift objects to this request as duplicative, at least in part, of Interrogatory numbers 6-10, 12-13, 15, and 19.

In light of the foregoing objections and limitations, Tradeshift responds as follows:

The Smucker Project required integrating software products from Tradeshift and BuyerQuest into a solution that could communicate with those two systems and with Smucker's systems. Tradeshift took on primary responsibility for integrating the three components and implemented a "middleware" system that would allow the three components to speak with each other. The middleware system took in data, documents, and other information from the Smucker system and (1) mapped that information into the format used by Tradeshift so that Tradeshift's systems could use the data and (2) mapped that information into the format used by BuyerQuest so that BuyerQuest's systems could use the data. It did the same in reverse for Tradeshift data and information and BuyerQuest data and information.

The middleware had to be specifically configured to accommodate the different formats and types of information used by each of the three systems (for example, a "quantity" field in one system might be configured with a dropdown menu in one system but with free-entry in another). Accordingly, any unauthorized or uncoordinated changes to the format of the information in any of the three systems could drastically affect the interoperability of the system as whole and would likely result in integration failures. As the lead contractor and the party contractually responsible for integrations, Tradeshift was to have the lead in directing, reviewing, and approving any changes that would be made that could impact system integration. BuyerQuest, in contrast, was Tradeshift's subcontractor on the Smucker Project and agreed in its contract with Tradeshift that it would follow Tradeshift's lead with respect to project management and would seek Tradeshift's approval before making any material changes to the scope of the project, including format changes. The BuyerQuest Agreements noted, for example, that "[Tradeshift] will lead all integration discussions with Smucker's with support from BuyerQuest for all integrations relevant to BuyerQuest," and "[Tradeshift] will handle all program management duties except BuyerQuest will be responsible for all BuyerQuest resources," and "[Tradeshift] and BuyerQuest will review and agree on all scope changes prior to adding new requirements to the project," and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                               - 9 -                    TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

1    "BuyerQuest will support [Tradeshift] with planning, configurations, deliverables, integrations,

2    change requests, and product updates as necessary for Smucker's implementation."

3          On several occasions, however, BuyerQuest initiated, directed, requested, and/or approved

4    changes to the Smucker Project without consulting Tradeshift (much less obtaining its approval or

5    consent to those changes), and/or otherwise usurped Tradeshift's contractual right to lead the

6    integration process.  In many cases, BuyerQuest's actions resulted in integration failures and/or

7    required a significant amount of work to account for the changes.  In certain cases, Smucker

8    blamed these failures on Tradeshift even though they were caused by BuyerQuest's failures to

9    follow protocol.  Internal BuyerQuest communications with BuyerQuest's CEO, Jack Mulloy,

10   indicate that BuyerQuest's conduct was part of a plan—which it referred to as "Operation

11   Fyrefest"—to undermine Tradeshift's credibility with Smucker so that it could eventually replace

12   Tradeshift on the Smucker Project.

13         For example, in early December 2019, BuyerQuest asked Smucker to make changes to the

14   format of the User Integration File without consulting, notifying, discussing or obtaining

15   Tradeshift's consent for this format change.  Smucker implemented the changes at BuyerQuest's

16   request.  The unapproved change in the format of the data caused a number of integration

17   problems, including that a number of Smucker users were unable to log into the system.  Smucker

18   appears to have improperly attributed the integration failure to Tradeshift even though the true

19   cause of the failure was due to BuyerQuest's unauthorized instruction to Smucker to alter its data

20   format.  This integration error appears to have unfairly undermined Tradeshift's credibility with

21   Smucker.  BuyerQuest should have contacted Tradeshift about any requests to modify the

22   Smucker data format including, at a minimum, by discussing BuyerQuest's suggested format

23   changes with Tradeshift and obtaining Tradeshift's agreement and consent before approaching

24   Smucker with format change instructions.  And BuyerQuest should have included Tradeshift on

25   all communications with Smucker about format changes.

26         As another example, in late December 2019, Smucker raised concerns about a requested

27   feature with BuyerQuest.  Smucker referred to this issue as "Defect 77."  To resolve the issue,

28   Smucker asked BuyerQuest to implement a feature that would allow the system to validate

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                    - 10 -                    TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

1   "Project" and "Task" values.  BuyerQuest agreed it would accommodate Smucker's request,

2   including by changing the format of a coding file which, in turn, would cause Tradeshift's

3   integrations to fail unless Tradeshift was given notice and time to adjust other format fields

4   accordingly.  In what was becoming a pattern, BuyerQuest agreed to the change in scope without

5   first discussing with Tradeshift, much less getting Tradeshift's consent and approval (as the

6   contract requires).  Once again, BuyerQuest only informed Tradeshift of what it had done after

7   the fact.  The unapproved change required Tradeshift to spend a significant amount of time

8   revising the integrations to accommodate BuyerQuest's change.  Instead of independently

9   agreeing to the change—which constituted a change in project scope—and neglecting to obtain

10  Tradeshift's consent and buy-in, BuyerQuest should have, at a minimum, first discussed

11  Smucker's request with Tradeshift and submitted a project change order to document the process,

12  as specified in the contract.

