# EXHIBIT 9

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4    TRADESHIFT, INC., a Delaware    )
 5    corporation,                    )
 6           Plaintiff,               )
 7           vs.                      ) Case No.
 8    BUYERQUEST, INC., an Ohio       ) 3:20-cv-1294-RS
 9    corporation,                    )
10           Defendant.               )
11    _____ )
12
13
14
15       VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
16              DEPOSITION OF JACK MULLOY
17
18             Tuesday, April 20, 2021
19          Testifying from Cleveland, Ohio
20
21
22
23    Reported By:
24    Hanna Kim, CLR, CSR No. 13083
25    Job No. 4502566
```

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA
 3
 4  TRADESHIFT, INC., a Delaware   )
 5  corporation,                   )
 6       Plaintiff,                )
 7       vs.                       ) Case No.
 8  BUYERQUEST, INC., an Ohio      ) 3:20-cv-1294-RS
 9  corporation,                   )
10       Defendant.                )
11  _____ )
12
13
14
15       Virtual videoconference video-recorded
16       deposition of JACK MULLOY, taken on behalf
17       of the Plaintiff, with the stipulations of
18       counsel thereof, on Tuesday, April 20,
19       2021, before Hanna Kim, CLR, Certified
20       Shorthand Reporter, No. 13083.
21
22
23
24
25
                                          Page 2
```

```
 1  REMOTE APPEARANCES OF COUNSEL:  (CONTINUED)
 2
 3  Also Present:
 4      LAUREL JAMTGAARD, ESQ., Tradeshift
 5      AMER MOORHEAD, ESQ., Tradeshift
 6      JESSICA CALLOW, ESQ., BuyerQuest
 7      ALICIA TRINLEY, ESQ., BuyerQuest
 8      SCOTT SLATER, Videographer
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 4
```

```
 1  REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
 2
 3  For Plaintiff:
 4      ORRICK, HERRINGTON & SUTCLIFFE LLP
 5      BY:  AMY VAN ZANT, ESQ.
 6      BY:  OLIVIA CLEMENTS, ESQ.
 7      1000 Marsh Road
 8      Menlo Park, California 94025-1015
 9      650.614.7400
10      amyvanzant@orrick.com
11      oclements@orrick.com
12
13  For Defendant:
14      GORDON REES SCULLY MANSUKHANI, LLP
15      BY:  ANTHONY PHILLIPS, ESQ.
16      BY:  CHRISTINA FLORES, ESQ.
17      275 Battery Street, Ste. 2000
18      San Francisco, California 94111
19      415.986.5900
20      aphillips@grsm.com
21      cflores@grsm.com
22
23
24
25
                                          Page 3
```

```
 1            INDEX OF EXAMINATION
 2
 3  WITNESS:  JACK MULLOY
 4  EXAMINATION                           PAGE
 5      BY MS. VAN ZANT:                    13
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 5
```

2 (Pages 2 - 5)

**Page 222**

1  (Short recess taken.)
2  THE VIDEOGRAPHER: We are back on the
3  record. The time is 7:06 p.m.
4  BY MS. VAN ZANT:
5  Q. Okay. Mr. Mulloy, I'd like to introduce
6  Exhibit 79.
7  (Mulloy Deposition Exhibit 79 was marked.)
8  MS. VAN ZANT: And for the reporter,
9  the -- Exhibit 79 is BQ100227 through BQ100242.
10 BY MS. VAN ZANT:
11 Q. Let me know when you've had a chance to
12 look at it and are ready to go.
13 A. I have it up.
14 Q. Okay. We've been told by other witnesses
15 that this is a presentation that BuyerQuest
16 prepared and gave to Smucker's for -- for
17 presentation.
18 Can you provide the date that this
19 document was drafted?
20 MR. PHILLIPS: Objection. Misstates the
21 record.
22 THE WITNESS: I don't know exactly the
23 date.
24 BY MS. VAN ZANT:
25 Q. Okay. But you're designated as

**Page 223**

1  Tradeshift's corporate designee on communications
2  between BuyerQuest and Smucker, including those
3  that discuss Tradeshift, which Exhibit 79 is one
4  of those.
5  And so did you review Exhibit 79 to
6  prepare to be Tradeshift's -- I'm sorry,
7  BuyerQuest's corporate designee today?
8  A. Yes.
9  Q. Okay. And did you talk to anyone besides
10 your lawyers about Exhibit 79 to try and determine
11 when it was prepared?
12 A. No.
13 Q. Do you know who at BuyerQuest provided a
14 copy of Exhibit 79 to Smucker's?
15 MR. PHILLIPS: Objection. Lacks
16 foundation.
17 THE WITNESS: No, I don't know who.
18 BY MS. VAN ZANT:
19 Q. Does Tradeshift -- I apologize.
20 Does BuyerQuest maintain copies of
21 presentations that it prepares for potential
22 customers in a central repository at the company?
23 A. No.
24 Q. Does BuyerQuest use Google Drive?
25 A. Sometimes.

