

**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

May 18, 2021                                    [REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

<u>Via ECF</u>

The Honorable Thomas Hixson
United States District Court
Northern District of California
450 Golden Gate Avenue
Courtroom A - 15th Floor
San Francisco, CA 94102

Re:     *Tradeshift, Inc. v. BuyerQuest, Inc.*, Case No. 3:20-cv-1294-RS

### Letter Brief Re JMS Privilege Claim Pursuant To FRCP 26(B)(5)(B)

Dear Judge Hixson:

Pursuant to Federal Rule of Civil Procedure 26(b)(5)(B), Tradeshift requests the Court's assistance on an urgent claim to claw back two documents as privileged made by third party, the J.M. Smucker Co. ("JMS"), at the May 12, 2021 deposition of its employee and FRCP 30(b)(6) witness, Jason Barr.[1]  JMS produce the documents in this case but is now trying to remove them under Rule 26(b)(5)(B).

[black redaction]

---

[1] Pursuant to Rule 26(b)(5)(B), Tradeshift promptly brought this dispute to the Court's attention and filed the relevant documents under seal.  *See* Ex. 1.  Tradeshift filed this letter brief given the Court's other practices and preferences, but can file supplemental briefing and declarations at the Court's request.  Tradeshift has also contemporaneously served unredacted copies of this letter brief and all exhibits on JMS and can also serve JMS with any subsequent order directing JMS to respond or otherwise setting a briefing schedule.

[2] JMS is a defendant in a parallel case proceeding in S.D.N.Y.  JMS and BuyerQuest have admitted that they entered into a joint defense agreement regarding Tradeshift's claims in these two cases.

The Honorable Thomas Hixson
May 18, 2021
Page No. 2



Following Mr. Barr's deposition, Tradeshift followed up to obtain specific information about the basis for JMS's privilege claim, which JMS is required to provide under Rule 26(b)(5)(B). But JMS could not or would not identify the foundational basis for its claim. Indeed, as of the date of this filing, JMS has not identified the attorney who supposedly directed Mr. Barr to draft the email and memo, when that unidentified attorney purportedly gave that instruction, or for what purpose (e.g., a business one or a legal one). Nor has it explained whether it claims the email and memo are privileged as reflecting an attorney-client communication or as constituting work product. Nor has JMS added the email and memo to its privilege log (which already comes it at a staggering 230+ questionable entries) despite stating that it would do so during the deposition. This alone is basis for finding that JMS waived any privilege that existed. Moreover, fact discovery closed on May 15 and expert reports are due on June 4. The clock is running out.

The Honorable Thomas Hixson
May 18, 2021
Page No. 3

Tradeshift is entitled to the clawed back documents and it is entitled to depose Mr. Barr about them before summary judgment briefing begins in July.

For the reasons stated herein, Tradeshift requests that the Court issue an order instructing JMS to explain why it should be allowed to claw back the documents it produced in this case. Tradeshift further requests that should the Court reject JMS's claw back claims, that it further order that JMS produce Mr. Barr for up to one hour of deposition testimony about the clawed back documents within seven (7) days of the Court's order. Finally, Tradeshift requests that the Court permit Tradeshift to make a further submission detailing its reasonable fees and costs incurred in filing this motion and sanction JMS for those reasonable fees and costs.

**Factual Background:** As this Court is familiar, this case centers around Tradeshift's claims for interference with contract and breach of contract against Defendant BuyerQuest. Dkt. No. 1. In June 2019, Tradeshift signed a contract with JMS pursuant to which Tradeshift agreed to license and implement a joint Tradeshift/BuyerQuest procurement software solution in exchange for fees from JMS (the "JMS Project"). Around the same time, Tradeshift signed a contract with BuyerQuest with Tradeshift agreeing to act as reseller for BuyerQuest's software solution on the JMS Project and with BuyerQuest agreeing to serve as Tradeshift's subcontractor in implementing the joint Tradeshift/BuyerQuest software solution at JMS.

BuyerQuest was greedy and wanted the entire JMS Project for itself. To that end, BuyerQuest's CEO, Jack Mulloy, cultivated a close relationship with Jason Barr, one of the "project owners" of the JMS Project. Ex. 2 at 17-25. Mulloy ultimately exploited that connection to begin a whisper campaign aimed at destroying JMS's confidence in Tradeshift. *Id.* Ultimately, Mr. Mulloy and his executive team proposed to JMS a plan by which they would replace Tradeshift on the JMS Project by adding functionality to their own product line.[3] *See e.g.*, Ex. 2 at 21-24; Ex. 3 at 9-10. Mr. Mulloy first pitched this plan to Mr. Barr in December 2019. Ex. 2 at 21-22. The BuyerQuest team formally pitched the plan to group Mr. Barr and a cross-functional group of JMS employees during an in-person meeting at BuyerQuest headquarters on January 7, 2020. Ex. 2 at 22-24; Ex. 3 at 10. That meeting included, from JMS: Barr and his non-attorney colleagues Kevin Hare, Brian Hiles, Mike Sterle, and Russ Wilson ████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

**Procedural Background:** Tradeshift served a subpoena on JMS in January 2021 seeking, among other things, documents and testimony related to BuyerQuest's interference and JMS's decision to terminate Tradeshift. Ex. 12 (subpoena). JMS agreed to provide a witness and, after a four month delay, on April 12, 2021, also agreed to produce documents. Ex. 4.

---

[3] The functionality that BuyerQuest was copied from Tradeshift Solution Description Document and other confidential specification and documents that Tradeshift had prepared for the project. Ex. 3 at 7-11.

The Honorable Thomas Hixson
May 18, 2021
Page No. 4



---

[4] Tradeshift would ultimately come to learn that JMS had unilaterally excluded *internal* communications about the Tradeshift/BuyerQuest project for the majority of relevant custodians (*see* Ex. 5), including for several of the drafters of the January 13 memo. What's more, JMS did not search using the terms "TS" or "BQ," which is how JMS regularly referred to Tradeshift and BuyerQuest internally.  *Id*.

[5] JMS also is withholding over 200 documents as privileged even though dozens of them lack a sufficient factual foundation predicate for doing so, including dozens of entries that JMS has marked as an "attorney-client communication" where a non-attorney is identified as the sole author and there are no identified recipients at all. JMS's initial log even claimed privilege over documents drafted by *Tradeshift employees* (*see, e.g.,* Ex. 6).

The Honorable Thomas Hixson
May 18, 2021
Page No. 5



The Honorable Thomas Hixson
May 18, 2021
Page No. 6



After the deposition, Tradeshift asked JMS if it intended to maintain its claw back claim over the January 13, 2020 cover email and business recommendation memorandum under Federal Rule of Civil Procedure 26(b)(5)(B) and, if so, to provide the foundational basis for the claim, as required by that rule.  Ex. 10 (5/13/2021 J. Yu Email).  Tradeshift specifically asked JMS to explain whether it was asserting attorney client privilege and/or work product; to identify the attorney who purportedly directed Mr. Barr to prepare the email and memorandum; to identify *when* counsel advised Mr. Barr to do so; and to identify where that instructing communication or any subsequent communication of the memo to counsel appeared on JMS's privilege log.  *See id.* JMS did not respond with any information to support its claim of privilege in response to that email or Tradeshift's follow up request.  *Id.*; Ex. 11 at 2 (5/14/2021 A. Van Zant Email).  Nor did JMS serve an updated log identifying the email or its attachment.

**Legal Standard:** Rule 26(b)(5)(B) governs the procedure for asserting privilege over documents purportedly have already been produced in a case.  Fed. R. Civ. P. 26(b)(5)(B). It states that the party making such a claim must provide the basis for its claim of privilege at the time it makes the claim.  *Id.*  Once it does so, the party receiving the request must promptly sequester the document.  The party may not use or disclose the document other than promptly presenting it to the court under seal to resolve the claim of privilege.  *Id.*  Additionally, the burden of proving that privilege applies "rests not with the party contesting privilege, but with the party asserting it.

---

[7] The Rough transcript states that Mr. Barr responded, "I don't recall.  Likely at the request of counsel."  Counsel's notes reflect that he said, "I don't recall, *possibly* at the request of counsel."  The final transcript will not be available for another week.

The Honorable Thomas Hixson
May 18, 2021
Page No. 7

*Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2010 WL 3911943, at *1 (N.D. Cal. Oct. 5, 2010) (citing *Weil v Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 25 (9th Cir. 2005).

**Argument:** 

Attorney-Client Privilege: There is no basis for JMS to argue that either the January 13, 2020 email or the business memorandum constitutes and attorney-client privileged communication.  In diversity actions, federal courts apply the forum state's rules for evidentiary privileges, here California.  Fed. R. Evid. 501.  Under California law, the attorney-client privilege is governed by statute. Cal. Evid. Code § 911 *et seq*; *Vieste, LLC v. Hill Redwood Dev.*, 2010 WL 4807058, at *2 (N.D. Cal. Nov. 18, 2010)  "It is the burden of the party claiming a privilege to show that the evidence it seeks to suppress falls within the terms of an applicable statute." *Id.*  "Because evidentiary privileges prevent the admission of relevant and otherwise admissible evidence, they should be narrowly construed."  *Id.*

"California recognizes an attorney-client privilege, which applies to confidential communications between client and lawyer during the course of the attorney-client relationship." *Id.* at *3; Cal. Evid. Code § 952.  This means "information transmitted between *a client and his or her lawyer* in the course of that relationship and in confidence . . . and includes *a legal opinion formed and the advice given by the lawyer* in the course of that relationship." *Id.* (emphasis in original).  Communications that do not include attorneys are not subject to the privilege.  *Id.* ("Communications between ZAC employees and Mr. Hartman in which no attorney participated thus cannot be attorney-client privileged communications.").

---

[8] BuyerQuest and JMS have a joint defense agreement in this case (though they refuse to produce a signed copy). As this court is aware, BuyerQuest and JMS  have previously  repeatedly misrepresented that they did not have responsive documents in Mr. Barr and Mr. Mulloy's personal email accounts about the interference claim when in fact they did.  *See e.g.*, DE 74 and 78 (Motion and Order regarding deleted and withheld emails from Mr. Mulloy's and Mr. Barr's personal email accounts); DE 83 (Letter Brief regarding Power Point Presentation "Created by BuyerQuest for Smucker's Use," noting Mr. Mulloy's testimony that Mr. Barr collaborated on the presentation). In fact, BuyerQuest even continued to withhold an April 29, 2020 email (identified in the Google data produced in response to Tradeshift's subpoena) between his and Mr. Barr's personal email accounts even *after* the Court had ordered his counsel to search for, identify, and produce all such communications.

The Honorable Thomas Hixson
May 18, 2021
Page No. 8



---

[10] Indeed, even if JMS were to present credible evidence that Mr. Barr did prepare the memorandum at the direction of counsel and subsequently provided that recommendation to counsel—something JMS has not established—that would only protect the communication that was actually made *to* said counsel.  It would not protect *this particular* communication to the non-attorney recipients on the cover email or the subsequent communication to his superiors.

[11] JMS would have to, for example, present declarations from the attorney(s) involved in the request to explain whether, how, when, and for what purpose he or she asked Mr. Barr to prepare the document and whether, how, and when he provided it to that attorney.  To the extent JMS does explain the basis for its claim of privilege and present evidence to support it, Tradeshift requests the opportunity to respond.

The Honorable Thomas Hixson
May 18, 2021
Page No. 9



And, as to both the email and memo, JMS has failed to timely provide the basis for its claw back claim.  Rule 26(b)(5)(B) requires that a party provide the basis for the claim *at the time it asserts the claim*.  Moreover, the committee notes indicated that this requires a detailed and timely disclosure of the basis for the privilege, otherwise the privilege is may be waived.  Fed. R. Civ. P. 26, 2006 advisory committee notes 2006 ("The notice should be <u>as specific as possible in identifying the information and stating the basis for the claim</u> . . . the notice should be sufficiently detailed so as to enable the receiving party and the court to understand the basis for the claim and to determine whether waiver has occurred. <u>Courts will continue to examine whether a claim of privilege or protection was made at a reasonable time when delay is part of the waiver determination under the governing law</u>.") (emphasis added); *see also* Fed. R. Evid. 502(b) (requiring holder of privileged to "promptly" take reasonable steps including "following Federal Rule of Civil Procedure 26(b)(5)(B)" in order to avoid waiver."); *Loop AI Labs Inc v. Gatti*, 2016 WL 3001158, at *2 (N.D. Cal. May 25, 2016) ("Although the failure to timely produce a privilege log does not result in a per se waiver of the privilege, a court makes a case-by case assessment to determine whether a party's untimeliness waived the privilege.").  JMS purported to claw the document back on May 12 and stated that it would update its privilege log.  Ex. 9.  Tradeshift followed up twice asking for the basis for JMS's claim (Exs. 10 & 11), but JMS never provided the information or an updated privilege log.  JMS's delay with this critical information days before the deadline to file motions to compel is not excusable and supports waiver.

<u>Attorney Work Product</u>: Mr. Barr's recommendation also does not qualify for work product protection.  "Unlike the attorney-client privilege, the application of the work product doctrine in diversity of citizenship cases is determined under federal law." *Anderson v. SeaWorld Parks &*

The Honorable Thomas Hixson
May 18, 2021
Page No. 10

*Ent., Inc.*, 329 F.R.D. 628, 635 (N.D. Cal. 2019).  "The work product doctrine, codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, protects from discovery 'documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative.'"  *Id.*  "This doctrine is distinct from the attorney-client privilege, and is in fact "not a privilege but a qualified immunity protecting [certain material] from discovery."  *Id.*



Accordingly, the Court should issue an order to show cause to JMS why its putative claw back claims should not be rejected.  The Court should reject JMS's unsupported request to claw back the cover email and memorandum in Exhibit 1 from this case and order JMS to provide Mr. Barr for one additional hour of deposition to testify regarding these documents.  Moreover, because

---

[12] Moreover, even if this document were to qualify as work product that would not mean the document is not discoverable.  Tradeshift would be able to demonstrate a necessity for the information given the probative value of the document and the dearth of any other evidence of Smucker's decision-making process.

The Honorable Thomas Hixson
May 18, 2021
Page No. 11

JMS's assertion of privilege is unreasonable, unsupported, and contrary to the clear testimony of
JMS's own witness, Tradeshift requests that the Court authorize Tradeshift to file a motion
seeking sanctions in the form of its fees and costs in bringing for having to bring this motion.


Respectfully submitted,


 ORRICK, HERRINGTON & SUTCLIFFE LLP


 */s/ Amy K. Van Zant*
 AMY K. VAN ZANT
 Attorneys for Plaintiff
 TRADESHIFT, INC.

# EXHIBIT 1

# CONDITIONALLY FILED UNDER SEAL

# EXHIBIT 2

1   AMY K. VAN ZANT (STATE BAR NO. 197426)
    avanzant@orrick.com
2   JASON K. YU (STATE BAR NO. 274215)
    jasonyu@orrick.com
3   TAMMY SU (STATE BAR NO. 329652)
    tsu@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
5   Menlo Park, CA  94025-1015
    Telephone:    +1 650 614 7400
6   Facsimile:    +1 650 614 7401

7   Attorneys for Plaintiff
    TRADESHIFT, INC.

8

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11

12  TRADESHIFT, INC., a Delaware corporation,        Case No. 3:20-cv-1294-RS

13              Plaintiff,                           **PLAINTIFF TRADESHIFT, INC.'S OBJECTIONS AND RESPONSES TO**
14       v.                                          **DEFENDANT BUYERQUEST, INC.'S FIRST SET OF INTERROGATORIES**
15  BUYERQUEST, INC., an Ohio corporation,           **(NOS. 1-19)**

16              Defendant.

17

18

19  **PROPOUNDING PARTY:**          **Defendant BuyerQuest, Inc.**

20  **RESPONDING PARTY:**           **Plaintiff Tradeshift, Inc.**

21  **SET NUMBER:**                 **One**

22

23

24      **CONTAINS INFORMATION DESIGNATED "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY " UNDER THE PROTECTIVE ORDER**

25

26

27

28

1      In accordance with Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Tradeshift,

2  Inc. ("Tradeshift" or "Plaintiff") hereby provides the following objections and responses

3  ("Responses") to the First Set of Interrogatories propounded by BuyerQuest, Inc.

4  ("BuyerQuest" or "Defendant").

5                                **GENERAL OBJECTIONS**

6      In addition to the specific objections noted below, Tradeshift asserts the following general

7  objections to each and every Interrogatory.

8      1.      By responding to any Interrogatory, Tradeshift does not waive any objection that

9  may be applicable to: (a) the use, for any purpose, by BuyerQuest of any information provided in

10 the response; or (b) the admissibility, relevance, or materiality of any of the information to any

11 issue in this case.

12     2.      Tradeshift objects to BuyerQuest's definitions and instructions to the extent they

13 require Tradeshift to provide information beyond that required by the Federal Rules of Civil

14 Procedure, the local rules of the Northern District of California, or any other applicable rules.

15     3.      Tradeshift objects to BuyerQuest's definitions and instructions to the extent they

16 add discrete subparts to individual interrogatories such that those interrogatories are compound

17 and should constitute multiple interrogatories that may exceed the maximum number of

18 interrogatories allowed in this case.  Tradeshift will respond to the prompts of the individual

19 interrogatories and is willing to confer regarding additional information that would be responsive

20 to additional interrogatories.

21     4.      Tradeshift objects to BuyerQuest's definition of "COMMUNICATION(S)" as

22 overly broad, seeking discovery of information where the burden of the proposed discovery

23 outweighs its likely benefit, seeking information not relevant to any claim or defense, and not

24 proportional to the needs of the case because the definition includes "any and all communications

25 of any kind" "whether written, oral, or by any other means."  Tradeshift further objects to this

26 definition as overly broad, unduly burdensome, and duplicative to the extent it is used to request

27 information contained in documents that Tradeshift will be producing in response to

28 BuyerQuest's requests for the production of documents.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 1 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

5.      Tradeshift objects to BuyerQuest's definition of "IDENTIFY" as overly broad, unduly burdensome, seeking irrelevant information, and seeking information not proportional to the needs of the case.  Tradeshift also objects to this definition as seeking information subject to a right of privacy and information that is duplicative of information that will be provided through other means, for example, in response to BuyerQuest's requests for production of documents. When identifying persons, Tradeshift will identify them by name and provide additional information to the extent it is reasonably available, relevant, not subject to a right of privacy, and not duplicative.  When identifying documents, Tradeshift will identify documents by Bates number if available, or by a reasonable description of the document.

6.      Tradeshift objects to BuyerQuest's definition of "YOU," "YOUR," and "TRADESHIFT" as vague and ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense, and not proportional to the needs of the case because the definition purports to include persons or entities who are not parties to the lawsuit, have no involvement in the subject matter of the lawsuit, have no information that would be relevant to the claims or defenses in this lawsuit, and/or are not within Tradeshift's control.  Tradeshift will respond only on behalf of, and with respect to, Tradeshift, Inc.  Tradeshift construes "you," "your," and "Tradeshift" to mean Plaintiff Tradeshift, Inc.

7.      Tradeshift objects to BuyerQuest's definition of "BUYERQUEST" as vague and ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense, and not proportional to the needs of the case because the definition includes "ALL PERSONS acting on its behalf, including without limitation, ALL past or present officers, directors, employees, representatives, consultants, partners, independent contractors, agents, or attorneys." Tradeshift construes "BUYERQUEST" to mean Defendant BuyerQuest, Inc.

8.      Tradeshift objects to BuyerQuest's definition of "SMUCKER" as vague and ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 2 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

and not proportional to the needs of the case because the definition includes "J.M. Smucker Company, J.M. Smucker Inc., and ALL PERSONS acting on their behalf, including without limitation, ALL past or present officers, directors, employees, representatives, consultants, partners, independent contractors, agents, or attorneys."  Tradeshift construes "SMUCKER" to mean Smucker Services Company, the J.M. Smucker Company, and J.M. Smucker, Inc.

9.       Tradeshift objects to Definition 16 as overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking discovery of information that is not relevant to any claim or defense, not proportional to the needs of this case, and inconsistent with Rules 26 and 34 of the Federal Rules of Civil Procedure because it purports to require Tradeshift to provide documents regarding hypothetical future events that have not yet occurred.

10.      Tradeshift objects to each Interrogatory to the extent that it calls for Tradeshift to reveal information that is the subject of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine.  Tradeshift will not provide privileged information and, instead, to the extent it is consistent with the parties' agreements regarding privileged communications, will withhold and log responsive privileged communications.

11.      To the extent that Tradeshift identifies and/or produces any information or documents in response to the Interrogatories, it does so with the understanding that such information or document shall not be deemed or construed to constitute a waiver of any privilege or right of Tradeshift, including the right to designate materials as confidential.  Tradeshift reserves all rights to recall from discovery any inadvertently produced document protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, doctrine, or immunity.  Tradeshift also reserves the right to designate (or redesignate) any confidential documents that may be inadvertently produced without the appropriate confidentiality designation.

12.      Tradeshift objects to these Interrogatories as premature to the extent they purport to request "all" facts or information in support of Tradeshift's claims.  Much of the documents and information supporting Tradeshift's claims is in the possession of BuyerQuest and/or

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                   - 3 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   Smucker.  Fact discovery remains open, and BuyerQuest and Smucker have yet to make complete

2   productions of all such documents and information in response to Tradeshift's discovery requests.

3   Accordingly, Tradeshift's responses are made without prejudice to its right to supplement or

4   amend its responses and to present evidence discovered hereafter at trial.

5          13.     Tradeshift objects to these Interrogatories to the extent that they seek confidential,

6   sensitive, or proprietary business or trade secret information of any third party.  Should any

7   interrogatory call for such information, Tradeshift will make reasonable efforts to obtain the

8   consent of any such third party and if it cannot obtain such third-party consent, Tradeshift will

9   clearly state so in its response.

10          14.     Tradeshift objects to these Interrogatories to the extent that they seek information

11   beyond what is available from: (a) a reasonable search of Tradeshift's files likely to contain

12   relevant or responsive documents or information and (b) a reasonable inquiry of Tradeshift

13   employees likely to have information relevant to a claim or defense of any party, or to the subject

14   matter of the litigation.

15                        **SPECIFIC OBJECTIONS AND RESPONSES**

16          Subject to and without waiving the above General Objections, Tradeshift objects and

17   responds to BuyerQuest's First Set of Requests for Production to Tradeshift as follows:

18   **INTERROGATORY NO. 1:**

19          IDENTIFY EACH TRADESHIFT employee, agent, or contractor who worked on or was

20   involved with the negotiation, drafting, or formation of the BUYERQUEST AGREEMENTS.

21   **RESPONSE TO INTERROGATORY NO. 1:**

22          Tradeshift specifically incorporates by reference each of its General Objections asserted

23   above.

24          Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

25   information that is the subject of the attorney-client privilege, the attorney work product doctrine,

26   or any other applicable privilege or doctrine.  Tradeshift will log any such communications it

27   excludes on this basis to the extent consistent with the parties' privilege log agreement.

28          Tradeshift objects to this interrogatory to the extent it seeks information that is equally or

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                          - 4 -                    TRADESHIFT'S OBJECTIONS AND
                                                                RESPONSES TO BUYERQUEST'S FIRST
                                                                SET OF FIRST SET OF ROGS (NOS. 1-19)

1    more readily available to BuyerQuest.

