1  Craig J. Mariam (SBN: 225280)
   cmariam@grsm.com
2  Anthony D. Phillips (SBN: 259688)
   aphillips@grsm.com
3  Eunice J. Liao (SBN: 330655)
   eliao@grsm.com
4  GORDON REES SCULLY MANSUKHANI, LLP
   275 Battery Street, Suite 2000
5  San Francisco, CA 94111
   Telephone: (415) 986-5900
6  Facsimile: (877) 306-0043
   Attorneys for Defendant
7  BUYERQUEST, INC.

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  TRADESHIFT, INC., a Delaware corporation, )   CASE NO.  3:20-cv-01294-RS
                                              )
12                            Plaintiff,      )   **DEFENDANT BUYERQUEST, INC.'S**
                                              )   **OPPOSITION TO PLAINTIFF'S MOTION**
13          vs.                               )   **FOR SUMMARY ADJUDICATION**
                                              )
14  BUYERQUEST, INC., an Ohio corporation,    )   **[REDACTED]**
                                              )
15                            Defendant.      )
                                              )   Judge: Hon. Richard Seeborg
16                                            )   Courtroom: 3 (17th Floor)
                                              )   Date: Sept. 9, 2021
17                                            )   Time: 1:30 PM
                                              )
18                                            )
                                              )
19  _____ )

20

21

22

23

24

25

26

27

28

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

- 1 -

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................................. 6

II. STATEMENT OF FACTS ................................................................................... 7

    A. Smucker, Tradeshift and the SSA ............................................................. 7

    B. Tradeshift Fails to Perform the SSA ......................................................... 7

    C. Tradeshift Fails to Perform the Master Agreement ................................... 9

    D. Smucker's Termination of Tradeshift and the SSA ................................... 9

III. FACTUAL REBUTTAL ..................................................................................... 12

    A. "Operation FyreFest" (MSA, 5:19-8:13) ................................................. 12

    B. Tradeshift's Confidential Information (MSA, 7:16-10:4) ........................ 15

    C. The January 7, 2020 Meeting (MSA, 10:7-13:9) ..................................... 16

IV. LEGAL STANDARD .......................................................................................... 17

V. ARGUMENT ....................................................................................................... 18

    A. Tradeshift Cannot Establish the Elements of Tortious Interference .......... 18

        1. The SSA Was Not a Valid Contract ............................................. 19

        2. BuyerQuest Did Not Act with Intent to Induce a Breach of the SSA ....... 19

        3. Tradeshift Cannot Establish an Independently Wrongful Act ................. 20

        4. Tradeshift Cannot Establish Intent to Interfere ......................... 21

        5. No Conduct of BuyerQuest Caused the Termination of the SSA ............. 22

    B. Tradeshift Cannot Establish the Elements of Breach of Contract .............. 23

        1. Tradeshift Cannot Establish Performance ................................. 24

        2. Tradeshift Cannot Establish Breach .......................................... 24

        3. Tradeshift Cannot Establish Causation ..................................... 26

    C. Tradeshift Cannot Establish the Elements of a Breach of Covenant of Good Faith and Fair Dealing .......................................................................... 27

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

- i -

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1. There Is No Waiver of Tradeshift's Burden to Prove It Performed the Master Agreement ................................................................................. 27

2. Tradeshift Cannot Establish A Breach of Covenant ................................ 27

3. The Master Agreement Permitted Solicitation of Smucker ..................... 28

D. The MSA Offers No Grounds for Summary Adjudication of BuyerQuest's Affirmative Defenses ............................................................................. 29

VI. CONCLUSION ........................................................................................... 30

- ii -

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*900 Capitol Services, Inc. v. Kugler, Peretz, Kaplan & Berlin, P.A.*,

5

   No. C 96-0601 SI, 1997 WL 776372 (N.D. Cal. 1997) ........................................................... 24

6

*Ambat v. City & County of San Francisco*,

   757 F.3d 1017 (9th Cir. 2014) ........................................................................................................ 17

7

8

*Anderson v. Liberty Lobby, Inc.*,

   477 US 242 (1986) ............................................................................................................................... 18

9

*Bauer v. Interpublic Group of Companies, Inc.*,

10

   255 F. Supp. 2d 1086 (N.D. Cal. 2003) .................................................................................... 20

11

*Cabanas v. Gloodt Assocs.*,

   942 F. Supp. 1295 (E.D. Cal. 1996),

12

   *aff'd sub nom. Cabanas v. Gloodt Assocs., Inc.*,

   141 F.3d 1174 (9th Cir. 1998) ........................................................................................................ 20

13

14

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,

   222 Cal. App. 3d 1371 (Cal. Ct. App. 1990) ........................................................................... 28

15

*Carma Developers, Inc. v. Marathan Dev. Cal., Inc.*,

16

   2 Cal. 4th 342 (Cal. 1992) ............................................................................................................... 28

17

*Celotex Corp. v. Catrett*,

   477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ................................................. 17, 18

18

19

*Coleman v. Quaker Oats Co.*,

   232 F.3d 1271 (9th Cir. 2000) ....................................................................................................... 25

20

*DeVoto v. Pacific Fidelity Life Ins. Co.*,

21

   618 F.2d 1340 (9th Cir. 1980) ....................................................................................................... 20

22

*Eastman Kodak Co. v. Image Technical Svcs., Inc.*,

   504 U.S. 451 (1992) ........................................................................................................................... 18

23

*Eisenberg v. Ins. Co. of N. Am.*,

24

   815 F.2d 1285 (9th Cir.1987) ................................................................................................. 17, 18

25

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,

26

   525 F.3d 822 (9th Cir. 2008) .......................................................................................................... 18

27

*Fontenot v. Upjohn Co.*,

   780 F2d 1190 (5th Cir. 1986) ........................................................................................................ 17

28

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

- iii -

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

*Gould v. Corinthian Colleges, Inc.*,
    192 Cal.App.4th 1176 (Cal. Ct. App. 2011) ............................................................. 27

*In re Wells Fargo Residential Mortg. Lending Discrimination Litig.*,
    No. C 08-1930 MMC (JL), 2009 WL 1771368 (N.D. Cal. June 19, 2009) ............................. 29

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    9 Cal. 5th 1130 (Cal. 2020) .................................................................... 18, 20, 21

*Karr v. Wells Fargo Bank, N.A.*,
    2016 WL 3068396 (N.D. Cal. 2016) ..................................................................... 23

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (Cal. 2003) ........................................................................... 21

*MAG Aerospace Indus., LLC v. Precise Aerospace Mfg., Inc.*,
    2019 WL 6655398 (C.D. Cal. 2019) ................................................................... 27

*McDonald v. John P. Scripps Newspaper*,
    210 Cal.App.3d 100 (1989) ........................................................................... 26

*Misha Consulting Grp., Inc. v. Core Educ. & Consulting Solutions, Inc.*,
    2013 WL 6073362 (N.D. Cal. 2013) .................................................................. 23

*Nat'l Funding, Inc. v. Com. Credit Counseling Servs., Inc.*,
    817 F. App'x 380 (9th Cir. 2020) ..................................................................... 19

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) ........................................................................ 18

*Patel v. City of Long Beach*,
    564 Fed.Appx. 881 (9th Cir. 2014) ................................................................... 25

*Pickern v. Pier 1. Imports (U.S.), Inc.*,
    457 F.3d 963 (9th Cir. 2006) ......................................................................... 25