13          As another example, in late December 2019 and early January 2020, BuyerQuest caused a

14  number of failures by refusing to follow Tradeshift's lead with certain project management

15  instructions.  In the integrated Tradeshift/BuyerQuest product, the BuyerQuest system sends

16  Purchase Orders to the Tradeshift system for processing.  Upon receiving the Purchase Order, the

17  Tradeshift system sends the BuyerQuest system a confirmation indicating that the Purchase Order

18  has been received.  The BuyerQuest system, however, was not processing the confirmations and,

19  as a result, continued to repeatedly send the same Purchase Orders to the Tradeshift system

20  multiple times.  This caused the Tradeshift system to fail when attempting to process each

21  Purchase Order because the Purchase Order was voided repeatedly, creating a new version of the

22  same Purchase Order.  Tradeshift asked BuyerQuest to adjust its system to properly identify and

23  process the confirmations, but subcontractor BuyerQuest refused Tradeshift's request (even

24  though Tradeshift was the project manager under the contract).  Tradeshift then implemented a

25  work around and BuyerQuest agreed that it would stop sending multiple copies of each Purchase

26  Order.  Notwithstanding the work around and its agreement to the contrary, BuyerQuest

27  continued to send multiple Purchase Orders, which continued to cause Tradeshift's systems to

28  fail.  These failures, which were identified as "Defect 104," appeared to unfairly undermine

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                    - 11 -                  TRADESHIFT'S OBJECTIONS AND
                                                                          RESPONSES TO BUYERQUEST'S FIRST
                                                                          SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

1  Tradeshift's credibility with Smucker.

2      Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

3  to supplement this response as additional information is identified.

4  **INTERROGATORY NO. 6:**

5      IDENTIFY EACH incident in which BUYERQUEST interfered "with Tradeshift's

6  program management duties," as alleged in Paragraph 31 of YOUR Complaint.

7  **RESPONSE TO INTERROGATORY NO. 6:**

8      Tradeshift specifically incorporates by reference each of its General Objections asserted

9  above.

10      Tradeshift objects to this Interrogatory because it seeks information that is equally or more

11  readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

12  communications between BuyerQuest and Smucker.  Accordingly some responsive information

13  was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

14  discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

15  BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

16  opportunity to review that information and incorporate it into its response.

17      Tradeshift objects to this request as duplicative, at least in part, of Interrogatory numbers

18  7-8, 10, 12, 14, 15, and 19.

19      In light of the foregoing objections and limitations, Tradeshift responds as follows:

20      Tradeshift incorporates its response to Interrogatory No. 5.

21      In addition, BuyerQuest refused to support Tradeshift's efforts to salvage the Smucker

22  Services Agreement at least in part because it planned to execute a new agreement between

23  BuyerQuest and Smucker for the Smucker Project that would exclude Tradeshift entirely.

24  Specifically, on January 16, 2020, Smucker sent Tradeshift a letter titled "Notice of Termination."

25  TS_BQ_00000001.  The Smucker Services Agreement (TS_BQ_00000053) states that Smucker

26  may only terminate the agreement if it provides Tradeshift with notice of a material breach and

27  Tradeshift does not correct the breach within 30 days of receiving such written notice.  The

28  "Notice of Termination," however, did not identify any such material breaches or indicate a

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                          - 12 -                                          TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   contractual basis upon which Smucker was terminating the Smucker Services Agreement at all.

2   Instead, without providing any specific examples, the letter stated that Tradeshift had

3   misrepresented the capabilities of Tradeshift's software and that Smucker was "offering a mutual

4   and immediate termination."  The letter further indicated that Smucker did not intend to comply

5   with its ongoing obligations under the Smucker Services Agreement and that Smucker would

6   block Tradeshift from further performing its contractual duties.  Smucker stated, for example, that

7   it had (1) instructed its internal team to cease cooperation with Tradeshift personnel and (2)

8   suspended Tradeshift's access to any of Smucker's facilities and systems.

9           After it received the January 16 letter from Smucker (and unaware of BuyerQuest's efforts

10  to convince Smucker to terminate the Smucker Services Agreement with Tradeshift in favor of a

11  BuyerQuest-Smucker-only agreement), Tradeshift promptly attempted to contact BuyerQuest by

12  phone and email to alert it to Smucker's claim that it would not allow further access or

13  cooperation on the Smucker Project.  Because Smucker's January 16 letter appeared to be

14  predicated on fundamental misunderstandings, Tradeshift requested that BuyerQuest, as its

15  subcontractor, cooperate with Tradeshift in helping to resolve any issues that Smucker may have.

16  BuyerQuest, however, ignored Tradeshift's attempts to contact BuyerQuest and did not respond

17  to Tradeshift's requests (and, in doing so, breached its contractual obligations to Tradeshift with

18  respect to project management and communication).  On January 23, 2020 (and by this time

19  suspecting that perhaps BuyerQuest was working with Smucker behind Tradeshift's back and in

20  violation of both the Smucker Services Agreement and the BuyerQuest Agreements), Tradeshift

21  sent a formal letter to BuyerQuest to request its cooperation and, again, asking for a response.

22  (TS_BQ_00000006). Tradeshift specifically reminded BuyerQuest of its obligations of good faith

23  and fair dealing under the BuyerQuest Agreements as Tradeshift's subcontractor.  Suggesting it

24  had been planning to thwart Tradeshift's contractual requests all along, that same day,

25  BuyerQuest responded to Tradeshift through a letter from its outside litigation law firm,

26  Kronenberger Rosenfeld.  (TS_BQ_00000004).  In that letter, BuyerQuest's counsel indicated

27  that BuyerQuest had no obligation to cooperate with Tradeshift under the BuyerQuest

28  Agreements due to Smucker's purported termination of the Smucker Services Agreement and,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                    - 13 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    perhaps even more concerning, argued that BuyerQuest was permitted to contract directly with

2    Smucker, including to replace Tradeshift on the Smucker Project.  Apparently, at this time,

3    BuyerQuest had already taken significant efforts to convince Smucker to terminate the Smucker

4    Services Agreement with Tradeshift and was working with Smucker to enter into a new contract

5    with just BuyerQuest for the Smucker Project.

6         Tradeshift responded to BuyerQuest in a letter dated January 27, 2020 and again reminded

7    BuyerQuest of its obligation of good faith and fair dealing as Tradeshift's subcontractor and again

8    asked BuyerQuest for its cooperation in working together to resolve any issues that Smucker had

9    raised.  (TS_BQ_00000010).  In a letter dated January 29, 2020, BuyerQuest's attorney

10   responded and expressly refused to assist or even to communicate with Tradeshift about the

11   existing Smucker Project.  (TS_BQ_00000012).