**Page 224**

1  Q. Okay. When a document such as Exhibit 79
2  is prepared, is it normally stored somewhere that
3  any employee or at least employees who have an
4  interest in the subject matter could access it?
5  A. No.
6  Q. Okay. Did you draft Exhibit 79?
7  A. No.
8  Q. Did you have any input on it whatsoever?
9  A. I saw it when it was being drafted.
10 Q. Okay. And do you have like a time frame
11 in which it was being drafted, like a month or a
12 season and a year?
13 A. February 2020.
14 Q. Okay. If you could please turn to the
15 third slide in the deck, the one that says "Why
16 are we here?"
17 A. Yes.
18 Q. Okay. It starts with "Smucker has tight
19 timeline with current Ariba contract.
20 "Concern that Tradeshift's P2P technical
21 and product solution are not at the level required
22 to meet JMS's requirements.
23 "Concern around Tradeshift financial
24 situation and their ability to pay vendors and
25 employees."

**Page 225**

1  And then "Concern around Tradeshift's
2  strategic and product focus in coming years."
3  Did -- did BuyerQuest draft the four
4  points that are shown on page 3 of Exhibit 79?
5  A. We worked with Smucker to put this deck
6  together. We --
7  Q. Okay. Who at Smucker -- I apologize.
8  A. We collaborated with -- with Smucker.
9  Q. Okay. And do you know who at Smucker
10 collaborated with someone at BuyerQuest to prepare
11 this deck?
12 A. Jason Barr.
13 Q. Okay. In -- when it says in here that
14 there's a -- a "Concern around Tradeshift's
15 financial situation and their inability to pay
16 vendors and employees" [as read], did you have
17 information that Tradeshift had a total inability
18 to pay vendors?
19 A. Yes.
20 Q. And what was the source of that
21 information?
22 A. Tradeshift.
23 Q. Who at Tradeshift?
24 A. Dan Roehrs, Bent Christiansen.
25 Q. Anyone else?

**Page 226**

1  A. No.
2  Q. And did they report that Tradeshift wasn't
3  paying any vendors at that time?
4  A. Yes.
5  Q. Do you know if Mr. Roehrs was accurate    19:13:02
6  when he told you that Tradeshift wasn't paying any
7  vendors at all at that time?
8     MR. PHILLIPS: Objection. Calls for
9  speculation.
10    THE WITNESS: I don't know.    19:13:19
11 BY MS. VAN ZANT:
12 Q. Has BuyerQuest ever slow paid vendors?
13 A. Yes.
14 Q. When -- at -- at the times BuyerQuest has
15 slow paid vendors, has BuyerQuest been in    19:13:37
16 financial distress?
17 A. No.
18 Q. Okay. When it says here that Tradeshift
19 had inability to pay employees, was that referring
20 to the one instance that you had -- we had seen in    19:13:56
21 a prior document where you said Dan Roehrs had
22 told you that Tradeshift had not paid North
23 American employees?
24 A. Yes.
25 Q. Were you aware of any other instance in    19:14:11

**Page 227**

1  which you had understood that Tradeshift had not
2  met payroll?
3  A. Yes.
4  Q. And was that with respect to China?
5  A. It's with respect to things written about    19:14:23
6  Tradeshift from employees and former employees in
7  Glassdoor.
8  Q. Right. And I was trying to find out,
9  was -- was it -- was the allegation in Glass Door
10 that Tradeshift had missed payroll in China?    19:14:43
11 A. Glassdoor reviews are anonymous, so I'm
12 not sure who -- who would have written them within
13 Tradeshift.
14 Q. I think I'm -- I'm asking a slightly
15 different question than what you're answering,    19:15:04
16 which is I know that Glassdoor reviews are
17 anonymous, but did you read one that said,
18 "Tradeshift has missed paying" -- "making payroll
19 in" -- "with the China team"?
20 A. I don't recall if it said "China" or not.    19:15:17
21 I just -- I read "missed payroll" a couple of
22 times.
23 Q. Okay. Do you -- how frequently do you go
24 on Glassdoor on a monthly basis?
25 A. Once a week.    19:15:36

**Page 228**

1  Q. Okay. And do you review the reviews of
2  BuyerQuest on Glassdoor?
3  A. Yes.
4  Q. Why were you looking at Tradeshift's
5  reviews on Glassdoor in 2019?    19:15:55
6  A. I had heard from Tradeshift that there was
7  a lot of noise on Glassdoor about Tradeshift.
8  Q. Why would Tradeshift tell you that there
9  was a lot of noise about Tradeshift on Glassdoor?
10    MR. PHILLIPS: Objection. Calls for    19:16:18
11 speculation.
12    THE WITNESS: I assume those resources
13 were concerned about the well being of the business
14 as well.
15 BY MS. VAN ZANT:    19:16:27
16 Q. Who at Tradeshift told you that there was
17 a lot of noise about Tradeshift on Glassdoor?
18 A. Dan Roehrs.
19 Q. Okay. Was Dan Roehrs the primary source
20 of your information about negative circumstances    19:16:50
21 at Tradeshift?
22 A. He was our primary contact with the
23 BuyerQuest/Tradeshift relationship.
24 Q. Okay. If we look at the comments on that
25 third page of Exhibit 79, the first bullet point    19:17:06