2         Tradeshift objects to the phrase "worked on or was involved with the negotiation, drafting,

3    or formation" as vague and ambiguous, overbroad, duplicative, and not proportional to the needs

4    of this case to the extent it seeks information about every individual remotely involved in the

5    subject matter of the request (including, for example, administrative assistants who may have

6    typed the agreements); Tradeshift will identify the principal parties responsible for negotiating the

7    terms of the BuyerQuest Agreements for Tradeshift.

8         In light of the foregoing objections and limitations, Tradeshift responds as follows:

9         Dan Roehrs (Apps Partnerships & Alliances) with support internally from Tradeshift's in-

10   house legal department, the content of which is privileged.

11        Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

12   to supplement this response as additional information is identified.

13   **INTERROGATORY NO. 2:**

14        IDENTIFY EACH TRADESHIFT employee, agent, or contractor who worked on or was

15   involved with the negotiation, drafting, or formation of the SMUCKER SERVICES

16   AGREEMENT.

17   **RESPONSE TO INTERROGATORY NO. 2:**

18        Tradeshift specifically incorporates by reference each of its General Objections asserted

19   above.

20        Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

21   information that is the subject of the attorney-client privilege, the attorney work product doctrine,

22   or any other applicable privilege or doctrine.  Tradeshift will log any such communications it

23   excludes on this basis to the extent consistent with the parties' privilege log agreement.

24        Tradeshift objects to the phrase "worked on or was involved with the negotiation, drafting,

25   or formation" as vague and ambiguous, overbroad, duplicative, and not proportional to the needs

26   of this case to the extent it seeks information about every individual remotely involved in the

27   subject matter of the request.  Tradeshift will identify the principal parties responsible for

28   negotiating the terms of the Smucker Services Agreement for Tradeshift.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                          - 5 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   In light of the foregoing objections and limitations, Tradeshift responds as follows:

2   Christopher Todd (Account Manager) and Jim Rahill (Regional VP of Sales) with support

3   internally from Tradeshift's in-house legal department, the content of which is privileged.

4   Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

5   to supplement this response as additional information is identified.

6   **INTERROGATORY NO. 3:**

7   IDENTIFY EACH TRADESHIFT employee, agent, or contractor who worked on or was

8   involved with the SMUCKER PROJECT.

9   **RESPONSE TO INTERROGATORY NO. 3:**

10   Tradeshift specifically incorporates by reference each of its General Objections asserted

11   above.

12   Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

13   information that is the subject of the attorney-client privilege, the attorney work product doctrine,

14   or any other applicable privilege or doctrine.  Tradeshift will log any such communications it

15   excludes on this basis to the extent consistent with the parties' privilege log agreement.

16   Tradeshift objects to this interrogatory to the extent it seeks information that is equally or

17   more readily available to BuyerQuest.

18   Tradeshift objects to the phrase "worked on or was involved with the SMUCKER

19   PROJECT" as vague and ambiguous, overbroad, duplicative, and not proportional to the needs of

20   this case to the extent it seeks information about every individual remotely involved in the subject

21   matter of the request, including those with peripheral or non-substantive roles; Tradeshift will

22   identify the principal persons who performed work on and/or supervised implementation of the

23   SMUCKER PROJECT on behalf of Tradeshift.

24   In light of the foregoing objections and limitations, Tradeshift responds as follows:

25   Sean Norton (Global VP, Professional Services); Deborah Gillman (Engagement

26   Manager); Catherine Fahidin (Professional Services Architect); Gareth Bowen (Professional

27   Services Solutions Architect); Wendy Sciara (Senior Client Executive); Doug Cottington

28   (Engagement Manager);  Amy Dhanoa (Program Manager); Alexandra Balan (Professional

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 6 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

Services Architect); Simona Saulean, (Professional Services Architect);  Kavita Rajagopal

(Solutions Consultant); Jeff Larsen (Senior Program Manager – Bristlecone).

Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

to supplement this response as additional information is identified.

**INTERROGATORY NO. 4:**

IDENTIFY EACH SMUCKER employee, agent, or contractor with whom YOU worked

on SMUCKER PROJECT.

**RESPONSE TO INTERROGATORY NO. 4:**

Tradeshift specifically incorporates by reference each of its General Objections asserted

above.  Tradeshift further objects to this interrogatory to the extent it seeks information that is not

in Tradeshift's possession, custody, or control or that is equally or more readily available to

BuyerQuest.

Tradeshift objects to the phrase "worked on SMUCKER PROJECT" [sic] as vague and

ambiguous, overbroad, duplicative, seeking information equally available to BuyerQuest, and not

proportional to the needs of this case to the extent it seeks information about every individual

remotely involved in the subject matter of the request, including those with peripheral or non-

substantive roles and including contractors and subcontractors like Tradeshift and BuyerQuest;

Tradeshift will identify the SMUCKER employees it interacted with while working on the

SMUCKER PROJECT.

In light of the foregoing objections and limitations, Tradeshift responds as follows:

Clint Adams
Jason Barr
Angela Burick,
Molly Davis
Joanna Dobina
Jeff Eshelman
Daniel Fill
Robert Ferguson
Danielle Frantz
Kevin Hare
Bryan Hiles
Kelly Hensch
Ryan Hoffman

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 7 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1
2   Bryan Hutson
    Debra Janda
3   Michelle Lawson
    Steve Lutikoff
4   Pai Milind
    Megan Morr
5   Dan Nowicki
    Viraaj Patel
6   Jacqueline Perchinske
    Susan Reed
7   Mike Resan
    John Slowey
8   Jennifer Smith
    Mike Sterle
9   Dustin Stout
    Jay Watson
10  Rowdy White
    Russ Wilson
11  Brandon Wilhelm
    Sunil Yerramesetti
12

13       Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

14  to supplement this response as additional information is identified.

15  **INTERROGATORY NO. 5:**

16       IDENTIFY EACH incident in which BUYERQUEST failed "to obtain Tradeshift's

17  review and consent to scope changes to the Smucker project," as alleged in Paragraph 31 of

18  YOUR Complaint.

19  **RESPONSE TO INTERROGATORY NO. 5:**

20       Tradeshift specifically incorporates by reference each of its General Objections asserted

21  above.

22       Tradeshift objects to this Interrogatory because it seeks information that is equally or more

23  readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

24  communications between BuyerQuest and Smucker.  Accordingly some responsive information

25  was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

26  discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

27  BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

28  opportunity to review that information and incorporate it into its response.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                              - 8 -

CONFIDENTIAL

Tradeshift objects to this request as duplicative, at least in part, of Interrogatory numbers 6-10, 12-13, 15, and 19.

In light of the foregoing objections and limitations, Tradeshift responds as follows:

The Smucker Project required integrating software products from Tradeshift and BuyerQuest into a solution that could communicate with those two systems and with Smucker's systems.  Tradeshift took on primary responsibility for integrating the three components and implemented a "middleware" system that would allow the three components to speak with each other.  The middleware system took in data, documents, and other information from the Smucker system and (1) mapped that information into the format used by Tradeshift so that Tradeshift's systems could use the data and (2) mapped that information into the format used by BuyerQuest so that BuyerQuest's systems could use the data.  It did the same in reverse for Tradeshift data and information and BuyerQuest data and information.

The middleware had to be specifically configured to accommodate the different formats and types of information used by each of the three systems (for example, a "quantity" field in one system might be configured with a dropdown menu in one system but with free-entry in another). Accordingly, any unauthorized or uncoordinated changes to the format of the information in any of the three systems could drastically affect the interoperability of the system as whole and would likely result in integration failures.  As the lead contractor and the party contractually responsible for integrations, Tradeshift was to have the lead in directing, reviewing, and approving any changes that would be made that could impact system integration.  BuyerQuest, in contrast, was Tradeshift's subcontractor on the Smucker Project and agreed in its contract with Tradeshift that it would follow Tradeshift's lead with respect to project management and would seek Tradeshift's approval before making any material changes to the scope of the project, including format changes.  The BuyerQuest Agreements noted, for example, that "[Tradeshift] will lead all integration discussions with Smucker's with support from BuyerQuest for all integrations relevant to BuyerQuest," and "[Tradeshift] will handle all program management duties except BuyerQuest will be responsible for all BuyerQuest resources," and  "[Tradeshift] and BuyerQuest will review and agree on all scope changes prior to adding new requirements to the project," and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765          - 9 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

"BuyerQuest will support [Tradeshift] with planning, configurations, deliverables, integrations, change requests, and product updates as necessary for Smucker's implementation."

On several occasions, however, BuyerQuest initiated, directed, requested, and/or approved changes to the Smucker Project without consulting Tradeshift (much less obtaining its approval or consent to those changes), and/or otherwise usurped Tradeshift's contractual right to lead the integration process.  In many cases, BuyerQuest's actions resulted in integration failures and/or required a significant amount of work to account for the changes.  In certain cases, Smucker blamed these failures on Tradeshift even though they were caused by BuyerQuest's failures to follow protocol.  Internal BuyerQuest communications with BuyerQuest's CEO, Jack Mulloy, indicate that BuyerQuest's conduct was part of a plan—which it referred to as "Operation Fyrefest"—to undermine Tradeshift's credibility with Smucker so that it could eventually replace Tradeshift on the Smucker Project.

For example, in early December 2019, BuyerQuest asked Smucker to make changes to the format of the User Integration File without consulting, notifying, discussing or obtaining Tradeshift's consent for this format change.  Smucker implemented the changes at BuyerQuest's request.  The unapproved change in the format of the data caused a number of integration problems, including that a number of Smucker users were unable to log into the system.  Smucker appears to have improperly attributed the integration failure to Tradeshift even though the true cause of the failure was due to BuyerQuest's unauthorized instruction to Smucker to alter its data format.  This integration error appears to have unfairly undermined Tradeshift's credibility with Smucker.  BuyerQuest should have contacted Tradeshift about any requests to modify the Smucker data format including, at a minimum, by discussing BuyerQuest's suggested format changes with Tradeshift and obtaining Tradeshift's agreement and consent before approaching Smucker with format change instructions.  And BuyerQuest should have included Tradeshift on all communications with Smucker about format changes.

As another example, in late December 2019, Smucker raised concerns about a requested feature with BuyerQuest.  Smucker referred to this issue as "Defect 77."  To resolve the issue, Smucker asked BuyerQuest to implement a feature that would allow the system to validate

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 10 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

1    "Project" and "Task" values.  BuyerQuest agreed it would accommodate Smucker's request,

2    including by changing the format of a coding file which, in turn, would cause Tradeshift's

3    integrations to fail unless Tradeshift was given notice and time to adjust other format fields

4    accordingly.  In what was becoming a pattern, BuyerQuest agreed to the change in scope without

5    first discussing with Tradeshift, much less getting Tradeshift's consent and approval (as the

6    contract requires).  Once again, BuyerQuest only informed Tradeshift of what it had done after

7    the fact.  The unapproved change required Tradeshift to spend a significant amount of time

8    revising the integrations to accommodate BuyerQuest's change.  Instead of independently

9    agreeing to the change—which constituted a change in project scope—and neglecting to obtain

10    Tradeshift's consent and buy-in, BuyerQuest should have, at a minimum, first discussed

11    Smucker's request with Tradeshift and submitted a project change order to document the process,

12    as specified in the contract.

13        As another example, in late December 2019 and early January 2020, BuyerQuest caused a

14    number of failures by refusing to follow Tradeshift's lead with certain project management

15    instructions.  In the integrated Tradeshift/BuyerQuest product, the BuyerQuest system sends

16    Purchase Orders to the Tradeshift system for processing.  Upon receiving the Purchase Order, the

17    Tradeshift system sends the BuyerQuest system a confirmation indicating that the Purchase Order

18    has been received.  The BuyerQuest system, however, was not processing the confirmations and,

19    as a result, continued to repeatedly send the same Purchase Orders to the Tradeshift system

20    multiple times.  This caused the Tradeshift system to fail when attempting to process each

21    Purchase Order because the Purchase Order was voided repeatedly, creating a new version of the

22    same Purchase Order.  Tradeshift asked BuyerQuest to adjust its system to properly identify and

23    process the confirmations, but subcontractor BuyerQuest refused Tradeshift's request (even

24    though Tradeshift was the project manager under the contract).  Tradeshift then implemented a

25    work around and BuyerQuest agreed that it would stop sending multiple copies of each Purchase

26    Order.  Notwithstanding the work around and its agreement to the contrary, BuyerQuest

27    continued to send multiple Purchase Orders, which continued to cause Tradeshift's systems to

28    fail.  These failures, which were identified as "Defect 104," appeared to unfairly undermine

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                - 11 -                TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

1    Tradeshift's credibility with Smucker.

2        Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

3    to supplement this response as additional information is identified.

4    **INTERROGATORY NO. 6:**

5        IDENTIFY EACH incident in which BUYERQUEST interfered "with Tradeshift's

6    program management duties," as alleged in Paragraph 31 of YOUR Complaint.

7    **RESPONSE TO INTERROGATORY NO. 6:**

8        Tradeshift specifically incorporates by reference each of its General Objections asserted

9    above.

10        Tradeshift objects to this Interrogatory because it seeks information that is equally or more

11    readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

12    communications between BuyerQuest and Smucker.  Accordingly some responsive information

13    was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

14    discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

15    BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

16    opportunity to review that information and incorporate it into its response.

17        Tradeshift objects to this request as duplicative, at least in part, of Interrogatory numbers

18    7-8, 10, 12, 14, 15, and 19.

19        In light of the foregoing objections and limitations, Tradeshift responds as follows:

20        Tradeshift incorporates its response to Interrogatory No. 5.

21        In addition, BuyerQuest refused to support Tradeshift's efforts to salvage the Smucker

22    Services Agreement at least in part because it planned to execute a new agreement between

23    BuyerQuest and Smucker for the Smucker Project that would exclude Tradeshift entirely.

24    Specifically, on January 16, 2020, Smucker sent Tradeshift a letter titled "Notice of Termination."

25    TS_BQ_00000001.  The Smucker Services Agreement (TS_BQ_00000053) states that Smucker

26    may only terminate the agreement if it provides Tradeshift with notice of a material breach and

27    Tradeshift does not correct the breach within 30 days of receiving such written notice.  The

28    "Notice of Termination," however, did not identify any such material breaches or indicate a

Orrick, Herrington &
Sutcliffe LLP
Attorneys at Law
Silicon Valley

4153-0116-1765                    - 12 -                    TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   contractual basis upon which Smucker was terminating the Smucker Services Agreement at all.

2   Instead, without providing any specific examples, the letter stated that Tradeshift had

3   misrepresented the capabilities of Tradeshift's software and that Smucker was "offering a mutual

4   and immediate termination."  The letter further indicated that Smucker did not intend to comply

5   with its ongoing obligations under the Smucker Services Agreement and that Smucker would

6   block Tradeshift from further performing its contractual duties.  Smucker stated, for example, that

7   it had (1) instructed its internal team to cease cooperation with Tradeshift personnel and (2)

8   suspended Tradeshift's access to any of Smucker's facilities and systems.

9         After it received the January 16 letter from Smucker (and unaware of BuyerQuest's efforts

10  to convince Smucker to terminate the Smucker Services Agreement with Tradeshift in favor of a

11  BuyerQuest-Smucker-only agreement), Tradeshift promptly attempted to contact BuyerQuest by

12  phone and email to alert it to Smucker's claim that it would not allow further access or

13  cooperation on the Smucker Project.  Because Smucker's January 16 letter appeared to be

14  predicated on fundamental misunderstandings, Tradeshift requested that BuyerQuest, as its

15  subcontractor, cooperate with Tradeshift in helping to resolve any issues that Smucker may have.

16  BuyerQuest, however, ignored Tradeshift's attempts to contact BuyerQuest and did not respond

17  to Tradeshift's requests (and, in doing so, breached its contractual obligations to Tradeshift with

18  respect to project management and communication).  On January 23, 2020 (and by this time

19  suspecting that perhaps BuyerQuest was working with Smucker behind Tradeshift's back and in

20  violation of both the Smucker Services Agreement and the BuyerQuest Agreements), Tradeshift

21  sent a formal letter to BuyerQuest to request its cooperation and, again, asking for a response.

22  (TS_BQ_00000006). Tradeshift specifically reminded BuyerQuest of its obligations of good faith

23  and fair dealing under the BuyerQuest Agreements as Tradeshift's subcontractor.  Suggesting it

24  had been planning to thwart Tradeshift's contractual requests all along, that same day,

25  BuyerQuest responded to Tradeshift through a letter from its outside litigation law firm,

26  Kronenberger Rosenfeld.  (TS_BQ_00000004).  In that letter, BuyerQuest's counsel indicated

27  that BuyerQuest had no obligation to cooperate with Tradeshift under the BuyerQuest

28  Agreements due to Smucker's purported termination of the Smucker Services Agreement and,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                           - 13 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   perhaps even more concerning, argued that BuyerQuest was permitted to contract directly with

2   Smucker, including to replace Tradeshift on the Smucker Project.  Apparently, at this time,

3   BuyerQuest had already taken significant efforts to convince Smucker to terminate the Smucker

4   Services Agreement with Tradeshift and was working with Smucker to enter into a new contract

5   with just BuyerQuest for the Smucker Project.

6         Tradeshift responded to BuyerQuest in a letter dated January 27, 2020 and again reminded

7   BuyerQuest of its obligation of good faith and fair dealing as Tradeshift's subcontractor and again

8   asked BuyerQuest for its cooperation in working together to resolve any issues that Smucker had

9   raised.  (TS_BQ_00000010).  In a letter dated January 29, 2020, BuyerQuest's attorney

10  responded and expressly refused to assist or even to communicate with Tradeshift about the

11  existing Smucker Project.  (TS_BQ_00000012).

12        Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

13  to supplement this response as additional information is identified.

14  **INTERROGATORY NO. 7:**

15        IDENTIFY EACH incident in which BUYERQUEST failed "to support Tradeshift with

16  planning, configurations, deliverables, integrations, change requests, and product updates

17  necessary for the Smucker project implementation," as alleged in Paragraph 31 of YOUR

18  Complaint.

19  **RESPONSE TO INTERROGATORY NO. 7:**

20        Tradeshift specifically incorporates by reference each of its General Objections asserted

21  above.

22        Tradeshift objects to this Interrogatory because it seeks information that is equally or more

23  readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

24  communications between BuyerQuest and Smucker.  Accordingly some responsive information

25  was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

26  discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

27  BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

28  opportunity to review that information and incorporate it into its response.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                           - 14 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

1    Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

2    including, for example, Interrogatory numbers 5 and 6.

3    In light of the foregoing objections and limitations, Tradeshift responds as follows:

4    Tradeshift incorporates its responses to Interrogatory Numbers 5 and 6.

5    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

6    to supplement this response as additional information is identified.

7    **INTERROGATORY NO. 8:**

8    IDENTIFY EACH incident in which BUYERQUEST failed "to follow Tradeshift's lead

9    with respect to supplier onboarding strategy and planning," as alleged in Paragraph 31 of YOUR

10   Complaint.

11   **RESPONSE TO INTERROGATORY NO. 8:**

12   Tradeshift specifically incorporates by reference each of its General Objections asserted

13   above.

14   Tradeshift objects to this Interrogatory because it seeks information that is equally or more

15   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

16   communications between BuyerQuest and Smucker.  Accordingly some responsive information

17   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

18   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

19   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

20   opportunity to review that information and incorporate it into its response.

21   Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

22   including, for example, Interrogatory numbers 5 and 6.

23   In light of the foregoing objections and limitations, Tradeshift responds as follows:

24   Tradeshift's strategy for onboarding suppliers was to first lockdown the functionality of

25   the combined product and then to start onboarding suppliers to ensure that the product fit the

26   information provided by the suppliers.  BuyerQuest did not follow this strategy or Tradeshift's

27   lead and started attempting to onboard suppliers much sooner than Tradeshift expected.

28   Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 15 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    to supplement this response as additional information is identified.

2    **INTERROGATORY NO. 9:**

3        IDENTIFY EACH incident in which BUYERQUEST failed "to follow the Change

4    Control Process," as alleged in Paragraph 31 of YOUR Complaint.

5    **RESPONSE TO INTERROGATORY NO. 9:**

6        Tradeshift specifically incorporates by reference each of its General Objections asserted

7    above.

8        Tradeshift objects to this Interrogatory because it seeks information that is equally or more

9    readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

10   communications between BuyerQuest and Smucker.  Accordingly some responsive information

11   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

12   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

13   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

14   opportunity to review that information and incorporate it into its response.

15       Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

16   including, for example, Interrogatory number 5.

17       In light of the foregoing objections and limitations, Tradeshift responds as follows:

18       Tradeshift incorporates its responses to Interrogatory Number 5.

19       Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

20   to supplement this response as additional information is identified.

21   **INTERROGATORY NO. 10:**

22       IDENTIFY EACH incident in which BUYERQUEST failed "to include Tradeshift in

23   COMMUNICATIONS with Smucker related to the Smucker project," as alleged in Paragraph 31

24   of YOUR Complaint.

25   **RESPONSE TO INTERROGATORY NO. 10:**

26       Tradeshift specifically incorporates by reference each of its General Objections asserted

27   above.

28       Tradeshift objects to this Interrogatory because it seeks information that is equally or more

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 16 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

2    communications between BuyerQuest and Smucker.  Accordingly some responsive information

3    was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

4    discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

5    BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

6    opportunity to review that information and incorporate it into its response.

7        Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

8    including, for example, Interrogatory numbers 5, 6 and 11.

9        In light of the foregoing objections and limitations, Tradeshift provides the following

10    response based on the information that has been made reasonably available to it at this time and

11    reasonable inferences from that information:

12        Tradeshift incorporates its responses to Interrogatory Numbers 5, 6, and 11.

13        Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

14    to supplement this response as additional information is identified.

15    **<u>INTERROGATORY NO. 11:</u>**

16        IDENTIFY EACH incident in which BUYERQUEST made misrepresentations about

17    TRADESHIFT, as alleged in Paragraph 37 of the Complaint, INCLUDING the speaker and

18    recipient and the substance, means, and date of EACH COMMUNICATION.

19    **<u>RESPONSE TO INTERROGATORY NO. 11:</u>**

20        Tradeshift specifically incorporates by reference each of its General Objections asserted

21    above.

22        Tradeshift objects to this Interrogatory because it seeks information that is equally or more

23    readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

24    communications between BuyerQuest and Smucker.  Accordingly some responsive information

25    was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

26    discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

27    BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

28    opportunity to review that information and incorporate it into its response.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 17 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1   Tradeshift objects to this request as duplicative, at least in part, of Interrogatory numbers

2   5, 6, 10, 12, 13, 15, and 19.

3   In light of the foregoing objections and limitations, Tradeshift provides the following

4   response based on the information that has been made reasonably available to it at this time and

5   reasonable inferences from that information:

6   Tradeshift incorporates its responses to Interrogatory Numbers 5 and 6.

7   In addition, at least as early as September 26, 2019, BuyerQuest planned to encourage

8   Smucker to terminate its contract with Tradeshift and enter into a new contract with BuyerQuest

9   instead.  On September 26, 2019, BuyerQuest's CEO, Jack Mulloy, sent an email to his

10  employees referring to this plan as "Operation Fyrefest."  (BQ043884).  Specifically, Mr. Mulloy

11  sent this email to Salman Siddiqui (BuyerQuest's Chief Operating Officer), Luke Batman

12  (BuyerQuest's Chief Financial Officer), Kyle Muskoff (BuyerQuest's Chief Revenue Officer),

13  and Dan Utyuzh (BuyerQuest's Implementation Team Leader), and told them that they "need to

14  be ready to pivot away from [Tradeshift]" and that he wanted "this group to be prepared to

15  execute 'Operation Fyrefest' . . . ."  Mr. Mulloy also outright told his team that BuyerQuest could

16  and would freely disregard its contract with Tradeshift in favor of its relationship with Smucker

17  by stating the following:

18  "Regardless of what contract BQ has with TS, **BuyerQuest's commitment is to**
19  **Smucker's and the success of the Smucker's project []** I can't emphasize this
    enough"

20

21  (BQ043884) (emphasis in original).