*Renaissance Realty, Inc. v. Soriano*,
    120 Cal. App. 3d Supp. 13 (Cal. Ct. App. 1981) ..................................................... 19

*Savage v. Pac. Gas & Elec. Co.*,
    21 Cal. App. 4th 434 (Cal. Ct. App. 1993) .......................................................... 20

*Shenzhenshi Haitiecheng Sci. & Tech. Co. v. Rearden, LLC*,
    No. 15-CV-00797-SC, 2015 WL 6082028 (N.D. Cal. 2015) ......................................... 27

*Torres Vargas v. Santiago Cummings*,
    149 F3d 29 (1st Cir. 1998) ........................................................................... 17

*VasoNova Inc. v. Grunwald*,
    2012 WL 4119970 (N.D. Cal. Sept. 18, 2012) ....................................................... 22

- iv -

*Wasco Products, Inc. v. Southwall Technologies, Inc.*,
    435 F.3d 989 (2006) ................................................................................................ 25

**Rules**

Federal Rules of Civil Procedure
    Rule 33 ................................................................................................................... 29

Federal Rules of Civil Procedure
    Rule 56 ................................................................................................................... 17

**Other Authorities**

Michael Baggs, Fyre Festival: Inside the World's Biggest Festival Flop, BBC Newsbeat
    (January 18, 2019), available at: https://www.bbc.com/news/newsbeat-46904445 ................ 12

Rest. (Second) of Torts § 766 ................................................................................................ 20

Restatement (Second) Torts § 772 ........................................................................................ 20

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1

## I.    INTRODUCTION

2

Software developer-Tradeshift obtained a lucrative contract with non-party Smucker by

3   misrepresenting its capabilities and finances during Smucker's vendor selection process.  When

4   work on the Smucker Project began Tradeshift's shortcomings were soon exposed.   Sub-

5   contractor BuyerQuest picked up the slack by providing numerous product functions that

6   Tradeshift could not deliver (and despite the fact that Tradeshift failed to pay BuyerQuest under

7   the terms of their own contract).  Inevitably, Smucker terminated Tradeshift for its performance

8   failures and misrepresentations.  BuyerQuest replaced Tradeshift on the Smucker Project and

9   successfully completed it.

10

Nevertheless, an unchastened Tradeshift sued BuyerQuest in this Court for Tortious

11   Interference with its relationship with Smucker; Breach of Contract; and, of the Covenant of

12   Good Faith and Fair Dealing.  It has also sued Smucker in New York for Breach of Contract

13   and Smucker has counter-claimed for Fraudulent Inducement.  Tradeshift now moves for

14   summary adjudication on the liability elements of its claims against BuyerQuest.

15

More than chutzpah is required to satisfy Rule 56.  Even the cherry-picked record

16   Tradeshift presents with its Motion cannot establish the absence of genuine issues of material

17   fact as to the essential elements of its claims.  And the complete account of the Smucker Project

18   - one that acknowledges the performance failures and misrepresentations that Tradeshift elides

19   as well as the independent decision by Smucker to terminate its non-performing vendor - puts

20   paid to them altogether.

21

BuyerQuest's actions constitute neither tort nor breach of contract. It did nothing more

22   than the prudent planning of a well-run business to protect its own interests and ensure the

23   success of the Smucker Project.  Tradeshift cannot establish anything to the contrary – let alone

24   enough to satisfy its burden for summary adjudication.

25   / / /

26   / / /

27   / / /

28   / / /

**Gordon & Rees LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA  94111**

## II.    STATEMENT OF FACTS

The undisputed factual history of the Smucker Project is provided below – it does not appear in Tradeshift's Motion for Summary Adjudication ("MSA").[1]  The selected facts that the MSA does present are then addressed.

### A.    Smucker, Tradeshift and the SSA

In early 2019, Smucker (the well-known consumer foods maker) began an extensive vendor evaluation process to select a new software provider for its e-procurement system.[2]  It solicited bids from a number of candidates who initially responded to a detailed list of questions set forth in a "Request for Proposal" (RFP).  Phillips Decl., Ex. A.[3]  Successful RFP candidates progressed to answer an even more extensive list of technical questions posed by Smucker's "Business Requirements Document" (BRD).  *Id*., Ex. B. ███████████████ ████████████████████████████████████████████████████████████████ *Id*.

Tradeshift and BuyerQuest separately submitted successful RFP responses and then together, a successful BRD response.  *Id*.  Smucker selected the joint Tradeshift-BuyerQuest proposal for its e-procurement system.   Tradeshift and BuyerQuest memorialized their partnership in a contract, by which Tradeshift subcontracted part of the Smucker Project to BuyerQuest.  Yu Decl., Ex. 19-20.  Tradeshift and Smucker entered into the SSA on June 30, 2019.  *Id*., Ex. 17.

### B.    Tradeshift Fails to Perform the SSA

The Smucker Project began in July 2019.  The shortcomings of Tradeshift's products soon became undeniably apparent.   By December 18, 2019, Smucker had concluded that Tradeshift could not perform the SSA and had seriously misrepresented its capabilities and its financial condition in its RFP and BRD responses.  Phillips Decl., Ex. C [p. 222:5-223:8;

---

[1] Except as otherwise indicated, all capitalized terms have the same definitions used in the MSA.
[2] "e-procurement" refers to the computerized process by which a business purchases goods and services for use in manufacturing and includes soliciting, ordering, shipping, invoice-handling and payment of suppliers.  A consumer foods company the size of Smucker requires its e-procurement system to automate millions of transactions with hundreds of suppliers and to integrate those transactions with its core business systems.
[3] All references "Phillips Decl., __" are to the concurrently-filed Declaration of Anthony D. Phillips in Support of Defendant BuyerQuest, Inc.'s Opposition to Plaintiff's Motion for Summary Adjudication.

- 7 -

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1  263:12-33]; Yu Decl., Ex. 46 (

2

3                      ).

4         Accordingly, on January 16, 2020, Smucker voided the SSA and terminated Tradeshift.

5  Yu Decl., Ex. 45.  On May 20, 2020, Smucker sued Tradeshift for fraudulent inducement in the

6  United States District Court for the Southern District of New York – that case continues.

7  Phillips Decl., Ex. D; *Tradeshift, Inc. v. Smucker Svcs. Corp.*, No. 20-cv-03661-ER

8  (S.D.N.Y.)(the "New York Action").  Tradeshift has also sued Smucker for Breach of Contract

9  in the New York Action.

10         Tradeshift's termination by Smucker was the ineluctable result of its failure to deliver a

11  workable e-procurement system as promised.  Over the course of the Project, numerous critical

12  functions Tradeshift had promised to provide were reassigned to BuyerQuest.

13

14

15

16

17

18

19         The software that Tradeshift did manage to implement was riddled with errors and non-

20  conformities that Smucker identified by testing it in December 2019.  Phillips Decl., Ex. G.

21

22

23

24                                                                                    *Id.*,

25  Ex. H.  By contrast, BuyerQuest had delivered its products as agreed (including those functions

26  taken over from Tradeshift), had remediated testing issues speedily and to Smucker's

27  satisfaction, and proven itself a reliable partner committed to the success of the Smucker

28  Project.  Yu Dec., Ex. 46 (                                        ).

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1

**C.      Tradeshift Fails to Perform the Master Agreement**

2      Tradeshift not only failed to perform under the SSA.  It also failed to perform its Master

3  Agreement and ROF with BuyerQuest.   The ROF contemplated a pass-through payment

4  arrangement for the Smucker Project: BuyerQuest would invoice Tradeshift for its share;

5  Tradeshift would invoice Smucker; Smucker would pay Tradeshift; and, Tradeshift would then

6  pay BuyerQuest.  The ROF required payment from Tradeshift to BuyerQuest ████████████

7  ██████████████████████████████████████████  Yu Decl., Ex. 20 (§ 3.d).