12        Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

13   to supplement this response as additional information is identified.

14   **INTERROGATORY NO. 7:**

15        IDENTIFY EACH incident in which BUYERQUEST failed "to support Tradeshift with

16   planning, configurations, deliverables, integrations, change requests, and product updates

17   necessary for the Smucker project implementation," as alleged in Paragraph 31 of YOUR

18   Complaint.

19   **RESPONSE TO INTERROGATORY NO. 7:**

20        Tradeshift specifically incorporates by reference each of its General Objections asserted

21   above.

22        Tradeshift objects to this Interrogatory because it seeks information that is equally or more

23   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

24   communications between BuyerQuest and Smucker.  Accordingly some responsive information

25   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

26   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

27   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

28   opportunity to review that information and incorporate it into its response.

Orrick, Herrington &
Sutcliffe LLP
Attorneys at Law
Silicon Valley

4153-0116-1765

- 14 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

1    Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

2    including, for example, Interrogatory numbers 5 and 6.

3    In light of the foregoing objections and limitations, Tradeshift responds as follows:

4    Tradeshift incorporates its responses to Interrogatory Numbers 5 and 6.

5    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

6    to supplement this response as additional information is identified.

7    **INTERROGATORY NO. 8:**

8    IDENTIFY EACH incident in which BUYERQUEST failed "to follow Tradeshift's lead

9    with respect to supplier onboarding strategy and planning," as alleged in Paragraph 31 of YOUR

10   Complaint.

11   **RESPONSE TO INTERROGATORY NO. 8:**

12   Tradeshift specifically incorporates by reference each of its General Objections asserted

13   above.

14   Tradeshift objects to this Interrogatory because it seeks information that is equally or more

15   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

16   communications between BuyerQuest and Smucker.  Accordingly some responsive information

17   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

18   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

19   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

20   opportunity to review that information and incorporate it into its response.

21   Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

22   including, for example, Interrogatory numbers 5 and 6.

23   In light of the foregoing objections and limitations, Tradeshift responds as follows:

24   Tradeshift's strategy for onboarding suppliers was to first lockdown the functionality of

25   the combined product and then to start onboarding suppliers to ensure that the product fit the

26   information provided by the suppliers.  BuyerQuest did not follow this strategy or Tradeshift's

27   lead and started attempting to onboard suppliers much sooner than Tradeshift expected.

28   Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                        - 15 -                    TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    to supplement this response as additional information is identified.

2    **INTERROGATORY NO. 9:**

3        IDENTIFY EACH incident in which BUYERQUEST failed "to follow the Change

4    Control Process," as alleged in Paragraph 31 of YOUR Complaint.

5    **RESPONSE TO INTERROGATORY NO. 9:**

6        Tradeshift specifically incorporates by reference each of its General Objections asserted

7    above.

8        Tradeshift objects to this Interrogatory because it seeks information that is equally or more

9    readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

10   communications between BuyerQuest and Smucker.  Accordingly some responsive information

11   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

12   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

13   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

14   opportunity to review that information and incorporate it into its response.

15       Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

16   including, for example, Interrogatory number 5.

17       In light of the foregoing objections and limitations, Tradeshift responds as follows:

18       Tradeshift incorporates its responses to Interrogatory Number 5.

19       Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

20   to supplement this response as additional information is identified.

21   **INTERROGATORY NO. 10:**

22       IDENTIFY EACH incident in which BUYERQUEST failed "to include Tradeshift in

23   COMMUNICATIONS with Smucker related to the Smucker project," as alleged in Paragraph 31

24   of YOUR Complaint.

25   **RESPONSE TO INTERROGATORY NO. 10:**

26       Tradeshift specifically incorporates by reference each of its General Objections asserted

27   above.

28       Tradeshift objects to this Interrogatory because it seeks information that is equally or more

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765          - 16 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and communications between BuyerQuest and Smucker.  Accordingly some responsive information was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during discovery.  Tradeshift reserves the right to update its response to this Interrogatory after BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable opportunity to review that information and incorporate it into its response.

Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories, including, for example, Interrogatory numbers 5, 6 and 11.

In light of the foregoing objections and limitations, Tradeshift provides the following response based on the information that has been made reasonably available to it at this time and reasonable inferences from that information:

Tradeshift incorporates its responses to Interrogatory Numbers 5, 6, and 11.

Discovery has just started.  Tradeshift is continuing its investigation and reserves its right to supplement this response as additional information is identified.

**INTERROGATORY NO. 11:**

IDENTIFY EACH incident in which BUYERQUEST made misrepresentations about TRADESHIFT, as alleged in Paragraph 37 of the Complaint, INCLUDING the speaker and recipient and the substance, means, and date of EACH COMMUNICATION.

**RESPONSE TO INTERROGATORY NO. 11:**

Tradeshift specifically incorporates by reference each of its General Objections asserted above.

Tradeshift objects to this Interrogatory because it seeks information that is equally or more readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and communications between BuyerQuest and Smucker.  Accordingly some responsive information was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during discovery.  Tradeshift reserves the right to update its response to this Interrogatory after BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable opportunity to review that information and incorporate it into its response.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 17 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1   Tradeshift objects to this request as duplicative, at least in part, of Interrogatory numbers

2   5, 6, 10, 12, 13, 15, and 19.