**Page 229**

1  underneath the slide says, "Tradeshift's P2P
2  solution is not at the level required to meet
3  JMS's requirements:" And then it says, "Inability
4  to load JMS accounting file due to filesize
5  limitation.    19:17:27
6     "Inexperience and inability to enable
7  suppliers to send invoices via cXML" and -- "or
8  EDI.
9     "Inability to do receiving (receiving
10 moved to BuyerQuest in Q4)."    19:17:42
11    And then "Inability to process PO's with
12 multiple line types."
13    Where did BuyerQuest get the information
14 for these four bullet points?
15 A. It came from the project team,    19:17:57
16 Smucker/Tradeshift/BuyerQuest project team.
17 Q. Okay. Who on that project team told
18 you -- told BuyerQuest that Tradeshift couldn't do
19 the things identified in those four bullet points?
20 A. Some of these are documented in the status    19:18:21
21 report that was published to Tradeshift and
22 Smucker and BuyerQuest.
23 Q. Below those bullet points, it says,
24 "Smucker has tight timeline with Ariba." And then
25 there's two sub-bullet points that say, "We aren't    19:18:45

**Page 230**

1 convinced that Tradeshift can deliver a working
2 product."
3        So BuyerQuest, it seems, wasn't convinced
4 that Tradeshift couldn't deliver a working
5 product, but did BuyerQuest think it was a                    19:19:00
6 possibility that Tradeshift still could?
7    A.  No.
8    Q.  So when you guys said "We aren't
9 convinced," did you mean "We're certain that
10 Tradeshift can't deliver a working product to            19:19:13
11 Smucker"?
12    A.  Not within the time frame.
13    Q.  At that time frame, did you think it was
14 possible that Tradeshift could deliver a working
15 product to Smucker?                                           19:19:29
16    A.  No.
17    Q.  Okay.  At any point did BuyerQuest think
18 that Smucker could deliver a working product to
19 Smucker?
20    A.  Yes.  At the inception of the project, we       19:19:41
21 were all hopeful that Tradeshift could deliver
22 what they signed up for.
23    Q.  And how quickly after the contracts were
24 signed did BuyerQuest come to the conclusion that
25 it believed that Tradeshift could not deliver a          19:20:03

**Page 231**

1 working product?
2    A.  Within days.
3    Q.  And did -- did you go and communicate this
4 to, for example, Christian Lanng?
5    A.  Did I?  No.                                              19:20:20
6    Q.  Well, you had just signed these contracts
7 for what was a significant deal for BuyerQuest,
8 and you said you figured out within days that
9 Tradeshift wasn't going to be able to deliver.
10       As CEO, why didn't you go to management at    19:20:35
11 Tradeshift and say, "What the heck are you guys
12 doing?  You sold us a bill of goods"?
13    A.  We decided to work with Tradeshift and
14 Smucker to move more of the functionality off of
15 Tradeshift's plate onto BuyerQuest's plate over     19:20:57
16 the course of, you know, July, August, September,
17 October, November, and December of 2019.
18    Q.  And Smucker and Tradeshift agreed to move
19 some of that functionality off Tradeshift's plate
20 to BuyerQuest's plate at Tradeshift's -- I              19:21:16
21 apologize.
22       Smucker agreed to move some of that
23 functionality off of Tradeshift's plate to
24 BuyerQuest's plate at BuyerQuest's suggestion;
25 right?                                                            19:21:28

**Page 232**

1    A.  At Tradeshift and BuyerQuest's suggestion.
2    Q.  Are you saying Tradeshift was in all
3 meetings between Tradeshift and -- I apologize,
4 between BuyerQuest and Smucker regarding changes
5 to who was responsible for providing what            19:21:43
6 functionality?
7    A.  I can't speak to all meetings, but
8 Tradeshift was keenly aware of the changes that
9 were being requested by the end client, Smucker.
10    Q.  Isn't it a fact that BuyerQuest was          19:21:58
11 repeatedly having meetings and calls with Smucker
12 where Tradeshift was not invited or informed of
13 the meeting in advance, where Smucker and
14 BuyerQuest independently agreed to move
15 functionality from Tradeshift to BuyerQuest?     19:22:16
16       MR. PHILLIPS:  Objection.
17       THE WITNESS:  No.
18       MR. PHILLIPS:  That's compound.  It's
19 argumentative.  Misstates his prior testimony.
20 BY MS. VAN ZANT:                                              19:22:27
21    Q.  What's your answer?
22    A.  No.
23    Q.  So there were no meetings like that
24 whatsoever?
25    A.  There were meetings --                                19:22:36