22  Mr. Mulloy's email laid out the purported reasons BuyerQuest would identify to Smucker

23  for terminating the contract with Tradeshift.  Specifically, he indicated that the group should

24  "discuss and agree to . . . [Tradeshift's] inability to execute, [Tradeshift's] unwillingness to

25  enable suppliers, [Tradeshift's] unwillingness to pay their bills or communicate properly with

26  BQ, etc."  Mr. Mulloy also indicated that the group needed to discuss how to communicate this

27  information to Smucker, *i.e.*, that the group should "discuss and agree to . . . [p]otential

28  communication plans between BQ/Smucker's."

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 18 -

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1    The facts show that Mr. Mulloy executed on "Operation Fyrefest" over the next four

2    months by repeatedly attempting to convince Smucker to terminate its contract with Tradeshift in

3    favor of a direct agreement with BuyerQuest.  Mr. Mulloy started by convincing Smucker's

4    Senior Director of Indirect Procurement (Jason Barr) to help BuyerQuest convince Smucker's

5    decisionmakers to terminate Smucker's contract with Tradeshift and transfer the work to

6    BuyerQuest.  Mr. Mulloy appears to have disparaged Tradeshift to Mr. Barr on numerous

7    occasions, including by text and telephone.  This included conversations on at least on October

8    21, 2019; October 22, 2019; October 31, 2019; November 1, 2019; November 4, 2019, and

9    November 5, 2019.  (*See* BQ103116; BQ103117).  For example, Mr. Mulloy reported to his

10   executive team that, on October 21, 2019, about a conversation he had with Mr. Barr "off the

11   record." (BQ109056; BQ103116).  During this conversation Mr. Mulloy made Mr. Barr aware of

12   Mr. Mulloy's "skepticism around [Tradeshift]."  He also told his team that Mr. Barr was "on

13   board" and that Smucker would now be conducting its own risk assessment on Tradeshift "based

14   on our convo."  (BQ109056)  The full content of these discussion is still being discovered.

15       Mr. Mulloy also met with his executive times multiple times to discuss and refine

16   "Operation Fyrefest," *i.e.*, BuyerQuest's plan to convince Smucker to replace Tradeshift.  On

17   October 21, 2019, for example, Mr. Mulloy told his team that "today's email from [Tradeshift]

18   was the last straw," and that his team was going to "design a play" and "call it 'Operation

19   Fyrefest'" in case BuyerQuest needed to "audible."  (*Id.*).  Mr. Mulloy continued to discuss

20   "Operation Fyrefest" with his executive team throughout the project, including during a 2 hour

21   meeting with his team on October 23, 2019.

22       Smucker's management appears to have initially resisted Mr. Mulloy's and Mr. Barr's

23   recommendations that Smucker terminate its agreement with Tradeshift. Notwithstanding those

24   recommendations, In November 2019, Smucker told Mr. Mulloy that "[BuyerQuest] and

25   Tradeshift need to find a way to come together and pull this thing across the finish line."

26   (BQ103117).  Mr. Mulloy responded to Mr. Barr that a particular Tradeshift employee was "a

27   master bs'er" and—notwithstanding Smucker's instructions—stated that "we'll continue to plan

28   for a world without [Tradeshift]."  (*Id.*).  In other words, Mr. Mulloy had no intention of ceasing

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                          - 19 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1    his efforts to interfere with Smucker's contract with Tradeshift.

2         On December 5, 2019 BuyerQuest's CEO (Mr. Mulloy) and COO (Mr. Siddiqui) met with

3    persons from Smucker at Smucker's building.  (BQ109256).  Mr. Mulloy later described his

4    conversation with Smucker to BuyerQuest's CFO, Luke Batman.  (BQ103035).  Mr. Mulloy

5    indicated that the conversation included at least Dan Nowikci from Smucker and that Smucker

6    still would not agree to terminate its agreement with Tradeshift.  Specifically, Mr. Mulloy

7    reported that it "sounds like smucker's doesn't want to bifurcate the contract until after we go

8    live."  BuyerQuest's COO (Salman Siddiqui) also described the meeting to another Smucker

9    employee, and stated that "it was an odd ride Jack [Mulloy]" and that "Jack [Mulloy] oversold

10   and just bitched about Tradeshift #ceo_not_jack." (BQ109258) (emphasis added).  Based on these

11   discussions, it is clear that Mr. Mulloy was having conversations with Smucker without including

12   Tradeshift, including conversations intended to disparage Tradeshift and convince Smucker to

13   terminate Tradeshift or otherwise implement "Operation Fyrefest."  Discovery into the exact

14   content of these conversations is still ongoing.

15        To further "Operation Fyrefest," at least as early as December 6, 2019, BuyerQuest's

16   executive team was preparing presentations to help convince Smucker to terminate its agreement

17   with Tradeshift.  On December 6, 2019, Kyle Muskoff sent an initial draft of such a document,

18   titled "Smucker Proposal" to Salman Siddiqui.  (*See* BQ109275).

19        On December 13, 2019, BuyerQuest's CEO, Jack Mulloy, sent an email to one of

20   BuyerQuest's board members, Clark Khayat.  (BQ091161).  In the email, Mr. Mulloy provided

21   Mr. Khayat with an update on BuyerQuest's business, including the Smucker Project and

22   BuyerQuest's relationship with Smucker. During the conversation, Mr. Mulloy admits that he had

23   conversations with Smucker in which he disparaged Tradeshift, its products, its employees, and

24   its finances.  Specifically, Mr. Mulloy stated:

25        ". . . the Tradeshift/Smucker's relationship is not good [].  Through social listening
          (***and hearing from me***), Smucker's is very concerned about Tradeshift's ability to
26        execute.  Their product is very immature.  The delivery team is weak [] and the
          word is out that TradeShift has missed payroll a few times recently and they
27        haven't paid any vendors in a couple of months."

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                  - 20 -                    TRADESHIFT'S OBJECTIONS AND
                                                                          RESPONSES TO BUYERQUEST'S FIRST
                                                                          SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

(BQ091161) (emphasis added).  Mr. Mulloy further stated that, as a result of Smucker's shaken confidence in Tradeshift (which BuyerQuest itself had caused), Smucker would likely terminate its contract with Tradeshift at some point.  Specifically, he stated:

> "A likely outcome at Smucker's is that Tradeshift/BuyerQuest go-live at Smucker's in May 2020.  Smucker's puts [its prior vendor] in the rearview […] soon after, Smucker's asks BuyerQuest to support 100% of their P2P efforts & remove the need for TS all together . . . .  This will result in a better commercial deal for BQ and a better solution for Smucker's."

(BQ091161).

On December 19, 2019, Mr. Mulloy had a conversation with Dan Utyuzh (BuyerQuest's Implementation Team Leader) via Slack (BQ112393).  During the conversation Mr. Mulloy admitted that he had another conversation with Smucker's Senior Director of Indirect Procurement (Jason Barr) and "further planted the seed" that Smucker should take over more of Tradeshift's work so it could ultimately cut Tradeshift out of the Smucker Project.  Specifically Mr. Mulloy stated:

> I further planted the seed that JMS could move invoicing for indirects to BQ and that would: 1) lessen the work TS needs to do (clearly TS is drowning) and 2) shift more of the scope into BQ so that we can blow TS completely out of JMS later in 2020.

(*Id.*) (emphasis added).

On or around December 20, 2019, Mr. Mulloy had another meeting with Smucker. (BQ095231).  Mr. Mulloy reported to his team that, during this meeting, Smucker was considering Mr. Mulloy's recommendations, but still had questions about BuyerQuest's ability to take over certain of Tradeshift's task, including "Invoicing," "Supplier Portal," and "Direct Orders."  (*Id.*).  He further indicated that BuyerQuest needed to explain how they would handle these issues in order to convince Smucker to terminate its contract with Tradeshift.  (*Id.*).  Mr. Mulloy further noted that he had set up a subsequent meeting with Smucker at BuyerQuest's offices so that BuyerQuest could explain why Smucker should terminate its contract with Tradeshift and transfer the work to Smucker.  As part of this, Mr. Mulloy notes that his contact at Smucker (Jason Barr) would be "building the story as to why Tradeshift failed & how

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                    - 21 -          TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1   BuyerQuest can save the day at [Smucker]."  Specifically, Mr. Mulloy's notes stated, among

2   other things, the following:

3   • "Smucker will be in our office on Tuesday, January 7th to discuss our go-forward plan in
      more detail.  For this meeting, we should be prepared to speak to: The updated project
4     timeline (by week), the product roadmap updates to support JMS, a demo of the Invoicing
5     functionality and supplier portal."

6   • "As part of the January 7th discussions, Jack, Jason, and Luke will split off at some point
      and talk about the go-forward commercials and contracting process."
7

8   • [. . .] "Jason mentioned that January 17th is the date when JMS will officially give us the
      greenlight to move forward.  Starting now, Jason will be building the story as to why
9     TradeShift failed & how BuyerQuest can save the day at JMS."

10  • "For obvious reasons, JMS asked us to keep this very quiet for now."

11  (BQ095231).

12      The January 7, 2020 meeting with Smucker appears to have gone forward.  (*See*

13  BQ113802).  On that date, Mr. Mulloy communicated to another BuyerQuest employee that the

14  "[S]mucker's team is almost here," and that they would be using "our front [conference] room on

15  [the] 3rd floor" for the presentation.  (*Id.*)  Mr. Mulloy's team appears to have prepared several

16  draft presentations to present to Smucker at this meeting or at some other time.  One such

17  presentation (BQ100227), included a section titled "Why are we here?" and proceeded to identify

18  the false information that Mr. Mulloy had communicated to Smucker as "concerns around

19  Tradeshift"

CONFIDENTIAL / HIGHLY CONFIDENTIAL



(BQ100229).  The presentation also included notes indicating the points that Mr. Mulloy had communicated to Smucker and that BuyerQuest intended to reiterate during the presentation:

- Tradeshift's P2P solution is not at the level required to meet JMS's requirements:
  - Inability to load JMS accounting file due to filesize limitation
  - Inexperience and inability to enable suppliers to send invoices via cXML or EDI
  - Inability to do receiving (receiving moved to BuyerQuest in Q4)
  - Inability to process PO's with multiple line types
- Smucker has tight timeline with Ariba
  - We aren't convinced that TradeShift can deliver a working product
  - We aren't convinced that TradeShift will be solvent in 2020

- Tradeshift is under tremendous financial pressure and can't pay vendors

(BQ10229).

       The presentation went on to explain how Smucker should transfer work from Tradeshift to BuyerQuest (thus breaching Smucker's contract with Tradeshift and BuyerQuest's contracts with Tradeshift).  Specifically, the presentation explained that "BuyerQuest is currently responsible for Indirect eProcurement and Supplier Catalog Management" and that "Tradeshift is currently

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL / HIGHLY CONFIDENTIAL

1  responsible for Indirect & Direct Accounts Payable as well as some Supplier Management."  It
2  further stated that "BuyerQuest will take over responsibility for Indirect and Direct POs &
3  Accounts Payable as well as all of the Supplier Management functionality."  (BQ100231).
4  Another presentation similarly explained the "Indirect P2P Scope" that BuyerQuest would be
5  taking over from Tradeshift.  (BQ097218).  One presentation also indicated that BuyerQuest
6  needed an "official green light" to take over the scope of work by January 17, 2020.  (BQ100235-
7  37).

8  　　　On January 8, 2020, Mr. Mulloy had another text conversation with Mr. Batman.  In that
9  conversation, Mr. Mulloy *again* indicated that (in violation of BuyerQuest's contractual
10  obligations to Tradeshift) he was actively encouraging Smucker to terminate its contract with
11  Tradeshift in favor of a contract with BuyerQuest.  (BQ103036).  Specifically, Mr. Mulloy asked
12  Mr. Batman whether there was a "cool down period" in BuyerQuest's contract with Tradeshift
13  that would delay BuyerQuest's ability to work directly with Smucker.  Mr. Batman indicated that
14  there was not such a provision.  Mr. Mulloy responded "Great.  ***I'm working it***.  Will keep you
15  posted.  Maybe we should connect tomorrow or Friday on some of the commercial elements."
16  (BQ103036) (emphasis added).

17  　　　Mr. Mulloy also appears to have spoken with Smucker on January 13, 2020 to further
18  encourage Smucker to terminate its contract with Tradeshift.  On that date, Mr. Mulloy spoke
19  with Salman Siddiqui (BuyerQuest's Chief Operating Officer) and noted that he was going to
20  speak with Smucker that day.  (BQ118909).  Mr. Siddiqui responded that Mr. Mulloy should "get
21  lots of $$ from [Smucker]," indicating that the Mr. Mulloy was already discussing a new contract
22  between Smucker and BuyerQuest at this time, *i.e.*, before Smucker's purported termination of its
23  contract with Tradeshift.  Mr. Mulloy also indicated that Smucker was meeting the following day
24  to make the "go / no-go decision . . . for [BuyerQuest]." *Id.*

25  　　　Mr. Mulloy's repeated efforts to interfere with Tradeshift's contract with Smucker
26  ultimately paid off.  On January 16, 2020—one day prior to the January 17, 2020 deadline that
27  BuyerQuest gave Smucker to give a "green light" for BuyerQuest to take over Tradeshift's
28  portion of the project—Smucker sent a letter to Tradeshift titled "Notice of Termination."

CONFIDENTIAL / HIGHLY CONFIDENTIAL

(TS_BQ_00000001).  In the letter, Smucker did not purport to terminate the agreement through the termination provisions provided in the contract.  Those provisions required Smucker to provide written notice of any material breaches to Tradeshift and to give Tradeshift 30-days to correct those purported breaches.  Instead of complying with those provisions, Smucker accused Tradeshift of fraud and stated that it was voiding the contract without complying with the termination provisions.

BuyerQuest has admitted that it subsequently worked with Smucker to finalize and execute a contract for BuyerQuest to replace Tradeshift on the Smucker Project.  Specifically, in its interrogatory responses, BuyerQuest admits that on or around January 21, 2020, Jason Barr from Smucker sent a draft contract to Jack Mulloy and BuyerQuest, and Smucker thereafter communicated about the provisions of the contract.  During this time, Tradeshift was still attempting to determine why Smucker had purported to terminate its contract with Smucker and requesting that BuyerQuest assist Tradeshift in salvaging the relationship and the agreement.  BuyerQuest outright refused to assist, apparently because it was finalizing this new agreement to take over Tradeshift's work.  On or around February 6, 2020, Dan Utyuzh at BuyerQuest sent a draft statement of work to Rowdy White at Smucker along with a Master Services Agreement.  On or around March 6, 2020, Smucker and BuyerQuest executed a new agreement for work that would have been done by Tradeshift under the Smucker Services Agreement and the BuyerQuest Agreements.

In addition to the documents, communications, and admissions indicating that BuyerQuest employees, including BuyerQuest CEO Jack Mulloy, communicated directly with Smucker without Tradeshift throughout fall of 2019 and January 2020 (and, in doing so, made false and disparaging statements about Tradeshift and encouraged Smucker to improperly terminate its contract with Tradeshift in favor of BuyerQuest), BuyerQuest has also admitted in its discovery responses that it had "[v]arious informal verbal communications in November and December 2019 about Tradeshift's [purported] failure to provide the services that Tradeshift was obligated to provide to Smucker."  BuyerQuest has not yet disclosed the timing or content of those discussions.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 25 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

2    to supplement this response as additional information is identified.

3    **INTERROGATORY NO. 12:**

4    IDENTIFY EACH incident in which BUYERQUEST disparaged TRADESHIFT to

5    SMUCKER, as alleged in Paragraph 37 of the Complaint, INCLUDING the speaker and recipient

6    and the substance, means, and date of EACH COMMUNICATION.

7    **RESPONSE TO INTERROGATORY NO. 12:**

8    Tradeshift specifically incorporates by reference each of its General Objections asserted

9    above.

10    Tradeshift objects to this Interrogatory because it seeks information that is equally or more

11    readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

12    communications between BuyerQuest and Smucker.  Accordingly some responsive information

13    was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

14    discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

15    BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

16    opportunity to review that information and incorporate it into its response.

17    Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

18    including, for example, Interrogatory numbers 5 and 11.

19    In light of the foregoing objections and limitations, Tradeshift provides the following

20    response based on the information that has been made reasonably available to it at this time and

21    reasonable inferences from that information:

22    Tradeshift incorporates its responses to Interrogatory Numbers 5 and 11.

23    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

24    to supplement this response as additional information is identified.

25    **INTERROGATORY NO. 13:**

26    IDENTIFY EACH incident in which BUYERQUEST "took steps to encourage Smucker

27    to wrongfully terminate the Smucker Services Agreement so that BuyerQuest could do a direct

28    deal with Smucker without Tradeshift for the Smucker project," as alleged in Paragraph 43 of

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 26 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    YOUR Complaint.

2    **RESPONSE TO INTERROGATORY NO. 13:**

3         Tradeshift specifically incorporates by reference each of its General Objections asserted

4    above.

5         Tradeshift objects to this Interrogatory because it seeks information that is equally or more

6    readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

7    communications between BuyerQuest and Smucker.  Accordingly some responsive information

8    was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

9    discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

10   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

11   opportunity to review that information and incorporate it into its response.

12        Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

13   including, for example, Interrogatory numbers 5, 6, and 11.

14        In light of the foregoing objections and limitations, Tradeshift provides the following

15   response based on the information that has been made reasonably available to it at this time and

16   reasonable inferences from that information:

17        Tradeshift incorporates its responses to Interrogatory Numbers 5, 6, and 11.

18        Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

19   to supplement this response as additional information is identified.

20   **INTERROGATORY NO. 14:**

21        IDENTIFY EACH incident in which BUYERQUEST "refused to communicate with,

22   cooperate with, or support Tradeshift in seeking to finish implementation of the Smucker

23   Project," as alleged in Paragraph 43 of YOUR Complaint.

24   **RESPONSE TO INTERROGATORY NO. 14:**

25        Tradeshift specifically incorporates by reference each of its General Objections asserted

26   above.

27        Tradeshift objects to this Interrogatory because it seeks information that is equally or more

28   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 27 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1   communications between BuyerQuest and Smucker.  Accordingly some responsive information

2   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

3   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

4   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

5   opportunity to review that information and incorporate it into its response.

6           Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

7   including, for example, Interrogatory Number 6.

8           In light of the foregoing objections and limitations, Tradeshift responds as follows:

9           Tradeshift incorporates its response to Interrogatory Number 6.

10          Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

11  to supplement this response as additional information is identified.

12  **INTERROGATORY NO. 15:**

13          IDENTIFY EACH incident in which BUYERQUEST "manufactured an excuse not to

14  perform its obligations under the BuyerQuest Agreements," as alleged in Paragraph 43 of YOUR

15  Complaint.

16  **RESPONSE TO INTERROGATORY NO. 15:**

17          Tradeshift specifically incorporates by reference each of its General Objections asserted

18  above.

19          Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal a

20  trade secret and/or confidential or proprietary business information.  If Tradeshift provides such

21  information, it will do so subject to the Protective Order entered in this case.

22          Tradeshift objects to this Interrogatory because it seeks information that is equally or more

23  readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

24  communications between BuyerQuest and Smucker.  Accordingly some responsive information

25  was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

26  discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

27  BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

28  opportunity to review that information and incorporate it into its response.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                          - 28 -                   TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

2    including, for example, Interrogatory numbers 5, 6, and 11.

3    In light of the foregoing objections and limitations, Tradeshift provides the following

4    response based on the information that has been made reasonably available to it at this time and

5    reasonable inferences from that information:

6    Tradeshift incorporates its responses to Interrogatory Numbers 5, 6 and 11.

7    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

8    to supplement this response as additional information is identified.

9    **INTERROGATORY NO. 16:**

10    IDENTIFY EACH reason that SMUCKER provided to TRADESHIFT for SMUCKER's

11    termination of the SMUCKER SERVICES AGREEMENT.

12    **RESPONSE TO INTERROGATORY NO. 16:**

13    Tradeshift specifically incorporates by reference each of its General Objections asserted

14    above.

15    Tradeshift objects to this request as vague and ambiguous because it asks about Smucker's

16    termination of the Smucker Services Agreement, but Smucker never properly terminated the

17    Smucker Services Agreement pursuant to the termination provisions in that contract; Tradeshift

18    will interpret this interrogatory as seeking information about the reasons Smucker gave for its

19    purported termination.  Tradeshift objects to this interrogatory as seeking information that is

20    equally available to BuyerQuest.

21    In light of the foregoing objections and limitations, Tradeshift responds as follows:

22    Smucker did not properly terminate the Smucker Services Agreement.  Instead, at the

23    behest of BuyerQuest, Smucker unexpectedly repudiated and breached its obligations under the

24    Smucker Services Agreement without following the required procedures for terminating the

25    agreement.

26    Pursuant to Federal Rule of Civil Procedure 33(d), Tradeshift identifies the following

27    documents: Smucker's January 16, 2020 letter (TS_BQ_00000001) and Smucker's January 30,

28    2020 letter (TS_BQ_00000014).

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 29 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

2  to supplement this response as additional information is identified.

3  **INTERROGATORY NO. 17:**

4    IDENTIFY ALL complaints that SMUCKER or BUYERQUEST communicated to YOU

5  about YOUR performance under the SMUCKER SERVICES AGREEMENT, INCLUDING

6  ANY complaints about the Tradeshift Platform Business Edition and the Tradeshift Pay Business

7  Edition.

8  **RESPONSE TO INTERROGATORY NO. 17:**

9    Tradeshift specifically incorporates by reference each of its General Objections asserted

10  above.

11    Tradeshift further objects to this Interrogatory on the grounds that it is vague and

12  ambiguous in its use of the term "complaints."  Tradeshift will construe "complaints" as defects

13  and "errors and change requests received regarding the Tradeshift Platform Business Edition and

14  the Tradeshift Pay Business Edition in connection with the Smucker Project."

15    In light of the foregoing objections and limitations, Tradeshift responds as follows:

16    Pursuant to Federal Rule of Civil Procedure 33(d), Tradeshift will produce documents

17  sufficient to disclose any complaints that Tradeshift received from Smucker or BuyerQuest

18  regarding Tradeshift's performance under the Smucker Services Agreements.

19    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

20  to supplement this response as additional information is identified.

21  **INTERROGATORY NO. 18:**

22    DESCRIBE YOUR calculation of EACH category of damages YOU seek from

23  BuyerQuest in this action, INCLUDING ALL DOCUMENTS that support that calculation.

24  **RESPONSE TO INTERROGATORY NO. 18:**

25    Tradeshift specifically incorporates by reference each of its General Objections asserted

26  above.

27    Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

28  information that is the subject of the attorney-client privilege, the attorney work product doctrine,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                    - 30 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

CONFIDENTIAL

1   or any other applicable privilege or doctrine.  Tradeshift will log any such communications it

2   excludes on this basis to the extent consistent with the parties' privilege log agreement.