8  █████████████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████████

14 ███████████████████████

15      BuyerQuest made repeated inquiries on payment status to Tradeshift and received no

16 satisfactory answer. ███████████████████████████████████████████████

17 █████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19      In those conversations, ██████████████████████████████████████

20 █████████████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████████████

22 ███████████████████████████████  Phillips Decl., Ex. C [102:11-22];

23 Ex. O [272:6-15].

24     **D.      Smucker's Termination of Tradeshift and the SSA**

25      As Smucker's concern about Tradeshift's performance of the SSA grew, so too did

26 Smucker's concern about Tradeshift's suitability as a business partner. ████████████████

27

28

**Gordon & Rees LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA  94111**

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1 ██████████████████████████████████████████████████

2 ███████████████████████████████████ *Id*.  This was untrue.[4]

3        In October 2019, Smucker decided to inquire further into the true state of Tradeshift's

4 finances.  The inquiry was prompted by several red flags.  Specifically, ██████████████

5 ██████████████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 ██████████████████████████████████████████████████

8 ██████████████████████████████████████████████████

9 ██████████████████████████████  And that BuyerQuest's own concerns

10 about those payments were exacerbated by similar social media reports which, in-turn, it shared

11 with Smucker.  Yu Decl., Ex. 22.

12        Smucker reached out to Tradeshift's CEO and CFO with its concerns.  Yu Decl., Ex. 57

13 and 58.  Tradeshift eschewed the opportunity to address them.  Its CFO declined to provide any

14 of the financial information that would have ameliorated Smucker's concerns.  Phillips Decl.,

15 Ex. Q [75:23-81:15].

16        Over time, multiple Smucker's executives weighed in on the Tradeshift question.  *Id*.,

17 Ex. C [185:10-186:18 ██████████████████████████████████;

18 Yu Decl., Ex. 46.  The conclusion became ineluctable: ███████████████

19 ████████████████████████  Phillips Decl., Ex. C

20 [222:5-224:11].  The SSA and Tradeshift would be terminated.

21        Before it could terminate Tradeshift, however, Smucker had to determine how best to

22 replace Tradeshift and complete the Project.   Smucker considered three main options:

23 ██████████████████████████████████████████████████

24 ██████████████████████████████████████████████████

25 ██████████████████████████████████████████████████

26

27 ─────────────────────

28 [4] ████████████████████████████████████
  ████  Phillips Decl., Ex. P.

- 10 -

█████████████████████████████.[5]  That presentation took place on January 7, 2020.

███████████████████████████████████████████████ Yu Decl., Ex. 46. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[6]  They are also the basis for Smucker's Fraudulent Inducement claim now pending against Tradeshift in the New York Action.  Phillips Decl., Ex. D.

Smucker's position throughout discovery in this case has been unequivocal: Smucker reached an independent and well-considered business decision to terminate Tradeshift and void the SSA.  BuyerQuest wielded no improper influence over that decision.

Smucker's corporate designee testified: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████  Phillips Decl., Ex. R [pp. 252:14-253:17].   He also articulated Smucker's reasons:



*Id.*, Ex. C [pp.263:12-23].

---

[5] Mr. Mulloy went on to relate: "██████████████████████████████████████████████████████████████████████████████████████████████████"  *Id.* (December 19 Slack messages).

[6] In response to its termination, Tradeshift terminated the ROF between it and BuyerQuest. Phillips Decl., Ex. U ("████████████████████████████████████████████████████).

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

### III.    FACTUAL REBUTTAL

The foregoing account of the Smucker Project is not controverted by the MSA. Tradeshift's performance failures are simply ignored.  So, too is the raft of sound business reasons on which Smucker independently based its unsurprising decision to terminate Tradeshift. Instead, the MSA jury-rigs disparate documents and testimony into a revisionist account in which a blameless Tradeshift fell victim to BuyerQuest's plot to steal the Smucker Project from a gullible Smucker.  Tradeshift advances three factual predicates for its story. None withstand scrutiny or warrant summary adjudication.

### A.    "Operation FyreFest" (MSA, 5:19-8:13)

The Fyre Festival was a famously-botched 2017 music festival in the Bahamas.  Its promoters sold tickets for up to $100,000, promising luxurious accommodation and the "best of food, music, art, and entertainment" to a bevy of celebrities and the wealthy.[7]  Guests arrived to find (literally) nothing of the sort.  Fyre Festival failed spectacularly to deliver or to pay its partners or issue refunds.  Litigation, fraud convictions, and two 2019 documentaries followed.

By September 26, 2019, the parallels to BuyerQuest's experience with Tradeshift on the Smucker Project were mordantly irresistible.   In an internal message on that date, BuyerQuest's-CEO made a humorous reference to "Operation FyreFest".[8]

What it referred to was less amusing: Tradeshift was failing to perform on the Smucker Project.   Its products obviously lacked the functionality it had promised in the BRD. BuyerQuest was increasingly picking up the slack by deploying its products to cover Tradeshift's shortfalls.  Concerns about payment to BuyerQuest were growing.[9]

---

[7] *See*, Michael Baggs, FYRE FESTIVAL: INSIDE THE WORLD'S BIGGEST FESTIVAL FLOP, BBC Newsbeat (January 18, 2019), available at: https://www.bbc.com/news/newsbeat-46904445.
[8] The term "Operation FyreFest" was used perhaps two other times in the thousands of documents produced in discovery.  *See, e.g.*, Yu Decl., Ex. 21. ████████████████████████
████████████████████████████████████████████████████████████████████
[9] Under the SSA, had Tradeshift correctly invoiced Smucker on the same date BuyerQuest invoiced Tradeshift (July 1), Smucker would have paid on August 30.  In fact, Tradeshift had botched the invoicing also.  Its corrected and resubmitted invoice would not be paid until October 2.  Phillips Decl., Ex. J.  The state of affairs was never explained to BuyerQuest.

1    Accordingly, a contingency plan was required.  If Tradeshift's failures and the

2    piecemeal reassignment of Project work to BuyerQuest continued, BuyerQuest perceived that

3    Smucker might need it to complete the entire Smucker Project itself.  If Tradeshift recovered

4    and performed as promised, the contingency plan would have become moot (but no less

5    prudent).  Tradeshift's own performance would (and did) dictate the outcome.

6        ***BuyerQuest Documents***.  "The Operation Fyrefest onslaught" the MSA labors to

7    portray comprised documents that show nothing more remarkable than a sensible contingency

8    plan to be used only in the event of Tradeshift's continued performance failure.  As Mr. Mulloy

9    said at the outset: "████████████████████████████████████████" [10] Ex. 49; *see also*,

10   Ex. 21 ("██████████████████████████"); Ex. 30 ("████████

11   ████████████████████████████████████████████████████

12   ████████████████")(emphasis added).[11]

13       Other documents reflect worries that BuyerQuest would be terminated along with

14   Tradeshift.  Yu Decl., Ex. 27 ("████████████████████████

15   ██████████████████████████████████████████").  Or, BuyerQuest's

16   growing awareness by November that Smucker was considering alternatives to Tradeshift.  Yu

17   Decl., Ex. 29 ("████████████████████████████████████

18   ████████████████");  *see also*, Phillips Ex. V ("████

19   ████████████").  The December meeting between BuyerQuest and Smucker (MSA, 6:17-7:2)

20   was described by the attendees as ████████████████████████████.