3   In light of the foregoing objections and limitations, Tradeshift provides the following

4   response based on the information that has been made reasonably available to it at this time and

5   reasonable inferences from that information:

6   Tradeshift incorporates its responses to Interrogatory Numbers 5 and 6.

7   In addition, at least as early as September 26, 2019, BuyerQuest planned to encourage

8   Smucker to terminate its contract with Tradeshift and enter into a new contract with BuyerQuest

9   instead.  On September 26, 2019, BuyerQuest's CEO, Jack Mulloy, sent an email to his

10  employees referring to this plan as "Operation Fyrefest."  (BQ043884).  Specifically, Mr. Mulloy

11  sent this email to Salman Siddiqui (BuyerQuest's Chief Operating Officer), Luke Batman

12  (BuyerQuest's Chief Financial Officer), Kyle Muskoff (BuyerQuest's Chief Revenue Officer),

13  and Dan Utyuzh (BuyerQuest's Implementation Team Leader), and told them that they "need to

14  be ready to pivot away from [Tradeshift]" and that he wanted "this group to be prepared to

15  execute 'Operation Fyrefest' . . . ."  Mr. Mulloy also outright told his team that BuyerQuest could

16  and would freely disregard its contract with Tradeshift in favor of its relationship with Smucker

17  by stating the following:

18      "Regardless of what contract BQ has with TS, **BuyerQuest's commitment is to
19      Smucker's and the success of the Smucker's project []** I can't emphasize this
        enough"

20

21  (BQ043884) (emphasis in original).

22  Mr. Mulloy's email laid out the purported reasons BuyerQuest would identify to Smucker

23  for terminating the contract with Tradeshift.  Specifically, he indicated that the group should

24  "discuss and agree to . . . [Tradeshift's] inability to execute, [Tradeshift's] unwillingness to

25  enable suppliers, [Tradeshift's] unwillingness to pay their bills or communicate properly with

26  BQ, etc."  Mr. Mulloy also indicated that the group needed to discuss how to communicate this

27  information to Smucker, *i.e.*, that the group should "discuss and agree to . . . [p]otential

28  communication plans between BQ/Smucker's."

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                          - 18 -                    TRADESHIFT'S OBJECTIONS AND
                                                                 RESPONSES TO BUYERQUEST'S FIRST
                                                                 SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1    The facts show that Mr. Mulloy executed on "Operation Fyrefest" over the next four

2    months by repeatedly attempting to convince Smucker to terminate its contract with Tradeshift in

3    favor of a direct agreement with BuyerQuest.  Mr. Mulloy started by convincing Smucker's

4    Senior Director of Indirect Procurement (Jason Barr) to help BuyerQuest convince Smucker's

5    decisionmakers to terminate Smucker's contract with Tradeshift and transfer the work to

6    BuyerQuest.  Mr. Mulloy appears to have disparaged Tradeshift to Mr. Barr on numerous

7    occasions, including by text and telephone.  This included conversations on at least on October

8    21, 2019; October 22, 2019; October 31, 2019; November 1, 2019; November 4, 2019, and

9    November 5, 2019.  (*See* BQ103116; BQ103117).  For example, Mr. Mulloy reported to his

10   executive team that, on October 21, 2019, about a conversation he had with Mr. Barr "off the

11   record." (BQ109056; BQ103116).  During this conversation Mr. Mulloy made Mr. Barr aware of

12   Mr. Mulloy's "skepticism around [Tradeshift]."  He also told his team that Mr. Barr was "on

13   board" and that Smucker would now be conducting its own risk assessment on Tradeshift "based

14   on our convo."  (BQ109056)  The full content of these discussion is still being discovered.

15       Mr. Mulloy also met with his executive times multiple times to discuss and refine

16   "Operation Fyrefest," *i.e.*, BuyerQuest's plan to convince Smucker to replace Tradeshift.  On

17   October 21, 2019, for example, Mr. Mulloy told his team that "today's email from [Tradeshift]

18   was the last straw," and that his team was going to "design a play" and "call it 'Operation

19   Fyrefest'" in case BuyerQuest needed to "audible."  (*Id.*).  Mr. Mulloy continued to discuss

20   "Operation Fyrefest" with his executive team throughout the project, including during a 2 hour

21   meeting with his team on October 23, 2019.

22       Smucker's management appears to have initially resisted Mr. Mulloy's and Mr. Barr's

23   recommendations that Smucker terminate its agreement with Tradeshift. Notwithstanding those

24   recommendations, In November 2019, Smucker told Mr. Mulloy that "[BuyerQuest] and

25   Tradeshift need to find a way to come together and pull this thing across the finish line."

26   (BQ103117).  Mr. Mulloy responded to Mr. Barr that a particular Tradeshift employee was "a

27   master bs'er" and—notwithstanding Smucker's instructions—stated that "we'll continue to plan

28   for a world without [Tradeshift]."  (*Id.*).  In other words, Mr. Mulloy had no intention of ceasing

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                      - 19 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1    his efforts to interfere with Smucker's contract with Tradeshift.

2         On December 5, 2019 BuyerQuest's CEO (Mr. Mulloy) and COO (Mr. Siddiqui) met with

3    persons from Smucker at Smucker's building.  (BQ109256).  Mr. Mulloy later described his

4    conversation with Smucker to BuyerQuest's CFO, Luke Batman.  (BQ103035).  Mr. Mulloy

5    indicated that the conversation included at least Dan Nowikci from Smucker and that Smucker

6    still would not agree to terminate its agreement with Tradeshift.  Specifically, Mr. Mulloy

7    reported that it "sounds like smucker's doesn't want to bifurcate the contract until after we go

8    live."  BuyerQuest's COO (Salman Siddiqui) also described the meeting to another Smucker

9    employee, and stated that "it was an odd ride Jack [Mulloy]" and that "Jack [Mulloy] oversold

10   and just bitched about Tradeshift #ceo_not_jack." (BQ109258) (emphasis added).  Based on these

11   discussions, it is clear that Mr. Mulloy was having conversations with Smucker without including

12   Tradeshift, including conversations intended to disparage Tradeshift and convince Smucker to

13   terminate Tradeshift or otherwise implement "Operation Fyrefest."  Discovery into the exact

14   content of these conversations is still ongoing.