**Page 233**

1       MR. PHILLIPS:  Asked and answered.
2 BY MS. VAN ZANT:
3    Q.  Go ahead.
4       MR. PHILLIPS:  Go ahead.
5       THE WITNESS:  There were meetings between   19:22:44
6 Tradeshift and Smucker where BuyerQuest wasn't
7 involved.  There were meetings with Tradeshift and
8 BuyerQuest where Smucker wasn't involved.  And
9 there were meetings with Smucker and BuyerQuest
10 where Tradeshift were -- weren't [verbatim]          19:22:56
11 involved.  It was a highly complex project.
12 BY MS. VAN ZANT:
13    Q.  Okay.  But under the terms of the
14 BuyerQuest/Tradeshift contracts, was BuyerQuest
15 supposed to have communications with Smucker    19:23:06
16 without Smucker's permission or attendance?
17       MR. PHILLIPS:  Objection.  Calls for a
18 legal conclusion.
19       THE WITNESS:  I -- I think the question
20 was not framed right, but could you ask it one more  19:23:27
21 time?
22 BY MS. VAN ZANT:
23    Q.  Sure.
24       My question is, under the terms of the
25 BuyerQuest/Tradeshift reseller order form, was    19:23:39

59 (Pages 230 - 233)

```
 1  BuyerQuest supposed to have meetings or
 2  communications with Smucker without first getting
 3  Tradeshift's permission or inviting Tradeshift to
 4  the meeting?
 5       MR. PHILLIPS:  Calls for a legal          19:24:03
 6  conclusion.
 7       Go ahead then, Mr. Mulloy.
 8       THE WITNESS:  Yes, there was going to be
 9  meetings where not all three parties were going to
10  be involved.  It was understood by all three        19:24:14
11  parties.
12  BY MS. VAN ZANT:
13    Q.  But that's not what the contract says;
14  right?  Under the terms of the reseller order
15  form, BuyerQuest was Tradeshift's subcontractor;    19:24:20
16  right?
17       MR. PHILLIPS:  Objection.  Calls for a
18  legal conclusion.  Misstates the document.
19       THE WITNESS:  Yes.
20  BY MS. VAN ZANT:                                    19:24:33
21    Q.  Okay.  And as a subcontractor, it was up
22  to the contractor, the party with the direct
23  contract with Smucker, to have communications with
24  Smucker; right?
25       MR. PHILLIPS:  Objection.  Calls for a        19:24:50
                                                    Page 234
```

```
 1  legal conclusion.  Lacks foundation.
 2       THE WITNESS:  BuyerQuest met with
 3  Tradeshift and with Smucker when all three parties
 4  were needed and met directly with Tradeshift
 5  without Smucker there when Smucker wasn't needed    19:25:07
 6  and met with Smucker when Tradeshift wasn't needed.
 7  BY MS. VAN ZANT:
 8    Q.  Did Tradeshift meet with Smucker without
 9  BuyerQuest when Trade- -- when -- I apologize.
10       Did BuyerQuest meet with Smucker without      19:25:20
11  Tradeshift being present when BuyerQuest wanted to
12  speak ill of Tradeshift?
13    A.  No.
14       MR. PHILLIPS:  Objection.  Argumentative.
15  Misstates the record.  Lacks foundation.           19:25:31
16  BY MS. VAN ZANT:
17    Q.  Uh-huh.
18       And in this presentation that we're
19  looking at right now where it's stating that
20  BuyerQuest doesn't think that Tradeshift can       19:25:43
21  deliver a product and that it doesn't think that
22  Tradeshift will be solvent in 2020, did you
23  include Tradeshift on this presentation?
24       MR. PHILLIPS:  Objection.  Misstates the
25  document and lacks foundation.                      19:25:57
                                                    Page 235
```

```
 1       THE WITNESS:  No.
 2  BY MS. VAN ZANT:
 3    Q.  And why didn't you include Tradeshift
 4  on -- why didn't you send them a copy of this
 5  presentation?                                       19:26:07
 6    A.  Smucker's had terminated the contract with
 7  Tradeshift prior to this document.
 8    Q.  But you just told me a few minutes ago
 9  that you don't know when this document was
10  prepared.                                           19:26:21
11    A.  I said I -- I estimated that it --
12       MR. PHILLIPS:  Objection -- hold on a
13  second, Mr. Mulloy.  Hold on a second, Mr. Mulloy.
14       Objection.  Misstates his prior testimony.
15       Go ahead.                                     19:26:30
16  BY MS. VAN ZANT:
17    Q.  Mr. Mulloy, the document here says "Why
18  are we here?"  And it says there's a concern that
19  Tradeshift can't deliver the product.  So clearly
20  the -- the contract couldn't have been terminated   19:26:40
21  by this point; right?
22       MR. PHILLIPS:  Objection.  Argumentative.
23  Misstates the document.  Assumes facts not in
24  evidence.  And lacks foundation.
25       MS. VAN ZANT:  Okay.  Enough of the          19:26:52
                                                    Page 236
```

```
 1  speaking objections.  You get to say "Objection.
 2  Form" or "Attorney-client privilege," and that's
 3  it.
 4  BY MS. VAN ZANT:
 5    Q.  Go ahead, Mr. Mulloy.                         19:26:59
 6       MR. PHILLIPS:  You -- you don't get to
 7  tell me what I get to say when I make an objection,
 8  Ms. Van Zant.  I'm entitled --
 9       MS. VAN ZANT:  I actually can tell you
10  what the rules require.                            19:27:07
11       MR. PHILLIPS:  I can make my record for
12  the basis of my objections for when the Court comes
13  to rule on these objections, and that's precisely
14  what I've been doing and what I will continue to
15  do.                                                 19:27:17
16       MS. VAN ZANT:  I would encourage you to
17  read --
18       MR. PHILLIPS:  My objection to your
19  question was that it was argumentative, misstates
20  the document, assumes facts not in evidence, and    19:27:22
21  lacks foundation.
22       With that, Mr. Mulloy, you can answer the
23  question.
24       MS. VAN ZANT:  Okay.  There was no need to
25  repeat your objections.  And your -- your          19:27:33
                                                    Page 237
```