3       Tradeshift objects to this interrogatory as premature to the extent it seeks expert testimony

4   and/or opinions that are not yet due under the scheduling order issued in this case.  Tradeshift

5   reserves the right to supplement and/or revise its calculation of damages based on the opinion of

6   such experts.

7       Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal a

8   trade secret and/or confidential or proprietary business information.  If Tradeshift provides such

9   information, it will do so subject to the Protective Order entered in this case.  Tradeshift further

10  objects to this Interrogatory to the extent that it calls for Tradeshift to reveal information that is

11  the subject of the attorney-client privilege or the attorney work product doctrine.

12      In light of the foregoing objections and limitations, Tradeshift responds as follows:

13      Tradeshift seeks at least $4,373,070.37 in damages from BuyerQuest, which is the

14  remaining amount that Smucker was required to pay pursuant to the Smucker Services

15  Agreement.  The Smucker Services Agreement provided that Smucker would pay $5,168,951 in

16  fees for implementation, services, and software licenses.  Smucker paid a total of $795,880.63

17  before BuyerQuest breached the BuyerQuest Agreements and interfered with the Smucker

18  Services Agreement.

19      Tradeshift also seeks punitive damages and attorneys' fees in amounts that have yet to be

20  determined.

21      Tradeshift will produce documents sufficient to support its damages claims.  Tradeshift

22  identifies the following non-exhaustive list of exemplary documents supporting Tradeshift's

23  damages claims: the Smucker Services Agreement (TS_BQ_00000053);  The BuyerQuest

24  Agreements (TS_BQ_00000016; TS_BQ_00000124); and Invoice and Payment Reports related

25  to the Smucker Project (TS_BQ_00000135; TS_BQ_00000136).

26      Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

27  to supplement this response as additional information is identified.

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 31 -

CONFIDENTIAL / HIGHLY CONFIDENTIAL

**INTERROGATORY NO. 19:**

IDENTIFY ALL conduct by BUYERQUEST by specific incident that supports YOUR request for punitive damages in this action.

**RESPONSE TO INTERROGATORY NO. 19:**

Tradeshift specifically incorporates by reference each of its General Objections asserted above.

Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal information that is the subject of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine. Tradeshift will log any such communications it excludes on this basis to the extent consistent with the parties' privilege log agreement.

Tradeshift objects to this Interrogatory because it seeks information that is equally or more readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and communications between BuyerQuest and Smucker. Accordingly some responsive information was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during discovery. Tradeshift reserves the right to update its response to this Interrogatory after BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable opportunity to review that information and incorporate it into its response.

Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories, including, for example, Interrogatory numbers 5, 6 and 11.

In light of the foregoing objections and limitations, Tradeshift responds as follows:

Tradeshift retained BuyerQuest as a subcontractor on the Smucker Project. As a result, BuyerQuest had contractual obligations to Tradeshift as well as an implied obligation of good faith and fair dealing. BuyerQuest completely ignored these obligations. It intentionally interfered with Tradeshift's contract with Smucker by undermining Tradeshift on the Smucker Project and secretly convincing Smucker to terminate the contract in favor of a direct deal with BuyerQuest only. BuyerQuest's plan—which it referred to as "Operation Fyrefest,"—was planned and executed by its executive officers, led by BuyerQuest's CEO, Jack Mulloy.

Tradeshift incorporates its responses to Interrogatory Numbers 5, 6, and 11.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                        - 32 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

1    Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

2  to supplement this response as additional information is identified.

3

4  Dated: August 10, 2020                    By:   _/s/ Amy K. Van Zant_
                                                    Amy K. Van Zant
5                                                   Jason K. Yu
                                                    Tammy Su
6                                                   Attorneys for Plaintiff
                                                    TRADESHIFT, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765                                  - 33 -

TRADESHIFT'S OBJECTIONS AND
RESPONSES TO BUYERQUEST'S FIRST
SET OF FIRST SET OF ROGS (NOS. 1-19)

**PROOF OF SERVICE**

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action.  My place of business is Orrick, Herrington & Sutcliffe, LLP, 1000 Marsh Road, Menlo Park, CA 94025.  On August 10, 2020, I served the within document(s):

**PLAINTIFF TRADESHIFT, INC.'S OBJECTIONS AND RESPONSES TO DEFENDANT BUYERQUEST, INC.'S FIRST SET OF INTERROGATORIES (NOS. 1-19).**

| | |
|---|---|
| **X** | By transmitting a courtesy copy **via electronic mail** the document(s) listed above to the email addresses set forth below on August 10, 2020. |

Karl S. Kronenberger
Jeffrey M. Rosenfeld
Liana W. Chen
Ruben Peña
KRONENBERGER ROSELFELD, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
karl@KRInternetLaw.com
jeff@KRInternetLaw.com
liana@KRInternetLaw.com
ruben@KRInternetLaw.com
**ATTORNEYS FOR DEFENDANT BUYERQUEST, INC.**

Executed on August 10, 2020 at Moss Beach, California.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*/s/ Karin Barnick*
Karin Barnick

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

4153-0116-1765

- 1 -

# EXHIBIT 3

AMY K. VAN ZANT (STATE BAR NO. 197426)
avanzant@orrick.com
JASON K. YU (STATE BAR NO. 274215)
jasonyu@orrick.com
TAMMY SU (STATE BAR NO. 329652)
tsu@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

Attorneys for Plaintiff
TRADESHIFT, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRADESHIFT, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BUYERQUEST, INC., an Ohio corporation,<br><br>Defendant. | Case No. 3:20-cv-1294-RS<br><br>**PLAINTIFF TRADESHIFT, INC.'S SUPPLEMENTAL RESPONSE TO DEFENDANT BUYERQUEST, INC.'S FIRST SET OF INTERROGATORIES (NO. 19)** |

**PROPOUNDING PARTY:**      **Defendant BuyerQuest, Inc.**

**RESPONDING PARTY:**      **Plaintiff Tradeshift, Inc.**

**SET NUMBER:**      **One**

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

1       In accordance with Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Tradeshift,

2  Inc. ("Tradeshift" or "Plaintiff") hereby provides the following supplemental objections and

3  responses ("Responses") to the First Set of Interrogatories propounded by BuyerQuest, Inc.

4  ("BuyerQuest" or "Defendant").

5                  **<u>GENERAL OBJECTIONS</u>**

6       In addition to the specific objections noted below, Tradeshift asserts the following general

7  objections to each and every Interrogatory.

8       1.      By responding to any Interrogatory, Tradeshift does not waive any objection that

9  may be applicable to: (a) the use, for any purpose, by BuyerQuest of any information provided in

10  the response; or (b) the admissibility, relevance, or materiality of any of the information to any

11  issue in this case.

12       2.      Tradeshift objects to BuyerQuest's definitions and instructions to the extent they

13  require Tradeshift to provide information beyond that required by the Federal Rules of Civil

14  Procedure, the local rules of the Northern District of California, or any other applicable rules.

15       3.       Tradeshift objects to BuyerQuest's definitions and instructions to the extent they

16  add discrete subparts to individual interrogatories such that those interrogatories are compound

17  and should constitute multiple interrogatories that may exceed the maximum number of

18  interrogatories allowed in this case.  Tradeshift will respond to the prompts of the individual

19  interrogatories and is willing to confer regarding additional information that would be responsive

20  to additional interrogatories.

21       4.      Tradeshift objects to BuyerQuest's definition of "COMMUNICATION(S)" as

22  overly broad, seeking discovery of information where the burden of the proposed discovery

23  outweighs its likely benefit, seeking information not relevant to any claim or defense, and not

24  proportional to the needs of the case because the definition includes "any and all communications

25  of any kind" "whether written, oral, or by any other means."  Tradeshift further objects to this

26  definition as overly broad, unduly burdensome, and duplicative to the extent it is used to request

27  information contained in documents that Tradeshift will be producing in response to

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 1 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

BuyerQuest's requests for the production of documents.

5.      Tradeshift objects to BuyerQuest's definition of "IDENTIFY" as overly broad, unduly burdensome, seeking irrelevant information, and seeking information not proportional to the needs of the case.  Tradeshift also objects to this definition as seeking information subject to a right of privacy and information that is duplicative of information that will be provided through other means, for example, in response to BuyerQuest's requests for production of documents. When identifying persons, Tradeshift will identify them by name and provide additional information to the extent it is reasonably available, relevant, not subject to a right of privacy, and not duplicative.  When identifying documents, Tradeshift will identify documents by Bates number if available, or by a reasonable description of the document.

6.      Tradeshift objects to BuyerQuest's definition of "YOU," "YOUR," and "TRADESHIFT" as vague and ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense, and not proportional to the needs of the case because the definition purports to include persons or entities who are not parties to the lawsuit, have no involvement in the subject matter of the lawsuit, have no information that would be relevant to the claims or defenses in this lawsuit, and/or are not within Tradeshift's control.  Tradeshift will respond only on behalf of, and with respect to, Tradeshift, Inc.  Tradeshift construes "you," "your," and "Tradeshift" to mean Plaintiff Tradeshift, Inc.

7.      Tradeshift objects to BuyerQuest's definition of "BUYERQUEST" as vague and ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense, and not proportional to the needs of the case because the definition includes "ALL PERSONS acting on its behalf, including without limitation, ALL past or present officers, directors, employees, representatives, consultants, partners, independent contractors, agents, or attorneys." Tradeshift construes "BUYERQUEST" to mean Defendant BuyerQuest, Inc.

8.      Tradeshift objects to BuyerQuest's definition of "SMUCKER" as vague and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 2 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

ambiguous, overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking information not relevant to any claim or defense, and not proportional to the needs of the case because the definition includes "J.M. Smucker Company, J.M. Smucker Inc., and ALL PERSONS acting on their behalf, including without limitation, ALL past or present officers, directors, employees, representatives, consultants, partners, independent contractors, agents, or attorneys."  Tradeshift construes "SMUCKER" to mean Smucker Services Company, the J.M. Smucker Company, and J.M. Smucker, Inc.

9.     Tradeshift objects to Definition 16 as overly broad, seeking discovery of information where the burden of the proposed discovery outweighs its likely benefit, seeking discovery of information that is not relevant to any claim or defense, not proportional to the needs of this case, and inconsistent with Rules 26 and 34 of the Federal Rules of Civil Procedure because it purports to require Tradeshift to provide documents regarding hypothetical future events that have not yet occurred.

10.     Tradeshift objects to each Interrogatory to the extent that it calls for Tradeshift to reveal information that is the subject of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine.  Tradeshift will not provide privileged information and, instead, to the extent it is consistent with the parties' agreements regarding privileged communications, will withhold and log responsive privileged communications.

11.     To the extent that Tradeshift identifies and/or produces any information or documents in response to the Interrogatories, it does so with the understanding that such information or document shall not be deemed or construed to constitute a waiver of any privilege or right of Tradeshift, including the right to designate materials as confidential.  Tradeshift reserves all rights to recall from discovery any inadvertently produced document protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, doctrine, or immunity.  Tradeshift also reserves the right to designate (or redesignate) any confidential documents that may be inadvertently produced without the appropriate confidentiality designation.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 3 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

12.     Tradeshift objects to these Interrogatories as premature to the extent they purport to request "all" facts or information in support of Tradeshift's claims.  Much of the documents and information supporting Tradeshift's claims is in the possession of BuyerQuest and/or Smucker.  Fact discovery remains open, and BuyerQuest and Smucker have yet to make complete productions of all such documents and information in response to Tradeshift's discovery requests.  Accordingly, Tradeshift's responses are made without prejudice to its right to supplement or amend its responses and to present evidence discovered hereafter at trial.

13.     Tradeshift objects to these Interrogatories to the extent that they seek confidential, sensitive, or proprietary business or trade secret information of any third party.  Should any interrogatory call for such information, Tradeshift will make reasonable efforts to obtain the consent of any such third party and if it cannot obtain such third-party consent, Tradeshift will clearly state so in its response.

Tradeshift objects to these Interrogatories to the extent that they seek information beyond what is available from: (a) a reasonable search of Tradeshift's files likely to contain relevant or responsive documents or information and (b) a reasonable inquiry of Tradeshift employees likely to have information relevant to a claim or defense of any party, or to the subject matter of the litigation.

## SPECIFIC OBJECTIONS AND RESPONSES

Subject to and without waiving the above General Objections, Tradeshift objects and responds to BuyerQuest's First Set of Interrogatories as follows:

**INTERROGATORY NO. 19:**

IDENTIFY ALL conduct by BUYERQUEST by specific incident that supports YOUR request for punitive damages in this action.

**RESPONSE TO INTERROGATORY NO. 19:**

Tradeshift specifically incorporates by reference each of its General Objections asserted above.

Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 4 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

1   information that is the subject of the attorney-client privilege, the attorney work product doctrine,

2   or any other applicable privilege or doctrine.  Tradeshift will log any such communications it

3   excludes on this basis to the extent consistent with the parties' privilege log agreement.

4         Tradeshift objects to this Interrogatory because it seeks information that is equally or more

5   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

6   communications between BuyerQuest and Smucker.  Accordingly some responsive information

7   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

8   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

9   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

10  opportunity to review that information and incorporate it into its response.

11        Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

12  including, for example, Interrogatory numbers 5, 6 and 11.

13        In light of the foregoing objections and limitations, Tradeshift responds as follows:

14        Tradeshift retained BuyerQuest as a subcontractor on the Smucker Project.  As a result,

15  BuyerQuest had contractual obligations to Tradeshift as well as an implied obligation of good

16  faith and fair dealing.  BuyerQuest completely ignored these obligations.  It intentionally

17  interfered with Tradeshift's contract with Smucker by undermining Tradeshift on the Smucker

18  Project and secretly convincing Smucker to terminate the contract in favor of a direct deal with

19  BuyerQuest only.  BuyerQuest's plan—which it referred to as "Operation Fyrefest,"—was

20  planned and executed by its executive officers, led by BuyerQuest's CEO, Jack Mulloy.

21        Tradeshift incorporates its responses to Interrogatory Numbers 5, 6, and 11.

22        Discovery has just started.  Tradeshift is continuing its investigation and reserves its right

23  to supplement this response as additional information is identified.

24  **<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:</u>**

25        Tradeshift specifically incorporates by reference each of its General Objections asserted

26  above.

27        Tradeshift objects to this Interrogatory to the extent that it calls for Tradeshift to reveal

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 5 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

1   information that is the subject of the attorney-client privilege, the attorney work product doctrine,

2   or any other applicable privilege or doctrine.  Tradeshift will log any such communications it

3   excludes on this basis to the extent consistent with the parties' privilege log agreement.

4       Tradeshift objects to this Interrogatory because it seeks information that is equally or more

5   readily (and, in some cases, uniquely) in BuyerQuest's possession, *e.g.*, discussions and

6   communications between BuyerQuest and Smucker.  Accordingly some responsive information

7   was only learned by Tradeshift after-the-fact and/or has yet to be disclosed by BuyerQuest during

8   discovery.  Tradeshift reserves the right to update its response to this Interrogatory after

9   BuyerQuest produces relevant documents and information and Tradeshift has had a reasonable

10  opportunity to review that information and incorporate it into its response.

11      Tradeshift objects to this request as duplicative, at least in part, of other Interrogatories,

12  including, for example, Interrogatory numbers 5, 6 and 11.

13      In light of the foregoing objections and limitations, Tradeshift responds as follows:

14      Tradeshift incorporates its responses to Interrogatory Numbers 5, 6, and 11.

15      Tradeshift retained BuyerQuest as a subcontractor on the Smucker Project.  As a result,

16  BuyerQuest had contractual obligations to Tradeshift as well as an implied obligation of good

17  faith and fair dealing.  BuyerQuest completely ignored these obligations.  It intentionally

18  interfered with Tradeshift's contract with Smucker by undermining Tradeshift on the Smucker

19  Project and secretly convincing Smucker to terminate the contract in favor of a direct deal with

20  BuyerQuest only.  BuyerQuest's plan—which it referred to as "Operation Fyrefest,"—was

21  planned and executed by its executive officers, led by BuyerQuest's CEO, Jack Mulloy.

22      Tradeshift contends that BuyerQuest also breached its contractual obligations to

23  Tradeshift and wrongfully interfered with Tradeshift's contract with Smucker by misusing

24  Tradeshift's confidential information in order to convince Smucker to terminate its contract with

25  Tradeshift.  This conduct also gives rise to punitive damages.  For example, BuyerQuest and

26  Tradeshift entered into the Master Agreement for the Tradeshift Partner Program on June 7, 2019.

27  (TS_BQ_00000124).  The Agreement included a confidentiality provision in which BuyerQuest

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 6 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

agreed not to use Tradeshift's confidential or proprietary information "for any purpose other than as necessary to perform under this Agreement."  BuyerQuest further acknowledged that such confidential information included "the Tradeshift Solution in any embodiment" as well as "technical and business information relating to inventions or software, research and development, future produce specifications, implementation methodologies, [and] engineering processes."

BuyerQuest breached these obligations in order to convince Smucker to hire BuyerQuest to replace Tradeshift on the Smucker Project and, as a known and expected consequence, caused Smucker to terminate its agreement with Tradeshift.  Specifically, BuyerQuest's Chief Product Officer, Salman Siddiqui, testified that BuyerQuest's CEO, Jack Mulloy, asked him to create a plan to develop functionality in BuyerQuest's products that would allow BuyerQuest to replace Tradeshift on the Smucker Project.  4/8/2021 Siddiqui Depo. Tr. at 73:1-10 ("Q. So they asked you to put together a plan explaining if and how BuyerQuest could create functionality  that satisfied the requirements that Tradeshift was handling up until that point; is that correct? . . . [A.] Yeah, they just – they wanted to know the product view on if and how we can cover our gaps to meet Smucker's requirement[s]."); *id.* at 74:16-75:6 (". . . you were asked by Jack Mulloy to create a plan for some functionality to present to Smucker to cover the gaps in BuyerQuest's current functionality, is that correct? . . . [A.] Yes . . . Q. When did Jack Mulloy tell you to create this plan? A. Sometime probably in the December time frame.").  At Mr. Mulloy's direction, Mr. Siddiqui raided the work product Tradeshift had created to define Tradeshift's solution for the Smucker Project.  He then used that information to develop the functionality that BuyerQuest would add to its own products and presented his roadmap for doing so to Smucker as part of BuyerQuest's efforts to take over the project.

Mr. Siddiqui had no legitimate business reason to review Tradeshift's solution documents for the Smucker Project.  Mr. Siddiqui testified that his role at BuyerQuest is to roadmap new features to be added to BuyerQuest's products and to build those features out.  4/8/2021 Siddiqui Depo. Tr. at 18:8-11 ("So as part of your role, you decide what features should be implemented in the BuyerQuest products; is that correct?  A. That is correct.").  He further testified that he is not

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 7 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

involved in the implementation side of the business (i.e., setting up and integrating BuyerQuest's software for customers) and was not involved in the implementation of the Smucker Project. *Id.* at 21:1-13 ("Q. Okay. So you didn't have any responsibilities as it pertains to professional services or implementation; is that correct?  A. That is correct . . . .I'm not involved in the project delivery.  Q. And is that true for the Smucker Project that occurred in 2019 and 2020? A. Yes."). Nonetheless, Mr. Siddiqui repeatedly asked for, reviewed, and discussed Tradeshift specifications and documents for the Smucker implementation in order to copy the functionality and operational approach that Tradeshift had created and develop similar functionality for BuyerQuest's products and operational approach.  For example:

- On October 30, 2019 Mr. Siddiqui contacted the BuyerQuest project manager for the Smucker Project, Dan Utyuzh, and asked him to gather the "gaps" that BuyerQuest would need to cover to take over Tradeshift's portion of the project. He asked Mr. Utyuzh for "*whatever it's in TS's [Tradeshift's] Scope.*" (Exhibit 19 - BQ119655).

- On October 31, 2019, Mr. Utyuzh sent Mr. Siddiqui a document entitled Smucker_Gaps.xlsx.  (Exhibit 20 – BQ109097).  On November 1, 2019 Mr. Siddiqui referred to this document as "a list of things we would need to do in Product if were to REPLACE Tradeshift." (Exhibit 30 – BQ119658).

- On November 5, 2019, Mr. Siddiqui asked Mr. Utyuzh, "Do we have the design from the JMS-TS PO integration," meaning the design specification that Tradeshift had written to describe its plan for integrating Smucker's systems with the Tradeshift system for purchase orders.  (Exhibit 31 – BQ119665).

- On December 30, 2019, Mr. Siddqui told his colleagues that they needed to "[g]et going on the gaps for booting TS."  (Exhibit 21 - BQ119719). Mr. Siddiqui testified that he was gathering these requirements to share them with Smucker.

- On January 2, 2020, Mr. Utyuzh offered to "send [Mr. Siddiqui] the entire solutions doc (TS doc)."  (Exhibit 22  - BQ113513).  Mr. Siddiqui responded, "send the doc."  *Id.*  Mr. Utyzh subsequently sent Mr. Siddiqui a document entitled "TSS Solution Description" document.  *Id.*  BuyerQuest produced a copy of a document entitled "Tradeshift Solution Description" from Mr. Siddiqui's files

which states,  on its face, that it was "Prepared by Tradeshift for J.M. Smucker Company."   (Exhibit 23 – BQ096569).  It is a 60-page confidential and trade secret description of the Tradeshift Solution.  In violation of the confidentiality provision that BuyerQuest had agreed to in its contract with Tradeshift, Mr. Siddiqui – who had no legitimate reason to review the document as he was not involved in the Smucker implementation – reviewed the document in order to copy the functionality into BuyerQuest's roadmap for its own products and thereby convince Smucker to hire BuyerQuest instead of Tradeshift.

- Mr. Siddiqui did not deny that he reviewed the "Tradeshift Solution Description" and, instead, stated that he did not recall whether or not he reviewed it. 4/8/2021 Siddiqui Depo. Tr. at 161:12-165:14.  It is clear from his contemporaneous communications, however, that he did review the document.  Specifically, Mr. Siddiqui told his colleagues that the "TS doc is an interesting read to compare their capabilities with ou[r] system.  If you are in the office next week let's do a working session to see how we would model some of these requirements.  Will be an interesting exercise."  (Exhibit 22  - BQ113513).  He also said "there is a lot of 'Reassigning' going on [for] invoices in TS.  Do you think we have a workaround that JMS will be okay with or do we need a true re-assign feature[?]"  *Id.*  He also said that "there was lots of talk in the TS requirement doc about creating, sending and completing survey[s] for suppliers."  Ex. 27 (BQ1119722).  He also said that "[t]here is a lot of talk of 'collaborating on, conversing about and reassigning of' invoices, both internally & externally, in the JMS-TS AP design . . .  Just sharing observations."  *Id.*

- Mr. Siddiqui apparently copied the requirements from Tradeshift's documents into a BuyerQuest document prepared for Smucker entitled "JMS Potential BQ Product Requirements."  He referred to these as "JMS requirements required to boot TS." (Exhibit 29 – BQ113507).

- Mr. Siddiqui later also asked Mr. Utyuzh to get him "the files stored on JMS sharepoint referred [to] in the TS config[uration] guide."  (Exhibit 24 – BQ113542).  Again, because Mr. Siddiqui's role is product development and not implementation, he did not have regular access to the documents on the project sharepoint and had no legitimate reason to ask for or review those documents.  Mr. Utyuzh sent him a document entitled "JMS – Tradeshift Configuration Sheet.xlsx."  *Id.*  Mr. Siddiqui again testified that he could not remember if he

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 9 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

reviewed this document or not, but BuyerQuest produced a copy of this document from Mr. Siddiqui's files.  (Exhibits 25 & 26 – BQ096816).  This is yet another example of work product that Tradeshift created for the project that BuyerQuest and Smucker misused and copied in order to "boot" Tradeshift off of the Smucker project.