21   *Id*., Ex. C [180:1-6]; Yu Decl., Ex. 1 [pp. 59:13-60:5].[12]

[10] Also, "████████████████████████████████████████

████████████████████" *Id.*

[11] Also, "██████████████████████████████████████

██████████████████."

[12] The MSA overstates the record respecting the December 5 meeting. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. The "open forum" testimony the MSA quotes out

of context referenced the public availability of information about Tradeshift's financial peril in

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

Throughout this time, BuyerQuest remained committed to the Smucker Project and, as such, to preserving Tradeshift's role in it.  *See*, *e.g.*, Yu Decl., Ex. 55 ("███████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████."); Ex. 39 (December 19, 2019); Ex. 25 (December 12, 2019); Phillips, Ex. W [p. 236:10-22]("███████ █████████████████████████████████████████████████████████").

***The Mulloy-Barr Communications.***  The MSA alludes to "*dozens*" of communications between Jack Mulloy and Jason Barr but cites only three.  MSA, 5:3 (emphasis in original). They show that Messrs. Barr and Mulloy communicated their independent but reinforcing concerns about Tradeshift's financial health.   Mulloy said that Tradeshift had not paid BuyerQuest.  Barr invited him to share those views with others at Smucker.  Yu Decl., Ex. 56 (Barr, 10/23/19: "████████████████████████████████████████████████ ███████████████████████████████████").  Mr. Mulloy went on to twice corroborate what he had heard by forwarding online reviews of Tradeshift, posted by ostensible insiders.[13] *Id*., Ex. 22 ("Attached are four of the recent glassdoor posts that gave me pause.") and 25 ("Attached are a couple more Glassdoor reviews.").[14]

By December, BuyerQuest did indeed enlist Smucker's help to get its invoices paid (having declined Smucker's offer to assist in October).  *Id*., Ex. 25; *see also*, Ex. 56.  The direct relationship sought with Smucker at that time was a direct ***payment*** relationship to forestall future late payments over the course of the three parties' relationship.  *Id*.; *see also*, Phillips Decl., Ex. C [pp. 102:11-103:6].

_____

late 2019.  *Id*. [pp. 89:3-90:3].  For good measure, Mr. Siddiqui also testified "I don't recall bashing."  *Id*. [p. 89:9-10].

[13] It is ***not*** "unclear what other communications they sent to each other between those [personal email] accounts."  MSA, n. 4.  Tradeshift pursued discovery into Messrs. Mulloy and Barr's personal email account *ad nauseum*, including by subpoenaing metadata from Google and moving to compel additional searches by BuyerQuest's counsel, which were completed.  These efforts yielded ***two*** responsive non-privileged emails between Mr. Mulloy and Mr. Barr.  Both were produced.  There are no others and the insinuation that there are is spurious.

[14] Mr. Mulloy had heard additional information from a contact at Tradeshift.  Yu Decl., Ex. 30 (e.g., "████████████████████████████████████████████████████████████████ ████████████████").

- 14 -

BuyerQuest made no pitch to supplant Tradeshift prior to December 19.  At that time, Smucker requested one. Smucker made this indisputably clear: "███████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████" *Id.* [p.100:19-24].   Likewise with respect to ***Smucker's*** decision to inquire into the health of Tradeshift in October 2019: "█████████████████████████████████████████████ ██████████████████" *Id.* [p.162:17-163:17]; *see also*, Ex. X [p. 19:1-10]("██████ ███████████████████████████████████████████████████████████████ ███████████████").

**B.      Tradeshift's Confidential Information (MSA, 7:16-10:4)**

The MSA focuses next on a theory concocted late in discovery that appears nowhere in Tradeshift's Complaint.  Namely, that BuyerQuest breached the confidentiality provision of the Master Agreement when it referenced joint Smucker Project documents before its January 7, 2020 meeting with Smucker.  The impropriety of this attempt at "ambush litigation" as a matter of law is addressed below. The substance fares no better, even taken at face value.

Tradeshift identifies two documents at issue: the "TSS Solution Description" and the "JMS – Tradeshift Configuration Sheet".  Yu Decl., Ex. 34 and 37.  Neither are marked as confidential.  *Id.*  More importantly, Tradeshift neglects to mention these were both jointly-created documents that contained information contributed by Tradeshift ***and*** BuyerQuest ***and*** Smucker on the Smucker Project. *See*, Phillips Decl., Ex. S [pp. 88:20-89:22]("████ ██████████████████████████████████████████████████████████████ ████████████████████████████"); *id.* [pp. 117:23-118:9](TSS Solution Description "███████████████████████████████████████████████████████████ █████████████"); *id.* [p. 120:15-22]("███████████████████████████ █████████████████████████████████████████████████████; Ex. Y (compilation of email invitations to edit both documents).

The MSA identifies no specific piece or pieces of Tradeshift confidential information that BuyerQuest purloined from these documents.  Nor does it explain how any was used by

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

BuyerQuest, nor whether such misappropriation played any role in Smucker's decision to terminate the SSA.[15]  Nor could it.

The record reflects the opposite: BuyerQuest referred to Smucker Project documents to understand the status of the Project and Smucker's requirements it might be called upon to fulfill.  *See*, Phillips Decl., Ex. S [113:7-17]("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); *id*. [75:8-13]("██████████████████████████████████████████████████████████████████████████████████████████████████████████").  Again, Smucker makes the point unequivocally: "Smucker can confirm that no Tradeshift confidential information was used in the BuyerQuest/Smucker Project as confirmed by the deposition testimony of Jason Barr on May 12, 2021." *Id*., Ex. Z [Supplemental Interrogatory Response No. 12].

**C.    The January 7, 2020 Meeting (MSA, 10:7-13:9)**

Tradeshift's third factual predicate is the January 7, 2020 meeting between Smucker and BuyerQuest. According to the MSA, at this "secret" meeting, BuyerQuest delivered the *coup de grace* of Operation FyreFest via PowerPoint presentation.  MSA, 10:6-12:3.

Again, the record belies Tradeshift's rhetoric.  Smucker had concluded weeks earlier, on December 18, that Tradeshift could not perform under the SSA.  At the same time, Smucker convened the January 7 meeting and asked BuyerQuest to present its capabilities to complete the Smucker Project.  BuyerQuest's selection as Tradeshift's replacement was not a foregone conclusion - even if the termination of Tradeshift was.  Phillips Decl., Ex. R [pp. 217:21-221:5 ("██████████████████████████████████████████████████████████████████████████████████████████ ██████████████").[16]

BuyerQuest presented as requested.  The first set of Powerpoint slides cited in the MSA do not mention Tradeshift.  Yu Decl., Ex. 42.  The second were an internal BuyerQuest draft it

---

[15] ***Why*** BuyerQuest would crib from documents detailing a product that had failed as miserably as Tradeshift's had on the Smucker Project is also unexplained by the MSA.

[16] *See also*, "Q: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" (objections to form omitted).

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1    never actually presented.[17]  On January 13, Smucker memorialized its final recommendations –

2    ███████████████████████████████████████████████████████.  Yu Decl., Ex. 46.

3    ████████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████.  The reasons

7    for terminating Tradeshift were not the reasons for selecting BuyerQuest and vice versa.  MSA,

8    12:10-22.