15         To further "Operation Fyrefest," at least as early as December 6, 2019, BuyerQuest's

16   executive team was preparing presentations to help convince Smucker to terminate its agreement

17   with Tradeshift.  On December 6, 2019, Kyle Muskoff sent an initial draft of such a document,

18   titled "Smucker Proposal" to Salman Siddiqui.  (*See* BQ109275).

19         On December 13, 2019, BuyerQuest's CEO, Jack Mulloy, sent an email to one of

20   BuyerQuest's board members, Clark Khayat.  (BQ091161).  In the email, Mr. Mulloy provided

21   Mr. Khayat with an update on BuyerQuest's business, including the Smucker Project and

22   BuyerQuest's relationship with Smucker. During the conversation, Mr. Mulloy admits that he had

23   conversations with Smucker in which he disparaged Tradeshift, its products, its employees, and

24   its finances.  Specifically, Mr. Mulloy stated:

25         ". . . the Tradeshift/Smucker's relationship is not good [].  Through social listening
        (***and hearing from me***), Smucker's is very concerned about Tradeshift's ability to
26       execute.  Their product is very immature.  The delivery team is weak [] and the
        word is out that TradeShift has missed payroll a few times recently and they
27       haven't paid any vendors in a couple of months."

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                              - 20 -                    TRADESHIFT'S OBJECTIONS AND
                                                                     RESPONSES TO BUYERQUEST'S FIRST
                                                                     SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1  (BQ091161) (emphasis added).  Mr. Mulloy further stated that, as a result of Smucker's shaken

2  confidence in Tradeshift (which BuyerQuest itself had caused), Smucker would likely terminate

3  its contract with Tradeshift at some point.  Specifically, he stated:

4       "A likely outcome at Smucker's is that Tradeshift/BuyerQuest go-live at
        Smucker's in May 2020.  Smucker's puts [its prior vendor] in the rearview […]
5       soon after, Smucker's asks BuyerQuest to support 100% of their P2P efforts &
        remove the need for TS all together . . . .  This will result in a better commercial
6       deal for BQ and a better solution for Smucker's."

7

8  (BQ091161).

9       On December 19, 2019, Mr. Mulloy had a conversation with Dan Utyuzh (BuyerQuest's

10  Implementation Team Leader) via Slack (BQ112393).  During the conversation Mr. Mulloy

11  admitted that he had another conversation with Smucker's Senior Director of Indirect

12  Procurement (Jason Barr) and "further planted the seed" that Smucker should take over more of

13  Tradeshift's work so it could ultimately cut Tradeshift out of the Smucker Project.  Specifically

14  Mr. Mulloy stated:

15      I further planted the seed that JMS could move invoicing for indirects to BQ and
        that would: 1) lessen the work TS needs to do (clearly TS is drowning) and 2)
16      shift more of the scope into BQ so that we can blow TS completely out of JMS
        later in 2020.

17

18  (Id.) (emphasis added).

19       On or around December 20, 2019, Mr. Mulloy had another meeting with Smucker.

20  (BQ095231).  Mr. Mulloy reported to his team that, during this meeting, Smucker was

21  considering Mr. Mulloy's recommendations, but still had questions about BuyerQuest's ability to

22  take over certain of Tradeshift's task, including "Invoicing," "Supplier Portal," and "Direct

23  Orders."  (Id.).  He further indicated that BuyerQuest needed to explain how they would handle

24  these issues in order to convince Smucker to terminate its contract with Tradeshift.  (Id.).  Mr.

25  Mulloy further noted that he had set up a subsequent meeting with Smucker at BuyerQuest's

26  offices so that BuyerQuest could explain why Smucker should terminate its contract with

27  Tradeshift and transfer the work to Smucker.  As part of this, Mr. Mulloy notes that his contact at

28  Smucker (Jason Barr) would be "building the story as to why Tradeshift failed & how

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                    - 21 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

BuyerQuest can save the day at [Smucker]."  Specifically, Mr. Mulloy's notes stated, among other things, the following:

- "Smucker will be in our office on Tuesday, January 7th to discuss our go-forward plan in more detail.  For this meeting, we should be prepared to speak to: The updated project timeline (by week), the product roadmap updates to support JMS, a demo of the Invoicing functionality and supplier portal."

- "As part of the January 7th discussions, Jack, Jason, and Luke will split off at some point and talk about the go-forward commercials and contracting process."

- [. . . ] "Jason mentioned that January 17th is the date when JMS will officially give us the greenlight to move forward.  Starting now, Jason will be building the story as to why TradeShift failed & how BuyerQuest can save the day at JMS."

- "For obvious reasons, JMS asked us to keep this very quiet for now."

(BQ095231).

      The January 7, 2020 meeting with Smucker appears to have gone forward.  (*See* BQ113802).  On that date, Mr. Mulloy communicated to another BuyerQuest employee that the "[S]mucker's team is almost here," and that they would be using "our front [conference] room on [the] 3rd floor" for the presentation.  (*Id.*)  Mr. Mulloy's team appears to have prepared several draft presentations to present to Smucker at this meeting or at some other time.  One such presentation (BQ100227), included a section titled "Why are we here?" and proceeded to identify the false information that Mr. Mulloy had communicated to Smucker as "concerns around Tradeshift"

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 22 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL



(BQ100229).  The presentation also included notes indicating the points that Mr. Mulloy had communicated to Smucker and that BuyerQuest intended to reiterate during the presentation:

- Tradeshift's P2P solution is not at the level required to meet JMS's requirements:
  - Inability to load JMS accounting file due to filesize limitation
  - Inexperience and inability to enable suppliers to send invoices via cXML or EDI
  - Inability to do receiving (receiving moved to BuyerQuest in Q4)
  - Inability to process PO's with multiple line types
- Smucker has tight timeline with Ariba
  - We aren't convinced that TradeShift can deliver a working product
  - We aren't convinced that TradeShift will be solvent in 2020

- Tradeshift is under tremendous financial pressure and can't pay vendors

(BQ10229).