| | |
|---|---|
| 1  objections are disturb- -- disrupting the<br>2  deposition.  They are wasting time.  And you should<br>3  read the Northern District Civil Guidelines for<br>4  what type of objections are allowed in this<br>5  District.                                                  19:27:46<br>6  BY MS. VAN ZANT:<br>7      Q.  Mr. Mulloy, go ahead and answer.<br>8      A.  Can you ask it again?<br>9          MR. PHILLIPS:  Can we have the question<br>10 back, please.  Hold on.                              19:27:49<br>11         MS. VAN ZANT:  No, no.  I'm going ahead<br>12 and ask him a question.<br>13 BY MS. VAN ZANT:<br>14     Q.  I asked you -- I said in this slide that<br>15 we were looking at, it said that BuyerQuest was    19:27:58<br>16 concerned whether Tradeshift could deliver the --<br>17 a working product.<br>18         And I said, based on that, do you think<br>19 that this presentation was made after Tradeshift<br>20 had already been terminated by Smucker.            19:28:17<br>21         MR. PHILLIPS:  Objection.  Misstates the<br>22 document.<br>23         THE WITNESS:  I think this was authored in<br>24 January of 2019.<br>25 BY MS. VAN ZANT:                                    19:28:38<br>Page 238 | 1      Q.  Okay.  And do -- do you know why<br>2  Smucker -- first of all, did Smucker make that<br>3  request in writing or verbally to BuyerQuest?<br>4      A.  Verbally.<br>5      Q.  Okay.  Who made the request?           19:29:55<br>6      A.  Jason Barr.<br>7      Q.  And who did he make it to?<br>8      A.  Kyle Muskoff.<br>9      Q.  And were you present for the conversation<br>10 between Kyle Muskoff and Jason Barr?             19:30:16<br>11     A.  Yes.<br>12     Q.  So did Jason Barr also communicate the<br>13 request to you?<br>14     A.  Yes.<br>15     Q.  Okay.  Why did you not mention the fact   19:30:27<br>16 that he had communicated the request to you<br>17 initially?<br>18     A.  He was asking Kyle to take point on it.<br>19     Q.  Okay.  Was anyone else around during this<br>20 call where Jason requested that BuyerQuest prepare 19:30:44<br>21 a deck the week of January 20?<br>22     A.  Not that I recall.<br>23     Q.  Okay.  And -- and what did -- did Mr. Barr<br>24 instruct you and Mr. Muskoff what type of<br>25 information should be in the deck that he asked to 19:31:03<br>Page 240 |
| 1      Q.  You think it was authored --<br>2      A.  Sorry, sorry, January of 2020.<br>3      Q.  Okay.  And do you think it was authored<br>4  before Smucker had terminated its contract with<br>5  Tradeshift?                                      19:28:47<br>6      A.  I don't know that.<br>7          MR. PHILLIPS:  Objection.  Calls for a<br>8  legal conclusion.<br>9  BY MS. VAN ZANT:<br>10     Q.  Do you know of any reason why Smucker and 19:28:52<br>11 Tradeshift -- Smucker and BuyerQuest should be<br>12 talking about Tradeshift and its pros and cons if<br>13 Smucker had already terminated Tradeshift?<br>14     A.  Smucker asked us to put together a deck<br>15 that they could share upwards within Smucker.    19:29:11<br>16     Q.  When did they ask you to prepare a deck<br>17 that they could share upwards at Smucker?<br>18     A.  You've -- the week of January 20th.<br>19     Q.  So that would be after the termination<br>20 letter then, which was on January 16th?          19:29:31<br>21         MR. PHILLIPS:  Objection.  Lacks<br>22 foundation.  Calls for legal conclusion.<br>23         THE WITNESS:  That would be after<br>24 January 16th, yes.<br>25 BY MS. VAN ZANT:                                 19:29:42<br>Page 239 | 1  be prepared?<br>2      A.  Yes.<br>3      Q.  And what did he want in there?<br>4      A.  He wanted a description of why we're at<br>5  this point, what the scope of the project is, any 19:31:21<br>6  product enhancements that would be required, what<br>7  a project timeline would look like, any project<br>8  assumptions or constraints, and next steps.<br>9      Q.  Okay.  And if -- if you can turn to the<br>10 next slide that says "Current Project Scope,"    19:31:42<br>11 please.<br>12         Do you see that slide?<br>13     A.  Yes.<br>14     Q.  Okay.  And it says in the text under<br>15 there "BuyerQuest is currently responsible for   19:31:55<br>16 Indirect eProcurement and Supplier Catalog<br>17 Management."<br>18         And then below that it says, "Tradeshift<br>19 is currently responsible for Indirect & Direct<br>20 Accounts Payable as well as some Supplier        19:32:10<br>21 Management."<br>22         Do you see that?<br>23     A.  Yes.<br>24     Q.  Does reading that maybe refresh your<br>25 recollection as to when this presentation was    19:32:19<br>Page 241 |