In early January, Mr. Siddiqui also enlisted one of BuyerQuest's technical architects, Andrii Korolov, and a team of developers to "code" the new functionality that Mr. Siddiqui had copied.  (Exhibit 28 – BQ119720).  He told Mr. Korolov that he would need the "features built & release[d]" by April 1.  *Id.*  Mr. Korolov asked Mr. Siddiqui if he had "draft requirements," and Mr. Siddiqui responded that "[I] am working on those."  *Id.*  Mr. Siddiqui also told Mr. Korolov that he would be "Meeting with JMS [on] Jan 7" and telling them to "decide FOR SURE by Jan 17."  *Id.*

Mr. Siddiqui testified that he subsequently attended an in-person meeting with Smucker personnel at BuyerQuest's headquarters on January 7, 2020 in order to discuss the "product development work that would have to be done [by BuyerQuest] in order [to meet] all the requirements for Smuckers."  4/8/2020 S. Siddiqui Depo. Tr. at 69:2-24.  He also discussed the "product releases" that BuyerQuest would provide in that regard.  *Id.*  He further testified that the product work was "existing scope to the Smucker project" and that it was "scope that Tradeshift was originally handling."  *Id.* at 69:25-70:11.

Mr. Siddiqui also testified that, on January 13, 2020, Mr. Mulloy "was going to have a conversation with Smucker's.  And, you know, we were trying to figure out the go-forward plan."  *Id.* at 221:10-17.  That same day, Mr. Siddiqui told Mr. Mulloy to "get lots of $$ from [Smucker]," indicating that the parties were already discussing contract terms even before Smucker had terminated its contract with Tradeshift.  (Exhibit 34 – BQ118909).

On January 16, 2020, a day before the January 17, 2020 deadline Mr. Siddiqui discussed, Smucker terminated its contract with Tradeshift.  Smucker subsequently entered into a contract with BuyerQuest to take over the Smucker Project.

BuyerQuest misused Tradeshift's confidential information in order to convince Smucker

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 10 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

1    to hire BuyerQuest to replace Tradeshift on the Smucker Project.  In doing so, BuyerQuest not

2    only breached its contractual obligations to Tradeshift, but it also wrongfully interfered with

3    Tradeshift's contract with Smucker.

4            Tradeshift is continuing its investigation and reserves its right to supplement this response

5    as additional information is identified.

6    Dated:  April 19, 2021

7
                                                    By:   *Jason K. Yu*
8                                                   Amy K. Van Zant
                                                    Jason K. Yu
9                                                   Tammy Su
                                                    Attorneys for Plaintiff
10                                                  TRADESHIFT, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 11 -

TRADESHIFT'S SUPPLEMENTAL
RESPONSE TO BUYERQUEST'S
INTERROGATORY NO. 19
CASE NO. 3:20-CV-1294-RS

**PROOF OF SERVICE**

I am a resident of the State of California and over the age of eighteen years, and not a

party to the within action.  My place of business is Orrick, Herrington & Sutcliffe, LLP, 1000

Marsh Road, Menlo Park, CA 94025.  On April 20, 2021, I served the within document(s):

**PLAINTIFF TRADESHIFT, INC.'S SUPPLEMENTAL RESPONSE TO DEFENDANT BUYERQUEST, INC.'S FIRST SET OF INTERROGATORIES (NO. 19)**

| | |
|---|---|
| **X** | By transmitting a courtesy copy **via electronic mail,** the document(s) listed above to the email addresses set forth below on April 20, 2021. |

Anthony D. Phillips
Craig J. Mariam
Eunice Liao
GORDON REES SCULLY MANSUKHANI, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
aphillips@grsm.com
cmariam@grsm.com
eliao@ grsm.com

**ATTORNEYS FOR DEFENDANT BUYERQUEST, INC.**

Executed on April 20, 2021 at Fremont, California.  I declare under penalty of perjury

under the laws of the State of California that the foregoing is true and correct.

/s/ *Sema Virrueta*
Sema Virrueta

# EXHIBIT 4

**Yu, Jason K.**

| | |
|---|---|
| **From:** | Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com> |
| **Sent:** | Monday, April 12, 2021 12:10 PM |
| **To:** | Yu, Jason K. |
| **Cc:** | Van Zant, Amy K.; Martinelli, Richard F.; Clements, Olivia; Lahtinen, Katri; Schmelz, Ronie M.; Fox, Savannah M.; Thiem, Carrie E. |
| **Subject:** | RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses |

Jason,

We can agree that the documents produced in NY can be used in CA so long as the agreement is mutual and Tradeshift agrees to produce the documents it produced in CA in the NY action.

Regarding Mr. Barr's documents, that is incorrect. We as counsel did not take possession of his emails but a search was done at the direction of counsel. We are not harvesting his email as we do not believe there is a basis to do so and it is further not proportional to the needs of the case.

Regarding Mr. Barr's deposition, we actually need to move it a day or two. Instead of April 28 could you do April 29 or 30?

Thank you,
Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Friday, April 2, 2021 2:29 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

**<<< EXTERNAL EMAIL >>>**

---

Hello Chelsea,

Can you please let us know your response regarding Smucker's production of documents in response to the subpoena or provide a time that we can meet to confer telephonically?

Please also let me know if I'm mistaken regarding the search of Mr. Barr's documents.

Thanks,

Jason

---

**From:** Yu, Jason K.
**Sent:** Tuesday, March 30, 2021 7:21 PM
**To:** 'Mikula, Chelsea' <Chelsea.Mikula@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Chelsea,

Thanks for your response.

With respect to Mr. Barr's documents, it's my understanding from your response that, in addition to interviewing Mr. Barr, you (Mr. Barr's attorneys) have electronically collected Mr. Barr's personal email account and searched for responsive documents.  Please let me know if that is not correct.  If Smucker/Mr. Barr have not conducted such a search, please confirm whether you will do so.

It's also my understanding that your search confirms that Mr. Barr's personal email account does not contain *any* communications between him and Mr. Mulloy (even the one evidenced in TJMSC0012399, i.e., the one that Mr. Barr forwarded to his work account).  Please let me know if that is not correct.  If there are such documents in Mr. Barr's account, please confirm whether you will collect and produce them from that account.

With respect to the Subpoena to Smucker, the issues in this case (and the documents related to those issues) overlap significantly across the two cases (as Judge Ramos indicated when he allowed our subpoena to BuyerQuest in the SDNY case).  Moreover, even if there were some documents relevant to one case and not the other, we fail to see any prejudice or harm that would result to Smucker from producing those documents in the California case.  If there are specific documents that Smucker has produced in the SDNY case that you contend are completely irrelevant to the N.D. California case, please identify them immediately so we can discuss.  Otherwise, we think the least burdensome and most efficient way to deal with the subpoena for all parties is for Smucker to simply produce the documents that have already been produced in the SDNY case.  I can't say for certain and I'm not authorized to agree at the moment, but to the extent Smucker were to propose that both parties simply produce all documents in both cases, we would consider it.  If you want to make that proposal, please make it and we can discuss.

Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Tuesday, March 30, 2021 8:12 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Jason,

We have interviewed Jason and also conducted a search, there are no more responsive communications in Mr. Barr or Smucker's possession. Mr. Barr did not delete any communications and does not recall any further communications with Mr. Mulloy. You are correct, Mr. Barr forwarded the sole communication to his work email, as he does not communicate on his personal email about work, which is why it was forwarded. Based on our interview, Mr. Barr stated the original message came through LinkedIn and that is why it went to his personal address. He has also confirmed there are no further communications on LinkedIn. He did not communicate with Mr. Mulloy on his personal email account, other than what we've produced and he received from Mr. Mulloy. You suggest you have an additional communication, if so, it may have been deleted upon receipt or never in fact received, I am not sure without seeing it. But our investigation has been more than sufficient and you are pushing an issue where there is nothing there. You've asked several times now, the answer remains the same, enough is enough. You are not entitled to discovery on discovery and we've been more than cooperative in our response in providing what we already have.

Mr. Barr has nothing responsive in his personal possession and everything responsive to the subpoena you already have. Further, there is a very valid reason not to designate everything produced in NY in CA, because the disputes have separate legal issues and the majority of documents produced in NY have no relevance to CA. If we were to agree to that, however, is Tradeshift willing to do the same and provide Smucker everything it produced in CA. I am not agreeing to it, but wondering if the agreement would be reciprocal.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Monday, March 29, 2021 9:41 AM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

<<< EXTERNAL EMAIL >>>

---

Hello Chelsea,

Our doubts about Mr. Barr's collection are the result of several things.  First, as I've mentioned in our prior correspondence, it is extremely unlikely that Mr. Mulloy and Mr. Barr exchanged only a single email between their accounts.  Among other reasons, there is no context for how the two started communicating by personal email or any explanation as to why they were doing so.  Moreover, there are no corresponding communications between their work emails indicating they were using personal email accounts for these types of communications.  Second, notwithstanding our inquiries, you have not explained any specifics about your investigation which, thus far, seems to consist of simply asking Mr. Barr whether any additional responsive emails exist without actually collecting or reviewing any documents from his email account.  Mr. Barr clearly does not want to produce these email and, in fact, the only email Smucker has produced it produced because Mr. Barr forwarded it to his work email account.  Third, BuyerQuest has produced communications between Jack Mulloy and Jason Barr in the BuyerQuest (N.D. Cal.) litigation and at least one of them

does not appear in your production. That communication is subject to the protective order in that case, but it demonstrates that your informal "investigation" into Mr. Barr's personal emails was not reasonable or adequate.

That other emails were exchanged between Mr. Barr and Mr. Mulloy is contrary to your representations about Mr. Barr's documents. *See* 1/22/2021 C. Mikula Email ("I can confirm that Jason preserved all documents and we have confirmed that there are no additional relevant documents in his live.com email account.") 1/25/2021 C. Mikula Email ("As previously stated, we can confirm that there are no additional responsive documents, or communications with Mr. Mulloy, on Mr. Barr's live.com email. We can also confirm that Mr. Barr has not deleted anything. You have a copy of the one and only communication and we see no reason to reproduce the same. Mr. Barr received an isolated communication from Mr. Mulloy that was work related and forwarded the same to his work account, as shown in the produced document."). Either Mr. Barr did not provide you with all responsive emails in his account, or he deleted some of those emails, or both. Accordingly, Smucker should (1) immediately preserve and electronically collect Mr. Barr's personal email account, (2) have its attorneys electronically search for any documents sent to or from Jack Mulloy, and (3) produce any such documents. Please confirm that Smucker will do so by April 7.

With respect to the subpoena to Mr. Barr in the BuyerQuest case (N.D. Cal.), we disagree that there are no additional documents to produce. To date, Smucker has not produced <u>any</u> documents from Mr. Barr's personal email account, and those documents are directly responsive to the subpoena to Mr. Barr (a subpoena to which he did not object). Accordingly, not only must Smucker collect and search Mr. Barr's email account as requested above in the Smucker case (SDNY), Mr. Barr must do so in response to the subpoena in the BuyerQuest case (N.D. Cal.).

With respect to the documents responsive to the subpoena to Smucker in the BuyerQuest case (N.D. Cal.) (*i.e.*, those that Smucker has produced in the SDNY litigation), we don't see any reason why Smucker would not simply designate those produced in the N.D. Cal. case as well, but we'll wait for your confirmation on that issue. Please confirm that Mr. Barr will produce these documents by April 7.

Please confirm by Wednesday (3/31) that Smucker and Mr. Barr will provide these responses and documents or provide a time that you are available to meet and confer.

Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Friday, March 26, 2021 8:37 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Jason,

When you say it is your understanding there are additional responsive documents, what are you referring to? As we've said several times, based on our investigation, there are no other responsive documents. If you have information to the contrary, please provide that.

4

We will advise on the production early next week whether we will allow the documents produced in NY to also be produced in CA or will make a new production. There are no additional documents, however, that you have not already seen in NY so you are in the possession of the documents. It's just a matter of the logistics and we are conferring with our client on that and will report back.


Chelsea


Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Thursday, March 25, 2021 1:45 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

**<<< EXTERNAL EMAIL >>>**

---

Hello Chelsea,

I'm writing to continue conferral regarding emails between Mr. Barr's personal email account and Mr. Mulloy. It is our understanding that there are additional responsive email communications other than the communication reflected in TJMSC0012399. This is contrary to Smucker's repeated representations that Mr. Barr does not have any other such emails and that he has not deleted any such emails. Accordingly, we insist that Smucker collect documents from Mr. Barr's email account, actually search for responsive documents (with attorney review), and produce any communications with Mr. Mulloy (including the communications reflected in TJMSC0012399 if it has not been deleted from that account).

Relatedly, all such documents are responsive to the subpoena we served on Mr. Barr in the N.D. California case against BuyerQuest and should also be produced in that case. I have asked for an expected date of production for these documents several times now (*See* J. Yu Emails from March 5, March 13, March 19, March 23). Please provide a date certain that we can expect these documents or provide a time that you are available to meet and confer. To the extent Mr. Barr will not agree to produce the documents next week, we intend to seek an order compelling production by a date certain.

To the extent Smucker and Mr. Barr are unwilling to produce these documents next week, please provide a time that you are available to discuss by phone. I am open most of the day tomorrow or Monday afternoon.


Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Monday, January 25, 2021 7:03 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia

<oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M.
<Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Jason,

As previously stated, we can confirm that there are no additional responsive documents, or communications with Mr. Mulloy, on Mr. Barr's live.com email. We can also confirm that Mr. Barr has not deleted anything. You have a copy of the one and only communication and we see no reason to reproduce the same. Mr. Barr received an isolated communication from Mr. Mulloy that was work related and forwarded the same to his work account, as shown in the produced document. We believe this issue is resolved and there is no basis at all to engage in discussions about discovery on discovery so we trust that we can move on.

Chelsea

Chelsea Mikula
216-696-2476

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Monday, January 25, 2021 5:59 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia
<oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M.
<Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

**<<< EXTERNAL EMAIL >>>**

Hello Chelsea,

Thanks for your response.  Just to clarify, it's my understanding that Smucker confirming that (1) it has collected Mr. Barr's live.com email account and searched for communications between Mr. Barr and Mr. Mulloy, and the only email it identified is the one reflected in TJMSC0012399 and (2) Mr. Barr confirmed he did not delete any other such emails with Mr. Mulloy prior to Smucker's collection and search.  Please let me know if that is not correct.  Tradeshift requests that Smucker produce the email reflected in TJMSC0012399 from Mr. Barr's live.com account.  Please let us know if Smucker will be producing that email.

Thanks,
Jason

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Friday, January 22, 2021 5:52 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia
<oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M.
<Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Jason,

Thanks. We will review this letter.

I can confirm that Jason preserved all documents and we have confirmed that there are no additional relevant documents in his live.com email account.

We will follow-up on the remaining topics next week.

Chelsea

Chelsea Mikula
216-696-2476

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Friday, January 22, 2021 5:27 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

**<<< EXTERNAL EMAIL >>>**

Hello Chelsea,

Please find attached a response to your January 13 letter regarding Tradeshift's discovery responses. We can be available to discuss next week.

Can you please let us know if you have an update on any of the items below? We are particularly interested in knowing whether Smucker has preserved the email account that Mr. Barr was using to communicate with BuyerQuest and whether and when it will be producing responsive documents from that account.

Thank you,

Jason

**From:** Yu, Jason K.
**Sent:** Tuesday, January 19, 2021 9:06 AM
**To:** 'Mikula, Chelsea' <Chelsea.Mikula@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Hello Chelsea,

We have received your letter regarding Tradeshift's discovery responses and anticipate providing a response this week.

We have also received Smucker's supplemental production on January 12 and are actively reviewing.  There are, however, a few items that we would like to follow up on:

1.  Can you please confirm that Smucker's production is substantially complete?  Based on our review thus far, there appear to be a number of documents that we believe are missing and would like to confirm that Smucker has completed its production or will do so shortly.  In particular, can you confirm that you have produced all communications related to the decision to terminate/void the Smucker Services Agreement and all documents and communications documents referring to, discussing, or relating to the communications below:

    a.  Conversation(s) between Jason Barr and Jack Mulloy on or around October 21, 2019
    b.  Conversation(s) between Jason Barr and Jack Mulloy on or around November 20, 2019
    c.  Conversation(s) between Jason Barr and Jack Mulloy on or around December 19, 2019
    d.  Conversation(s) between Jason Barr, Mike Sterle, and Jack Mulloy on or around December, 2020.
    e.  The meeting between Smucker employees and BuyerQuest employees on or around January 7, 2020, including by collecting documents from Jason Barr, Mike Sterle, Dan Nowicki, and any Smucker employees who attended or were invited to this meeting.

2.  Can you please confirm whether Smucker intends to produce responsive chats or messages from, for example, Slack or Microsoft Teams chats/conversations.

3.  Based on our review of documents, we believe that responsive and relevant communications between Jason Barr and BuyerQuest (and particularly Jack Mulloy) may be located in Mr. Barr's email account jmbarr@live.com (*see* TJMSC0012399).  Can you please confirm that Smucker will be collecting and producing documents from that email account (and any others that Mr. Barr used to communicate with BuyerQuest).  We also ask that you (1) remind Mr. Barr of his obligations to preserve any responsive communications in that email account, (2) take any steps necessary to preserve the email account, and (3) immediately notify us if Mr. Barr deleted or otherwise lost any responsive communications prior to the account being preserved.

4.  Pursuant to the terms of the parties agreement, we expected a privilege log earlier this month.  Can you please confirm when we will receive that log?

5.  Can you please let us know when we can expect Smucker to produce supplemental responses to Tradeshift's interrogatories per our conferral?

Please let us know Smucker's position on the items above and/or whether it would be helpful to have a call to discuss.

Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Wednesday, January 13, 2021 2:32 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M.

<Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Jason,

Please see the attached additional correspondence.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Monday, December 21, 2020 8:20 AM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

**<<< EXTERNAL EMAIL >>>**

---

Hello Chelsea,

Please find attached a response to your December 7, 2020 Letter regarding Tradeshift's responses to Smucker's RFAs, RFPs, and Interrogatories.  We can be available to discuss tomorrow afternoon or most of the day Wednesday.  Please let us know if there is a time that works for you.

Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Wednesday, December 16, 2020 5:16 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Jason,

We have not received a response to our meet and confer on Tradeshift's responses. You had said you would respond in writing. Please do so by the end of the week.

Chelsea

Chelsea Mikula

216-696-2476

---

**From:** Mikula, Chelsea
**Sent:** Monday, December 7, 2020 1:35 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Lahtinen, Katri <klahtinen@orrick.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** Tradeshift v. Smucker: Mikula to Tradeshift re: discovery responses

Jason,

Please see the attached regarding Tradeshift's responses to Smucker's Discovery Requests.

Thank you,
Chelsea

**Chelsea Mikula | Attorney | Tucker Ellis LLP**
950 Main Avenue, Suite 1100 | Cleveland, OH 44113
Direct: 216-696-2476 | Fax: 216-592-5009 | Cell: 440-527-3309
email Chelsea.Mikula@tuckerellis.com

This e-mail is sent by the law firm of Tucker Ellis LLP and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately by return email.

---

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT 5

## Yu, Jason K.

| | |
|---|---|
| **From:** | Yu, Jason K. |
| **Sent:** | Wednesday, May 5, 2021 5:33 PM |
| **To:** | 'Fox, Savannah M.' |
| **Cc:** | Thiem, Carrie E.; Mikula, Chelsea; Van Zant, Amy K.; Su, Tammy; Clements, Olivia; Chow, Michael C. |
| **Subject:** | RE: Tradeshift v. Smucker: Discovery Conferral |

Hello Savannah,

We appreciate you looking into these issues, but your email doesn't actually state exactly what your investigation confirmed.  Specifically, did Smucker's search encompass collecting, identifying, and producing internal communications during implementation from the following custodians: Mike Sterle, Mike Resan, Bryan Hiles, Jay Watson, Kevin Hare, and Viraaj Patel?  Also, did Smucker collect, search, and produce *any* documents from Dan Nowicki, Colby Orr, and Pai Milind?  As I noted in my earlier email, the metadata associated with Smucker's production indicates that Smucker did not do so.  Can you please confirm?

Given the apparent gaps in Smucker's production, we disagree that our proposed search is "flatly unreasonable."  To the contrary, internal documents that (1) were sent or received by these custodians (all of whom were involved in the project), (2) were sent from July 1, 2020 to February 1, 2020 (the term of the project implementation) and (3) refer or relate to Tradeshift/TS or BuyerQuest/BQ (the two vendors involved in the project) are plainly relevant and responsive.  This should have been the very first and bare minimum search that Smucker completed at the outset of this case.  To the extent you need to be pointed to requests seeking documents about implementation, termination, or Tradeshift, please refer to Tradeshift's Request for Production Nos. 9, 16, 17, 19, and 20.  Smucker agreed to produce documents in response to each of these requests.  Smucker cannot legitimately certify that it completed a reasonable and diligent search and production for the documents it agreed to produce while excluding internal communications from these custodians.

It is also frustrating on our end that we have to ask for a basic responsive documents like these at this point in the case.

I will get back to you on the deposition issue.  In the meantime, please confirm the scope of Smucker's search and whether Smucker will agree to the search we've proposed.

Thanks,
Jason

---

**From:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Sent:** Wednesday, May 5, 2021 3:27 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Thiem, Carrie E. <Carrie.Thiem@tuckerellis.com>; Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>; Chow, Michael C. <mchow@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

Jason,

Thank you for your patience as we looked into the issues raised in your email. After consulting Smucker's search terms and productions, we confirmed what we already knew: Smucker's collection was beyond reasonable.

It is frustrating that Tradeshift only now questions the reasonableness of Smucker's efforts. Search terms, custodians, and time periods could have been negotiated at the outset of discovery. They were not. Smucker created robust searches based on each individual request from Tradeshift that reflected what was asked. If there is a certain category of documents or custodian that you believe is missing from Smucker's production, it was because it was not requested or flatly unreasonable.

It has been nearly six months since Smucker made its first production. We have produced over 12,000 documents, most of which Tradeshift possessed since January. Smucker has accommodated Tradeshift's meet and confer efforts, expanding its initial search significantly to include other vendors, post-termination documents, "TS" and "BQ" search terms, etc. We have conducted reasonable searches of relevant custodians in response to your requests.

Specifically, in regards to the "TS" and "BQ" documents, we collected documents according to the exact search terms you proposed in your April 20, 2021 email and are in the process of finalizing a small production. We will have those documents to you in the coming days.

While we understand that depositions are set to begin on May 17, these are issues that could have been raised some time ago. We still anticipate that depositions will go forward. Because you have raised the issue of delay, please let us know if you wish to continue the depositions. We will have to discuss with the client but want to make clear that we will only produce a witness for deposition once.

It is troubling that Smucker's efforts are being called into question by the same party that, until recently, produced only 2,914 documents to Smucker and 16,339 documents to BuyerQuest. We remain open to hearing which of your specific requests were unfilled (subject, of course, to our previous objections). Please let us know if you would like to discuss further.