9    **IV.    LEGAL STANDARD**

10       Summary adjudication is proper only where there are no genuine issues of material fact

11   and when, viewing the evidence most favorably to the non-moving party, the movant is clearly

12   entitled to prevail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317,

13   322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285,

14   1288–89 (9th Cir.1987).

15       The moving party bears the "heavy burden" of demonstrating the absence of any triable

16   issue of material fact both by initial production of evidence and by ultimate persuasion as a

17   matter of law.  *Ambat v. City & County of San Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014).

18   When a plaintiff moves for summary judgment on an affirmative claim, "he must establish

19   beyond peradventure *all* of the essential elements of the claim…to warrant judgment in his

20   favor."  *Fontenot v. Upjohn Co.* 780 F.2d 1190, 1194 (5th Cir. 1986)(emphasis in original);

21   *Torres Vargas v. Santiago Cummings,* 149 F3d 29, 35 (1st Cir. 1998)(party with burden of proof

22   on dispositive issue must provide conclusive evidence). Where the moving party fails to satisfy

23   its initial burden, the nonmoving party has no obligation to produce anything and summary

24

25

26   [17] BuyerQuest says it prepared but did not share the draft slides.  Smucker's Mr. Barr could not
     remember whether he saw them or not or whether the information they contain was presented,
27   but testified only that the slide deck "████████████████████████████████████████████████
     ████████"  Phillips Decl., Ex. C [pp. 133:24-134:23].  In any case, nothing in the record indicates
28   anything contained in the draft presentation was considered by Smucker in deciding to terminate
     Tradeshift (not least because the termination decision was made three weeks before the meeting).

- 17 -

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

judgment must be denied. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102–03 (9th Cir. 2000).

At summary judgment, the non-movant's version of any disputed issue of fact is presumed correct. *Eastman Kodak Co. v. Image Technical Svcs., Inc.* 504 U.S. 451, (1992). And whatever evidence the nonmoving party does produce must be regarded as true. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986)("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *see also*, Celotex, 477 U.S. at 324; *Eisenberg,* 815 F.2d at 1289.

Tradeshift asks the Court to enter summary adjudication as to BuyerQuest's liability on all three of Tradeshift's claims.  Yet Tradeshift fails to satisfy its initial burden of production on the essential elements of those claims and, even if it had, the evidence cited by BuyerQuest above goes far beyond that required to establish genuine issues of material fact exist. The MSA should be denied.

## V.     ARGUMENT

### A.     Tradeshift Cannot Establish the Elements of Tortious Interference

Tradeshift's animating theory of its case is that BuyerQuest plotted (through the notorious "Operation FyreFest") to disparage it and convince Smucker to terminate the SSA and replace Tradeshift with BuyerQuest alone.  The record presented with the MSA falls far short of vindicating this conspiracy theory.  When viewed in light of the evidence Tradeshift ignores, it withers entirely.

Intentional Interference with Contractual Relations has five elements: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption; and (5) resulting damage. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (Cal. 2020)(citations omitted); *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 825 (9th Cir. 2008).

/ / /

1

### 1.    The SSA Was Not a Valid Contract

2      Tradeshift handwaves over the threshold issue: existence of a valid contract, i.e. the

3  SSA between it and Smucker.   MSA, 14:20-21.   Without a valid contract, the tortious

4  interference claim must fail at the outset.   *Nat'l Funding, Inc. v. Com. Credit Counseling*

5  *Servs., Inc.*, 817 F. App'x 380, 383 (9th Cir. 2020)(quotations and citations omitted);

6  *Renaissance Realty, Inc. v. Soriano*, 120 Cal. App. 3d Supp. 13, 18 (Cal. Ct. App. 1981)("a

7  fraudulently procured contract cannot be the subject of the tort of interference with a business

8  or contractual relationship.").

9      Tradeshift bears the burden of establishing the SSA was a valid contract.  It cannot.

10  Smucker voided the SSA on January 16, 2020 citing numerous misrepresentations made by

11  Tradeshift that Smucker relied on in signing the SSA.  Yu Decl., Ex. 45.  It went on to sue

12  Tradeshift for fraudulent inducement in the New York Action, seeking a judgment confirming

13  the SSA was void *ab initio* and unenforceable.  Phillips Decl., Ex. D.  That case continues.

14  Tradeshift's bid for summary adjudication of its tortious interference claim cannot.

15      ### 2.    BuyerQuest Did Not Act with Intent to Induce a Breach of the SSA

16      Tradeshift posits two "acts" of interference: "(1) circumventing Tradeshift...to have

17  surreptitious communications 'bashing' Tradeshift's technical aptitude and financial status to

18  Smucker" and "(2) offering a BuyerQuest-only solution to replace Tradeshift on the Smucker

19  Project."  MSA, 15:3-5.  Neither is sufficiently supported to warrant summary adjudication.

20      First, Tradeshift cites *no* instance in which BuyerQuest and Smucker ever discussed

21  Tradeshift's "technical aptitude" or lack thereof.  *See*, *id.*; and II.B.  Second, as to "financial

22  status", Tradeshift cites one text exchange and two emails forwarding public internet reviews.

23  *Id.*, 5:2-7.  They communicated concerns based on public information about whether Tradeshift

24  could pay BuyerQuest as agreed. [18]  Tradeshift does not contest their accuracy.

25

26  [18] *See, e.g.* Ex. 56 (Mulloy: "████████████████████████████████████████

27  ████████████"); Ex. 22 (10/1/19 review by Tradeshift employee: "I hear rumors of vendors
not being paid and deals not closing…Am I sitting on a dumpster that's about to explode?"); Ex.

28  25 (12/10/19 reviews by Tradeshift employees: "can't give salary on time" and "Losing big
client after big client."); *see also*, Ex. 30.

- 19 -

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1      There can be no tort liability based on these communications.  *See, e.g. Savage v. Pac.*

2  *Gas & Elec. Co.*, 21 Cal. App. 4th 434, 449 (Cal. Ct. App. 1993) ("A person cannot incur

3  liability for interfering with contractual or economic relations by giving truthful information to

4  a third party.")(citations omitted); *Cabanas v. Gloodt Assocs.*, 942 F. Supp. 1295, 1307 (E.D.

5  Cal. 1996), *aff'd sub nom. Cabanas v. Gloodt Assocs., Inc.*, 141 F.3d 1174 (9th Cir. 1998)

6  (finding that it is not improper to interfere with a contract if one gives "honest advice within the

7  scope of a request for the advice" and that "the advice was given in good faith")(*quoting*

8  Restatement (Second) Torts § 772(b)).

9      Third, as to the "BuyerQuest-only" proposal, Tradeshift conflates the decision to

10  terminate it with the decision to replace it with BuyerQuest.  The former was made by Smucker

11  by December 18, 2019.  Only then did Smucker request a proposal from BuyerQuest, which it

12  presented on January 7, 2020.  The selection of BuyerQuest to salvage the Smucker Project was

13  no foregone conclusion at that point.  The termination of Tradeshift was.  *Supra*, § III.C.