The presentation went on to explain how Smucker should transfer work from Tradeshift to BuyerQuest (thus breaching Smucker's contract with Tradeshift and BuyerQuest's contracts with Tradeshift).  Specifically, the presentation explained that "BuyerQuest is currently responsible for Indirect eProcurement and Supplier Catalog Management" and that "Tradeshift is currently

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 23 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

responsible for Indirect & Direct Accounts Payable as well as some Supplier Management."  It further stated that "BuyerQuest will take over responsibility for Indirect and Direct POs & Accounts Payable as well as all of the Supplier Management functionality."  (BQ100231). Another presentation similarly explained the "Indirect P2P Scope" that BuyerQuest would be taking over from Tradeshift.  (BQ097218).  One presentation also indicated that BuyerQuest needed an "official green light" to take over the scope of work by January 17, 2020.  (BQ100235-37).

On January 8, 2020, Mr. Mulloy had another text conversation with Mr. Batman.  In that conversation, Mr. Mulloy *again* indicated that (in violation of BuyerQuest's contractual obligations to Tradeshift) he was actively encouraging Smucker to terminate its contract with Tradeshift in favor of a contract with BuyerQuest.  (BQ103036).  Specifically, Mr. Mulloy asked Mr. Batman whether there was a "cool down period" in BuyerQuest's contract with Tradeshift that would delay BuyerQuest's ability to work directly with Smucker.  Mr. Batman indicated that there was not such a provision.  Mr. Mulloy responded "Great.  ***I'm working it***.  Will keep you posted.  Maybe we should connect tomorrow or Friday on some of the commercial elements." (BQ103036) (emphasis added).

Mr. Mulloy also appears to have spoken with Smucker on January 13, 2020 to further encourage Smucker to terminate its contract with Tradeshift.  On that date, Mr. Mulloy spoke with Salman Siddiqui (BuyerQuest's Chief Operating Officer) and noted that he was going to speak with Smucker that day.  (BQ118909).  Mr. Siddiqui responded that Mr. Mulloy should "get lots of $$ from [Smucker]," indicating that the Mr. Mulloy was already discussing a new contract between Smucker and BuyerQuest at this time, *i.e.*, before Smucker's purported termination of its contract with Tradeshift.  Mr. Mulloy also indicated that Smucker was meeting the following day to make the "go / no-go decision . . . for [BuyerQuest]."  *Id.*

Mr. Mulloy's repeated efforts to interfere with Tradeshift's contract with Smucker ultimately paid off.  On January 16, 2020—one day prior to the January 17, 2020 deadline that BuyerQuest gave Smucker to give a "green light" for BuyerQuest to take over Tradeshift's portion of the project—Smucker sent a letter to Tradeshift titled "Notice of Termination."

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 24 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

(TS_BQ_00000001).  In the letter, Smucker did not purport to terminate the agreement through the termination provisions provided in the contract.  Those provisions required Smucker to provide written notice of any material breaches to Tradeshift and to give Tradeshift 30-days to correct those purported breaches.  Instead of complying with those provisions, Smucker accused Tradeshift of fraud and stated that it was voiding the contract without complying with the termination provisions.

BuyerQuest has admitted that it subsequently worked with Smucker to finalize and execute a contract for BuyerQuest to replace Tradeshift on the Smucker Project.  Specifically, in its interrogatory responses, BuyerQuest admits that on or around January 21, 2020, Jason Barr from Smucker sent a draft contract to Jack Mulloy and BuyerQuest, and Smucker thereafter communicated about the provisions of the contract.  During this time, Tradeshift was still attempting to determine why Smucker had purported to terminate its contract with Smucker and requesting that BuyerQuest assist Tradeshift in salvaging the relationship and the agreement.  BuyerQuest outright refused to assist, apparently because it was finalizing this new agreement to take over Tradeshift's work.  On or around February 6, 2020, Dan Utyuzh at BuyerQuest sent a draft statement of work to Rowdy White at Smucker along with a Master Services Agreement.  On or around March 6, 2020, Smucker and BuyerQuest executed a new agreement for work that would have been done by Tradeshift under the Smucker Services Agreement and the BuyerQuest Agreements.

In addition to the documents, communications, and admissions indicating that BuyerQuest employees, including BuyerQuest CEO Jack Mulloy, communicated directly with Smucker without Tradeshift throughout fall of 2019 and January 2020 (and, in doing so, made false and disparaging statements about Tradeshift and encouraged Smucker to improperly terminate its contract with Tradeshift in favor of BuyerQuest), BuyerQuest has also admitted in its discovery responses that it had "[v]arious informal verbal communications in November and December 2019 about Tradeshift's [purported] failure to provide the services that Tradeshift was obligated to provide to Smucker."  BuyerQuest has not yet disclosed the timing or content of those discussions.

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

2   to supplement this response as additional information is identified.

3   **INTERROGATORY NO. 12:**

4   IDENTIFY EACH incident in which BUYERQUEST disparaged TRADESHIFT to

5   SMUCKER, as alleged in Paragraph 37 of the Complaint, INCLUDING the speaker and recipient

6   and the substance, means, and date of EACH COMMUNICATION.

7   **RESPONSE TO INTERROGATORY NO. 12:**

8   Tradeshift specifically incorporates by reference each of its General Objections asserted

9   above.

10   Tradeshift objects to this Interrogatory because it seeks information that is equally or more

11   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

12   communications between BuyerQuest and Smucker.  Accordingly some responsive information

13   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

14   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

15   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

16   opportunity to review that information and incorporate it into its response.