1  drafted and presented?
2     A.  No.
3     Q.  Okay.  If you could turn to the next slide
4  that says "Future" Product "Scope" -- "Project
5  Scope."                                            19:32:40
6         Are you there?
7     A.  I'm there.
8     Q.  Okay.  And it says, "BuyerQuest will take
9  over responsibility for Indirect & Direct POs &
10 Accounts Payable as well as all of the Supplier     19:32:49
11 Management functionality."
12        Do you see that?
13    A.  Yes.
14    Q.  Okay.  And it's under the heading "Future
15 Project Scope," not current; right?                 19:33:03
16    A.  Correct.
17    Q.  And then below that it said, "Tradeshift
18 software and functionality will not be leveraged."
19        Had somebody suggested that BuyerQuest try
20 and leverage Tradeshift software and functionality  19:33:14
21 after Tradeshift had been terminated by Smucker?
22    A.  No.
23    Q.  Okay.  If you'd turn to the next page,
24 please, the "Current BuyerQuest Capability" slide.
25        Are you there?                              19:33:46

Page 242

1     A.  Yes.
2     Q.  Okay.  It says, "BuyerQuest currently
3  meets over 85 percent of the requirements needed
4  by Smucker for go live."
5         Would that mean that BuyerQuest didn't      19:33:57
6  meet 15 percent of the requirements for go-live?
7     A.  Yes.
8     Q.  Okay.  You had said earlier this afternoon
9  that BuyerQuest could do everything but 1 percent
10 of the requirements for Smucker.                    19:34:14
11        Did -- did Smucker's requirements change
12 at some point?
13        MR. PHILLIPS:  Objection.  Misstates prior
14 testimony.
15 BY MS. VAN ZANT:                                    19:34:26
16    Q.  I'm sorry, I couldn't hear what you said,
17 Mr. Mulloy.
18    A.  Yes, their requirements became more
19 specific and they did change.
20    Q.  Okay.  When you say they "became more       19:34:36
21 specific," what do you mean by that?
22    A.  There was certain functionality around
23 receiving change orders and credit memos that was
24 not defined in the right level of detail in the
25 RFP documents, but became increasingly clear as we  19:34:57

Page 243

1  went through the implementation of the software.
2     Q.  Okay.  So did BuyerQuest have a different
3  understanding of what Smucker wanted with respect
4  to credit memos, for example, when it submitted
5  the RFP response than it would later come to have  19:35:17
6  after having further meetings with Smucker?
7     A.  Yes.
8     Q.  Okay.
9         If you could turn to three slides from
10 where you are right now.  The heading is "Project   19:35:36
11 Assumptions & Constraints."
12        You all set?
13    A.  Yes.
14    Q.  Okay.  The second-to-last bullet point
15 says, "Firm sign-off path forward & scope changes   19:35:52
16 by January 17th."  And then the last bullet point
17 says, "Finalize delivery estimates & timeline by
18 January 31st."
19        In reading those two bullet points, do you
20 believe that Exhibit 79 was prepared before or      19:36:10
21 after Smucker had terminated the Tradeshift
22 contract?
23        MR. PHILLIPS:  Objection.  Calls for a
24 legal conclusion.
25        THE WITNESS:  I don't know.                 19:36:25

Page 244

1  BY MS. VAN ZANT:
2     Q.  And I'm sorry, what did you do to try and
3  identify when this document was prepared as you
4  were preparing to be Tradeshift's corporate
5  designee on communications between Tradeshift -- I 19:36:42
6  apologize, BuyerQuest and Smucker?
7         And I think I misspoke and said
8  Tradeshift's witness, not BuyerQuest's witness, so
9  I will substitute in BuyerQuest.
10    A.  I met with my attorneys.                    19:36:58
11    Q.  Okay.  Did you do anything besides meet
12 with your attorneys to identify this particular
13 document and when it was drafted and sent?
14    A.  Yes, I reviewed different documents.
15    Q.  Which other documents did you review to     19:37:16
16 determine when this document was prepared and sent
17 to Smucker?
18    A.  There was a lot of different documents.
19    Q.  Well, can you describe any of them?
20    A.  The initial proposal to Smucker.            19:37:34
21    Q.  How would the initial proposal to Smucker
22 tell you anything about when this PowerPoint
23 presentation was drafted for Smucker?
24    A.  It wouldn't.
25    Q.  Okay.  It's okay if you didn't review       19:37:58