Thank you,
Savannah

**Savannah M. Fox | Attorney | Tucker Ellis LLP**
Direct: 216-696-3950 | Cell: 330-417-7166

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Monday, May 3, 2021 4:53 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Thiem, Carrie E. <Carrie.Thiem@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>; Chow, Michael C. <mchow@orrick.com>
**Subject:** FW: Tradeshift v. Smucker: Discovery Conferral

<<< EXTERNAL EMAIL >>>

Hello Chelsea,

We have identified a series of issues with Smucker's document collection and production.  As we've recently been discussing, Smucker's initial searches for responsive documents did not include searching for documents referring to Tradeshift as "TS" and to BuyerQuest as "BQ" (terms that Smucker regularly used to refer to Tradeshift and BuyerQuest),  and Smucker has agreed to run certain searches using the "TS" and "BQ" terms for specific custodians in specific time periods.  We've not yet seen the results of those searches, but we anticipate that a substantial number of additional documents will be located.  Upon further review, however, it now also appears that Smucker's search was limited in other ways for at least the following custodians: Mike Sterle, Mike Resan, Bryan Hiles, Jay Watson, Kevin Hare, Dan Nowicki, Joanna Dobina, Viraaj Patel, Colby Orr, and Pai Milind.

Specifically, for many of these custodians (Mike Sterle, Mike Resan, Bryan Hiles, Jay Watson, Kevin Hare, and Viraaj Patel), it appears that Smucker only searched for documents during the implementation period that were sent to or received from BuyerQuest or Tradeshift (e.g., that included "BuyerQuest" or "Tradeshift" in the to/from/cc metadata).  Not only did these searches omit key terms (including at least "TS" and "BQ"), they exclude internal Smucker emails (i.e., those not sent to or received from BuyerQuest or Tradeshift).  Indeed, we know from other documents produced in the case that these custodians communicated internally about the Smucker Project, but the total number of internal emails produced from these particular custodians (i.e., for which they are named in the "Custodian" or "CustodiansAll" fields) during the implementation period is zero.  In other words, relevant and responsive internal communications certainly exist but were not collected from these custodians.  Even worse, for custodians Dan Nowicki, Colby Orr, and Pai Milind (all key players on the Smucker Project), it appears that Smucker didn't bother to collect any documents at all.

Accordingly, Smucker has not complied with its discovery obligations under the federal rules or its written agreements to produce responsive documents.  This failure to conduct a reasonable search of each relevant custodian for responsive documents has already prejudiced Tradeshift by forcing it to spend time scouring Smucker's production to ensure compliance; that prejudice will only multiply with depositions set to start in two weeks. Accordingly, Smucker must promptly run the following searches and produce all responsive documents that have not already been produced with appropriate metadata (including in the Custodian and Custodians All fields):

     a.  Custodians:  Mike Sterle, Mike Resan, Bryan Hiles, Jay Watson, Kevin Hare, Dan Nowicki, Joanna Dobina, Viraaj Patel, Colby Orr, Pai Milind.

     b.  Search Terms: Documents including the terms "Tradeshift," "TS," "BuyerQuest," or "BQ" that have not already been produced.

     c.  Dates: July 1, 2019 to February 1, 2020.

Further, to the extent that Smucker has not already searched the files of Russ Wilson, Rowdy White, and Jason Barr for the terms "Tradeshift," "TS," "BuyerQuest," and "BQ" during this time period and produced all responsive emails, it must also promptly do so now.

With deposition set to start in two weeks, we must have Smucker's further production of responsive documents by no later than Monday, May 8.  Please advise by no later than May 5 if Smucker does not intend to comply with its obligations as requested in this email so that Tradeshift can seek court intervention.

Additionally, please provide an update on the discussed in our April 20, 21, and 28 emails.

Sincerely,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Wednesday, April 28, 2021 6:13 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>; Thiem, Carrie E. <Carrie.Thiem@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

Jason,

We ran the search as requested on Teams but through date of termination only, and there are zero hits.

We are running the revised search terms on the Smucker emails and are reviewing to determine whether they have already been produced. That process is not yet complete. If they have not been produced, we will prepare a supplemental production.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Tuesday, April 27, 2021 10:26 AM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>; Thiem, Carrie E. <Carrie.Thiem@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

**<<< EXTERNAL EMAIL >>>**

Hello Chelsea,

Can you please provide us an update on the revised search for Teams messages?  Can you also let us know about the revised search terms for Smucker's email search?

Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Wednesday, April 21, 2021 12:51 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>; Thiem, Carrie E. <Carrie.Thiem@tuckerellis.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

Jason,

The final privilege log is attached.

The client did agree to run your original proposed search terms and custodians on Teams. That is underway and we will report back.

And I have received your request on search terms and am evaluating that request but do not yet have an answer for you.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Tuesday, April 20, 2021 11:31 AM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

<<< EXTERNAL EMAIL >>>

---

Hello Chelsea,

I'm writing to follow up on a few of these issues.

1. <u>Smucker's Privilege Log</u>:  Can you let us know when we'll be receiving the official version of Smucker's privilege log?

2. <u>Smucker's Production of Teams/Slack Documents</u>: Can you please confirm that Smucker will run the proposed search for Teams documents using the custodians and search terms we've identified?  We would also like to add Rowdy White to the list of custodians.

3. <u>Smucker's production of relevant emails</u>: It has come to our attention that Smucker also used limited search terms for its search for responsive emails.  Specifically, it appears that Smucker did not use the terms "TS" or "BQ" to produce responsive documents.  This is entirely insufficient as the documents produced to date indicate that the parties regularly referred to Tradeshift as "TS" and BuyerQuest as "BQ" when discussing internally.  Smucker's search is neither reasonable or diligent, particularly in light of the dearth of relevant communications about the decision to terminate Tradeshift and hire BuyerQuest for the Smucker Project.

   As proposed compromise, Tradeshift is willing to agree to an initial search for documents that is limited to a narrow set of custodians, search terms, and dates and, after receiving the results the parties can discuss whether additional searches are necessary.  Specifically, we ask that Smucker conduct the search below.  Please let us know by the end of the week whether Smucker will agree.  We can be available to discuss by phone.

5

   a. <u>Custodians</u>:  Jason Barr, Brian Hiles, Kevin Hare, Mike Sterle, Robert Ferguson, Dan Nowicki, Rowdy White,
   b. <u>Search Terms</u>: Documents including the terms "TS" OR "BQ" that have not already been produced.
   c. <u>Dates</u>: October 15, 2019 to February 1, 2020.

Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Friday, April 16, 2021 12:44 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

Jason,

Please see responses below in red.

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Thursday, April 15, 2021 11:25 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

**<<< EXTERNAL EMAIL >>>**

---

Hello Chelsea,

Thanks for the call yesterday.  Below is a recap and some follow up on the issues we discussed.

1. <u>Smucker's Privilege Log</u>: Thank you for the draft copy of the privilege log Savannah circulated.  You confirmed this includes all of the documents that Smucker has withheld, but are still trying to cross reference bates numbers for a final copy. Correct.

2. <u>Smucker's Production of Teams/Slack Documents</u>: You indicated that Smucker does not use Slack.  Smucker searched the Teams messages for Russ Wilson, Rowdy White, and Jason Barr for the terms "Tradeshift" or "BuyerQuest" and didn't identify any messages.  I noted that this would not be an adequate search.  You invited me to provide a more comprehensive search that Smucker would run to identify responsive documents.  We proposed the search below for Teams communications.  Please let us know how many responsive documents this returns and whether Smucker is maintaining its burden objection based on the number or responsive hits: We did

not agree to run this search but rather asked for a proposal to discuss with our client. I will discuss with the client and report back.

    a.  <u>Custodians</u>: Jason Barr, Brian Hiles, Kevin Hare, Mike Sterle, Russ Wilson, Robert Ferguson, Dan Nowicki

    b.  <u>Search Terms</u>: "Tradeshift" OR "TS" OR "BuyerQuest" OR "BQ" OR "Appretio" OR "Fyre"

    c.  <u>Time Period</u>: March 1, 2019 to February 1, 2020

3.  <u>Smucker's Responses to Tradeshift's Interrogatories</u>: We agreed we are at an impasse here. I stated that we are responding to your letter and will be supplementing at least one response.

4.  <u>Production of Documents in California</u>:

    a.  You confirmed that we may use the documents Smucker produced in New York in California. You indicated that you would be producing those documents to BuyerQuest. Correct.

    b.  You asked about our production of documents from the California. I indicated that we expect to have that production out next week. Please ensure we receive the documents no later than next Friday, April 23. That is more than sufficient time to produce to us documents that have already been produced.

    c.  You asked whether we would be producing the privilege log in BuyerQuest. I indicated that we hadn't planned on producing the privilege log, but I would get back to you. The documents on that log are not responsive to any category of documents that we have agreed to produce in this case and so they are not properly logged in this case. Can you provide Smucker's position why Tradeshift should have to produce that log here? We can forego the request at this time but may renew the request once we see the documents.

5.  <u>Mr. Barr's email account</u>: You confirmed that you did not "harvest" Mr. Barr's email account. You indicated that Mr. Barr is now searching his personal email account for communications between him and Mr. Mulloy and will be producing those documents from his email account. Can you please confirm when we will have that production? The documents and any follow up will likely be relevant to Mr. Barr's deposition in the California case. Tradeshift does not agree that relying on Mr. Barr to search his own personal account for documents under these circumstances would necessarily constitute a reasonable or diligent search and reserves its rights in that respect. We should have these for you early next week.

6.  <u>Mr. Barr's deposition</u>: You indicated that you are asking Mr. Barr for availability in early May and indicated this morning that May 12 will work. May 12 works for us. We will likely want to file a stipulation or notice with the court that we will be taking this deposition out of schedule and will circulate a draft and will get you a draft. We will reserve May 12.

7.  <u>Depositions Generally</u>: We discussed the presumptive limits for depositions (10), and the fact that Tradeshift has noticed 11 depositions and Smucker identified 15 witnesses for deposition. We will remove Robert Ferguson from our list for the time being. Can you let us know which ten witnesses Smucker would like dates for? I will let you know this next week.

Thanks,
Jason

**From:** Yu, Jason K.
**Sent:** Wednesday, April 14, 2021 8:20 AM
**To:** 'Mikula, Chelsea' <Chelsea.Mikula@tuckerellis.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

Hi Chelsea,

That works for me.  We can use the dial in below.

    Dial in      1-877-211-3621
    Passcode   993578

Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Wednesday, April 14, 2021 8:13 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

Jason,

Savannah and I can do 2:30 this afternoon, if that works for you.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Tuesday, April 13, 2021 12:06 AM
**To:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

**<<< EXTERNAL EMAIL >>>**

---

Hello Chelsea,

Can you confirm that Wednesday at 2pm EST works for you or propose another time that afternoon.  I will respond to your other emails today separately.


Thanks,
Jason

---

**From:** Yu, Jason K.
**Sent:** Saturday, April 10, 2021 7:13 PM
**To:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Cc:** 'Mikula, Chelsea' <Chelsea.Mikula@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** FW: Tradeshift v. Smucker: Discovery Conferral

Hello Savannah,

Thanks for updating me.  Please provide the log by COB on Tuesday.

Chelsea, I'm available to confer on Wednesday (4/14).  I'll propose 2pm EST.  Please let me know if that works.  We'd like to discuss the following issues:

1. Smucker Privilege Log: To the extent we haven't received it by our call, we intend to file seek a premotion conference with the court for guidance.
2. Smucker Production of Teams/Slack Documents: Please be prepared to discuss what documents are available and what burden Smucker contends is associated with collection and production
3. Smucker's Supplemental Responses to Tradeshift's Interrogatories: The issues noted in my March 29 letter.
4. Production of Smucker Documents in response to our subpoena in CA: Please confirm that the documents Smucker has produced can be treated as produced in response to the subpoena.
5. Mr. Barr's personal email account: including the search that was done for documents responsive to Tradeshift's discovery requests and the subpoena to Mr. Barr.
6. The topics for which Smucker will be producing a corporate witness in the CA Case: As discussed in my March 23 email.


Thanks,
Jason

---

**From:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Sent:** Friday, April 9, 2021 2:14 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Su, Tammy <tsu@orrick.com>; Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Subject:** Re: Tradeshift v. Smucker: Discovery Conferral

Hello Jason,

Our privilege log is prepared but is still being processed to add in the corresponding Bates labels. I apologize for the inconvenience and will have the log to you as soon as possible.

Thanks,
Savannah

Savannah Fox
216-696-3950

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Tuesday, April 6, 2021 9:41 PM
**To:** Yu, Jason K.
**Cc:** Fox, Savannah M.; Schmelz, Ronie M.; Van Zant, Amy K.; Martinelli, Richard F.; Clements, Olivia; Su, Tammy
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

Jason,

I am in depositions this week in two other cases so apologies for the delay in my responses. I won't be able to meet and confer this week, plus our client contact is on spring break this week. So it may be most productive if we schedule a call for next Wednesday. Let us know what works for you.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Monday, April 5, 2021 10:28 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

**<<< EXTERNAL EMAIL >>>**

---

Hello Chelsea,

The letter I sent last Monday (3/29) regarding Smucker's supplemental interrogatory responses was not the same letter we sent in November regarding Smucker's original responses.  It is a new letter identifying the reasons Smucker's supplemental responses deficient.  Many of the issues overlap between the letters because Smucker made almost no effort to address the issues we raised in the original letter, but we are not simply "forwarding a prior correspondence."  Please let us know when you have time to discuss telephonically.  I can be available after 3pm Eastern tomorrow.

We look forward to your response regarding Teams/Slack communications. Please let us know about the your response by April 7.

Thank you for confirming that Smucker will be providing its privilege log this week.

Thanks,

Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Monday, April 5, 2021 12:51 PM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

Jason,

We did in good faith amend our responses and forwarding a prior correspondence is not a sufficient meet and confer. If you'd like to identify specific issues, we will consider those.

I will follow-up on the Teams/Slack and advise.

And we waited to do our privilege review until all documents were produced rather than piece-meal. That is complete and we are finalizing the log for all productions. You have yet to produce a privilege log yourself, so if you allege delay it has been mutual. But we disagree and are moving forward in good faith and will have that to you this week.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Monday, April 5, 2021 12:16 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Discovery Conferral

**<<< EXTERNAL EMAIL >>>**

---

Hello Chelsea,

I didn't see a response from you on this last week.  I'm available to discuss tomorrow (4/6) after 2pm EDT and will propose 2:30pm.  Please confirm or let me know if there is a better time.  Absent a good faith effort to resolve these issues, Tradeshift intends to seek a premotion conference with the court.

Thanks,
Jason

---

**From:** Yu, Jason K.
**Sent:** Monday, March 29, 2021 8:05 PM

**To:** 'Mikula, Chelsea' <Chelsea.Mikula@tuckerellis.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Schmelz, Ronie M. <Ronie.Schmelz@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Martinelli, Richard F. <rmartinelli@orrick.com>; Clements, Olivia <oclements@orrick.com>; Su, Tammy <tsu@orrick.com>
**Subject:** Tradeshift v. Smucker: Discovery Conferral

Hello Chelsea,

I'm writing to continue conferral on a number of issues.

First, we have received Smucker's supplemental responses to Tradeshift's first set of interrogatory responses. We are disappointed that, notwithstanding our discussions and the several months Smucker had to supplement, Smucker has not address most of the issues raised in our November 2019 letter on those responses. Please find the attached letter, which reiterates our earlier discussions. Please provide a time that you are available to confer telephonically.

Second, Savannah indicated on March 2 that Smucker was working on the potential costs associated with producing Teams/Slack communications, but never got back to us. Unless you plan to provide the information this week or agree to produce responsive documents, we believe we are at an impasse. Please provide a time this week that you are available to confer telephonically.

Third, Smucker's first production was made on November 30, 2020 with subsequent productions on January 12, 2021 and March 2, 2021. Smucker has yet to produce a privilege log, and, as such, any privilege is months overdue. See, November 20, 2020 Stipulated Order Re: Discovery of Electronically Stored Information at 10 ("The parties shall provide privilege logs and updated privilege logs within 45 days of any substantial production"). Despite numerous attempts by Tradeshift to ascertain the status of Smucker's privilege log, Smucker continues to withhold this critical information. Please confirm this week that Smucker will produce its privilege log by for at least its November 30, 2020 and January 12, 2021 productions by April 7. Otherwise let us know if there is a time to confer on this issue.

Thanks,
Jason

**Jason K. Yu**
Partner
Intellectual Property

Orrick
Silicon Valley ⊙
T +1-650-614-7363
jasonyu@orrick.com



**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT 6



May 5, 2021

*Via Email*

**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400
**orrick.com**

Chelsea Mikula
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Chelsea.mikula@tuckerellis.com

**Jason K. Yu**

E  jasonyu@orrick.com
D  +1 650 614 7363
F  +1 650 614 7401

Re: *Tradeshift, Inc. v. Smucker Services Company;* JMS Privilege Log.

Dear Chelsea:

Following up on my email of May 3, 2021, I write pursuant to Fed. R. Civ. P. 37(a)(1), Local Rule 37.2 and Judge Ramos' Individual Practice 2.A to meet and confer regarding Smucker Services Company's ("JMS") improper claims of privilege and deficient privilege log.

### A.  JMS's Privilege Log was Untimely

Preliminarily, the vast majority of JMS's privilege claims are untimely and thus waived.  The parties stipulated to produce privilege logs within 45 days of any substantial production.  DE 58 at §9b.  JMS's first substantial production was November 30, 2021.  It's second production was January 12, 2021.  JMS withheld responsive documents as privileged from both of these productions and JMS's objections to those documents are therefore waived.  Tradeshift reserves its rights with respect to these untimely claims of privilege.

### B.  Communications Withheld as Privileged in Spite of Being Authored by or Sent to Third Parties Who Were Not JMS's Attorneys

JMS makes numerous claims of privilege in its April 21, 2021 log that facially lack any basis for such a claim because they identify documents that were authored by or sent to *Tradeshift employees*.  *See, e.g.*, Privilege ID Nos. 149 (authored by Laurel Jamtgaard with no identified recipients), 162 (authored by Himanshu Shah with no identified recipients), 185 (authored by Himanshu Shah with no identified recipients), and 214 (authored by Laurel Jamtgaard with no identified recipients).  In numerous other cases, JMS has claimed privilege over communications that went between Tradeshift and JMS.  *See, e.g.,* Privilege ID Nos. 53 (email between JMS's Michelle Schuld and Tradeshift's Laurel Jamtgaard and others) and 203 (email between JMS's Rowdy White and Tradeshift's Jim Rahill, neither of whom is an attorney).  JMS cannot claim privilege over communications *from Tradeshift* nor can it claim privilege over communications



Chelsea Mikula
May 5, 2021
Page 2

between a JMS attorney and a third party, much less between a non-JMS attorney and a third party. *Egiazarya v. Zalmayev*, 290 F.R.D. 421, 431 (S.D. N.Y. 2013) ("The attorney-client privilege protects confidential communications between a lawyer and client relating to legal advice sought by the client" and "[d]isclosure of attorney-client communication to a third party or communications with an attorney in the presence of a third party, not an agent or employee of counsel, vitiates the confidentiality required for asserting the privilege."); *Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 104 (S.D.N.Y 2007) (holding that attorney-client privilege was waived when provided to a third party).

To be clear, Tradeshift has not identified here every instance where JMS has improperly claimed privilege over non-JMS-authored documents (*e.g.*, #85), communications between JMS and at least one third party who is not its lawyer (*e.g.*, #53), and communications between a non-lawyer from JMS and a non-lawyer from a third party (*e.g*., #203). From what we can discern, there appear to be a number of such entries on the privilege log. That JMS withheld and logged so many documents that are clearly not privileged causes us concern about the level of care and diligence that JMS applied when withholding such documents. Please immediately confirm that JMS will produce by May 11, 2021 every document that has been withheld on a claim of privilege where anyone outside of JMS is the author or recipient of such communication. Otherwise Tradeshift intends to move to compel and seek sanctions for withholding such clearly non-privileged documents.

### C.  Documents Improperly Withheld as Privileged Without a Single Attorney Identified

JMS's privilege log also identifies communications withheld on the basis of attorney-client privilege that do not include an attorney as an author/sender or recipient. *See, e.g.*, Privilege ID Nos. 19 (two non-attorneys), 24 (three non-attorneys), 25 (a non-attorney), 26 (a non-attorney), 34 (two non-attorneys), 49 (two non-attorneys), 51 (two non-attorneys), 62 (three non-attorneys), 75 (two non-attorneys), 76 (five non-attorneys), 77 (a non-attorney), 166 (four non-attorneys), 168 (a non-attorney), 169 (a non-attorney), 170 (two non-attorneys), 171 (a non-attorney), 193 (two non-attorneys), 197 (two non-attorneys), 198 (a non-attorney), 205 (a non-attorney).

For example, No. 19 is an October 31, 2019 email (*i.e*., months prior to JMS's termination of the Tradeshift contract) from JMS's Jason Barr, Sr. Director of Indirect Procurement, to Rob Ferguson, JMS's Sr. VP of Pet Foods. The privilege description is "Email reflecting confidential attorney-client communications regarding Tradeshift contract performance." This description is



Chelsea Mikula
May 5, 2021
Page 3

inaccurate because neither the author nor the recipient is an attorney. Further, even if the communication were between an attorney and recipient (and it's not), JMS's claim that this particular email is "regarding Tradeshift contract performance" does not provide any foundation for why such a discussion would or could be privileged – where is the advice being solicited or received? There is no such description of advice being received or related because (based on JMS's own description) the withheld document is simply a communication about a non-lawyer's observations about Tradeshift's performance to another non-lawyer. In fact, this email appears to discuss JMS's preparation for a phone call with Tradeshift's CEO that JMS contends was critical to its decision to terminate its agreement with Tradeshift and thus is, without a doubt, relevant and responsive to outstanding RFPs. This communication – and the dozens of others improperly withheld on grounds of privilege while nowhere identifying the attorney alleged to have been involved – must be produced immediately and JMS should explain why it tried to improperly hide responsive, non-privileged evidence under a facially baseless claim of privilege.

Nor can JMS try to argue belatedly that these withheld communications somehow reflect legal advice rendered by an attorney nowhere on the author or recipient list since pursuant to the parties' stipulation and the Court's November 20, 2020 Order (hereinafter "ESI Stipulation") JMS was obligated to include:

> A description of why privilege is being asserted over the document. This description should include information sufficient to identify if the document contained attachments over which privilege is also being asserted. *To the extent the counsel who is the basis of the privilege or work product claim is not apparent from the other information (to, from, cc, etc.) the parties shall identify the attorney(s) in the description.*

DE 58, para. 9.a.vii. (emphasis added). JMS failed to do so because these communications were not with an attorney and do not (by JMS's own descriptions) relay the content of legal advice. Having failed to substantiate its burden in making these "attorney-less" claims of privilege, JMS cannot now attempt to do so retroactively. *LPD New York LLC v. Adidas America, Inc.*, 2018 WL 6437078 *5 (E.D. N.Y. Dec. 7, 2018) (finding unsubstantiated assertions in a privilege log failed to sustain defendants' "burden of establishing that the attorney-privilege applies to communications to or between business personnel") (citing *AIU Ins. v. TIG Ins. Co.*, 2008 WL 4067437 *9-10 (S.D. N.Y. July 8, 2009)). Indeed, even if JMS could belatedly show some



Chelsea Mikula
May 5, 2021
Page 4

attorney communication was embedded or discussed in these numerous non-attorney communications, at most that would entitle JMS to redact the privileged information and produce the remainder of the communication. *Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 600 (S.D. N.Y. 2015) (requiring production of email communications between two of defendant's non-attorney employees with discussions with counsel redacted because the remainder of the communication "discusses business decisions, not legal advice").