14      Communications with Smucker after its decision to replace Tradeshift are irrelevant to

15  Tradeshift's interference claim.  *See DeVoto v. Pacific Fidelity Life Ins. Co.,* 618 F.2d 1340,

16  1348 (9th Cir. 1980)("where a contract has been abrogated, competitors may thereafter offer to

17  deal with the party who repudiated the contract without incurring liability in tort: there is no act

18  of inducement, and once the contract is abrogated there is no advantage to appropriate")(*citing*

19  Rest. (Second) of Torts § 766, cmt. n); *Bauer v. Interpublic Group of Companies, Inc.,* 255 F.

20  Supp. 2d 1086, 1093, 1095 (N.D. Cal. 2003).  Nor could a presentation on January 7 bring about

21  a decision reached three weeks earlier.  Tradeshift has the cause and effect backwards: Smucker

22  asked for BuyerQuest's proposal because it had decided to terminate Tradeshift on December 18.

23  It did not decide to terminate Tradeshift because of the presentation made by BuyerQuest on

24  January 7.

25      **3.      Tradeshift Cannot Establish an Independently Wrongful Act**

26      Even if tenable as intentional interference, the conduct alleged by Tradeshift cannot

27  satisfy the "independently wrongful" standard required to sustain a tortious interference claim for

28  an at-will contract.  *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148, 470 P.3d 571,

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

580 (2020) ("to state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act.").

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Yu Decl., Ex. 17 § 2(e).  *See Ixchel*, 9 Cal. 5th at 1147 ("An at-will contract may be terminated, by its terms, at the prerogative of a single party, whether it is because that party found a better offer from a competitor, because the party decided not to continue doing business, or for some other reason.").

In such circumstances, proof of an independently-wrongful act is required, i.e., an "unlawful [act], that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Id*., at 1143 (*quoting Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1153 (Cal. 2003)).  Absent an independently-wrongful act, California law protects "a competitor's good faith offer that causes a business to withdraw from an at-will contract" from a tortious interference claim.  *Korea Supply Co.*, 29 Cal. 4th at 1148 ("Allowing disappointed competitors to state claims for interference with at-will contracts without alleging independently wrongful conduct may expose routine and legitimate business competition to litigation.").

None of the conduct Tradeshift cites can satisfy the independently-wrongful act test. BuyerQuest shared truthful information and presented a proposal when invited by Smucker to do so. No legal standard proscribes this conduct.  California law does not require Smucker to throw good money after bad on a failed vendor and a doomed project.  Nor did it oblige BuyerQuest to go silently down with the ship.

### 4.     Tradeshift Cannot Establish Intent to Interfere

The intent element of the Interference claim means an intent to disrupt or bring about a breach of the contract in question.  The MSA cites two internal BuyerQuest exchanges which it

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1   characterizes as evidencing BuyerQuest's intent to interfere with the SSA.  MSA 15:10-12

2   (*citing* Yu Decl., Ex. 27 and 62).[19]

3          Yet the record abounds with alternative and more compelling explanations of

4   BuyerQuest's intent.  Namely, its communications with Smucker were directed at obtaining the

5   payments owed BuyerQuest by Tradeshift.  This is the "direct" relationship contemplated with

6   Smucker – direct **payment** to BuyerQuest eliminating the unreliable middleman Tradeshift.

7          Nor did BuyerQuest's preparation of a contingency plan prove intent to induce a breach

8   of the SSA – no matter what ironic nickname Jack Mulloy gave it.  BuyerQuest saw

9   Tradeshift's track record on the Smucker Project and prepared to continue taking on the

10  functionality that Tradeshift failed consistently to provide, if necessary.  BuyerQuest repeatedly

11  couched its planning in contingency terms and did not present itself as a solo alternative until

12  asked by Smucker to do so.

13         Again, Tradeshift reverses cause and effect.   Tradeshift failed first, thereby

14  necessitating the transfer of scope to BuyerQuest and ultimately Tradeshift's replacement.  It

15  was not replaced because of BuyerQuest's plan for that eventuality.   Rather, BuyerQuest

16  developed the plan because of Tradeshift's mounting failures and as more and worse failures

17  became likely.  Had Tradeshift simply performed under the SSA, none of the events that gave

18  rise to this lawsuit would have transpired.

19         **5.      No Conduct of BuyerQuest Caused the Termination of the SSA**

20         The element of causation requires a showing that the "contract would otherwise have

21  been performed[.]"  *VasoNova Inc. v. Grunwald*, 2012 WL 4119970, at *4 (N.D. Cal. Sept. 18,

22  2012) (quotations and citations omitted).   Tradeshift cites the January 7 BuyerQuest

23  presentation and Smucker's January 13 "Revised Recommendation" memorializing its decision

24  to terminate Tradeshift and retain BuyerQuest as evidence of causation.  MSA, 16-19.

25         Tradeshift conflates the decision to terminate it and the decision about who should

26  replace it.   Tradeshift completely ignores the extensive evidence that Smucker decided

27  _____

28  [19] The other internal communications cited post-date the December 18 decision to terminate
    Tradeshift and are therefore irrelevant.  *Id*. (*citing* Exs. 39, 26, 48, 32, 48, 43).  As addressed
    above, they do not establish intent to interfere.  *Supra*, Section III.A.

1    independently and after its own extensive and multi-faceted inquiry and business analysis to

2    terminate Tradeshift.  BuyerQuest had no role in or influence over that process.

3        Tradeshift elides the key document it relies on. ████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    █████   Yu Decl., Ex. 46.  This was the reason for termination given internally on January 13;

7    in the January 16 Termination Letter; and, that became the basis for Smucker's Fraudulent

8    Inducement claim in the New York Action.  It was the reason testified to by Jason Barr at his

9    deposition amongst others – none of which involved the influence of BuyerQuest.  Phillips, Ex.

10   C [p. 263:12-23].

11       Smucker made the point with characteristic directness: "████████████████

12   ████████████████████████████████████████████████████████████████

13   ██████████████████████████████" *Id*., Ex. R [pp. 252:14-253:17].

14

15       **B.     Tradeshift Cannot Establish the Elements of Breach of Contract**

16       Next, Tradeshift asks for summary adjudication on its Breach of Contract claim based

17   on a theory that appears nowhere in its Complaint.  Namely, that BuyerQuest breached the

18   confidentiality provision of the Master Agreement by referencing shared documents the parties

19   prepared during the Smucker Project.  MSA, 19-21.[20]  The unpled theory is neither properly

20   before this Court nor supported by the evidence.

21       A breach of contract claim has four elements: (1) existence of a contract; (2); plaintiff's

22   performance or excuse for nonperformance; (3) defendant's breach; and (4) the resulting

23   damages to plaintiff.  The MSA cannot establish performance or breach (it does not attempt to

24   establish Tradeshift's damages and the existence of the Tradeshift-BuyerQuest contract is not

---

[20] Tradeshift has apparently abandoned the original Breach of Contract theory in its Complaint
for obvious reasons.  ECF 1 (¶¶ 30-31).  There was never any prohibition on BuyerQuest
communicating directly with Smucker – even the Complaint could not articulate the provisions
of the contract that created the obligation sued on.  *See*, *Karr v. Wells Fargo Bank, N.A.*, 2016
WL 3068396 at *1 (N.D. Cal. 2016)("the plaintiff must identify with specificity the contractual
obligations allegedly breached the defendant.")(*quoting Misha Consulting Grp., Inc. v. Core
Educ. & Consulting Solutions, Inc.*, 2013 WL 6073362 at *1 (N.D. Cal. 2013)

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

disputed).