17   Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

18   including, for example, Interrogatory numbers 5 and 11.

19   In light of the foregoing objections and limitations, Tradeshift provides the following

20   response based on the information that has been made reasonably available to it at this time and

21   reasonable inferences from that information:

22   Tradeshift incorporates its responses to Interrogatory Numbers 5 and 11.

23   Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

24   to supplement this response as additional information is identified.

25   **INTERROGATORY NO. 13:**

26   IDENTIFY EACH incident in which BUYERQUEST "took steps to encourage Smucker

27   to wrongfully terminate the Smucker Services Agreement so that BuyerQuest could do a direct

28   deal with Smucker without Tradeshift for the Smucker project," as alleged in Paragraph 43 of

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 26 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   YOUR Complaint.

2   **RESPONSE TO INTERROGATORY NO. 13:**

3           Tradeshift specifically incorporates by reference each of its General Objections asserted

4   above.

5           Tradeshift objects to this Interrogatory because it seeks information that is equally or more

6   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

7   communications between BuyerQuest and Smucker.  Accordingly some responsive information

8   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

9   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

10   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

11   opportunity to review that information and incorporate it into its response.

12           Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

13   including, for example, Interrogatory numbers 5, 6, and 11.

14           In light of the foregoing objections and limitations, Tradeshift provides the following

15   response based on the information that has been made reasonably available to it at this time and

16   reasonable inferences from that information:

17           Tradeshift incorporates its responses to Interrogatory Numbers 5, 6, and 11.

18           Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

19   to supplement this response as additional information is identified.

20   **INTERROGATORY NO. 14:**

21           IDENTIFY EACH incident in which BUYERQUEST "refused to communicate with,

22   cooperate with, or support Tradeshift in seeking to finish implementation of the Smucker

23   Project," as alleged in Paragraph 43 of YOUR Complaint.

24   **RESPONSE TO INTERROGATORY NO. 14:**

25           Tradeshift specifically incorporates by reference each of its General Objections asserted

26   above.

27           Tradeshift objects to this Interrogatory because it seeks information that is equally or more

28   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                                    - 27 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1  communications between BuyerQuest and Smucker.  Accordingly some responsive information

2  was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

3  discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

4  BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

5  opportunity to review that information and incorporate it into its response.

6       Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

7  including, for example, Interrogatory Number 6.

8       In light of the foregoing objections and limitations, Tradeshift responds as follows:

9       Tradeshift incorporates its response to Interrogatory Number 6.

10       Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

11  to supplement this response as additional information is identified.

12  **INTERROGATORY NO. 15:**

13       IDENTIFY EACH incident in which BUYERQUEST "manufactured an excuse not to

14  perform its obligations under the BuyerQuest Agreements," as alleged in Paragraph 43 of YOUR

15  Complaint.

16  **RESPONSE TO INTERROGATORY NO. 15:**

17       Tradeshift specifically incorporates by reference each of its General Objections asserted

18  above.

19       Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal a

20  trade secret and/or confidential or proprietary business information.  If Tradeshift provides such

21  information, it will do so subject to the Protective Order entered in this case.

22       Tradeshift objects to this Interrogatory because it seeks information that is equally or more

23  readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

24  communications between BuyerQuest and Smucker.  Accordingly some responsive information

25  was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

26  discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

27  BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

28  opportunity to review that information and incorporate it into its response.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 28 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1  Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

2  including, for example, Interrogatory numbers 5, 6, and 11.

3  In light of the foregoing objections and limitations, Tradeshift provides the following

4  response based on the information that has been made reasonably available to it at this time and

5  reasonable inferences from that information:

6  Tradeshift incorporates its responses to Interrogatory Numbers 5, 6 and 11.

7  Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

8  to supplement this response as additional information is identified.

9  **<u>INTERROGATORY NO. 16</u>:**

10  IDENTIFY EACH reason that SMUCKER provided to TRADESHIFT for SMUCKER's

11  termination of the SMUCKER SERVICES AGREEMENT.

12  **<u>RESPONSE TO INTERROGATORY NO. 16</u>:**

13  Tradeshift specifically incorporates by reference each of its General Objections asserted

14  above.

15  Tradeshift objects to this request as vague and ambiguous because it asks about Smucker's

16  termination of the Smucker Services Agreement, but Smucker never properly terminated the

17  Smucker Services Agreement pursuant to the termination provisions in that contract; Tradeshift

18  will interpret this interrogatory as seeking information about the reasons Smucker gave for its

19  purported termination.  Tradeshift objects to this interrogatory as seeking information that is

20  equally available to BuyerQuest.

21  In light of the foregoing objections and limitations, Tradeshift responds as follows:

22  Smucker did not properly terminate the Smucker Services Agreement.  Instead, at the

23  behest of BuyerQuest, Smucker unexpectedly repudiated and breached its obligations under the

24  Smucker Services Agreement without following the required procedures for terminating the

25  agreement.

26  Pursuant to Federal Rule of Civil Procedure 33(d), Tradeshift identifies the following

27  documents: Smucker's January 16, 2020 letter (TS_BQ_00000001) and Smucker's January 30,

28  2020 letter (TS_BQ_00000014).

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 29 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

2    to supplement this response as additional information is identified.

3    **INTERROGATORY NO. 17:**

4    IDENTIFY ALL complaints that SMUCKER or BUYERQUEST communicated to YOU

5    about YOUR performance under the SMUCKER SERVICES AGREEMENT, INCLUDING

6    ANY complaints about the Tradeshift Platform Business Edition and the Tradeshift Pay Business

7    Edition.

8    **RESPONSE TO INTERROGATORY NO. 17:**

9    Tradeshift specifically incorporates by reference each of its General Objections asserted

10    above.