Page 245

62 (Pages 242 - 245)

```
 1  anything to prepare for this.  I'm just trying to
 2  find out what you did or you didn't do.
 3       So did you review any documents in an
 4  effort to try and determine when this presentation
 5  was prepared or sent?                    19:38:12
 6    A.  Yes.
 7    Q.  What documents did you review?
 8    A.  This document, it was in January.
 9    Q.  Okay.  But when in January was this
10  document given to Smucker's?             19:38:27
11       Can you --
12       MR. PHILLIPS:  Objection.  Lacks
13  foundation.
14  BY MS. VAN ZANT:
15    Q.  Can you determine whether it was before  19:38:34
16  Smucker terminated the Tradeshift contract or
17  after?  Do you know that?
18       MR. PHILLIPS:  Objection.  Calls for a
19  legal conclusion.
20       THE WITNESS:  I didn't see when this    19:38:42
21  document was sent to Smucker.
22  BY MS. VAN ZANT:
23    Q.  Okay.  Can you go to -- two slides ahead
24  to one that says "Next Steps"?  Are you --
25    A.  Yes.                               19:39:00
```
Page 246

```
 1    Q.  -- on that slide?  Okay.
 2       And the first point there says, "Need
 3  official green light by January 17th to achieve
 4  May 4th go live date."
 5       What was the official green light that   19:39:19
 6  BuyerQuest needed by January 17?
 7       MR. PHILLIPS:  Objection.  Calls for
 8  speculation.  Misstates the document.
 9       THE WITNESS:  We needed a green light from
10  Smucker that they wanted to continue the project.  19:39:37
11  BY MS. VAN ZANT:
12    Q.  That they wanted to continue the project
13  with only BuyerQuest or with both Tradeshift and
14  BuyerQuest?
15    A.  Not with only BuyerQuest, but without  19:39:46
16  Tradeshift.
17    Q.  Okay.  And why -- why did BuyerQuest want
18  Smucker to give the green light to them
19  specifically by January 17?
20       MR. PHILLIPS:  Objection.  Lacks        19:40:10
21  foundation.
22       THE WITNESS:  Our goal was always to make
23  Smucker successful and getting them off of Ariba in
24  May of 2020.
25  BY MS. VAN ZANT:                            19:40:23
```
Page 247

```
 1    Q.  Okay.  But you -- your contract with
 2  Tradeshift was to support Tradeshift in its
 3  implementation and software deployment at
 4  BuyerQuest; right?
 5    A.  At Smucker, correct.               19:40:39
 6       MR. PHILLIPS:  Objection.  Calls for a
 7  legal conclusion.
 8  BY MS. VAN ZANT:
 9    Q.  I apologize.
10       Okay.  And -- and so you didn't have any  19:40:46
11  legal -- BuyerQuest did not have a legal
12  obligation -- strike that.
13       BuyerQuest didn't have any contractual
14  obligation to Smucker to ensure that Tradeshift
15  completed the project on time; did it?    19:41:02
16       MR. PHILLIPS:  Objection --
17       THE WITNESS:  Correct.
18       MR. PHILLIPS:  Objection.  Calls for a
19  legal conclusion.
20       Wait for me to finish the objection,   19:41:14
21  Mr. Mulloy.
22       THE WITNESS:  I'm sorry.
23  BY MS. VAN ZANT:
24    Q.  I'm sorry, what was your response?
25    A.  BuyerQuest had a penalty that we would  19:41:18
```
Page 248

```
 1  have had to paid Smucker as a result of
 2  Tradeshift's shortcomings and inability to deliver
 3  the project.
 4    Q.  So BuyerQuest was interested in saving its
 5  own skin to make sure it didn't have to pay a   19:41:34
 6  penalty then; right?
 7       MR. PHILLIPS:  Objection.  Argumentative.
 8       THE WITNESS:  No.
 9  BY MS. VAN ZANT:
10    Q.  So why did you mention, then, that    19:41:44
11  BuyerQuest had a penalty there?
12    A.  BuyerQuest was committed with Tradeshift
13  to get Smucker live in May of 2020 to avoid the
14  penalty that was squarely placed upon BuyerQuest.
15    Q.  Were you angry that BuyerQuest accepted  19:42:07
16  100 percent of the risk on that penalty?
17    A.  I was more disappointed that Tradeshift
18  didn't have the functionality that they said they
19  had.
20    Q.  If -- if you found out that Tradeshift had  19:42:21
21  been going to Smucker and saying, "Ugh, BuyerQuest
22  is slow paying its vendors.  Can you believe it?
23  And they missed payroll.  What a disaster," would
24  you have been upset at Tradeshift for doing that?
25       MR. PHILLIPS:  Objection.  Incomplete  19:42:44
```
Page 249