This is another example of the egregious license that JMS took in applying improper privilege claims for the purposes of withholding plainly relevant, non-privileged information. These documents should be produced by May 11 or Tradeshift will move to compel.

### D.  Claims Regarding the January 16, 2020 Termination Letter

JMS also asserts a privilege over documents authored/sent or received by non-attorney Jason Barr or in-house corporate attorney Michelle Schuld regarding JMS's termination of the Smucker Services Agreement ("the SSA") with Tradeshift. *See, e.g.,* Privilege ID Nos. 6-18 and 20-26. JMS has identified Barr and Schuld as the two people who made the decision to terminate the SSA. Smucker's Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories (Nos. 1-9), p. 2. Tradeshift disagrees that JMS's privilege claims are appropriate or adequately substantiated.

First, JMS asserts an overly broad privilege claim over Mr. Barr's documents, including, *e.g.*, documents regarding the termination authored solely by Jason Barr, a non-attorney. *See, e.g.,* Privilege ID Nos. 11 and 14 (in both cases, the "Privilege Description" is "Draft memorandum reflecting legal advice prepared in anticipation of litigation regarding claims against Tradeshift"). It is unclear what a "memorandum reflecting legal advice" means, but to the extent Jason Barr authored the document, it cannot provide legal advice as he is not an attorney. And even if some portion of the document were to contain legal advice, that would not apply to entirety of Mr. Barr's memoranda. The dates for these putative privilege claims are almost all January 16, 2020, *i.e.,* the exact day that JMS sent Tradeshift its notice of termination. Accordingly, it appears JMS is withholding documents that discuss the termination letter itself, the putative factual basis for it, and Tradeshift's reaction/response to it. But a privilege claim would be improper in each of these instances since no *legal advice* is being rendered or sought. And, the fact that a non-privileged document was subsequently attached to a communication with an attorney does not mean that the non-privileged attachment suddenly becomes privileged. *McGowan v. JPMorgan*



Chelsea Mikula
May 5, 2021
Page 5

*Chase Bank, N.A.*, 2020 WL 1974109 *2 (S.D. N.Y. April 24, 2020) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney").  Accordingly, JMS must update the Privilege Description by May 11 for every claim of privilege made in connection with the January 16, 2020 termination letter to state the foundation for the claim with sufficient specificity to enable Tradeshift to determine whether a challenge is appropriate.

Second, JMS also appears to have asserted a privilege claim over any document that includes Michelle Schuld as an author/sender/recipient of an internal document (in many cases, she is the sole person listed in the sender/author/recipient fields and appears to be the reason for the assertion of a privilege claim).  *See, e.g.,* Privilege ID Nos. 4-10, 20, 23, 27, 29-33, and 35-48. But privilege does no extent to business discussions and decisions where no *legal advice* is being rendered or sought.  *MSF Holding, Ltd. v. Fiduciary Trust Co. Intern.*, 2005 WL 3338510 *1 (S.D.N.Y. Dec. 7, 2005) (finding that attorney-client privilege did not apply to an email drafted by in house counsel because the email was devoid of legal analysis and "evidently [counsel] relied on her knowledge of commercial practice rather than her expertise in the law"); *McGowan v. JPMorgan Chase Bank, N.A.*, 2020 WL 1974109 *2 (S.D. N.Y. April 24, 2020) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney").

Indeed, it is unclear from JMS's descriptions why any of these documents should be entitled to privilege.  Many of the entries rely on fuzzy descriptions that are unclear about the type of information provided to Ms. Schuld, *e.g.*, "email ***providing confidential information to assist in rendering*** legal advice regarding contract negotiations with Tradeshift."  Privilege ID No. 30. Confidential information that is provided to an attorney in order that the attorney can then use it to provide legal advice does not render that factual, non-advice information "privileged" whether it was "confidential" or not.  *Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 70 (S.D. N.Y. 2010) ("It is well-settled that [t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.") (internal quotations omitted).  JMS's log is rife with similarly insufficient foundational bases for its claims of privilege involving Ms. Schuld.  *See, e.g.,* Privilege ID Nos. 5 ("Email reflecting confidential attorney client ***communications regarding delays***"); 20 ("Email ***providing confidential information to assist in*** rendering legal advice regarding delays"); 28 ("Spreadsheet ***providing confidential information to assist in rendering legal advice*** regarding delays").  The stated descriptions do not provide enough information to determine whether Ms. Schuld is acting



Chelsea Mikula
May 5, 2021
Page 6

in her decision-making (*i.e.*, business) role or her advising role (other than JMS's conclusory assertion).  Accordingly, JMS should promptly produce by May 11 the documents for which it has made an improper claim of privilege and update the Privilege Description for documents authored or received by Ms. Schuld[1] and Mr. that actually do include a discussion of legal advice she rendered or was requested to render.

### E.  Failure to Log Common Interest Communications

We also note that JMS's privilege log fails to identify any documents withheld based on common interest.  However, we also know that JMS and BuyerQuest have a joint defense agreement (which they've refused to produce) and thus anticipate that there are numerous communications between BuyerQuest and JMS that are being withheld without being logged.  Indeed, documents produced by JMS even reference that such communications were going to take place.  *See, e.g.*, TJMSC0025221 (Jason Barr says to Jack Mulloy "I think our counsel is reaching out to yours to discuss.")  JMS should update its log by May 11 to indicate whether and which documents have been withheld on the basis of a putative common interest claim.

### F.  Additional Defects

JMS further has failed to comply with the parties' agreement to log documents withheld under a claim of privilege in the following respects:

1.  It fails to include separate columns for metadata extracted from the "Email CC" and "Email BCC" fields (ESI Stipulation, para. 9.iv); and

2.  It fails to identify the email addresses of the sender and recipient(s) of allegedly privileged email communications (ESI Stipulation, para. 9.vi.).

---

[1] Nor can JMS claim that anything and everything Ms. Schuld wrote or received as JMS corporate counsel justifies the assertion of a privilege. It is well established that in-house lawyers "wear two hats," that of a businessperson and that of a legal counselor, but it is only those communications that involve rendering legal advice that are privileged.  If the predominant purpose of a document authored by an in-house attorney was for business purposes, the document is not privileged.  *In re Aenergy, S.A.*, 451 F, Supp, 3d 319, 323 (S.D.N.Y. 2020) (granting motion to compel production of emails involving corporate counsel over claim of privilege because the predominant purpose of those emails was for business purposes).



Chelsea Mikula
May 5, 2021
Page 7

3. The "Privilege Descriptions" lack sufficient detail to establish a foundation for a privilege claim.

JMS should update each entry on its log to be fully compliant with the ESI Stipulation and to fairly put Tradeshift on notice as to the basis of the foundation for its privilege claims by no later than May 11. Again, and for sake of clarity, none of the examples provided herein are exhaustive and JMS bears the burden of reviewing its entire log (which clearly was not prepared with due care to ensure only the good faith assertion of privilege claims) in order to rectify its gross over-assertion of privilege claims and facially deficient provisions of foundational information.

* * *

Please confirm by May 7, 2021 that JMS will produce each document over which it has made a facially improper claim of privilege and serve an updated log that is compliant with the ESI Stipulation and contains sufficient foundational information in the Privilege Description to support a privilege claim. If JMS will not agree to withdraw its improper privilege claims and serve an updated log before May 11, JMS will promptly bring this matter to the Court for resolution. We would like to discuss this dispute with you later this week when we are also scheduled to discuss JMS's deficient responses to Tradeshift's most recent sets of SROGs, RFPs, and RFAs.

Very truly yours,

/s/ *Jason K. Yu*

Jason K. Yu

# EXHIBIT 7

# CONDITIONALLY FILED UNDER SEAL

# EXHIBIT 8

# CONDITIONALLY FILED UNDER SEAL

# EXHIBIT 9

# CONDITIONALLY FILED UNDER SEAL

# EXHIBIT 10

## Yu, Jason K.

| | |
|---|---|
| **From:** | Yu, Jason K. |
| **Sent:** | Thursday, May 13, 2021 12:12 PM |
| **To:** | 'Mikula, Chelsea' |
| **Cc:** | Fox, Savannah M.; Van Zant, Amy K.; Su, Tammy; Clements, Olivia |
| **Subject:** | RE: Tradeshift v. Smucker: Smucker Clawback |

Hi Chelsea,

We disagree that's enough information to disclose "the basis" for Smucker's claim of privilege under Rule 26.  Is Smucker asserting attorney client privilege or work product?  Also, who does Smucker contend directed Mr. Barr to prepare the document, when did they do so, and for what purpose(s)? Was this document subsequently sent to any attorneys and, if so, where does that subsequent communication appear on Smucker's privilege log?

Thanks,
Jason

---

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Thursday, May 13, 2021 10:35 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** RE: Tradeshift v. Smucker: Smucker Clawback

Jason,

We maintain our position. As Jason Barr testified yestreday, this email was sent and the document was prepared at the direction of counsel.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Thursday, May 13, 2021 10:38 AM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>; Su, Tammy <tsu@orrick.com>; Clements, Olivia <oclements@orrick.com>
**Subject:** Tradeshift v. Smucker: Smucker Clawback

**<<< EXTERNAL EMAIL >>>**

---

Hello Chelsea,

1

I'm writing to address Smucker's clawback of the email and attachment produced at TJMSC0034689-91 during Mr. Barr's deposition yesterday.  Tradeshift disagrees the document is subject to any legitimate claim of privilege.  The communication does not include any attorneys and is clearly a business recommendation identifying business reasons for terminating Tradeshift and hiring BuyerQuest.

Can you please immediately confirm whether Smucker actually intends to claw this document and maintain its claim of privilege.  If Smucker is doing so, we ask that, pursuant to Federal Rule of Civil Procedure 26(b)(5)(B), you provide the basis for Smucker's claim of privilege.  Pursuant to that section, Tradeshift intends to present the information for a determination of the claim and will be requesting its fees in the matter.

Thanks,

Jason


**Jason K. Yu**
Partner
Intellectual Property

Orrick
Silicon Valley Ⓥ
T +1-650-614-7363
jasonyu@orrick.com



---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT 11

**Yu, Jason K.**

| | |
|---|---|
| **From:** | Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com> |
| **Sent:** | Sunday, May 16, 2021 9:26 AM |
| **To:** | Van Zant, Amy K. |
| **Cc:** | Yu, Jason K.; Fox, Savannah M.; Thiem, Carrie E. |
| **Subject:** | RE: Smucker depositions |

Amy,

Thank you for your email. Apologies, I had some family commitments yesterday that had me tied up.

We do not agree to continue any of the depositions. Witnesses have reserved their schedules and are prepared to go forward, so we intend to do so.

We do not agree that the issues below impact these depositions. We will respond to those separately this week but as you know from prior correspondence, we disagree.  And I would encourage Tradeshift to focus on what really matters. The amount of discovery disputes, meet and confer letters, has done nothing to move this case forward other than increase the costs of litigation – which does not benefit either of our clients. There has been no hide the ball or gamesmanship and I say that with the utmost confidence. We have produced thousands of documents in response to reasonable search terms. We have withheld documents that are privileged, as we are entitled to do. You and Jason have repeatedly sought to expand the scope of discovery and we have agreed, but for what. For example, you fought and fought on the other vendor information so we spent weeks harvesting, reviewing and producing that data, which is a significant reason the privilege log was delayed, and what did that accomplish? I would argue nothing. You have the documents relevant to this case, so I would encourage you to focus on the depositions and moving this case forward.

And we also do not agree to the proposed extension of the case schedule. We will agree to take depositions of fact witnesses past June 11 to the extent necessary due to witness availability, but we will not hold that open until July 16.

Regarding expected length of depositions – I would suggest we discuss the timing of depositions the Friday before the following week. I don't think it makes sense to discuss witnesses now that are not being deposed for weeks, as prior deposition testimony may short circuit some depositions. We are confirmed for Bryan on Monday at 11:00. If you can let us know Monday whether you need more time with the other witnesses next week, then we'll ask you to adjust to 10 AM.

See you tomorrow,
Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Van Zant, Amy K. <Avanzant@orrick.com>
**Sent:** Friday, May 14, 2021 6:28 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Yu, Jason K. <jasonyu@orrick.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Thiem, Carrie E. <Carrie.Thiem@tuckerellis.com>
**Subject:** RE: Smucker depositions

**<<< EXTERNAL EMAIL >>>**

Chelsea:  Further to my email of this morning, Jason and I have talked through the existing discovery disputes, depositions, and schedule.  Following is Tradeshift's list of disputes that we believe could have an impact on depositions:

1. Confirmation whether Smucker searched for and produced internal communications for Mike Sterle, Mike Resan, Bryan Hiles, Jay Watson, Kevin Hare, and Viraaj Patel and, if not, confirmation whether Smucker will do so with all due haste now. (pending from your call with Jason a week ago).
2. Confirmation whether Smucker searched for and produced <u>any</u> documents from Dan Nowicki, Colby Orr, and Pai Milind and, if not, whether Smucker will do so with all due haste now. (same)
3. Confirmation whether Smucker searched for documents using the terms "Tradeshift," "TS," "BuyerQuest," and "BQ" and, if not, whether Smucker will do so with all due haste now. (same)
4. Resolution of the claw back dispute related to the two exhibits from Jason Barr's deposition. (identified during Wednesday's deposition)
5. Production of the documents that Smucker recently withdrew its claims of privilege over. (per your letter of Monday)
6. Resolution of the disputes over the privilege claims made by Smucker as identified in Jason's correspondence. (your letter of Monday does not resolve our issues – let's see quickly if we can try to compromise and if not, get it in court asap)

This is not an exhaustive list of open issues between the parties, just a list of those that we think could result in holding depositions open.  We invite you to identify any pressing disputes that JMS has that might relate to the depositions and then we suggest getting on a call Monday or Tuesday to discuss.

We would like to have a call with you early next week to see if we can resolve any of the foregoing issues quickly enough that some or most of the scheduled deposition dates can hold. However, as reluctant as we are to go back to witnesses for new dates and to extend the schedule, we think it is the most efficient thing to do at this point.  **For now, we propose that we clear next week of depositions and instead use the time to meet and confer on disputes and to get letters to the court on any we don't resolve.  That would mean taking Hiles off for Monday, Nowicki off for Tuesday, and Resan for Thursday**.  We appreciate that each of these witnesses has a busy schedule, so we will keep them on calendar if they prefer – however,  we don't believe we have access to all of the documents we are entitled to related to these three witnesses and so it might be best to work those issues out first. To be clear, we aren't going to hold their depositions open and insist on further time just for the heck of it.  We would only do so if we obtained additional information that is important to examine with them.  But since we think that's a strong possibility, we want to give them the option of a later date – the choice is entirely up to you and the witnesses for next week.

It's our hope that we could get our disputes resolved in the next 1-2 weeks and keep the existing deposition calendar as much as possible, but also extending the fact discovery deadline (and other deadlines) by a small amount to account for the time to confer.  Our proposed modified scheduled is:

| Event | Current Deadline | Revised Deadline |
|---|---|---|
| Completion of non-expert depositions | June 11, 2021 | July 16, 2021 |
| Opening expert reports | August 6, 2021 | October 8, 2021 |
| Rebuttal reports | September 10, 2021 | November 22, 2021 |

| Expert depositions | October 15, 2021 | December 17, 2021 |
| End of discovery | October 15, 2021 | December 17, 2021 |
| Case Management Conference | October 20, 2021 | January 12, 2022 |

**Since you are not receiving this until after business hours on a Friday, we currently plan to go forward with at least Mr. Hiles' deposition on Monday unless you tell us otherwise over the weekend**.  The decision is entirely yours whether to go forward.  We hope that this information is helpful in setting expectations and working towards finding compromises if and where we are able.  No matter what substantive disputes we may have, we want to do things as efficiently as possible for all parties involved.

I'm available at 408-206-0307 over the weekend should you prefer to discuss any of the foregoing and I'm also free Monday morning. If we don't talk until Monday, I wish you a good weekend and will look forward to hearing from you on Monday.

Sincerely,
Amy

**From:** Van Zant, Amy K. <Avanzant@orrick.com>
**Sent:** Friday, May 14, 2021 11:13 AM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Cc:** Yu, Jason K. <jasonyu@orrick.com>; Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Thiem, Carrie E. <Carrie.Thiem@tuckerellis.com>
**Subject:** Re: Smucker depositions

Chelsea:  Thank you for being flexible with us on the start times. We will look at the list of deponents over the weekend and send you our thoughts on estimated duration on Monday. Do you think you would be able to do the same for our witnesses on Monday?

Relatedly, Jason and I spoke last night and agreed it makes sense to look at the overall deposition schedule taking into consideration the discovery disputes we have in order to evaluate whether it makes sense to discuss some adjustments to who we depose and when. We honestly do not want to have a reason to hold any deposition open or to depose anyone twice and I'm sure you likely feel the same. Yet we do have some serious disputes that relate to many of the deponents. Those disputes will likely need to be resolved by the court, hopefully on a compressed timeline in view of the case schedule (and our overall view that extending the schedule generally leads to increased costs for both parties, which we want to avoid). So we've identified the problem but haven't yet reached our own consensus as to how we might solve it.

Jason and I are putting our heads together on this and will circle back to you today with our thoughts and we would sincerely welcome yours in return.  We have a lot to do in a short time and we want to work with you to do it as efficiently as possible.

Best,
Amy

On May 14, 2021, at 10:25 AM, Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com> wrote:

Amy,

I appreciate this response and am glad we are able to agree on this issue, and really hoping we can agree on more as the case moves forward.

If you do not anticipate 7 hours, we can leave them at 11 AM EST based on that representation and hope that it will be respected. If there are witnesses that you anticipate needing 7 hours with, I would ask for the 10 AM EST start so we can try and accommodate their evenings with their families. I am not aware of any specific time constraints rather just trying to be respectful of their evenings with family. For the same reasons you state the early mornings are inconvenient for you, the late evenings are also inconvenient for them.

And we have no problem being candid about expected length of depositions for your witnesses and if any witnesses have time constraints just make us aware and we will accommodate. We'll notice your witnesses for 11 EST as well, unless we hear otherwise. We agree witness schedules are paramount.

Chelsea

Chelsea Mikula
216-696-2476

---

**From:** Van Zant, Amy K. <Avanzant@orrick.com>
**Sent:** Friday, May 14, 2021 12:32 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>; Yu, Jason K. <jasonyu@orrick.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Thiem, Carrie E. <Carrie.Thiem@tuckerellis.com>
**Subject:** RE: Smucker depositions

**<<< EXTERNAL EMAIL >>>**

---

Hi Chelsea: We are happy to work with you on start times. The convention that we had with BuyerQuest was generally to start at 9 am or 930 am PT even with witnesses on the east coast and thus we thought we were improving substantially on that convention here – we intended no disrespect in suggesting what would be an 8 am start for us on the west coast. That said, we agree that the convenience of the witnesses is paramount so we can look at generally starting the east coast depositions at 7 a.m. PT, which I hope you will agree puts the witness's schedule first but also allows for some convenience to the west coast attorneys, where all of us are still mandated to work at home and thus have issues with waking up the whole house if we start any earlier. If there are particular witnesses who have time constraints that make an even earlier start preferable, we will do our very best to accommodate and so please just identify anyone who falls into that category. We expect that many and perhaps even most of the depositions won't take anywhere close to 7 hours on the record and we will be happy to exchange our best guesses on that issue if you will do the same with us for our witnesses. In those cases, perhaps we can start a little later so our families here will hate us a bit less! We will coordinate with you on the start time for each witness individually.

Thank you for accommodating us on Ms. Schuld and we will get back to you on Mr. Bowen.

Sincerely,
Amy

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Friday, May 14, 2021 8:43 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>; Van Zant, Amy K. <Avanzant@orrick.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>; Thiem, Carrie E.
<Carrie.Thiem@tuckerellis.com>
**Subject:** RE: Smucker depositions

This is a first in my legal career where attorneys notice the depositions for their own convenience and not the time zone of the case or witnesses. Since you are starting all depositions at 11 AM, hopefully you do not anticipate using the full 7 hours with each witness, as to inconvenience us all week with late evenings.

Ms. Schuld can be available June 17 or 18.

You noticed Joanna Dobina for June 3 and veritext sent her a link, so we rearranged schedules so she can do that date. So please provide a new date for Mr. Bowen.

Chelsea Mikula
216-696-2476

**From:** Yu, Jason K. <jasonyu@orrick.com>
**Sent:** Thursday, May 13, 2021 3:50 PM
**To:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>; Van Zant, Amy K. <Avanzant@orrick.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** RE: Smucker depositions

**<<< EXTERNAL EMAIL >>>**

Hi Chelsea,

Thanks for reaching out.  We will be sending out updated notices today and will notice these for 11am EST.

I also wanted to let you know that Gareth Bowen can be available for deposition on June 3, and Mr. Van Pruissen can be available for deposition on June 23.  I am still trying to obtain dates for Mr. Cottington and Mr. Lanng.

Also, we have a conflict next Friday (5/21) for Ms. Schuld's deposition.  Can you please provide a different date that she is available?  I believe we are also still waiting for a new date for Ms. Dobina.

Thanks,
Jason

**From:** Mikula, Chelsea <Chelsea.Mikula@tuckerellis.com>
**Sent:** Thursday, May 13, 2021 8:56 AM
**To:** Yu, Jason K. <jasonyu@orrick.com>; Van Zant, Amy K. <Avanzant@orrick.com>
**Cc:** Fox, Savannah M. <Savannah.Fox@tuckerellis.com>
**Subject:** Smucker depositions

Jason and Amy,

Can you please confirm the start time of the depositions next week. I don't think we have amended notices and the original notices do not have a start time, to my recollection. As it is a NY action and the witnesses are all in Ohio, we would ask that you accommodate an east coast schedule. Please confirm.

Chelsea s

**Chelsea Mikula | Attorney | Tucker Ellis LLP**
950 Main Avenue, Suite 1100 | Cleveland, OH 44113
Direct: 216-696-2476 | Fax: 216-592-5009 | Cell: 440-527-3309
email Chelsea.Mikula@tuckerellis.com

This e-mail is sent by the law firm of Tucker Ellis LLP and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately by return email.

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com.*

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT 12

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| TRADESHIFT, INC. | ) |
| _Plaintiff_ | ) |
| v. | ) |
| | ) |
| BUYERQUEST, INC. | ) |
| _Defendant_ | ) |

Civil Action No.    3:20-cv-1294-RS

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                            SMUCKER SERVICES COMPANY
c/o CT Corporation, 4400 Easton Commons Way, Columbus, OH 43219
_(Name of person to whom this subpoena is directed)_

☒  _Testimony:_  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
See Exhibit A.

| Place: | Veritext1100 Superior Avenue, Suite 1820 Cleveland, OH 44114 (or taken remotely if agreed by parties in advance) | Date and Time: | 02/19/2021 @ 9:30 a.m. |
|---|---|---|---|

The deposition will be recorded by this method:   stenographically and by videotape

☒  _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
See Exhibit B.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     01/25/2021

_CLERK OF COURT_

OR

_____                    /s/ Amy Van Zant
_Signature of Clerk or Deputy Clerk_                              _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_  _____
Tradeshift, Inc.                                                    , who issues or requests this subpoena, are:
Amy Van Zant; Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025-1015;
avanzant@orrick.com; (650) 614-7403.