### 1.    Tradeshift Cannot Establish Performance

Tradeshift bears the burden of proof that it performed its obligations under the Master Agreement or the ROF.  It makes no attempt to do so.  Instead, it argues this element is necessarily satisfied because BuyerQuest has not asserted a breach of contract claim against Tradeshift.  MSA, 19:16-22.  This, of course, is not the law.  Where the moving party will have the burden of proof on an issue at trial, "the ***movant*** must ***affirmatively demonstrate*** that no reasonable trier of fact could find other than for moving party."  *900 Capitol Services, Inc. v. Kugler, Peretz, Kaplan & Berlin, P.A.*, No. C 96-0601 SI, 1997 WL 776372 at *3 (N.D. Cal. 1997)(emphasis added).

Moreover, the record flatly contradicts the factual basis for Tradeshift's attempt to whipsaw BuyerQuest with the burden of proof of performance. Tradeshift says: "BuyerQuest did not identify any breaches of the Master Agreement whatsoever."  MSA, 19:20-22 (*citing* Ex. 14 BuyerQuest Supplemental Responses to Interrogatories, 7-18).  But the Interrogatories in fact say: "Tradeshift's failure to make timely payments as required under the [ROF] and its misrepresentations to BuyerQuest regarding the status of payments materially breached the [ROF]."  *Id.* (*citing* ROF § 3(d)).

The undisputed facts are in accord (and ignored by the MSA).  ███████████  ████████████████████████████████████  The first payment to BuyerQuest came 36 days after receipt.  The second, 63 days after receipt.  BuyerQuest inquired repeatedly about the status of payment and received no satisfactory response from Tradeshift.  Tradeshift's tardiness, in turn, drove much of the concern that led to the contingency planning Tradeshift now claims was tortious.  Tradeshift cannot establish the essential element of performance.

### 2.    Tradeshift Cannot Establish Breach

The breach theory advanced by the MSA fails on procedural and substantive grounds. Either justifies denial of the MSA.

***The MSA's Confidentiality Breach Theory Is Procedurally Improper because Tradeshift Did not Assert it in the Complaint.*** As to procedure, Tradeshift's Complaint alleges

- 24 -

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1   breach based on a raft of project management issues related to the Smucker Project.  ECF 1, ¶

2   31.  The Complaint neither alleges nor alludes to any breach of the confidentiality provision of

3   the Master Agreement.[21]  This Court previously held as much - denying Tradeshift's motion to

4   compel documents related to its new theory after the close of discovery.  ECF 94:8-12

5   ("BuyerQuest's misuse of Tradeshift's technical documentation … is simply outside of this well-

6   told story. … The Court understands exactly what Tradeshift's claims are about and they are not

7   about this.").

8         A plaintiff cannot seek summary adjudication on a theory of liability that does not appear

9   in its complaint.  *See Pickern v. Pier 1. Imports (U.S.), Inc.*, 457 F.3d 963, 968-969 (9th Cir.

10  2006); *Patel v. City of Long Beach*, 564 Fed.Appx. 881, 882 (9th Cir. 2014) ("Allowing a

11  plaintiff to proceed on a new theory would prejudice defendants because '[a] complaint guides

12  the parties' discovery putting defendant on notice of the evidence it needs to adduce in order to

13  defendant against plaintiff's allegations.'")(*quoting Coleman v. Quaker Oats Co.*, 232 F.3d 1271,

14  1292 (9th Cir. 2000).

15        The prejudice in allowing Tradeshift to switch theories at this late stage is manifest.

16  *Coleman*, 232 F.3d at 1291-1292 ("[t]he lack of notice on this issue central to the cause of action

17  makes it difficult, if not impossible, for [defendant] to defend itself.").  "[S]ummary judgment is

18  not a procedural second chance to flesh out inadequate pleadings."  *Wasco Products, Inc. v.*

19  *Southwall Technologies, Inc.*, 435 F.3d 989, 992 (internal citation omitted).

20        ***The Record Does Not Support Tradeshift's Breach of Confidentiality Theory.***  As to

21  substance, even if the Court were to entertain Tradeshift's new theory, summary adjudication is

22  unwarranted.  The MSA asserts that the Master Agreement contained a confidentiality provision

23  and that during the Smucker Project, BuyerQuest accessed Project documents that contained

24  Tradeshift's confidential information.  MSA, 19:24-21:3.  From these facts, Tradeshift asks the

25  Court to hold that a breach of contract took place and that that breach caused the termination of

26  the SSA.  The *post hoc* fallacy is obvious.

27

28  [21] A point underscored by Tradeshift's recent attempt to salvage its claim in its pending
    "Contingent Motion for Leave to File First Amended Complaint".  ECF 107.

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Tradeshift also fails to mention that the two documents in question were joint project documents worked on by Tradeshift and BuyerQuest and Smucker.  It also elides the testimony of two BuyerQuest witnesses who explained they referenced the documents to understand Smucker's requirements only.  That Mr. Siddiqui was BuyerQuest's Chief Product Officer, rather than a member of the on-site Smucker Project team, adds nothing to Tradeshift's position.  MSA, 20:6-7.  It is entirely unremarkable that Mr. Siddiqui, with his knowledge of the BuyerQuest product suite, would be called upon to explain how BuyerQuest's products could be used or upgraded to meet Smucker's requirements.  Phillips Decl., Ex. T [pp.17:4-20:11]; *see also*, Yu Decl. Ex. 42.  The MSA's confidentiality breach theory is a red herring from the outset.

More damningly, nothing in the MSA explains what specific confidential information of Tradeshift's was referenced by BuyerQuest.  MSA, 20:3-28.[22]  Nor how BuyerQuest used it.  *Id.*  Nor whether that use played any role in Smucker's termination of the SSA.  *Id.*

### 3.      Tradeshift Cannot Establish Causation

Mr. Siddiqui received copies of the joint Tradeshift Solution and Configuration documents.  Smucker terminated the SSA.  Tradeshift offers no connection between these two events.  The essential element of causation cannot be satisfied by *post hoc, ergo propter hoc*. *McDonald v. John P. Scripps Newspaper*, 210 Cal.App.3d 100, 104 ("A fundamental rule of law is that whether the action be in tort or contract compensatory damages cannot be recovered unless there is a causal connection between the act or omission complained of and the injury sustained.") (internal quotations omitted).

With no explanation for causation, Tradeshift's argument collapses.  Particularly given the extensive record of alternative explanations for the cause of Smucker's termination of the SSA. *Supra*, § III.C.  Tradeshift failed to perform after misrepresenting its capabilities.  Smucker had concluded as much before Mr. Siddiqui ever looked at the documents Tradeshift complains of.  Yu Decl., Ex. 32 (December 30, 2019).

/ / /

---

[22] The bulleted list in the MSA merely recounts the fact that BuyerQuest had access to the two documents.  It connects none of the events listed to any element of Tradeshift's claim.

### C. Tradeshift Cannot Establish the Elements of a Breach of Covenant of Good Faith and Fair Dealing

Tradeshift's bid for summary adjudication on its third Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing fails first for the same reason its arguments on Breach of Contract fail – it cannot establish the essential element of performance. *See*, *supra*, § V.B.1.