11    Tradeshift further objects to this Interrogatory on the grounds that it is vague and

12    ambiguous in its use of the term "complaints."  Tradeshift will construe "complaints" as defects

13    and "errors and change requests received regarding the Tradeshift Platform Business Edition and

14    the Tradeshift Pay Business Edition in connection with the Smucker Project."

15    In light of the foregoing objections and limitations, Tradeshift responds as follows:

16    Pursuant to Federal Rule of Civil Procedure 33(d), Tradeshift will produce documents

17    sufficient to disclose any complaints that Tradeshift received from Smucker or BuyerQuest

18    regarding Tradeshift's performance under the Smucker Services Agreements.

19    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

20    to supplement this response as additional information is identified.

21    **INTERROGATORY NO. 18:**

22    DESCRIBE YOUR calculation of EACH category of damages YOU seek from

23    BuyerQuest in this action, INCLUDING ALL DOCUMENTS that support that calculation.

24    **RESPONSE TO INTERROGATORY NO. 18:**

25    Tradeshift specifically incorporates by reference each of its General Objections asserted

26    above.

27    Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

28    information that is the subject of the attorney-client privilege, the attorney work product doctrine,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 30 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

or any other applicable privilege or doctrine.  Tradeshift will log any such communications it excludes on this basis to the extent consistent with the parties' privilege log agreement.

Tradeshift objects to this interrogatory as premature to the extent it seeks expert testimony and/or opinions that are not yet due under the scheduling order issued in this case.  Tradeshift reserves the right to supplement and/or revise its calculation of damages based on the opinion of such experts.

Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal a trade secret and/or confidential or proprietary business information.  If Tradeshift provides such information, it will do so subject to the Protective Order entered in this case.  Tradeshift further objects to this Interrogatory to the extent that it calls for Tradeshift to reveal information that is the subject of the attorney-client privilege or the attorney work product doctrine.

In light of the foregoing objections and limitations, Tradeshift responds as follows:

Tradeshift seeks at least $4,373,070.37 in damages from BuyerQuest, which is the remaining amount that Smucker was required to pay pursuant to the Smucker Services Agreement.  The Smucker Services Agreement provided that Smucker would pay $5,168,951 in fees for implementation, services, and software licenses.  Smucker paid a total of $795,880.63 before BuyerQuest breached the BuyerQuest Agreements and interfered with the Smucker Services Agreement.

Tradeshift also seeks punitive damages and attorneys' fees in amounts that have yet to be determined.

Tradeshift will produce documents sufficient to support its damages claims.  Tradeshift identifies the following non-exhaustive list of exemplary documents supporting Tradeshift's damages claims: the Smucker Services Agreement (TS_BQ_00000053);  The BuyerQuest Agreements (TS_BQ_00000016; TS_BQ_00000124); and Invoice and Payment Reports related to the Smucker Project (TS_BQ_00000135; TS_BQ_00000136).

Discovery has just started.  Tradeshift is continuing its investigation and reserves its right to supplement this response as additional information is identified.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 31 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

**INTERROGATORY NO. 19:**

IDENTIFY ALL conduct by BUYERQUEST by specific incident that supports YOUR request for punitive damages in this action.

**RESPONSE TO INTERROGATORY NO. 19:**

Tradeshift specifically incorporates by reference each of its General Objections asserted above.

Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal information that is the subject of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine. Tradeshift will log any such communications it excludes on this basis to the extent consistent with the parties' privilege log agreement.

Tradeshift objects to this Interrogatory because it seeks information that is equally or more readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and communications between BuyerQuest and Smucker. Accordingly some responsive information was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during discovery. Tradeshift reserves the right to update its response to this Interrogatory after BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable opportunity to review that information and incorporate it into its response.

Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories, including, for example, Interrogatory numbers 5, 6 and 11.

In light of the foregoing objections and limitations, Tradeshift responds as follows:

Tradeshift retained BuyerQuest as a subcontractor on the Smucker Project. As a result, BuyerQuest had contractual obligations to Tradeshift as well as an implied obligation of good faith and fair dealing. BuyerQuest completely ignored these obligations. It intentionally interfered with Tradeshift's contract with Smucker by undermining Tradeshift on the Smucker Project and secretly convincing Smucker to terminate the contract in favor of a direct deal with BuyerQuest only. BuyerQuest's plan—which it referred to as "Operation Fyrefest,"—was planned and executed by its executive officers, led by BuyerQuest's CEO, Jack Mulloy.

Tradeshift incorporates its responses to Interrogatory Numbers 5, 6, and 11.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 32 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1          Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

2   to supplement this response as additional information is identified.

3

4   Dated: August 10, 2020                    By:   /s/ Amy K. Van Zant

5                                                  Amy K. Van Zant
                                                   Jason K. Yu
                                                   Tammy Su
6                                                  Attorneys for Plaintiff
                                                   TRADESHIFT, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                  - 33 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

## PROOF OF SERVICE

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action.  My place of business is Orrick, Herrington & Sutcliffe, LLP, 1000 Marsh Road, Menlo Park, CA 94025.  On August 10, 2020, I served the within document(s):

**PLAINTIFF TRADESHIFT, INC.'S OBJECTIONS AND RESPONSES TO DEFENDANT BUYERQUEST, INC.'S FIRST SET OF INTERROGATORIES (NOS. 1-19).**

| X | By transmitting a courtesy copy **via electronic mail** the document(s) listed above to the email addresses set forth below on August 10, 2020. |
|---|---|

Karl S. Kronenberger
Jeffrey M. Rosenfeld
Liana W. Chen
Ruben Peña
KRONENBERGER ROSELFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
karl@KRInternetLaw.com
jeff@KRInternetLaw.com
liana@KRInternetLaw.com
ruben@KRInternetLaw.com
**ATTORNEYS FOR DEFENDANT BUYERQUEST, INC.**

Executed on August 10, 2020 at Moss Beach, California.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*/s/ Karin Barnick*
Karin Barnick