63 (Pages 246 - 249)

| | |
|---|---|
| 1  Procure-to-Pay Overview." <br> 2       And I just wanted to ask, is Exhibit 80 <br> 3  a -- do you recognize it to be a true and correct <br> 4  copy of a presentation that BuyerQuest made to <br> 5  Smucker's on January 7, 2020?         19:48:38 <br> 6     A.  I don't see the date on this. <br> 7     Q.  There is no date, actually, on -- on here. <br> 8  I'm just asking you as the 30(b)(6) designee about <br> 9  Smucker/BuyerQuest communications that relate to <br> 10 the Smucker project or Tradeshift, if this is the   19:49:15 <br> 11 true and correct copy of the January 7th, 2020, <br> 12 presentation that was made by BuyerQuest to <br> 13 Smucker's. <br> 14     Is it just the date that's tripping you <br> 15 up?                         19:49:36 <br> 16    A.  Yeah. <br> 17    Q.  Okay.  Let me just ask this, then.  Is -- <br> 18 do you recognize the slides at Exhibit 80? <br> 19    A.  Yes. <br> 20    Q.  And are these a true and correct copy of   19:49:41 <br> 21 the slide deck entitled "BuyerQuest Smucker's <br> 22 Procure-to-Pay Overview"? <br> 23    A.  Yes. <br> 24    Q.  Okay. <br> 25      MS. VAN ZANT:  We can take a break now.   19:49:54 <br> Page 254 | 1  no. <br> 2     Q.  Do you -- do you think it was presented to <br> 3  Smucker's at some point? <br> 4     A.  It could have been. <br> 5     Q.  But you're not sure, one way or the other?   20:37:15 <br> 6     A.  No. <br> 7     Q.  Okay.  And this is a communication between <br> 8  Smucker and BuyerQuest about Tradeshift and the <br> 9  Smucker project; right? <br> 10      MR. PHILLIPS:  Objection.  Misstates his   20:37:34 <br> 11 prior testimony.  Lacks foundation. <br> 12 BY MS. VAN ZANT: <br> 13    Q.  The presentation talks about Tradeshift <br> 14 and the Smucker project; correct? <br> 15    A.  Yes.                     20:37:44 <br> 16    Q.  Okay.  I -- I'd like to introduce a new <br> 17 exhibit that I marked on the break, and it's <br> 18 Exhibit 76. <br> 19      (Mulloy Deposition Exhibit 76 was marked.) <br> 20      MS. VAN ZANT:  And for the record,     20:38:26 <br> 21 Exhibit 76 has the Bates number BQ104029.  And it <br> 22 is Slack messages dated September 18, 2019. <br> 23      THE WITNESS:  I've got it in front of me. <br> 24 BY MS. VAN ZANT: <br> 25    Q.  Okay.  Do you recognize Exhibit 76?   20:38:51 <br> Page 256 |
| 1       THE VIDEOGRAPHER:  We are off the record. <br> 2  The time is 7:49 p.m. <br> 3       (Short recess taken.) <br> 4       THE VIDEOGRAPHER:  We are back on the <br> 5  record.  The time is 8:35 p.m.         20:35:34 <br> 6  BY MS. VAN ZANT: <br> 7     Q.  Mr. Mulloy, you're welcome to go back and <br> 8  look at Exhibit 79, if you'd like to.  That was <br> 9  the BuyerQuest/Smucker presentation of an unknown <br> 10 date.                         20:35:54 <br> 11      And just let me know when you're ready. <br> 12    A.  Yeah, I've got it. <br> 13    Q.  Okay.  And my only question on this one <br> 14 is, we haven't located any e-mails or means by <br> 15 which this presentation was transmitted between   20:36:30 <br> 16 BuyerQuest and Smucker in written form. <br> 17      Do you know how -- how BuyerQuest sent <br> 18 Exhibit 79 to Smucker's? <br> 19    A.  I don't believe this was ever sent to <br> 20 Smucker's.                     20:36:48 <br> 21    Q.  Oh -- <br> 22    A.  I believe it to be a draft. <br> 23    Q.  Do you think it was just an internal draft <br> 24 at BuyerQuest, then? <br> 25    A.  I don't think it was sent to Smucker's,   20:36:59 <br> Page 255 | 1     A.  Yes. <br> 2     Q.  And is Exhibit 76 a true and correct copy <br> 3  of Slack messages shared between you, Luke Batman, <br> 4  Kyle Muskoff, Dan Utyuzh, and I can't tell who <br> 5  that first person on the list is.         20:39:16 <br> 6       Do you know who "mpdm" refers to? <br> 7     A.  I do not. <br> 8     Q.  Okay.  Well, is this a true and correct <br> 9  copy of -- of Slack messages between you, Luke, <br> 10 Kyle, Dan, and the other person whose initials we   20:39:34 <br> 11 don't recognize here? <br> 12    A.  Yes. <br> 13    Q.  Okay.  And in the first message, <br> 14 Mr. Muskoff writes "I spoke to Jason Barr today <br> 15 and he is open to revisiting the contractual     20:39:52 <br> 16 agreement surrounding the Penalty clause for <br> 17 Smucker's." <br> 18      Was BuyerQuest trying to renegotiate the <br> 19 penalty clause in its agreement with Tradeshift in <br> 20 September 2019?                 20:40:07 <br> 21    A.  Yes. <br> 22    Q.  Okay.  And was Mr. Muskoff speaking <br> 23 directly to Jason Barr about the possibility of <br> 24 renegotiating the penalty clause? <br> 25      MR. PHILLIPS:  Objection.  Calls for   20:40:31 <br> Page 257 |

65 (Pages 254 - 257)