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.      Case 3:20-cv-01294-RS

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named individual as follows: _____

_____   on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____                  _____
                                                  *Server's signature*

                                        _____
                                                  *Printed name and title*

                                        _____
                                                  *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

## EXHIBIT A

## DEFINITIONS

1.      These Definitions supplement any definitions and rules of construction set forth in the Federal Rules of Civil Procedure, Federal Rules of Evidence, or the Local Rules.  Such definitions are incorporated herein by reference.

2.      The terms "DOCUMENT" or "DOCUMENTS" as used herein are intended to be defined in the broadest sense and include, without limitation, the original and all nonidentical copies (including drafts and those with any notations) of all "documents," "writings," "recordings," and "photographs" of the types designated in Rule 34(a) of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence, and includes materials in digital forms.  "DOCUMENTS" are stored in any medium from which information can be obtained either directly or, if necessary, after translation by SMUCKER into a reasonably usable form.

3.      The term "COMMUNICATION" means any contact, oral or documentary, formal or informal, at any place or under any circumstances whatsoever whereby information of any nature is transmitted or transferred, including, without limitation, a single person seeing or hearing any information by any means.

4.      The term "ANY" shall be understood to include and encompass "ALL."  As used herein, the singular shall always include the plural and the present tense shall also include the past tense.

5.      The term "PERSON" or "PERSONS" as used herein includes both natural persons and legal entities, including, without limitation, corporations, companies, firms, partnerships, joint ventures, proprietorships, associations, unincorporated organizations, trusts,

and governmental bodies or agencies.  Unless noted otherwise, references to any person, entity or party herein include its, his, or her principals, agents, representatives, attorneys, employees, employers, officers, directors, expert witnesses or consultants, or others acting on behalf of said person, entity, or party.

6.      The terms "CONCERNING," "DISCUSSING," "REGARDING," "RELEVANT TO," "RELATE TO," or "REFER TO," or any variants thereof, when used in connection with any document, shall be understood to apply if the document directly or indirectly mentions, discusses, constitutes, concerns, explains, comprises, sets forth, or in any other way deals with the subject matter described in the request in which the term appears.

7.      The terms "DEFENDANT" or "BUYERQUEST" as used herein means Defendant BuyerQuest, Inc., and its officers, directors, principals, employees, agents, subsidiaries, and ALL other PERSONS and entities representing or acting on behalf of it in any capacity.

8.      The terms "PLAINTIFF" or "TRADESHIFT" as used herein means Plaintiff Tradeshift, Inc., and its officers, directors, principals, employees, agents, subsidiaries, and ALL other PERSONS and entities representing or acting on behalf of it in any capacity.

9.      The terms "SMUCKER," "YOU," and "YOUR" as used herein means Smucker Services Company, and its parent(s), officers, directors, principals, employees, agents, subsidiaries, and ALL other PERSONS and entities representing or acting on behalf of it in any capacity, and specifically includes the J.M. Smucker Company.

10.     The term "SMUCKER SERVICES AGREEMENT" as used herein means the contract entitled "Services Agreement," entered on June 30, 2019, between SMUCKER and TRADESHIFT.

11.     The term "TRADESHIFT PARTNER PROGRAM AGREEMENT" as used herein means the contract entitled "Master Agreement for the Tradeshift Partner Program," entered on June 7, 2019, between BUYERQUEST and TRADESHIFT.

12.     The term "CROSS SELLING ATTACHMENT" as used herein means the document entitled "Cross Selling Attachment," entered on June 7, 2019, between BUYERQUEST and TRADESHIFT.

13.     The term "RESELLER ORDER FORM" as used herein means the document entitled "Reseller Order Form," executed on June 28, 2019, between BUYERQUEST and TRADESHIFT.

14.     The term "BUYERQUEST AGREEMENTS" as used herein means the TRADESHIFT PARTNER PROGRAM AGREEMENT, CROSS SELLING ATTACHMENT, and RESELLER ORDER FORM.

15.     The term "SMUCKER PROJECT" as used herein means the project memorialized in the SMUCKER SERVICES AGREEMENT and the RESELLER ORDER FORM and includes the services and software that both TRADESHIFT and BUYERQUEST were required to provide pursuant to the SMUCKER SERVICES AGREEMENT.

16.     The term "NEW SMUCKER SERVICES AGREEMENT" as used herein means the contract entitled "Services Agreement," entered into on approximately March 6, 2020, between SMUCKER and BUYERQUEST.

17.     The term "CONTINUED SMUCKER PROJECT" as used herein means the project memorialized in the NEW SMUCKER SERVICES AGREEMENT and includes the services and software BUYERQUEST was contracted to provide and did provide pursuant to the SMUCKER SERVICES AGREEMENT.

18.     The term "NATIVE FORMAT" as used herein means the default or proprietary file format that a program uses to generate, process, transmit, or store data.

19.     The term "THIRD PARTY" as used herein means any PERSON or entity other than the parties to this action and ALL PERSONS and entities representing or acting on behalf of them.

20.     The term "OPERATION FYREFEST" as used herein means any planning, discussion, or conduct related to BUYERQUEST's decision or plan to pivot away from its obligations to TRADESHIFT with respect to the SMUCKER PROJECT as described in the BUYERQUEST AGREEMENTS and SMUCKER SERVICES AGREEMENT and/or to obtain a direct contract with SMUCKER.

21.     The term "LITIGATION" as used herein means the lawsuits that TRADESHIFT has asserted against BUYERQUEST in the Northern District of California and against SMUCKER in the Southern District of New York (*Tradeshift, Inc. v. Smucker Services Company*, Case No. 1:20-cv-03661 (S.D.N.Y.)) and the underlying claims, counterclaims, and defenses.

## DEPOSITION TOPICS

1.     The RFP and BRD that SMUCKER provided to potential vendors for the SMUCKER PROJECT, including the questions and requirements contained therein, the scope and meaning of those questions and requirements, the reasons for including those questions or requirements, and SMUCKER's understanding of the term "out of the box."

2.     SMUCKER's evaluation of vendor responses to the RFP and BRD, including the reasons for selecting particular vendors to move on in the vetting process and for selecting

TRADESHIFT for the SMUCKER PROJECT (including relevant internal communications between decisionmakers at SMUCKER).

3.      The specific statements in TRADESHIFT's responses to the RFP and BRD that SMUCKER believes or contends were false and/or fraudulent, the reasons for SMUCKER's belief or contention, the circumstances and reasons pursuant to which SMUCKER developed the belief or contention (including the first time SMUCKER developed that belief or contention), and whether and, if so, how much those statements bore on SMUCKER's decision to select TRADESHIFT, including documents or other written evidence regarding this topic.

4.      Any statements or representations (whether verbally or in writing) allegedly made by TRADESHIFT outside of the RFP or BRD that SMUCKER contends were false and/or fraudulent.

5.      The SMUCKER SERVICES AGREEMENT, including the negotiation and drafting of the agreement and the statement of work included therein.

6.      The implementation of the SMUCKER PROJECT from July 1, 2019 to January 16, 2020, including progress reports, milestones, or changes in scope (including internal SMUCKER communications discussing problems and progress on the SMUCKER PROJECT).

7.      The alleged errors, defects, or other complaints by SMUCKER regarding the implementation of the SMUCKER PROJECT, including the specific errors or defects that SMUCKER contends are inconsistent with or otherwise relate to one of the representations or statements identified in Topic Nos. 3 and 4.

8.      SMUCKER's COMMUNICATIONS identifying or discussing any alleged errors, defects, or complaints regarding TRADESHIFT's implementation of the SMUCKER PROJECT.

9.      COMMUNICATIONS between SMUCKER and BUYERQUEST regarding TRADESHIFT, including but not limited to TRADESHIFT's responses to the RFP or BRD, TRADESHIFT's financial condition, TRADESHIFT's employees, and TRADESHIFT's performance on the SMUCKER PROJECT.  This will include written and electronic COMMUNICATIONS as well as any verbal COMMUNICATIONS and any presentations, including, for example, COMMUNICATIONS between Jason Barr and Jack Mulloy discussing proposals to remove TRADESHIFT from the SMUCKER PROJECT and replace TRADESHIFT with BUYERQUEST.

10.     COMMUNICATIONS between SMUCKER and BUYERQUEST regarding BUYERQUEST completing or taking over the SMUCKER PROJECT, including COMMUNICATIONS about (1) plans or proposals for BUYERQUEST to complete the work or (2) SMUCKER entering into a contract directly with BUYERQUEST for the CONTINUED SMUCKER PROJECT.  This will include written and electronic COMMUNICATIONS as well as any verbal COMMUNICATIONS and any presentations.

11.     SMUCKER's decision to declare the SMUCKER SERVICES AGREEMENT void and to instruct TRADESHIFT to discontinue work on the SMUCKER PROJECT on or around January 16, 2020.  This will include, but is not limited to, the PERSONS involved in the decision(s), the discussions leading up to the decision(s), the timing of the decisions, and the reasons for the decision.

12.     SMUCKER's decision to claim fraud rather than provide TRADESHIFT with formal, written notice (under section 2(c) or 8(a)(ii) of the SMUCKER SERVICES AGREEMENT) of any specific material breaches of the SMUCKER SERVICES AGREEMENT and allow TRADESHIFT to attempt to cure within 30 days.

13.     SMUCKER's decision to enter into the NEW SMUCKER SERVICES
AGREEMENT with BUYERQUEST for the work associated with the SMUCKER PROJECT,
including but not limited to, the reasons for the decision and any COMMUNICATIONS,
discussions, or conversations that impacted or lead to that decision.  This will include, but is not
necessarily limited to, any verbal or written COMMUNICATIONS with between SMUCKER
agents and personnel and BUYERQUEST from July 1, 2019 to March 6, 2020 regarding
products and services BUYERQUEST could provide to replace the Tradeshift Pay product in the
SMUCKER PROJECT.

14.     The drafting and negotiation of the NEW SMUCKER SERVICES
AGREEMENT.

15.     The implementation of the CONTINUED SMUCKER PROJECT, including any
problems, defects, delays, or errors with the implementation and any COMMUNICATIONS with
BUYERQUEST regarding such problems, defects, delays, or errors.

16.     The scope of the work, technical requirements, and statement of work for the
CONTINUED SMUCKER PROJECT pursuant to the NEW SMUCKER SERVICES
AGREEMENT, including whether the NEW SMUCKER SERVICES AGREEMENT requires
BUYERQUEST to provide/satisfy each and every of the requirements identified in the 2019
BRD.  This will include, in particular, any requirements from the 2019 BRD that SMUCKER has
waived or omitted from the NEW SMUCKER SERVICES AGREEMENT and also each such
requirement that BUYERQUEST is not meeting or expects not to meet.

17.     IDENTIFICATION of all written agreements between SMUCKER and
BUYERQUEST related to the LITIGATION, including whether any such agreements exist,
when they were entered into, when they were negotiated, and whether they remain in effect.

18.     Whether BUYERQUEST has offered or agreed to indemnify or reimburse SMUCKER for any damages owed or litigation fees/expenses related to the LITIGATION.

19.     SMUCKER's experience with implementing the Ariba software payment system that the TRADESHIFT/BUYERQUEST solution provided for in the SMUCKER SERVICES AGREEMENT was intended to replace, including whether there were any delays, missed milestone deadlines, project scope changes, and/or disputes between Ariba and SMUCKER about technical requirements.

20.     IDENTIFICATION of the SMUCKER employees who had primary responsibility for supervising and managing the implementation of the SMUCKER PROJECT and CONTINUED SMUCKER PROJECT, including any prior experience each such employee had in implementing CRM, accounting, or payment software.

# EXHIBIT B

## EXHIBIT B

## DEFINITIONS

1.       These Definitions supplement any definitions and rules of construction set forth in the Federal Rules of Civil Procedure, Federal Rules of Evidence, or the Local Rules.  Such definitions are incorporated herein by reference.

2.       The terms "DOCUMENT" or "DOCUMENTS" as used herein are intended to be defined in the broadest sense and include, without limitation, the original and all nonidentical copies (including drafts and those with any notations) of all "documents," "writings," "recordings," and "photographs" of the types designated in Rule 34(a) of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence, and includes materials in digital forms.  "DOCUMENTS" are stored in any medium from which information can be obtained either directly or, if necessary, after translation by Smucker into a reasonably usable form.

3.       The term "COMMUNICATION" means any contact, oral or documentary, formal or informal, at any place or under any circumstances whatsoever whereby information of any nature is transmitted or transferred, including, without limitation, a single person seeing or hearing any information by any means.

4.       The term "ANY" shall be understood to include and encompass "ALL."  As used herein, the singular shall always include the plural and the present tense shall also include the past tense.

5.       The term "PERSON" or "PERSONS" as used herein includes both natural persons and legal entities, including, without limitation, corporations, companies, firms, partnerships, joint ventures, proprietorships, associations, unincorporated organizations, trusts,

and governmental bodies or agencies.  Unless noted otherwise, references to any person, entity or party herein include its, his, or her principals, agents, representatives, attorneys, employees, employers, officers, directors, expert witnesses or consultants, or others acting on behalf of said person, entity, or party.

6.      The terms "CONCERNING," "DISCUSSING," "REGARDING," "RELEVANT TO," "RELATE TO," or "REFER TO," or any variants thereof, when used in connection with any document, shall be understood to apply if the document directly or indirectly mentions, discusses, constitutes, concerns, explains, comprises, sets forth, or in any other way deals with the subject matter described in the request in which the term appears.

7.      The terms "DEFENDANT" or "BUYERQUEST" as used herein means Defendant BuyerQuest, Inc., and its officers, directors, principals, employees, agents, subsidiaries, and ALL other persons and entities representing or acting on behalf of it in any capacity.

8.      The terms "PLAINTIFF" or "TRADESHIFT" as used herein means Plaintiff Tradeshift, Inc., and its officers, directors, principals, employees, agents, subsidiaries, and ALL other persons and entities representing or acting on behalf of it in any capacity.

9.      The terms "SMUCKER," "YOU," or "YOUR," as used herein mean Smucker Services Company, and its parent(s), officers, directors, principals, employees, agents, subsidiaries, and ALL other persons and entities representing or acting on behalf of it in any capacity, and specifically includes the J.M. Smucker Company.

10.      The term "SMUCKER SERVICES AGREEMENT" as used herein means the contract entitled "Services Agreement," entered on June 30, 2019, between SMUCKER and TRADESHIFT.

11.     The term "TRADESHIFT PARTNER PROGRAM AGREEMENT" as used herein means the contract entitled "Master Agreement for the Tradeshift Partner Program," entered on June 7, 2019, between BUYERQUEST and TRADESHIFT.

12.     The term "CROSS SELLING ATTACHMENT" as used herein means the document entitled "Cross Selling Attachment," entered on June 7, 2019, between BUYERQUEST and TRADESHIFT.

13.     The term "RESELLER ORDER FORM" as used herein means the document entitled "Reseller Order Form," executed on June 28, 2019, between BUYERQUEST and TRADESHIFT.

14.     The term "BUYERQUEST AGREEMENTS" as used herein means the TRADESHIFT PARTNER PROGRAM AGREEMENT, CROSS SELLING ATTACHMENT, and RESELLER ORDER FORM.

15.     The term "SMUCKER PROJECT" as used herein means the project memorialized in the SMUCKER SERVICES AGREEMENT and the RESELLER ORDER FORM and includes the services and software that both TRADESHIFT and BUYERQUEST were required to provide pursuant to the SMUCKER SERVICES AGREEMENT.

16.     The term "NEW SMUCKER SERVICES AGREEMENT" as used herein means the contract entitled "Services Agreement," entered into on approximately March 6, 2020, between SMUCKER and BUYERQUEST.

17.     The term "CONTINUED SMUCKER PROJECT" as used herein means the project memorialized in the NEW SMUCKER SERVICES AGREEMENT and includes the services and software BUYERQUEST was contracted to provide and did provide pursuant to the SMUCKER SERVICES AGREEMENT.

18.     The term "NATIVE FORMAT" as used herein means the default or proprietary file format that a program uses to generate, process, transmit, or store data.

19.     The term "THIRD PARTY" as used herein means any person or entity other than the parties to this action and ALL persons and entities representing or acting on behalf of them.

20.     The term "OPERATION FYREFEST" as used herein means any planning, discussion, or conduct related to BUYERQUEST's decision or plan to pivot away from its obligations to TRADESHIFT with respect to the SMUCKER PROJECT as described in the BUYERQUEST AGREEMENTS and SMUCKER SERVICES AGREEMENT and/or to obtain a direct contract with SMUCKER.

21.     The "LITIGATION" as used herein means the lawsuits that TRADESHIFT has asserted against BUYERQUEST in the Northern District of California and against SMUCKER in the Southern District of New York (*Tradeshift, Inc. v. Smucker Services Company*, Case No. 1:20-cv-03661 (S.D.N.Y.)) and the underlying claims, counterclaims, and defenses.

## **INSTRUCTIONS**

22.     Unless otherwise noted, the relevant time period for ALL requests includes DOCUMENTS created, sent, or received since January 1, 2019 to the present.

23.     In responding to the following document requests, YOU are required to furnish ALL information that is within YOUR possession, custody, or control, including information in the possession, custody, or control of YOUR investigators, employees, agents, representatives, guardians, attorneys, investigators for YOUR attorneys, PERSONS acting on YOUR behalf, or any other companies or PERSONS affiliated with YOU as required by statute.

24.     If YOU cannot fully produce the DOCUMENTS and other tangible things requested below after exercising due diligence to secure them, respond to the extent possible,

specify the portion of any request for production to which YOU are unable to fully respond, state the facts upon which YOU base YOUR contention that YOU are unable fully to respond to such portion, and state any knowledge, information, or belief YOU have concerning such portion.

25.     If any DOCUMENT or other tangible thing cannot be produced in full, YOU are requested to produce it to the extent possible, specifying the reasons for the inability to produce the remainder and stating whatever information, knowledge, or belief YOU have concerning the unproduced portion.

26.     If YOU object to any request or part thereof, produce ALL DOCUMENTS and other tangible things to which YOUR objection does not apply and specify to which part YOU have objected.

27.     If in answering these requests YOU claim any ambiguity in either a request or a definition or instruction applicable thereto, identify in YOUR response the language YOU consider ambiguous and state the interpretation YOU are using in responding.

28.     If YOU or YOUR attorneys know of the existence, past or present, of any DOCUMENT or other tangible thing described in any of these requests, but such DOCUMENT or tangible thing is not presently in YOUR possession, custody, or control or in the possession, custody, or control of YOUR agents, representatives, or attorneys, YOU shall so state in response to the request, identify the DOCUMENT or other tangible thing, and identify the PERSON in whose possession, custody, or control the DOCUMENT or other tangible thing was last known to reside.  If any responsive DOCUMENTS or tangible things have been destroyed or otherwise removed from YOUR custody, possession, or control, please state when, how, and why such DOCUMENT or tangible thing was destroyed or removed from YOUR custody, possession, or control.

## DOCUMENTS TO PRODUCE

1.      ALL DOCUMENTS SMUCKER has produced and intends to produce in the case *Tradeshift, Inc. v. Smucker Services Company*, Case No. 1:20-cv-03661 (S.D.N.Y.).

2.      ALL DOCUMENTS and COMMUNICATIONS REGARDING SMUCKER'S evaluation of the vendor responses to the RFP and BRD, including but not limited to, the vendor responses and internal and external COMMUNICATIONS referring to or discussing the responses.

3.      ALL DOCUMENTS and COMMUNICATIONS REGARDING the negotiation and drafting of the SMUCKER SERVICES AGREEMENT.

4.      ALL DOCUMENTS and COMMUNICATIONS REGARDING the implementation of the SMUCKER PROJECT, including but not limited to, ALL project documents, progress reports, schedules, milestones documents, defect lists, change orders, and all COMMUNICATIONS discussing scheduling, progress, milestones, defects, errors, or changes in scope.

5.      ALL DOCUMENTS and COMMUNICATIONS DISCUSSING or referring to TRADESHIFT's performance on the SMUCKER PROJECT.

6.      ALL DOCUMENTS and COMMUNICATIONS DISCUSSING or referring to BUYERQUEST's performance on the SMUCKER PROJECT.

7.      ALL DOCUMENTS AND COMMUNICATIONS between July 1, 2019 and January 16, 2020 REGARDING ANY BUYERQUEST products, features, or services that could potentially replace the TRADESHIFT products, features, and services on the SMUCKER PROJECT, including but not limited to ANY BUYERQUEST products, features, or services that

were ultimately included in the scope of work for the March 6, 2020 Agreement between SMUCKER and BUYERQUEST.

8.      ALL DOCUMENTS and COMMUNICATIONS REGARDING proposals or plans for removing TRADESHIFT from the SMUCKER PROJECT and/or contract with BUYERQUEST to assume work related to the SMUCKER PROJECT, including ALL COMMUNICATIONS between Jason Barr and Jack Mulloy discussing proposals to remove TRADESHIFT from the SMUCKER PROJECT and replace TRADESHIFT with BUYERQUEST.

9.      ALL DOCUMENTS and COMMUNICATIONS REGARDING SMUCKER's decision to void and repudiate the SMUCKER SERVICES AGREEMENT and to instruct TRADESHIFT to discontinue work on the SMUCKER PROJECT on or around January 16, 2020.

10.     ALL DOCUMENTS and COMMUNICATIONS REGARDING the decision to enter into a new agreement with BUYERQUEST and/or replace TRADESHIFT's services and products on the SMUCKER PROJECT with BUYERQUEST services and products.

11.     DOCUMENTS sufficient to show whether BUYERQUEST continued to work on the SMUCKER PROJECT between January 16, 2020 and March 6, 2020.

12.     ALL DOCUMENTS showing or evidencing BUYERQUEST and/or SMUCKER's post-January 16, 2020 use of TRADESHIFT software or other resources received by them from TRADESHIFT.

13.     ALL DOCUMENTS and COMMUNICATIONS REGARDING the negotiation and drafting of the NEW SMUCKER SERVICES AGREEMENT.

14.     ALL DOCUMENTS and COMMUNICATIONS REGARDING the implementation of the CONTINUED SMUCKER PROJECT, including but not limited to, ALL project documents, progress reports, schedules, milestones documents, defect lists, change orders, and all COMMUNICATIONS discussing scheduling, progress, milestones, defects, errors, or changes in scope.

15.     INTERNAL SMUCKER COMMUNICATIONS and COMMUNICATIONS between SMUCKER and BUYERQUEST discussing or describing delays, problems, project scope changes on the CONTINUED SMUCKER PROJECT.

16.     DOCUMENTS sufficient to show each payment made by SMUCKER to BUYERQUEST for the CONTINUED SMUCKER PROJECT.

17.     COMMUNICATIONS between SMUCKER and Ariba about an extension of the original Ariba payment software contract.

18.     DOCUMENTS sufficient to show each payment made by SMUCKER to Ariba in 2020 and 2021, including DOCUMENTS sufficient to show reason for each such payment.

19.     DOCUMENTS sufficient to show all agreements between SMUCKER and BUYERQUEST related to the LITIGATION.

20.     DOCUMENTS AND COMMUNICATIONS discussing or evidencing whether BUYERQUEST has offered or agreed to indemnify or reimburse SMUCKER for any damages owed or litigation fees/expenses related to the LITIGATION.

21.     DOCUMENTS discussing or evidencing any disputes between SMUCKER and BUYERQUEST regarding the SMUCKER PROJECT, the CONTINUED SMUCKER PROJECT, or the LITIGATION.