#### 1. There Is No Waiver of Tradeshift's Burden to Prove It Performed the Master Agreement

For its Covenant claim, Tradeshift makes the additional argument that its performance is established as a matter of law because BuyerQuest accepted the eventual payments made and thereby waived any right to contest performance. MSA, 22:13-23:3. The argument remains unavailing – ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Yu Decl., Ex. 18 § 12.3; *see also*, *Shenzhenshi Haitiecheng Sci. & Tech. Co. v. Rearden, LLC,* No. 15-CV-00797-SC, 2015 WL 6082028, at *3 (N.D. Cal. 2015)(antiwaiver provisions enforceable unless "absurd" or "unconscionable")(*quoting Gould v. Corinthian Colleges, Inc.* 192 Cal.App.4th 1176, 1180 (Cal. Ct. App. 2011).[23]

#### 2. Tradeshift Cannot Establish A Breach of Covenant

Tradeshift advances three theories to satisfy the breach element of its Covenant claim: "backchannel" communications; use of confidential information; and, the disputed draft presentation of January 7, 2020. Each of these theories is duplicative of theories Tradeshift

---

[23] The case cited by Tradeshift on waiver does not alter the outcome. MSA, 22:23 (*citing, MAG Aerospace Indus., LLC v. Precise Aerospace Mfg., Inc.*, 2019 WL 6655398, at *5 (C.D. Cal. 2019). In *MAG*, the late-paying party promptly explained why its payments were late, remedied its missed payments and began paying promptly. *Id.*, at **4-6. The parties then continued to perform and the Court held Defendant had waived its right to allege breach and rescind the contract as a result. *Id.*, at *5. Here, BuyerQuest does not assert a breach claim of its own – performance is an element of Tradeshift's claim. Moreover, BuyerQuest did not continue performing in blithe acquiescence to Tradeshift's late payments – it repeatedly complained to Tradeshift; threatened to stop staffing the Smucker Project; and, sought a new direct payment arrangement with Smucker.

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1   advances for its Breach of Contract claim. *See*, ECF 1 (¶32; ¶43); MSA, 23:11-19. The

2   Covenant claim therefore fails as duplicative. *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222

3   Cal. App. 3d 1371, 1395 (Cal. Ct. App. 1990)("If the allegations do not go beyond the

4   statement of a mere contract breach and, relying on the same alleged acts, simply seek the same

5   damages or other relief already claimed in a companion contract cause of action, they may be

6   disregarded as superfluous[.]").[24]

7        Moreover, the record gainsays Tradeshift's theories – BuyerQuest communicated with

8   Smucker about payment issues and both parties' growing and justified concerns about

9   Tradeshift, not to deprive Tradeshift of the benefit of the Master Agreement. *See*, *supra*, §

10  III.A.  Indeed, the events of late 2019 show both Smucker and BuyerQuest attempting to give

11  Tradeshift every opportunity to perform and make the Smucker Project a success. *Id*.  The

12  draft presentation on which Tradeshift relies was not prepared until after the decision to

13  terminate Tradeshift – and whether it was even shared with Smucker at all is (at most) a

14  disputed question. *Id*., § III.C.

15       **3.    The Master Agreement Permitted Solicitation of Smucker**

16       As also argued in BuyerQuest's Motion for Summary Judgment, the Master Agreement

17  itself expressly permitted BuyerQuest to solicit Smucker (irrespective of whether it actually

18  did).  Yu Decl., Ex. 19 §§ 12.2 (Master Agreement); 9.2 (CSA).[25]  Tradeshift cannot use an

19  implied Covenant claim to challenge conduct that is expressly permitted by the parties'

20  agreement. *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (Cal.

21  1992)("implied terms should never be used to very express terms.").  The Covenant claim fails

22  as a matter of law.

23  / / /

24  / / /

25  / / /

26

27  [24] In the case of the confidentiality theory, it is not pled at all in the Complaint and therefore fails
    for the same reason as the duplicative theory of breach does on the Contract claim.

28  [25] ████████████████████████████████████████████████████████

- 28 -

**D.    The MSA Offers No Grounds for Summary Adjudication of BuyerQuest's Affirmative Defenses**

Lastly, Tradeshift argues in conclusory fashion for summary adjudication of *proposed* Affirmative Defenses asserted by BuyerQuest in connection with its *pending* Motion for Leave to Amend Answer (ECF 109).  MSA, 24:4-25:27.  It ignores the *operative* Answer BuyerQuest filed in response to the *operative* Complaint.  ECF 37. It also makes no factual presentation in support of its argument and none sufficient to meet its initial burden on summary judgment. *Nissan Fire & Marine,* 210 F.3d at 1102–03 ("If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied.").  These procedural *non sequiturs* alone are sufficient grounds for the Court to reject Tradeshift's perfunctory attack on BuyerQuest's Affirmative Defenses.

Nevertheless, if examined, the record is replete with legal and factual support for the affirmative defenses that Tradeshift challenges.[26]  Specifically, the act of Third Party-Smucker brought about the termination of the SSA independently of any conduct of BuyerQuest.  *See, e.g., supra,* § II.D; MSA, 24:21-24 (Third Party Acts). Tradeshift waived its claims against BuyerQuest by terminating the Master Agreement.  *See, e.g., supra,* n. 6; Yu Decl., Ex. 19 § 3.4 ("████████████████████████████████████████████████ ██████████████████████████████████████"); MSA at 24:24-27 (Waiver); any recovery by Tradeshift here must necessarily be reduced by the amount of any recovery it obtains from Smucker in the duplicative New York Action. *See, e.g., supra,* § II.B; MSA, 24:28-25:2 (Set Off).[27]   Tradeshift's failure to perform the Smucker Project rendered

---

[26] Tradeshift misdirects the Court from the actual extensive fact record to BuyerQuest's Responses and Objections to its premature contention interrogatories – which Tradeshift did not move to compel.  BuyerQuest objected to the timing of the Contention Interrogatories and reserved the right to supplement its responses as required under the Federal Rules, i.e. before the Pre-Trial Conference.  *See* Fed.R.Civ.P 33(a); *see also, In re Wells Fargo Residential Mortg. Lending Discrimination Litig*., No. C 08-1930 MMC (JL), 2009 WL 1771368, at *7 (N.D. Cal. June 19, 2009) ("Neither Fed.R.Civ.P. 33(a)(2) nor applicable case law requires [a party] to answer the contention interrogatories until [requesting party] has produced the information necessary for them to do so.").

[27] Likewise, Tradeshift's Complaint in the New York Action asserts duplicative claims against Smucker and seeks the same remedy sought from BuyerQuest here.  The New York Action will have res judicata effect on this case and is asserted against an indispensable party (Smucker) that

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1    BuyerQuest's performance under the Master Agreement impossible.  *See, e.g., supra*, § II.B;

2    MSA 25:3-4 (Impossibility); BuyerQuest's conduct was justified because taken to secure the

3    payments owed BuyerQuest under the Master Agreement or to avoid the penalty provision

4    BuyerQuest would bear for failure to deliver the Smucker Project.  *See, e.g., supra*, § II.C;

5    MSA, 25:5-13 (Justification defense).

6         Tradeshift's cursory attack on the viable Affirmative Defenses available to BuyerQuest

7    cannot alter the outcome of the MSA – it should be denied outright.

8    **VI.    CONCLUSION**

9         For the foregoing reasons, BuyerQuest respectfully requests this Court deny the MSA

10   outright.

11   Respectfully submitted,

12

13   Dated:  August 19, 2021                    GORDON REES SCULLY MANSUKHANI, LLP

14                                              By: _____

15                                                  Craig J. Mariam

16                                                  Anthony D. Phillips
                                                    Eunice J. Liao
                                                    Attorneys for Defendant BuyerQuest, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon & Rees LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA  94111**

Tradeshift has failed to join here.  *See, id.*, 25 (Res Judicata; Duplicative Claims; Failure to Join Indispensable Parties defenses).